**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

TYRONE WALKER,

                              Plaintiff,                    No. 9:17-CV-1008
                    v.                                     (GTS/CFH)

JOSEPH BELLNIER, DONALD UHLER,
PAUL P. WOODRUFF, JOANNE FITCHETTE,
and MELISSA A. COOK,

                              Defendants.

_____

**APPEARANCES:**                           **OF COUNSEL:**

Tyrone Walker
94-A-5258
Upstate Correctional Facility
P.O. Box 2001
Malone, New York 12953
Plaintiff <u>pro</u> <u>se</u>

Attorney General for the                   MATTHEW P. REED, ESQ.
State of New York                          Assistant Attorney General
The Capitol
Albany, NY 12224
Attorney for Defendants

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER[1]

    Plaintiff Tyrone Walker ("Walker"), an inmate who was, at all relevant times, in the

custody of the New York Department of Corrections and Community Supervision

("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983.  Dkt. No. 8 ("Am. Compl.").

Walker contends that Defendants Deputy Commissioner Joseph Bellnier ("Bellnier"),

_____

    [1]    This matter was referred to the undersigned for report and recommendation pursuant to 28
U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

Superintendent Donald Uhler ("Uhler"), Deputy Superintendent of Security Paul P. Woodruff ("Woodruff"), Deputy Superintendent of Programs Joanne Fitchette ("Fitchette"), and Offender Rehabilitator Coordinator Melissa A. Cook ("Cook") violated his constitutional rights under the Fourteenth Amendment during periodic reviews of his administrative segregation status.  See id.

## I.  Background

### A.  Procedural History

In September 2017, Walker commenced this action with the filing of a pro se civil rights Complaint.  Dkt. No. 1.  On November 30, 2017, Walker filed an Amended Complaint.  See Am. Compl.  On March 27, 2018, in lieu of filing an answer, Defendants filed a motion to dismiss the Amended Complaint.  Dkt. No. 14.  Walker has opposed the motion, and seeks to "amend and supplement his complaint."  Dkt. No. 16 at 3.  To the extent Walker seeks to amend his complaint, the undersigned construes this statement as a cross-motion for leave to file a second amended complaint.[2]

---

[2]      Walker requests that "the defendants['] motion and plaintiff's reply be treated as a motion for summary judgment[.]"  See Dkt. No. 16 at 5.  To the extent that the undersigned interprets Walker's submission as "cross motion," the undersigned concludes that such motion does not comply with this Court's Local Rules.  See N.D.N.Y. L.R. 7.1.  Accordingly, the undersigned declines to consider the submission as a motion for summary judgment, and treats Walker's submission only as an opposition to Defendants' motion to dismiss.  See Ebert v. Holiday Inn, No. 11 CIV. 4102, 2014 WL 349640, at *1, n.1 (S.D.N.Y. Jan. 31, 2014), aff'd, 628 F. App'x 21 (2d Cir. 2015) (summary order) ("In light of Defendants' failure to abide by this Court's Individual Practices, the Court declines to consider Defendants' cross-motion for summary judgment and treats Defendants' submission only as an opposition to Plaintiffs' summary judgment motion.").

**B. Facts**[3]

The facts are related herein in the light most favorable to Walker as the non-moving party.  See subsection II(A) infra.  At the relevant time, Walker was confined to the Special Housing Unit ("SHU") at Upstate Correctional Facility ("Upstate C.F.") under administrative segregation.  See generally Am. Compl.  Walker seeks monetary relief.  See id. at 8.

Administrative segregation admission results from a determination by the facility that the inmate's presence in general population would pose a threat to the safety and security of the facility.  N.Y. COMP. CODES R. & REGS. tit. 7, § 301.4(b); Dkt. No. 8-1 at 79.[4]  An inmate in administrative segregation status shall have such status reviewed every seven days for the first two months and at least every 30 days thereafter.[5]  Id. at § 301.4(d).  Form #2170 "Administrative Segregation Review," shall be used to record the report(s), any recommendation, and the decision.  Id.  The procedure is as follows:

> (1) A three-member committee consisting of a representative of the facility executive staff, a security supervisor, and a member of the guidance and counseling staff shall examine the inmate's institutional record and prepare and submit to the superintendent or designee a report setting forth the following:
>
> > (i) reasons why the inmate was initially determined to

---

[3]      Walker annexed exhibits to his Amended Complaint.  See Dkt. No. 8-1.  Defendants do not contest the validity of the exhibits and cite to the exhibits as support for the motion to dismiss.  See generally Dkt. No. 14-1.

[4]      Throughout this Report-Recommendation, references to page numbers in items that appear on the docket refer to the pagination of the header numbers generated by CM/ECF, not to the page numbers used by the parties in the individual documents.

[5]      Prior to April 2017, administrative segregation reviews were conducted every sixty days.  Dkt. No. 14-1 at 5, n. 2; Dkt. No. 8-1 at 79.

be appropriate for administrative segregation;

(ii) information on the inmate's subsequent behavior and attitude; and

(iii) any other factors that they believe may favor retaining the inmate in or releasing the inmate from administrative segregation.

N.Y. COMP. CODES R. & REGS. tit. 7, § 301.4(d)(1); Dkt. No. 8-1 at 79.

Upon receipt of the report and any written statement from the inmate, the superintendent shall make a determination to retain or release the inmate.  N.Y. COMP. CODES R. & REGS. tit. 7, § 301.4(d)(2).  In cases, such as Walker's, where the Deputy Commissioner for Correctional Facilities has notified the superintendent that the subject inmate shall receive central office review, the superintendent will refer the report and inmate statement to a three-member central office committee.  Id. at § 301(d)(3); Dkt. No. 8-1 at 38, 79.  The committee completes a review and forwards the paperwork, along with its recommendation, to the Deputy Commissioner for Correctional Facilities, who shall make the determination to retain the inmate in or release the inmate from administrative segregation.  Id.

On January 17, 2014, Walker was placed in the SHU based on an administrative segregation recommendation.  Am. Compl. at 2; Dkt. No. 8-1 at 38.  Administrative segregation hearings were held on February 26, 2014 and June 11, 2014.  Am. Compl. at 3; Dkt. No. 8-1 at 38.

On August 20, 2014, a three-member committee conducted a sixty-day review of Walker's administrative segregation.  Dkt. No. 8-1 at 38-41.  The committee consisted of

4

the offender rehabilitation coordinator, security supervisor, and committee chairperson.[6]

Id.  The committee noted that Walker was initially placed in administrative segregation

due to a "past [ ] marked with assaults and brutality showing a deprived indifference to

human life."  Id.  The committee summarized Walker's criminal history, reporting that he

had entered into  DOCCS' custody in 1994 to serve 47 ½ years to life sentence pursuant

to convictions in state court for attempted robbery, criminal possession of a weapon,

narcotics charges, and two counts of murder.  Id.

The committee discussed Walker's institutional record, which included twenty-seven

misbehavior reports for weapons, drugs, smuggling, demonstrations, assault on staff,

disobeying orders, altering items, and threats.  Dkt. No. 8-1 at 38.  The committee

summarized an incident in September 2000 at Great Meadow Correctional Facility

("Great Meadow C.F.") involving Walker and two officers.  Id.  According to the report,

Walker attacked the officers with two homemade weapons secured to his hands with

leather thongs.  Id.  Walker stabbed the officers in the head, chest, and back, causing

serious injuries.  Id.  While Walker was confined to county jail for trial, he plotted an

escape, assaulted another inmate, smuggled a razor blade into court, attempted to hire a

"hit man" to kill witnesses, and assaulted a deputy in an attempt to steal his keys.  Id.   As

a result of the incident, Walker was sentenced to the SHU for 35 months.  Id.

On August 26, 2014, the committee interviewed Walker, and described him as tidy,

well groomed, and with "appropriate" interaction with staff.  Dkt. No. 8-1 at 38.  They

noted that Walker spent his time writing a non-fiction book about black history.  Id.  The

---

[6]     Walker does not allege that the three member committee included any named defendant.

committee considered a letter from Walker dated August 22, 2014. Id. at 38-41, 43; Dkt. No. 14-1 at 6.

On August 29, 2014, the three-member committee completed its review, and recommended that Walker remain in administrative segregation. Dkt. No. 8-1 at 38. The committee concluded:

> Clearly, Inmate Walker has demonstrated a propensity for assaultive and dangerous behavior in the correctional facility and the community. Walker's willingness to enact extreme violence on staff and other inmates has proven his presence in general confinement of any correctional facility an extreme risk to staff and inmates, as well as the safety and security and good order of the facility.

Dkt. No. 8-1 at 38.

On September 8, 2014, the central office committee completed its review and agreed with the recommendation.[7] Dkt. No. 8-1 at 38. On October 8, 2014, Bellnier made the final determination to continue Administrative Segregation. Id.

On April 12, 2016, Walker sent a letter to the Administrative Segregation Review Committee ("ASRC"). Am. Compl. at 3-4; Dkt. No. 8-1 at 14-17. Walker claimed that the reviews were "perfunctory" because Woodruff "made it clear," during rounds, that Walker would not be released from administrative segregation for two-to-three years. Am. Compl. at 6; Dkt. No. 8-1 at 14-17. Walker also maintained that Cook, his counselor, made false statements that were included in the reviews. Id. Specifically, plaintiff alleges that Cook intentionally provided false information related to a weapons charge at Clinton C.F. in

---

[7]    The Court notes, and Defendants concede, that the copy of the written review, annexed to the Amended Complaint, is incomplete. See Dkt. No. 8-1 at 38-41; Dkt. No. 14-1 at 5, n. 3.

2014.[8]  Id.  Cook erroneously concluded that Walker intended to be caught with weapons in an attempt to "manipulate[] [his] environment" to stay at Clinton C.F.  Id.  However, Walker claimed that he "hated Clinton" and requested a transfer from that facility on four separate occasions.  Id. at 14-17.  Walker also asserted that the reviews were untimely and sought direction regarding his potential release from administrative segregation.  Id.; Am. Compl. at 3.

On July 4, 2016, Walker sent a letter to Uhler and the ASRC claiming that he did not receive his March 2016 review, and asked that the correspondence be considered and acknowledged during the next scheduled review.  Am. Compl. at 3; Dkt. No. 8-1 at 18-23.  Walker reiterated his claims that the reviews were a "sham" and that Woodruff had no intention of allowing him to leave the SHU.  Id.  Walker repeated his objection to false information included in his reviews.  Id.

On August 16, 2016, Cook interviewed Walker regarding his continued confinement in administrative segregation.  Dkt. No. 8-1 at 24.  At that time, Walker was participating in cell study, with a focus in psychology, the "call home program," daily exercise, and religious practices.  Id.  Walker was also focused on completing a book.  Dkt. No. 8-1 at 24.

On August 17, 2016, a three-member committee, including Cook and Fitchette, conducted a second 60-day review.  Dkt. No. 8-1 at 24-26.  The committee recounted Walker's criminal history and institutional record as set forth in the first review and relied

---

[8]    Walker was transferred to Upstate C.F. from Clinton C.F. on March 4, 2014.  Dkt. No. 8-1 at 38.

upon Cook's interview with Walker.[9]  Id.  The committee determined that continued

confinement was appropriate, reiterating the conclusions of the prior committee, verbatim.

Id. at 24.  The central office committee recommended that Walker remain in

Administrative Segregation and, on February 10, 2017, the Deputy Commissioner agreed

with the determination.[10]  Id.  Walker did not receive a copy of the review until February

17, 2017.  Am. Compl. at 3.

    On January 30, 2017, a three-member committee, including Fitchette, conducted a

third 60-day review.  Dkt. No. 8-1 at 34-36.  The committee recounted Walker's criminal

history and institutional record as set forth in prior reviews.  Id.  On February 2, 2017, a

counselor met with Walker to discuss his segregation.  Id.  The counselor noted that

Walker was writing a book, watched movies outside his cell, exercised daily "to keep his

mind and body healthy," and spoke to his daughter every week.  Id.  Walker's attitude and

outlook were "improved," and his overall behavior was noted as "satisfactory."  Dkt. No. 8-

1 at 34-36.  On February 9, 2017, the committee found that continued segregation was

appropriate and restated the conclusions of the prior committees, verbatim.  Id.  In July

2017, the central office committee and the Deputy Commissioner approved the

recommendation.[11]  Id.  On August 4, 2017, Plaintiff received a copy of the review.  Am.

Compl. at 4.

---

     [9]     Walker claims that the committee did not consider his April 2016 or July 2016 statements.
Am. Compl. at 3.

     [10]     Defendants' claim that signature of the Deputy Commissioner on the August 2016 review is
not Bellnier's signature.  Dkt. No. 14-1 at 7, n. 4.

     [11]     Defendants' claim that signature of the Deputy Commissioner on the January 2017 review is
not Bellnier's signature.  Dkt. No. 14-1 at 6, n. 5.

On June 1, 2017, a counselor met with Walker to discuss his segregation.  Dkt. No. 8-1 at 76.  Walker was studying multiple subjects and continued to exercise and communicate with his family.  Id.  Walker was noted as "polite" and "cooperative."  Id.

On June 2, 2017, Walker wrote to Bellnier complaining that he did not receive the August 2016 review until February 2017, and that he had not received any review for nearly one year.  Dkt. No. 8-1 at 74-75.  Walker objected to the reviews as "perfunctory" because the committee did not consider "a lot [of] [his] issues" including his complaints surrounding a cell shield covering his cell door and lack of access to religious services.  Dkt. No. 8-1 at 74-75.

On June 12, 2017, a three-member committee conducted a fourth 60-day review.  Dkt. No. 8-1 at 76-78.  The committee relied upon the summary of Walker's criminal history and institutional record as set forth in the prior reviews.  Id.  The committee also noted that Walker used "drag lines" to smuggle contraband "which he turns over readily."  Id.  The committee considered the June 1, 2017 interview and referred to a recent misbehavior report Walker received charging him with interference, harassment, and disobeying a direct order during a telephone call home.  Id.  The committee considered Walker's June 2017 correspondence, and recommended continued confinement, reiterating the conclusions of the prior committees, verbatim.  Id. at 76.  On September 21, 2017, the central office committee agreed with the recommendation and, on September 25, 2017, the Deputy Commissioner affirmed.[12]  Id.  On October 1 2017, Plaintiff received a copy of the review.  Am. Compl. at 6.

---

[12]    Defendants' claim that signature of the Deputy Commissioner on the June 2017 review is not Bellnier's signature.  Dkt. No. 14-1 at 7, n. 7.

On August 11, 2017, a three-member committee conducted a fifth 60-day review. Dkt. No. 16 at 21.[13] The committee referred Walker's criminal history and institutional record as set forth in the prior reviews. Id. The committee determined that segregation was appropriate to "greatly reduce[] the risk his behavior presents to staff and inmates, as well as the safety and security and good order of the facility." Id. The central office committee agreed and, on December 12, 2017, the Deputy Commissioner approved the determination. Id. On December 21, 2017, Walker received a copy of the review. Dkt. No. 16 at 24.

## II. Discussion[14]

Walker alleges that Defendants violated his due process rights because the periodic reviews of his administrative confinement were untimely and predetermined. See generally Am. Compl. Walker claims that the reviews contained untruthful information and were arbitrarily conducted in an attempt to punish him. See id. Defendants argue that Walker was afforded the necessary due process during the periodic review of his administrative segregation status and, thus, the Amended Complaint must be dismissed. See Dkt. No. 14-1 at 10-16.

---

[13]    A copy of the August 2017 review was annexed to Walker's response to the motion to dismiss. Dkt. No. 16 at 21-23. Defendants do not object to the authenticity of the report.

[14]  All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to plaintiff pro se.

## A.  Motion to Dismiss

### 1.  Legal Standard

Under Rule 12 (b)(6), a defendant may move to dismiss a complaint for a plaintiff's "failure to state a claim upon which relief can be granted."  FED. R. CIV. P. 12(b)(6).  When considering such a motion, a court must "construe plaintiff['s] complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in plaintiff['s] favor."  Selevan v. N.Y. Thruway Auth., 584 F.3d 82, 88 (2d Cir. 2009) (quoting Holmes v. Grubman, 568 F.3d 326, 335 (2d Cir. 2009)) (internal quotation marks omitted). However, this "tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 664 (2009)) (internal quotation marks and alterations omitted).

Accordingly, to survive a motion to dismiss, a complaint must state a claim for relief that is "'plausible on its face.'"  Iqbal, 556 U.S. at 678 (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007) (explaining that the plausibility test "does not impose a probability requirement . . . it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]."));  see also Arar v. Ashcroft, 585 F.3d 559, 569 (2d Cir. 2009) (holding that "[o]n a motion to dismiss, courts require enough facts to state a claim to relief that is plausible . . . .") (internal citations omitted).  Determining whether plausibility exists is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Iqbal, 556 U.S. at 679.

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude.  See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006).  As the Second Circuit stated,

> [t]here are many cases in which we have said that a *pro se* litigant is entitled to special solicitude, that a *pro se* litigant's submissions must be construed liberally, and that such submissions must be read to raise the strongest arguments that they suggest.  At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not consistent with the *pro se* litigant's allegations or arguments that the submissions themselves do not suggest that we should not excuse frivolous or vexatious filings by *pro se* litigants, and that *pro se* status does not exempt a party from compliance with relevant rules of procedural and substantive law . . . .

Id. (internal quotation marks, citations, and footnote omitted); see also Sealed Plaintiff, 537 F.3d at 191-92 ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se*, . . . a court is obliged to construe his pleadings liberally.") (internal citations omitted).

## 2. Due Process

The Due Process Clause of the Fourteenth Amendment states: "[n]o State shall . . . deprive any person of life, liberty, or property without due process of law."  U.S. CONST. amend. XIV § 1.  To state a prima facie due process claim, "a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process."  Giano v. Selsky, 238 F.3d 223, 225 (2d Cir. 2001) (citation and quotation marks omitted); see Mitchell v. Keane, 974 F. Supp. 332, 342 (S.D.N.Y. 1997) ("To state a procedural due process claim challenging a

disciplinary action, a prisoner must allege *both* that he was deprived of a liberty interest cognizable under the Due Process Clause, and that he was deprived of that interest without the requisite [procedural due] process.") (emphasis added).

### a. Liberty Interest

An inmate has a protected liberty interest in being free from segregated confinement but only where the alleged deprivation imposed amounts to an "atypical and significant hardship in relation to the ordinary incidents of prison life." Sandin v. Connor, 515 U.S. 472, 483-84 (1995). Defendants concede that, for the purposes of this motion, Walker's confinement implicated a liberty interest. See Dkt. No. 14-1 at 8.

### b. Procedural Due Process

Administrative segregation "is appropriate when necessary to incapacitate a detainee who 'represents a security threat' or to 'complet[e] . . . an investigation into misconduct," and "[s]o long as prison officials seek to achieve one or both of those goals, they have wide latitude in the procedures they deploy." See Proctor v. LeClaire, 846 F.3d 597, 609 (2d Cir. 2017) (quoting Hewitt v. Helms, 459 U.S. 460, 474-77 (1983) ("Administrative segregation is not used for indefinite confinement of the inmate.")). The Second Circuit has stated that

> The state's interest in flexible [administrative segregation] review procedures — maintaining institutional security — is substantial. Institutional safety and security are perhaps a prison facility's most important considerations. Courts must preserve prison officials' free[dom] to take appropriate action to

13

> ensure the safety of inmates and corrections
> personnel and to prevent escape. Prison
> administrators therefore should be accorded
> wide-ranging deference in the adoption and execution
> of policies and practices that in their judgment are
> needed to preserve internal order and discipline and
> to maintain institutional security.

Proctor, 846 F.3d at 610 (internal quotation marks and citation omitted). Nevertheless, this

public interest must be weighed against the individual's private interest "implicated by an

extended and indefinite stay in [administrative segregation]." Id.

"Before confining an inmate in Ad Seg, prison officials must provide 'some notice of

the charges against him and an opportunity to present his views to the prison official

charged with deciding whether to transfer him to [Ad Seg],' although not necessarily a full

hearing." Proctor, 846 F.3d at 609 (citing Hewitt, 459 U.S. at 476, accord Taylor v.

Rodriguez, 238 F.3d 188, 192 (2d Cir. 2001)). "Once that has occurred, prison officials

need only conduct 'an informal, nonadversary evidentiary review' of whether the

confinement is justified." Id. (citing Hewitt, 459 U.S. at 476). These periodic reviews are

"flexible and may be based on 'a wide range of administrative considerations,' including but

not limited to observations of the inmate in [administrative segregation], 'general

knowledge of prison conditions,' misconduct charges, ongoing tensions in the prison, and

any ongoing investigations." Id. (quoting Hewitt, 459 U.S. at 477 n.9). The prison official's

final determination may be based on "purely subjective evaluations and on predictions of

future behavior." Id. (quoting Hewitt, 459 U.S. at 474 (internal quotation marks omitted)).

However, "[t]h[e] periodic reviews must be meaningful." Proctor v. Kelly, No. 905-CV-0692

(GTS/GJD), 2008 WL 5243925, at *25 (N.D.N.Y. Dec. 16, 2008) ("The question of periodic

review is a due process claim that is separate from the claim for the initial placement in

administrative segregation.") (citations omitted).

In this Circuit, a meaningful periodic review must fulfill a three-step process:

> First, the reviewing prison officials must actually evaluate whether the inmate's continued [administrative segregation] confinement is justified. It is not sufficient for officials to go through the motions of nominally conducting a review meeting when they have developed a pre-review conclusion that the inmate will be confined in [administrative segregation] no matter what the evidence shows. Review with a pre-ordained outcome is tantamount to no review at all.
>
> Second, the reviewing officials must evaluate whether the justification for [administrative segregation] exists at the time of the review or will exist in the future, and consider new relevant evidence as it becomes available.
>
> Third and finally, the reviewing officials must maintain institutional safety and security (or another valid administrative justification) as their guiding principles throughout an inmate's [administrative segregation] term. SHU confinement that began for proper [administrative segregation] purposes may not morph into confinement that persists for improper purposes.

Proctor, 846 F.3d at 610-11 (internal citations omitted).

Walker claims that the periodic reviews were untimely, preordained, and used as punishment. Dkt. No. 16 at 6, 9-10. Walker also asserts that the delay in transmitting the reviews to him prevented the committee from addressing his concerns. Id. at 15-18. Defendants argue that the administrative segregation reviews complied with the Proctor criteria.[15] See Dkt. No. 14-1 at 12-16.

---

[15]    Defendants assert that "plaintiff acknowledges that the required periodic reviews took place." Dkt. No. 14-1 at 12. A careful review of Walker's pleadings and opposition to the motion belies that assertion.

The first review of Walker's confinement occurred in August 2014.  At that time, the three-member committee noted that Walker was initially confined in administrative segregation due to his criminal history, "marked with assaults and brutality showing a deprived indifference for human life."   Dkt. No. 8-1 at 38.  The committee summarized Walker's criminal convictions and sentences and recounted the events surrounding the 2000 assault at Great Meadow C.F. and Walker's heinous behavior while awaiting trial. Id. In each subsequent Sixty-Day review, the three member committee used *identical* language regarding Walker's criminal history and institutional record. Compare Dkt. No. 8-1 at 38 with Dkt. No. 8-1 at 24, 34, 75 and Dkt. No. 16 at 21.

In each review, the committee noted that Walker maintained a positive disciplinary record, his interaction with staff was "appropriate," and he was neat, tidy, and well-groomed.  Dkt. No. 8-1 at 24, 34, 38, 76; Dkt. No. 16 at 21.  Walker participated in the "call home program" with his family and spent his time studying, reading, writing, exercising, and practicing religion.  Id.  Additionally, "[a]ll staff state[d] that Walker[']s overall behavior has been satisfactory and there is nothing new to report."  Id. at 24, 34.  Despite this seemingly improved behavior in every review, the committees repeated the language from the August 2014 review, verbatim, and concluded that Walker's "extreme violence on staff and other inmates" and "propensity for assaultive and dangerous behavior in the correctional facility and community" were "other factors [. . . ] in favor [of] retaining the offender" in administrative segregation.  Dkt. No. 8-1 at 38.  Dkt. No. 8-1 at 24, 34, 75 and Dkt. No. 16 at 21.

Although similar language in periodic reviews "does not necessarily mean that the reviews" are a "sham," see Zimmerman v. Seyfert, No. 9:03-CV-1389 (TJM), 2007 WL

16

2080517, at *19 (N.D.N.Y. July 19, 2007), taking the allegations in the Amended Complaint as true, at this stage in the litigation, the facts suggest that Defendants did not provide Walker with meaningful, periodic reviews regarding his continued administrative confinement.  "At some point . . . the administrative necessity for involuntary lock-up begins to pale." Covino v. Vermont Dep't of Corrs., 933 F.2d 128, 130 (2d Cir. 1991).  Indeed, the Second Circuit found in Covino that a nine-month administrative segregation "smacks of punishment." Id.  Here, although the documents attached to the Amended Complaint indicate the reasons why Walker was initially placed in administrative segregation, there is nothing on the record that shows why he remained there for three years.

Taking the allegations in the Amended Complaint as true, the veracity of the reviews is suspect due to the alleged false information reported.  Specifically, Walker asserts that the reviews contained "embellished" information related to his weapons charge at Clinton C.F. and "drag lines" used to smuggle contraband.  Dkt. No. 16 at 12-14.  In response, defense counsel makes various factual assertions related to these claims.  To wit, counsel maintains that any improper information related to historic disciplinary issues, "has no effect on the thoroughness of plaintiff's review" and alleges that the review board considered Walker's "criticism, feedback, or additional information [. . . ] when making their next determination."  Dkt. No. 14-1 at 13, 14.  Counsel further asserts that while Walker objects to Defendants' statements regarding his motive for the 2000 attack, "this detail is of no consequence" because Walker's historic acts of misconduct "speak to a deliberate indifference to the value of human life, and current staff members evaluating plaintiff's eligibility for release from administrative segregation are permitted to consider plaintiff's actions, and give them weight their experience in the administration and security of a safe

and secure prison system requires." Id. at 15.

Because counsel's claims are alleged in conclusory terms unsupported by the allegations in the Amended Complaint or an affidavit or declaration from any named defendant or individual with personal knowledge, the undersigned is unpersuaded by the arguments at this stage in the litigation. See Bennett v. Goord, 343 F.3d 133, 139 (2d Cir. 2003) (finding that "DOCS offered only a conclusory denial of these allegations, failing to submit affidavits or any other admissible evidence concerning what [ ] officials did or did not know."); Lind v. Vanguard Offset Printers, Inc., 857 F. Supp. 1060, 1066 n.4 (S.D.N.Y. 1994) (holding that "an assertion in a memorandum of law cannot create a bona fide issue of fact") (citation omitted); see also Rivera v. City of New York, No. 07 CIV. 5999, 2010 WL 1253983, at *4 (S.D.N.Y. Mar. 17, 2010) (denying motion based upon counsel's assertion unsupported by any citation, or the affidavit of someone with firsthand knowledge).

Lending further support to Walker's claims are the inexplicable gaps and overlaps between and among the reviews. The record contains only five reviews over a period of three years of administrative confinement. Alarmingly, Walker's first review occurred in 2014, but the second review did not commence until two years later. Dkt. No. 8-1 at 24, 38. Thereafter, six months lapsed between the commencement of the second, third, and fourth reviews. Id. at 24, 34, 75. Additionally, the time necessary to complete each review was inconsistent. The record indicates that the reviews took anywhere between two to seven months to finish and the third, fourth, and fifth reviews commenced *before* the prior

reviews were completed.[16]  Further, Walker asserts that he did not receive copies of the second, third, and fourth review until *after* the subsequent review began.  Finally, Walker was interviewed in connection with the third, fourth, and fifth reviews *before* he received a copy of the prior reviews.  Defendants do not contest or address these contentions.

At this juncture, drawing all reasonable inferences in Walker's favor and construing the Amended Complaint liberally under the special solicitude due to the pro se plaintiff, the Court finds that Walker's due process claim regarding his continued confinement in administrative segregation cannot be dismissed at this stage.  See Colon v. Annucci, ___ F. Supp. 3d ___, 2018 WL 4757972, at *13-17 (S.D.N.Y. Sept. 28, 2018) (denying the defendants' motion to dismiss the plaintiff's claim that the review process was "perfunctory" and a "sham" because the plaintiff's allegations were supported by sixty-day review forms that failed to suggest how his "present and future behavior" justified continued segregation).  Although the reasons for Walker's initial placement in the SHU are compelling, absent any indication from Walker or Defendants that Walker's assaultive and dangerous behavior continued for three years and necessitating administrative segregation for that entire time, the undersigned finds it inappropriate to dismiss these claims at this juncture, as the continued segregation could "amount[ ] to 'punishment' in the constitutional sense."  Bell v. Wolfish, 441 U.S. 520, 537 (1979).

Accordingly, it is recommended that Defendants' motion, on this ground, be denied.

---

[16]    The second review was completed on February 10, 2017.  The third review began on January 30, 2017and was completed on August 31, 2017.  The fourth review began on June 12, 2017 and was completed on September 25, 2017.  The fifth review began on August 11, 2017. Dkt. No. 8-1 at 24, 34, 38, 75 and Dkt. No. 16 at 21.

### 3.  Personal Involvement

Defendants seem to suggest that Uhler, Woodruff, Fitchette, and Cook lack

personal involvement in this action and argue that these defendants should be dismissed

from the action because lacked the authority to retain or release Walker from

administrative segregation.  See Dkt. No. 14-1 at 12-13.

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a

prerequisite to an award of damages under § 1983."  Wright v. Smith, 21 F.3d 496, 501 (2d

Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)).  Thus,

supervisory officials may not be held liable merely because they held a position of

authority.  Id.; Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996).  However, supervisory

personnel may be considered "personally involved" if:

> (1) [T]he defendant participated directly in the
> alleged constitutional violation;
>
> (2) the defendant, after being informed of the
> violation through a report or appeal, failed to
> remedy the wrong;
>
> (3) the defendant created a policy or custom under
> which unconstitutional practices occurred, or
> allowed the continuance of such a policy or custom;
>
> (4) the defendant was grossly negligent in
> supervising subordinates who committed the
> wrongful acts; or
>
> (5) the defendant exhibited deliberate indifference
> to the rights of inmates by failing to act on
> information indicating that unconstitutional acts
> were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Williams v. Smith, 781 F.2d 319,

323–24 (2d Cir. 1986)).[17]  Assertions of personal involvement that are merely speculative are insufficient to establish a triable issue of fact.  See e.g., Brown v. Artus, 647 F.Supp.2d 190, 200 (N.D.N.Y. 2009).

Here, Walker argues that Defendants' lack of authority to "actually release" him from administrative segregation does not preclude his claim because the Deputy Commissioner relied upon recommendations and information from Uhler, Woodruff, Fitchette, and Cook. Dkt. No. 16 at 11.  Walker maintains that Defendants interacted with him, while the Deputy Commissioner "never even saw the Plaintiff or interact[ed] with Plaintiff."  Id.

Construing the Amended Complaint liberally and accepting all factual allegations in the Amended Complaint as true, Walker has sufficiently alleged personal involvement on the part of Defendants as, even though they were not the ultimate authority on plaintiff's release from administrative segregation, at this stage in the litigation, the record suggests that they did contribute in the recommendations to keep him confined.  See Pugh v. Goord, 571 F. Supp. 2d 477, 514 (S.D.N.Y. 2008) (finding that the plaintiff sufficiently alleged personal involvement on the part of defendant who "made 'certain contributions' to 'formulation of policy,' despite the fact that he was not 'the ultimate authority.'").  Even assuming that Defendants lacked the authority to release Walker, "that is not to say that [they] w[ere] not personally involved in one or more of the[] decisions."  Jackson v.

_____

[17]    Various courts in the Second Circuit have postulated how, if at all, the Iqbal decision has affected the five Colon factors which were traditionally used to determine personal involvement.  Pearce v. Estate of Longo, 766 F.Supp.2d 367, 376 (N.D.N.Y. 2011), rev'd in part on other grounds sub nom., Pearce v. Labella, 473 F. App'x 16 (2d Cir. 2012) (summary order) (recognizing that several district courts in the Second Circuit have debated Iqbal's impact on the five Colon factors); Kleehammer v. Monroe Cnty., 743 F.Supp.2d 175, 182 (W.D.N.Y.2010) (holding that "[o]nly the first and part of the third Colon categories pass Iqbal's muster ...."); D'Olimpio v. Crisafi, 718 F.Supp.2d 340, 347 (S.D.N.Y. 2010) (disagreeing that Iqbal eliminated Colon's personal involvement standard).

Johnson, 15 F. Supp. 2d 341, 353 (S.D.N.Y. 1998) (denying motion dismissing retaliation claims based upon the allegation that the defendant lacked the authority to initiate a transfer).

Accordingly, it is recommended that Defendants' motion on this ground be denied.

### B.   "Cross-Motion" to Amend

Pursuant to Rule 15(a), leave to amend a pleading shall be freely given when justice so requires.  See Livingston v. Piskor, 215 F.R.D. 84, 85 (W.D.N.Y. 2003).  "Absent evidence of undue delay, bad faith or dilatory motive on the part of the movant, undue prejudice to the opposing party, or futility, Rule 15's mandate must be obeyed."  Monahan v. New York City Dep't of Corrs., 214 F.3d 275, 283 (2d Cir. 2000) (citing Foman v. Davis, 371 U.S. 178, 182 (1962)).  A motion to amend must comply with Northern District of New York Local Rule 7.1.  The motion must include a notice of motion, supporting affidavit, and a copy of the proposed amended complaint.  The proposed amended pleading must be a complete pleading, which, if accepted for filing, would replace the complaint in all respects.

Here, Walker's opposition to Defendants' motion is not a formal cross-motion and fails to (1) attach a copy of the proposed amended pleading; and (2) set forth specifically the proposed amendments, and identify the amendments in the proposed pleading, either through the submission of a red-lined version of the Amended Complaint or other equivalent means, in violation of Local Rule 7.1(a)(4).  Accordingly, to the extent that Walker's submission may be interpreted as a cross-motion for leave to file a second amended complaint, this motion is denied.

22

### III. Conclusion

**WHEREFORE**, for the reasons stated herein, it is hereby:

**RECOMMENDED**, that Defendants' motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) (Dkt. No. 14) be **DENIED**; and it is

**ORDERED**, that, to the extent that Walker's submission may be interpreted a as a cross-motion for leave to file a second amended complaint (Dkt. No. 16), the motion be **DENIED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**.  Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED R. CIV. P. 6(a), 6(e), 72.[18]

Dated: January 15, 2019
Albany, New York

Christian F. Hummel
U.S. Magistrate Judge

---

[18] If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order was mailed to you to serve and file objections.  FED. R. CIV. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Id. § 6(a)(1)(C).