UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

TYRONE WALKER, #94A5258                          17-CV-1008
                    Plaintiff,

      -against-                                  GTS/CFH

JOSEPH BELLNIER; JAMES O'GORMAN;
DONALD UHLER; PAUL P. WOODRUFF;
JOANNE FITCHETTE; MELISSA A. COOK,
                    Defendants.


PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF
            SUMMARY JUDGMENT


      BRIEF FOR PRO-SE PLAINTIFF
            TYRONE WALKER



                          Tyrone Walker 94A5258
                          Upstate Correctional Facility
                          P.O. Box 2001
                          Malone, N.Y. 12953

# TABLE OF CONTENTS

PRELIMINARY STATEMENT . . . . . . . . . . 1

LEGAL STANDARDS GOVERNING A MOTION FOR
SUMMARY JUDGMENT . . . . . . . . . . 1

FACTS . . . . . . . . . . . . . 2

POINT 1
DEFENDANT'S VIOLATED PLAINTIFF'S DUE PROCESS LIBERTY
INTEREST RIGHT AND SUBJECTED PLAINTIFF TO ATYPICAL
AND SIGNIFICANT HARDSHIP WHEN THEY GAVE PLAINTIFF
REVIEWS YEARS LATE OR NO REVIEWS . . . . . . 8

POINT 2
PLAINTIFF'S AD-SEG REVIEWS ARE A SHAM, ROTE
PERFUNCTORY AND A FRAUD . . . . . . . . 11

POINT 3
PLAINTIFF DENIED THE RIGHT TO BE HEARD . . . . 20

POINT 4
DEFENDANT'S ARE NOT ENTITLED TO QUALIFIED
IMMUNITY . . . . . . . . . . . 23

CONCLUSION . . . . . . . . . . . 24

I

# TABLE OF AUTHORITIES

<u>CASE</u>                                                                                                          <u>PAGE</u>

Anderson v. Liberty Lobby Inc. 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed 2d 202
(1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Armstrong v. Manzo, 380 U.S. 545, 85 S.Ct. 1187, 14 L.Ed. 2d 62 (1965) . . 22

Black v. Coughlin, 76 F.3d 72 (2d. Cir. 1996) . . . . . . . . . . . . . 23

Colon v. Howard 215 F.3d 227 (2d. Cir. 2000) . . . . . . . . . . . . 9

Covino v. Vermont Dept of Corcs., 933 F.2d 128 (2d. Cir. 1991) . . . . 19

Edmonson v. Coughlin 21 F.Supp. 2d 242 (W.D.N.Y. 1988) . . . . . . 22

Frazier v. Coughlin, 81 F.3d 313 (2d. Cir. 1996) . . . . . . . . . . . 9

Giano v. Kelly 869 F.Supp. 143 (W.D.N.Y. 1994) . . . . . . . . . . . 19

Giano v. Kelly No. 98-CV-727(2) 2000 WL 876855 (W.D.N.Y. 2000) . . . 23

Gitten v. LeFevre, 891 F.2d 38 (2d. Cir. 1989) . . . . . . . . . . . . 10

Goldberg v. Kelly 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed. 2d 287 (1970) . . 22

Hewitt v. Helms 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed. 2d 675 (1983) . . 10

H'shaka v. Gorman 2020 WL 1188075 . . . . . . . . . . . . . . . 16, 21, 23

Matthews v. Eldridge, 424 U.S. 319, 47 L.Ed. 2d 18 (1976) . . . . . . 22

Mims v. Shapp. 744 F.2d 946 (3rd Cir. 1984) . . . . . . . . . . . . . 19, 22

Parratt v. Taylor, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed. 2d 420 (1981) . . 22

Proctor v. LeClaire, 846 F.3d 597 (2d. Cir. 2017) . . . . . . . . 9, 10, 11, 12, 22

Russell v. Coughlin 910 F.2d 75 (2d. Cir. 1990) . . . . . . . . . . . 10

Sandin v. Conner 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed. 418 (1995) . . 9

Soto v. Walker 44 F.3d 169 (2d. Cir. 1995) . . . . . . . . . . . . . 9, 10

Taylor v. Rodriguez, 238 F.3d 188 (2d. Cir. 2001) . . . . . . . . . . 22

Tellier v. Fields 280 F.3d 69 (2d. Cir. 2000) . . . . . . . . . . . . . 9

Tellier v. Scott, 49 F.Supp. 2d 607 (1998) . . . . . . . . . . . . . . 10

Williams v. Hobbs 662 F.3d 994 (8th Cir. 2011) . . . . . . . . . . . 19

Zimmerman v. Seyfert, No. 9:03-CV-1389 (TJM), 2007 WL 2080517
(N.D.N.Y. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . 19

# FEDERAL STATUTES AND DOCCS REGULATIONS

42 U.S.C. Section 1983 . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed. R. Civ. P 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

7 N.Y.C.R.R. Directive 4933 Section 301.4(d) . . . . . . . . 9, 10, 20, 23

7 N.Y.C.R.R. Directive 4933 Section 305.5(a) . . . . . . . . . . . . 6

II

## PRELIMINARY STATEMENT

This is a civil action brought pursuant to 42 U.S.C. Section 1983. The Plaintiff is a pro-se litigant that brought this action while in the custody of the New York State Department of Corrections and Community Supervision (D.O.C.C.S.) house at Upstate Correctional Facility. The Plaintiff's issues raised in his complaint are as follows: (1) The Defendants' has subjected the Plaintiff to atypical and significant hardship violating his liberty interest due process rights. This violates Plaintiff's Fourteenth Amendment Constitutional Right. The Plaintiff is being held in Administrative Segregation (solitary confinement S.H.U.) status without meaningful reviews, at times the reviews don't exist at all, or they are so late they undermine the process, the Plaintiff's issues are not being heard, and the Defendants has gone as far as inserting false information into the reviews to support the basis for continued Administrative Segregation (Ad-Seg) confinement.

## LEGAL STANDARDS GOVERNING A MOTION FOR SUMMARY JUDGMENT

Under Fed. R. Civ. P. 56, Summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]." Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed. 2d 202 (1986). As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law ... Factual disputes that are irrelevant or unnecessary will not be counted." Anderson, 477 U.S. at 248, 106 S.Ct. 2505. Once the Plaintiff has met his initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ. P. 56 (a)(c), (e).

# FACTS

The Plaintiff is an Ad-Seg inmate and as such he was entitled to reviews which was initially every 60 days, but as of April, 18, 2017 these reviews was revised to take place every 30 days, and inmates also have a right to be heard and their statements are to be considered. All this is stated in Directive 4933 which govern Ad-Seg inmates in S.H.U. (Affidavit Exhibit 1)

The Plaintiff's 8-17-16 Ad-Seg review was completed on 2-10-17 and the Plaintiff did not receive it until 2-17-17 (over 6 months later). Plaintiff's 1-30-17 Ad-Seg Review was completed on 7-31-17 and the Plaintiff did not receive it until 8-4-17 (over 6 months later). Plaintiff's June, 12, 2017 Ad-Seg review completed on 9-25-17 and the Plaintiff did not receive it until 12-27-17 (over 6 months later). From 8-17-16 to 12-27-17 the Plaintiff either received over a year of late reviews or no reviews at all. (Dkt. No. 31 Comp. #16, 19 and Exhibits 3 and 6 also Dkt. No. 16 Exhibit 1 Affidavit Exhibit 7 1-30-17 Review

On January, 24, 2019 the Plaintiff would receive 9 Ad-Seg reviews dated 9-12-17, 10-10-17, 11-07-17, 12-05-17, 1-03-18, 1-31-18, 2-28-18, 3-27-18 and 5-22-18. They are all stamped Upstate C.F. Executive Office Jan. 22-19 which indicate when the facility received them. Deducting the 30 days alotted for the Ad-Seg review to be completed and the total number of days the 9 later reviews came up to being 3,417 days, that's about 9½ years. It should be noted the Deputy Commissioner at this time was O'Gorman. The Plaintiff raised this issue in his 1-26-19 Ad-Seg Statement and it was never responded to in their response. All the Defendants in their interrogatories stated they don't know why Plaintiff received 9 reviews at one time and they don't know if the Directive supports that. (Dkt. No. 31 #21 Exhibit 7 and 8; Affidavit Exhibit 6 Interrog. #10).

The Superintendent Dale Artus gave the Plaintiff a 75 day time-cut of Keeplock time and 3 months S.H.U. time on May, 5, 2009. Then on 9-25-09 he gave the Plaintiff a 3 month S.H.U. time-cut. Then on 8-12-10 the Deputy Superintendent of Security S. Racette

gave Plaintiff a 6 months S.H.U. time cut. Then the Deputy Supt. of security S. Brown would give Plaintiff a 2 month S.H.U. time-cut on 10-22-12. Then he would give Plaintiff a 1 month S.H.U. time-cut on 4-8-13. Then he would give Plaintiff a 1 month S.H.U. time-cut on 6-10-2013. Then he would give Plaintiff a 1 month S.H.U. time-cut on 7-26-2013. On 11-25-2013 the Superintendent T. LaValley would give Plaintiff a 1 month S.H.U. time-cut (Aff. Exh. 2 Time-cut forms).

The Plaintiff scored 75% in Book 2 Post-Test ART Workbook Assignment and 82% in Book 3 Post-Test ART Workbook Assignment. Then the Plaintiff completed the SHU ART Workbook Program receiving an average evaluation in all areas (Aff. Exh. 3 ART Forms).

The Plaintiff did not like Clinton Correctional Facility and that's reflected in the fact Plaintiff sought a transfer from the facility whenever he was eligible, the Plaintiff filed 3 lawsuits while in the facility, the Plaintiff was repeatedly placed on a restraint order and required to remain in restraints on the visit and in the exercise cage at times, the Plaintiff accused the administration of using the restraint as being a white savage act by the administration to make Plaintiff's life a living hell. Being the Plaintiff was subject to inadequate clothing during exercise and remained in restraints, the Plaintiff would file a preliminary injunction, having legal precedence on his side, he forced Clinton to transfer him or give him the win. The facility would transfer Plaintiff and render the issue moot. (Aff. Exh 3 and 5)

Defendants claim "Walker has proven his ability to obtain and craft weapons and to manipulate his environment; he purposefully obtained or created a weapon in February, 2014, while still at Clinton Correctional Facility. He knew possession of such contraband would result in a Tier III disciplinary action and believed that this would cause his transfer to be cancelled". This claim exist in Plaintiff's 12-4-15, 2-16-16, 6-12-17, 11-07-17 and 12-05-17 Ad-Seg reviews in whole and in part it's in numerous Ad-Seg reviews. The Plaintiff addressed this issue in his 4-12-16 and 7-4-16 Ad-Seg statements and it was never responded to in Any Ad-Seg Response. The Defendant's was asked

3

if this statement is true and if they had any documentation to support the statement, all the Defendants stated they don't have no knowledge about the statement and no documentation to support those claims. (Dkt. No. 31 Exhibit 3 Ad-seg Statements, Exhibit 6 6-12-17, 11-07-17 Ad-seg Reviews, Exhibit 7 11-07-17 and 12-05-17 Ad-seg Reviews; Affidavit Exhibit 6 12-4-15 and 2-16-16 Ad-seg Reviews and all of Defendants interrogatories # 7)

The Plaintiff's charge for a weapon dated 2-27-14 states Plaintiff sought favorable treatment an award for his good behavior and good deed of finding a weapon on the floor and giving it to the Captain. (Affidavit Exhibit 6 Misbehavior Report)

Based on Plaintiff's Central Monitoring Case Designation (CMC status) and Security Classification, Plaintiff is transferred outside the facility with DOCCS CERT security unit and he is never informed in advance whenever he leaves outside the facility. (Affidavit Exhibit 6 CMC Status Security Classification)

The Defendants created a false statement in Plaintiff's Ad-Seg reviews stating the Plaintiff assaulted the Dep. Supt. of Security for no reason in blind rage. This statement in whole exist in Plaintiff's 12-4-15, 1-25-16, 6-27-16, 1-30-17, 6-16-17, 11-7-17 and 12-05-17 8-11-17 Reviews. Variations of this statement such as being quite unpredictable, extreme rage or assaulting the Dep. without provocation would exist in all of the Ad-seg Reviews when the matter was addressed in Plaintiff's Ad-Seg statement dated 12-27-17 the Defendants didn't respond to it in there response. When the Defendants was asked if it's true and do they have any documentation to support that statement all the Defendants claim to not know what Plaintiff was talking about, except the D.S.S. who states it's true and he has paperwork from Green Haven that Plaintiff attacked without provocation but he not sure who wrote up the paperwork, he also never mentions the blind rage part. On March, 27, 2018 the Defendants admit the assault was motivated by religious complaints when he assaulted the Green Haven Deputy Superintendent

of security, and the blind rage is a misstatement (to state wrongly or falsely, a lie). (Dkt. No. 31 Exhibit 9 12-27-17 Ad-Seg Statement; Affidavit Exhibit 6 Interrogatories #16,17, 12-4-15 and 2-16-16 Ad-Seg Reviews; Exhibit 7 6-27-16, 1-30-17 Reviews, Dkt. No. 31 Exhibit 6 6-16-17; Exhibit 7 11-7-17 and 12-05-17 Ad-Seg Review; Dkt. No. 14 page #13; Dkt. No. 16 Exhibit 1 8-11-17 Ad-Seg Review).

One variation of just "rage" would exist in the Ad-Seg Reviews 2-28-18 and 5-22-18 it states Plaintiff demonstrated rage saying that he would have assaulted the O.S.S. if given the opportunity because the Department didn't send his property out at the Department's expense. When the Plaintiff ask the Defendants in their interrogatories if the Plaintiff threatened to cause physical harm to any correctional staff would he be issued a misbehavior report, All the Defendants stated Plaintiff would be issued a misbehavior report and the O.S.S. added that the Plaintiff never threatened to cause physical harm to correctional staff at Upstate Correctional Facility. The Plaintiff's daughter came to see him from Virginia on 3-11-17, but forgot to pick-up Plaintiff's property. The O.S.S. extended the Plaintiff a courtesy to get another visit and told the visiting room to not destroy his property because the 14 days lapsed. The Plaintiff had his brother come see him on 4-9-17, but the visiting room did not give the Plaintiff's brother his property, so the O.S.S. told the visiting room to give Plaintiff's brother, Plaintiff's property and the Plaintiff's brother came on the visit again on 4-23-17 and he received all of Plaintiff's property. The Plaintiff was truly appreciative for the O.S.S. involvement dealing with Plaintiff's property and has expressed gratitude to the O.S.S. for addressing Plaintiff's issues on numerous occassions. The O.S.S. has even admitted the Plaintiff has expressed gratitude to him for certain past occasions. (Affidavit Exhibit 7, Exhibit 16 Admissions #15)

The Plaintiff is subject to an illegal cell shield, the Plaintiff's Ad-Seg statement in relation to it has been completely ignored more than one accasion. The O.S.S. admits because there are

inmates at upstate Correctional facility who are unruly and uncontrollable so they keep the plexiglas on the cell doors to protect the correctional staff and nurses from having something thrown on them. Directive 4933 which govern cell shields on cell doors states at Section 305.5 (a) "In those SHU cells that have only one solid door, the fixed vision panels will be maintained with the solid metal hatch coverings in an "opened position", unless a deprivation order is issued. The DSS imposing a cell shield on inmates without a deprivation order is unconstitutional and a 14th Amendment Constitutional Violation, Plaintiff is being deprived due process it's a liberty interest violation. The Superintendent Defendant Uhler Claims Section 1 Operations (F) governs Expanded Vision panels at Upstate in Directive 4933; the problem with this claim is the Secretary of State, states there is no such section that's a part of Directive 4933. (Dkt. No. 31 Exhibit 3 Plaintiff's 4-12-16 and 7-4-16 Ad-Seg Reviews; Affidavit Exhibit 9 DSS Admissions and Responses Uhler's Affidavit and Secretary of State).

Plaintiff's 12-4-18 Ad-Seg Review states "the Committee recommends that inmate Walker speak with his offender Rehabilitation Coordinator about being added to the waitlist for the ART and ASAT workbook programs. Programming may better prepare inmate Walker for eventual transition to a less restrictive environment. After Plaintiff completes ART on 5-19-2019, the 6-17-19 Ad-Seg Review states "Release from Ad-Seg for inmate Walker will require a level of humility and remorse that has thus far not been demonstrated. There is no formula or benchmark for such a demonstration – only personal growth. This is a high bar to demand for release from Ad-Seg, but the cost of an untimely release could be the lives of other inmates or correctional staff. While the committee recognizes the conundrum inherent in requiring a demonstration of growth and non-violent problem-solving while continuing administrative segregation due to the risk of violence inherent in the subject, we are unable to recommend step-down to a less restrictive environment. They periodically expresses the possibility to a less restrictive environment in their Ad-Seg reviews. (Dkt. No. 31 Exhibit 7 12-4-18 Ad-Seg Review; Affidavit Exhibit 10 6-17-2019 and 7-16-2019 reviews and, Exhibit 18 Reviews).

The Plaintiff is muslim and addressed his desire to be able to practice his religious belief while in Ad-Seg, by being able to listen to a pre-recorded Khutbah during Jumuah Service. This issue is raised in Plaintiff's 4-12-16 and 7-4-16 Ad-Seg statements, but the Defendants has never addressed the issue (DKt. No. 31 Exhibit 3 Ad-Seg Statements).

The Plaintiff wrote complaints based on Defendant Fitchette denying Plaintiff access to the Court by way of denying Plaintiff legal copies for this case. The Defendants never responded to Plaintiffs issue in their responses (DKt. No. 31 Exhibit 7 Ad-Seg Statements 9-6-2018 and 1-26-19; Exhibit 9 3-13-2019).

The Plaintiff's health has deteriorated over the 19 years he has been in S.H.U.; namely, his vision has weaked, his immune system has weakened, he has chronic Plantar Fasciitis inwhich he wears medical boots for; he has severe internal hemorrhoids and he has gastrointestinal problems (DKt. No. Exhibit; DKt. No. 16 Exhibit 2).

Plaintiff's Ad-Seg Review states a colonoscopy has been scheduled for Walker; meanwhile a year and a half has passed and the Plaintiff has not had a colonoscopy done yet. (Affidavit Exhibit 8 2-26-2019 Ad-Seg Review).

The   Plaintiff's Ad-Seg Review 12-3-19 states Plaintiff complains about his Kosher diet, meanwhile the Plaintiff has never been on a Kosher diet (Affidavit Exhibit 4 and 12)

Plaintiff don't have a written complaint based on the Controlled "A" High Fiber Diet he exist on for at least 6 months prior to 12-3-19 (Affidavit Exhibit 12)

The Plaintiff's disciplinary record and unusual incident report show the Plaintiff has not engaged in no physical acts of violence with inmates or correctional staff in the over 19 years he has been in S.H.U. (Affidavit Exhibit 13).

# POINT 1

## DEFENDANT'S VIOLATED PLAINTIFF'S DUE PROCESS LIBERTY INTEREST RIGHT AND SUBJECTED PLAINTIFF TO ATYPICAL AND SIGNIFICANT HARDSHIP WHEN THEY GAVE PLAINTIFF REVIEWS YEARS LATE OR NO REVIEWS

Plaintiff's grievance # UST-54614-14 filed on 8-14-14 was based on the illegality of his Ad-Seg treatment. The response stated in part ... "that administrative segregation inmates housed in S.H.U. will be subject to the same rules as those who have completed thirty day of satisfactory adjustment. Further, an inmate in administrative segregation shall have such status reviewed every sixty days" The sixty day review was reiterated by C.O.R.C. on 12-30-14 (Dkt. No. 31 Exhibit 1).

The Plaintiff's 8-17-16 Ad-Seg review was completed on 2-10-17 and the Plaintiff did not receive it until 2-17-17 (6 months later) Plaintiff's 1-30-17 Ad-Seg Review was completed on 7-31-17 and the Plaintiff did not receive it until 8-4-17 (over 6 months later). Plaintiff's June, 12, 2017 Ad-Seg review completed on 9-25-17 and the Plaintiff did not receive it until 12-27-17 (over 6 month later). From 8-17-16 to 12-22-17 the Plaintiff either received over a year of late reviews or no reviews at all. (Dkt. No. 31 Comp. # 16, 19 and Exhibits 3 and 6; Dkt. No. 16 Exhibit 1, Aff. Exh. 7)

On January, 24, 2019 the Plaintiff would receive 9 Ad-Seg reviews dated 9-12-17, 10-10-17, 11-07-17, 12-05-17, 1-03-18, 1-31-18, 2-28-18, 3-27-18 and 5-22-18. They are all stamped Upstate C.F. Executive Office Jan. 22-19 which indicate when the facility received them. Deducting the 30 days alotted for the Ad-Seg reviews to be completed, the 9 late reviews came up to 3,417 days (that's about 9½ years). It should be noted O'Gorman was the Deputy Commissioner, at this time. The Plaintiff raised this issue in his 1-26-19 Ad-Seg Statement and it was never responded to in their response. All the Defendants in their interrogatories stated they don't know why Plaintiff received 9 reviews at one time and they don't know if the Directive supports that (Dkt. No. 31 # 21 Exhibit 7 and 8; Affidavit Exhibit 6 Interrog. # 10).

According to the Second Circuit Court of Appeals state prisoners have a liberty interest in remaining free from administrative confinement

when a prisoner can prove (1) that the confinement creates an atypical and significant hardship and (2) that the government has granted inmates- by regulation or statute - a protected liberty interest in remaining free from that confinement (See. Frazier v. Coughlin, 81 F.3d 313, 317 (2d Cir. 1996). This is how the Second Circuit interpret Sandin v. Conner, 515 U.S. 472, 115 S. Ct. 2293, 132 L. Ed 2d 418 (1995), and this ruling was reaffirmed in Tellier v. Fields. 280 F.3d 69 (2d Circuit 2000) decision.

In respect to establishing proof of atypical and significant hardship the Second Circuit has held in Colon v. Howard, 215 F.3d 227 at 231-232 (2d Circuit 2000) (that confinement for less than 101 days under normal S.H.U. conditions is probably not atypical and significant, 305 days is, and anything in between requires close examination of the first. Being Plaintiff has existed in S.H.U. in excess of 1,300 days he has satisfied this part of the requirement; in fact the Defendants concede that Plaintiff has established a liberty interest in avoiding lengthy restrictive confinement". (Dkt. No. 14 Page 8)

The prison has by regulation stated in Directive 4933 Section 301.4(d) in part: "An inmate in administrative segregation shall have such status reviewed every sixty days". ... This directive is signed by Defendant Bellnier and dated 4-19-2016, This directive was revised on 4-18-2017 by Bellnier and Section 301.4(d) states in part: "An inmate in administrative Segregation status shall have such status reviewed every seven days for the first two months and at least every 30 days thereafter." (Affidavit Exh.1)

The Second Circuit has mandated Directive 4933 Section 301.4(d) of DOCCS regulatory code (administrative segregation status reviewed every sixty days) be followed in Proctor v. LeClaire, 846 F.3d 597 at 601-02 (2017 2d.Cir).

The Second Circuit Court of Appeals has long held that state prisoners have a liberty interest in remaining free from administrative confinement where prison regulations specify certain conditions that must be met to permit a prisoner's placement in such confinement and even as short a time as seven days was a violation. Soto v. Walker

9

, 44 F. 3d 169 at 172 (2d Cir. 1995); Russell v. Coughlin, 910 F.2d 75, 78 (2d Cir. 1990) (ten-day delay violative of due process); Gittens v. LeFevre, 891 F.2d 38, 40 (2d Cir. 1989) (seven day delay violative of due process).

The Second Circuit Court would continue this legal precedence in Tellier v. Scott, 49 F. Supp. 2d 607 (1998) who did not receive an administrative review for 522 days. The court found his due process liberty right was violated when his ad-seg reviews wasn't completed in a timely fashion. In light of this case, the Plaintiff receiving years of no reviews and over 9 years of late reviews clearly established a due process liberty interest right violation.

In Hewitt v. Helms, 459 U.S. 460, 477 n.9, 103 S.Ct. 864, 74 L.Ed. 2d 675 (1983), (held "To ensure that a state prison facility does not use Ad-Seg as a pretext to commit an inmate to the S.H.U. indefinately, the Due Process Clause of the Fourteenth Amendment mandates that prison officials periodically review whether an inmate continues to pose a threat to the facility). This periodic review mandate requirement is expounded on in more detail in Proctor v. LeClaire, 846 F. 3d 597 at 601-602 (2d. Cir. 2017). The Court held "New York effectuates that mandate provide an inmate ... with reviews conducted pursuant to title 7 (Directive 4933) Section 301.4(d) of the DOCCS regulatory code every sixty days until he is returned to the general population. In Plaintiff's case this mandate is deficient, thus making Plaintiff's constitutional right deficient.

It should also be noted there are numerous other Ad-Seg reviews that was months late or not done at all. These ones expounded on are the most significant and sufficient in establishing a constitutional violation, but the record is clear, a due process liberty interest violation exist.

# PLAINTIFF'S AD-SEG REVIEWS ARE A SHAM, ROTE, PERFUNCTORY AND A FRAUD

The Plaintiff's Ad-Seg reviews are a sham, rote, perfunctory and a fraud; namely, because the Defendants deliberately falsified information to support continued confinement. The Second Circuit has identified three criteria that meaningful periodic reviews of continued Ad-Seg confinement must satisfy: (1) the officials must actually evaluate whether the continued confinement is justified rather than simply go through the procedural motions guided by a preordained outcome (i.e, regardless of what the evidence shows); (2) the officials must evaluate whether the justification exist at the time of review or will exist in the future, considering new evidence related to changes in prison conditions and inmate behavior, although the officials are not barred from according significant weight to past events; and (3) the officials' purpose in continuing Ad-Seg must be maintaining institutional safety and security or another valid reason rather than the desire to impose punishment on the inmate, Proctor v. LeClaire, 846 F.3d 597, 610 - 11. In Plaintiff's case, the criteria has not been met in the reviews with blantingly false information being inserted into the reviews they were not meaningful it was a pretextual sham process. Proctor, 816 F.3d at 612-13.

The Defendants deliberate and malicious false statement inserted in Plaintiff's reviews to bolster and magnified the security threat Plaintiff posed would be used for years in whole and in part for years. The Defendants would state the Plaintiff assaulted the Deputy Superintendent of Security for no reason in blind rage, and they would claim this information is according to Plaintiff. It exist in Plaintiff's 12-4-15, 1-25-16, 6-27-16, 1-30-17, 6-16-17, 8-11-17, 11-7-17 and 12-05-17 Ad-Seg Reviews, in whole. Then Plaintiff statement addressing this false information in Plaintiff's 12-27-11 Ad-Seg the Defendants would not respond. The Plaintiff would Amend his complaint inserting documents in his exhibits that are in DOCCS possession from the state Court and DOCCS inwhich state specifically why Plaintiff assaulted the DSS in Green Haven. Then the Defendants would move to Dismiss Plaintiff's lawsuit on the basis that he failed to state a claim. Inside their motion the Defendants acknowledged they was

11

using that lie for years to support continued confinement, they state the assault was religiously motivated, and the Blind Rage is a misstatement (wrongly stated, false, a lie). (Dkt. No. 31 Exhibit 6  6-12-17 Ad-Seg Review, Huntley Notice, Supporting Deposition; Exhibit 7  11-7-17, and 12-05-17 Ad-Seg Review; Exhibit 9  12-27-17 Ad-Seg Statement, Dkt. No. 14 Motion to Dismiss P. 13; Dkt. No. 16 Exhibit 1,  8-14-17 Ad-Seg Review, Affidavit Exhibit 6, 12-4-15 and 2-16-16, Exhibit 7 6-27-16, 1-30-17 reviews)

After the Defendants admit the reason for Plaintiff's actions was based on religious reasons and the blind rage was a lie, they would continue to use the lies of the Plaintiff being unpredictable and attacking the Dep. without provocation, and the Plaintiff being filled with rage for years in the Ad-Seg Reviews. They would even create another major lie based on the rage to maintain the continued confinement. In Plaintiff's 2-28-18 and 5-22-18 Ad-Seg Reviews the Defendant's claim, because the O.S.S. refused to send out Plaintiff's property at the Departments expense, the Plaintiff demonstrated rage suggesting that he would have assaulted the OSS if given the opportunity. (Dkt. No. 31 Exhibit 7)

The OSS approved the Plaintiff to send his property in storage out on the visit, but told Plaintiff if he didn't get a visit or his visitor don't pick-up Plaintiff's property, the property would be destroyed the property is not going to be restored back in storage. The Plaintiff signed the disposal form that stated: The item will be held a maximum of 14 days pending arrival of a visitor. Circle your second choice for disposition in case visitor does not come or accept item. Donate to Charitable org. Or Destroy at Facility." The Plaintiff's daughter came to see him from Virginia on 3-11-17 but forgot to pick-up Plaintiff's property. The OSS extended the Plaintiff a courtesy to get another visit and told the visiting room to not destroy Plaintiff's property because the 14 days lapsed. The Plaintiff had his brother come see him on 4-9-17, but the visiting room did not give the Plaintiff's brother Plaintiff's property so the O.S.S. told the visiting room to give Plaintiff's brother Plaintiff's property and do not destroy it. Then Plaintiff's brother came on the visit on 4-23-17 and received all of

Plaintiff's property. The Plaintiff expressed gratitude to the O.S.S. as the Plaintiff has done on numerous occasions when he addressed the Plaintiff's issues. The OSS even acknowledged the Plaintiff has expressed gratitude to him for certain past occasions. All the Defendants acknowledge if the Plaintiff threatened to cause physical harm to correctional staff he would have been issued a misbehavior report. The O.S.S. adds that the Plaintiff never threatened to cause physical harm to any Correctional staff the 4 years he existed in the facility. (Affidavit Exhibit 7 Visiting Log, Disposal form for property, Exhibit 6 Interrogatories #16,17, Exhibit 16 Admissions #15)

With all the facts to expose the lies of this false claim of rage and wanting to assault the O.S.S. for not sending out Plaintiff's property at the Departments expense. The Defendant's even acknowledged Plaintiff's Ad-seg Statement in which it states how the Plaintiff likes the OSS for righting the wrongs and being fair and note that statement mischaracterize his relationship, with the O.S.S. in their response. Yet, the Defendants will continue to state Plaintiff have rage issues in Plaintiff's Ad-seg reviews as the other false claims being exposed wasn't enough, just to support continued confinement (DKt. No. 31 Exhibit 9  3-13-19;  Plaintiff's 3-26-2019).

Another blantant false claim inserted in Plaintiff's Ad-Seg reviews that would exist in there for years states: "Walker has proven his ability to obtain and craft weapons and to manipulate his environment; he purposefully obtained or created a weapon in February, 2014, while still at Clinton Correctional Facility after he found out he was being transferred to Upstate Correctional Facility. He knew possession of such contraband would result in a Tier III disciplinary action and believed that this would cause his transfer to be cancelled." This false claim would exist in whole for years in Plaintiff's 12-4-15, 2-16-16, 6-12-17, 11-07-17 and 12-05-17 Ad-seg Reviews, then it would continue to exist in Plaintiff's reviews for years in part claiming Plaintiff manipulative. The Counselor Cook would add to the review the aforementioned statement, to support continued confinement. The Plaintiff would address this false claim in his Ad-seg statements and the Defendants would never respond to it. (DKt. No. 31 Exhibit 3  4-12-16, 7-4-16 Ad-seg Reviews

13

, Exhibit 6  6-12-17, Exhibit 7 11-07-17, and 12-05-17; Affidavit Exhibit 12-4-15 and 2-16-16 Ad-Seg Reviews),

The idea of Plaintiff being notified in advance that he was being transferred is false because based on Plaintiff's security Classification and Central Monitoring Case Designation (CMC status) the Plaintiff is never notified in advance when he is transferred outside the facility. The DOCCS CERT (security unit) will come to Plaintiff's cell and they will transfer Plaintiff on the spot his property and possessions will be packed-up later. (Affidavit Exhibit 6)

The idea that the Plaintiff believed a weapon would cancel his transfer is proven false, for the Plaintiff had been in S.H.U. for 15 years at the time of this review and living in S.H.U. the Plaintiff saw numerous other inmates transferred with a weapon and other charges and the Plaintiff himself was transferred himself with a weapon charge in GreenHaven and was transferred the same day to Great Meadow Correctional Facility so Plaintiff did not believe something that was the opposite of facts inwhich he experienced and saw for himself. (Affidavit Exhibit 14 Misbehavior Report and Locator system)

The Plaintiff obtaining a weapon on purpose to obtain a Tier III is contradicted by the misbehavior report itself. The Plaintiff's misbehavior report for obtaining a weapon also had a charge for bribery inwhich the Plaintiff was accused of seeking a reward for his good behavior and good deed of giving the Captain a piece of metal he found on the floor. The seeking of a reward for a good deed do not mean obtaining a weapon charge. The Plaintiff do not like getting misbehavior reports the Plaintiff is not, nor never was a mental health patient (Affidavit Exhibit 6)

The claim Plaintiff wanted to stay in Clinton is contradicted by the fact the Plaintiff hated Clinton and sought a transfer from the facility whenever he was eligible, the Plaintiff was repeatedly placed on restraint orders, that required the Plaintiff to remain in restraints in the visiting area and the Plaintiff accused the administration of being white racist savage act (imposing the restraint orders) by

the administration to make Plaintiff's life a living hell. The Plaintiff never litigated before, in Clinton, Plaintiff would file 3 lawsuits and 3 article 78's. The reason the Plaintiff was transferred stem from Plaintiff's preliminary injunction for his lawsuit dealing with inadequate clothing and being subject to wear restraints in the exercise area. This issue forced the administration to give Plaintiff the win or transfer him and render the issue moot and they transferred the Plaintiff and rendered the issue moot. So the notion the Plaintiff wanted to stay at Clinton is totally unfounded and the fact the Ad-seg Committee never addressed the issue in Plaintiff's Ad-seg statement is because they couldn't address it without saying it was false. When the Defendants was asked if the statement was true, why it's stated in Plaintiff's Ad-seg review, do they have any documentation to support that statement they state they Deny Knowledge or information with which to respond, or simply "they have no such knowledge" and they do not have no documentation to support this statement. (Affidavit Exhibit 4,5 and 6 ; DKT No. 31 Exhibit 3 Ad-seg Statement, transfer request) Affidavit Exhibit 4 Interrogatories #7).

The Defendants not having a valid basis to support continued confinement because Plaintiff only acquired 1 tier II misbehavior report in the 6 years he has been in Ad-seg, so they created the false narratives in Plaintiff Ad-seg reviews that Plaintiff is a person enraged, filled with so much rage that he attacked the OSS for no reason, it was "blind rage". Then when this narrative is exposed to be a lie, so much that the Defendants have to admit to it's fallacy, they continue with the narrative of being unpredictable, assaulting the OSS without provocation (just excluding the word blind rage) but the Plaintiff is still presented as a person filled with so much anger and rage he wants to assault the O.SS. because he won't send out Plaintiff's Property's at the administration's expense (meanwhile, this is the best correctional staff Plaintiff ever had to deal with and he actually extended the Plaintiff a courtesy he didn't have to inorder to make sure Plaintiff was able to send out his property successfully). Then they create a narrative of Plaintiff being pretty stupid in the light of the facts, saying Plaintiff obtained a weapon on purpose to

stay in a facility he sought a transfer from, that he accused the administration of trying to make his life a living hell based on imposing restraint orders that required the Plaintiff to remain in, in the exercise and visit areas. Then the Plaintiff is said to have believed he would have a transfer cancelled if he acquired a misbehavior report for a weapon, when the Plaintiff was transferred with a weapon charge and saw other inmates transferred with weapon and other charges. Then Plaintiff's weapon charge, also had a bribery charge where the Plaintiff sought a reward for giving the Captain a weapon, and the reward Plaintiff sought was a misbehavior report to stay in that facility, the same facility the Plaintiff filed a preliminary injunction that would put the facility in a situation where they had to transfer him in order to dismiss his issue. Then this super stupid inmate is able find out he is being transferred when he is never notified of a transfer in advance because of his security classification and CMC status. Then this is all done to explain how manipulative the Plaintiff is, how he manipulates the system. These narratives exist in Plaintiff's Ad-Seg Reviews for years and supports the continued confinement. Regardless of how illogical, exposed to be false, unsupported and ridiculous these narratives are, they continued for several years. These false claims, are a pretextual effort to bolster their preconceived desire to retain Plaintiff in Ad-Seg as punishment for his past violence against correctional staff (H'Shaka v. Gorman 2020 WL 1188075 at 10). The Court must evaluate only whether Defendants' method for coming to their Ad-Seg determinations is sufficient. Proctor, 846 F.3d 608, in Plaintiff's case the determination is insufficient.

The Plaintiff sought to know what he could do to be released from Ad-Seg, after years of inquiring in the Ad-Seg statement, Plaintiff's Ad-Seg Review states "the committee recommends that inmate Walker speak with his Offender Rehabilitation Coordinator about being added to the waitlist for ART and ASAT workbook programs. Programming may better prepare inmate Walker for eventual transition to a less restrictive environment." Plaintiff's 12-4-18 states this. Furthermore, there is no ASAT workbook program (DKt.No. 31 Exhibit 7 12-4-18 Ad-Seg Review, Aff. Exh 10 6-17-19 review)

16

The Plaintiff would complete the ART workbook program on 5-19-2019 but his 6-17-19 Ad-Seg review removes the goalpost and states: "Release from Ad-Seg for inmate Walker will require a level of humility and remorse that has thus far not been demonstrated. There is no formula or benchmark for such a demonstration - only personal growth. This is a high bar to demand for release from Ad-Seg, but the cost of an untimely release could be the lives of other inmates or correctional staff. While the committee recognizes the conundrum inherent in requiring a demonstration of growth and non-violent problem-solving while continuing administrative segregation due to the risk of violence inherent in the subject we are unable to recommend step-down to a less restrictive environment. (Affidavit Exhibit 3 ART Forms, Exhibit 10 6-17-19 Ad-Seg Review).

Even this designed impossible benchmark is met and expounded upon over a year and a half earlier in Plaintiff's 12-27-17 Ad-Seg statement it states: "I regret what I did in my past in respect to assaulting Correctional Staff (a show of remorse) and I have never done it again. In fact I haven't assaulted anybody in over 17 years. It's not because it can't be done, since I've been in S.H.U. I've seen hundreds of assaults with other inmates, but in my case I've refrained from violence because I don't want to engage in violence. I've learned to address my grievances through litigating which I have done for over a decade and I've and I've learned to have patience and accept the reality that violence is not always the answer or a viable option... I've learned to accept the repurcussions of my actions and hope and expect the best of some human decency through the litigation process... Living in this environment not knowing how to litigate or deal with the matter I exercised poor judgment to exercise violence with violence. Like I said that wasn't the answer and regret what I've done, and never did it again and don't want any problems. I've demonstrated my acts of non-violence and even saw a little circular piece of metal on the floor and picked it up off the floor, and when I saw Captain Lucia come on the company a man who harassed me for years at Clinton. I gave it to him and let him know he didn't have to see me as a bad person and he could treat me better" (Dkt. No. Exhibit 9, 12-27-17 Statement)

17

The fact Plaintiff has never displayed any physical acts of violence in over 19 years indicates personal growth, that also demonstrate their is no violence inherent in Plaintiff. The fact the Plaintiff didn't know how to litigate and now resolves his issues through the non-violent problem solving mechanism demonstrates personal growth, especially since he has done it consistently for over a decade. The fact the Plaintiff express regret for his actions is a show of remorse (according to the definition of remorse). Then as a muslim the Plaintiff who have to deal with being in the box for 20 years, still get on his knees and puts his face on the ground asking for Allah, his creator to forgive him for his sins. This creator he cannot see, nor do the God answer him back the way a human will. There is no greater show of humility than this. The fact the Plaintiff went from acquiring 13 misbehavior reports during his disciplinary segregation period, to 1 misbehavior report during his Administrative segregation period and it was a tier II clearly indicates personal growth. Furthermore, it should be noted Plaintiff's behavior was good enough for him to acquire numerous time-cuts from different persons in the administration while in Clinton. In addition to that, Plaintiff's Ad-Seg Reviews has for years consistently contains language indicating good behavior for example Plaintiff's 7-16-2019 states: "Inmate Walker keeps his cell in good order and maintains good personal hygiene. Inmate Walker has had maintained appropriate behavior and it is reported that he continues with his self-studies. OMH staff and medical raised no concerns during this report period. Inmate Walker's interactions with staff are appropriate. Inmate Walker is currently a PIMs level III. Inmate Walker utilizes his phone and visitation privileges, his last visitor being on July, 14, 2018. He successfully completed the ART workbook program on 5-19-2019. He continues to participate in Cell Study." There is similiar language in the Courts Report-Recommendation and Order, and even the Ad-Seg Review committee has suggested the possibility of a less restrictive environment on numerous occasions based on Plaintiff's good behavior. (Dkt No. 18 Report-Recommendation pages 8-9; Affidavit, Exhibit 18, Exhibit 10 6-17-2019, and 7-16-2019 Reviews; Exhibit 13 Disciplinary Record and Unusual Incident Reports; Exhibit 2 Time-Cut forms)

Therefore, in light of the aforementioned facts, the Plaintiff's reviews were a sham, they was done in a rote, perfunctory

and illegitimate manner. (See Proctor v. LeClaire 846 F.3d 597 at 613 held " The review paperwork also contains inexplicable logic that raises concerns whether the underlying reviews were conducted genuinely"); and Proctor at 614 quoting Williams v. Hobbs, 662 F.3d 994, at 1002 (8th Cir. 2011) (held " relying on prison warden's attribution of inmate's "years of incident free conduct to his isolation from the general population" as evidence of meaningless reviews).

In Giano v. Kelly, 869 F.Supp. 143 at 150-151 (W.D.N.Y. 1994) quoting Mims v. Shapp. 744 F.2d 946 (3rd Cir. 1984) states: " Mims involved an inmate named Burton who, while serving a sentence for the murder of a police officer, participated in the killing of a Deputy Warden. Burton subsequently served over five years in administrative segregation and was released only after a court order." They found Burton due process right were violated when his     behavior gradually improved and his Ad-seg Reviews consistently disregarded his good behavior and the lack of a threat in which he posed was a pattern in maintaining him in continued confinement. The court stated to insure that periodic review does not become simply a sham, the content,       and substance of that review must be scrutinized under illumination of the fourteenth amendment at 953-54 Mims Supra. The third circuit ruled that a plaintiff who remained in a restricted housing unit for a full year with no more than a review was denied due process finding that "Over time reasons which would have justified (the Plaintiff's) early detention in administrative custody were applied in rote fashion in later reviews when experience should have led officials to let (the Plaintiff) into the general population.

The Court in Zimmerman v. Seyfert, No: 9:03-CV-1389 (TJM), 2007 WL 2080517 at 19 (N.D.N.Y. 2007) (held "Regardless of plaintiff's good behavior in administrative segregation/SHU, the reviewers continued to find that Plaintiff was a threat to security." In Covino v. Vermont Dept of Corrs., 933 F.2d 128, 130 (2d. Cir. 1998) (the Court held " at some point... the administrative necessity for involuntary lock-up begins to pale." A nine-month Administrative Segregation "smacks of punishment"). Removing the false claims Plaintiff's case overshadows all the aforementioned cases that contain legal precedence.

POINT 3
# PLAINTIFF DENIED THE RIGHT TO BE HEARD

Directive 4933 Section 301.4-d-4 states in part: "Prior to your next review, you may write to the Superintendent or designee to make a statement regarding the need for continued administration segregation. The reasons stated in this notice, any written statement that you submit, as well as your overall custodial adjustment will be considered during the next scheduled review." (Affidavit Exhibit 1).

The Plaintiff has submitted numerous statements addressing issues of a constitutional magnitude and the Defendants has not considered it or addressed it at all in subsequent Ad-Seg reviews, the issues are as follows:

The Plaintiff's 8-17-16 Ad-Seg Review was not received until 2-17-17 (over 6 months later), on January, 24, 2019 the Plaintiff would receive 9 reviews and it came up to being 9½ years (or 3,417 days) late. These late reviews was addressed in Ad-Seg statements but was never responded to. (Dkt. No. 31 Exhibit 6 6-2-17, Exh 7 1-26-19 statement)

For years the Defendants claimed the Plaintiff sought to stop a transfer that he knew existed and purposely obtained a weapon, believing a misbehavior report would cancel the transfer. This is how Plaintiff tried to manipulate his environment. This false claim would be raised in multiple Ad-Seg reviews, but never responded to. (Dkt. No. 31 Exhibit 3 4-12-16, 7-4-16 statements)

For years the Defendants claim the Plaintiff assaulted the OSS without provocation just in blind rage, the Plaintiff would address this false claim in his Ad-Seg statements but it was never responded to. (Dkt. No. 31 Exh. 9 12-27-17 Ad-Seg Statement)

The Plaintiff sought to practice his religious belief while in S.H.U. providing the administration with a viable option on how the Plaintiff could participate in Jummah services and the Defendants never responded in their Ad-Seg Review (Dkt. No. 31 Exhibit 4-12-16, 7-4-16 and Exh. 6 6-2-17 Ad-Seg Statements)

The Plaintiff has been subject to an illegal cell shield in which the Defendants have no valid justification for and the Plaintiff raised this issue in his Ad-Seg Statements and received no response (DKt. No. 31 Exh. 3  7-4-16  Exhibit 6  6-2-2017 Ad-seg statements)

The Defendant Fitchette has repeately denied Plaintiff access to the court by way of legal copies and the Plaintiff has addressed this in multiple Ad-Seg statements and has never received a response from the Ad-Seg Review Committee (DKt. No. 31 Exh. 7  9-6-18, 1-26-19 Ad-Seg statements).

The Plaintiff sought to have the Defendants to consider all his health issues as a mitigating factor for him to be released from Ad-Seg. The Defendants are required to discuss factors such as the inmate's medical health, discuss any statements that the inmate has made about being in Ad-Seg, letters that the inmate has sent, concerns that the inmate has about being in Ad-Seg, and interactions that the facility has noted between the inmate and others. These discussions take place on a facility level and Central Office Committee level. The Defendants has made mention of certain health issues, but they have never considered it as a factor in why Plaintiff should be released from Ad-Seg because the Plaintiff no longer pose a threat due to the multitude of debilitating health issues the Plaintiff is dealing with having been in S.Hll. for 20 years. This issue has been raised in an Ad-Seg statement and has never been responded to. The Defendants hasn't taken Plaintiff's medical issues seriously, this is demonstrated in the Ad-Seg Review in which they claim Plaintiff's gastrointestinal issues are being addressed and he has been scheduled for a colonoscopy, Yet, Plaintiff has not had a colonoscopy and over a year and a half has passed. Or it can bee seen with the falsely claim Plaintiff complains about his Kosher diet and the Plaintiff has never been on a Kosher diet and there is no complaint based on the high fiber diet the Plaintiff is on, at least 8 months prior to that review. (H'shaka v. O'Gorman 2020 WL 1188075 at 5, 7 #75, 89 92, 93 and 97) (DKt. No. 31 Exhibit 9  12-27-17 Ad-Seg Statement, Exhibit 10 Medical Records, Affidavit Exhibit 8  2-26-2019 Ad-Seg Review, Exhibit 12  12-3-19 Ad-Seg Review, Controlled "A" High Fiber Diet, Rabbi denying Kosher diet, Exhibit 4 lawsuit denying Kosher Diet).

All of the aforementioned issues raised in Plaintiff's Ad-Seg statements that has never even been acknowledged in the Ad-Seg review is a testament as to how the Ad-Seg reviews were rote, perfunctory, a sham and illegitimate, because the Defendants failed to provide a review that was legitimate where Plaintiff's was heard or there was some indication that the information is actually considered ( See. Edmenson v. Coughlin 21 F.Supp. 2d 242, 253-54 (W.D. N.Y. 1988)

It is well established that whenever process is constitutionally due, no matter the context, " it ... must be granted at a meaningful time and in a meaningful manner." Armstrong V. Manzo 380 U.S. 545, 552, 85 S.Ct. 187, 14 L.Ed. 2d 62 (1965); accord Parratt v. Taylor, 451 U.S. 527, 540, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981); Matthews v. Eldridge, 424 U.S. 319, 33, 47 L.Ed. 2d 18 (1976); Goldberg v. Kelly 397 U.S. 254, 267, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); Taylor v. Rodriguez, 238 F.3d 188 at 193 (2d. Cir. 2001). Plaintiff measures what Hewitt requires for meaningful periodic review of Ad-Seg Guiding that analysis are the three Matthews factors — the government interest in limited fiscal and administrative burdens, the private interest in freedom from restraint, and the risk of an erroneous deprivation of [the private] interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards." 424 U.S. at 335, 96 S.Ct. 893. In regard to Plaintiff's case the Defendants abandoned and totally disregarded Plaintiff's right to be heard and interest in freedom from confinement and risk of an erroneous deprivation of Plaintiff's interest through the procedure used for his Ad-Seg review.

Proctor V. LeClaire, 846 F.3d 597 (2017) Second Circuit decision at 610 cites Mims v. Shapp. 744 F.2d 946 at 951-52 (3d Cir. 1984) (holding " an inmate who has spent an extended period of time in Ad-Seg and whose term is potential limitless has a more significant liberty interest for due process analysis than that attributed to Helms."

22

# DEFENDANT'S ARE NOT ENTITLED
## TO QUALIFIED IMMUNITY

The Deputy Commissioners Bellnier and O'Gorman were the one's responsible to make the determination to retain or release Plaintiff from Ad-Seg according to Directive 4933 Section 301.4. The other Defendants on the Ad-Seg Committee were personally responsible for the Plaintiff being retained in Ad-Seg because according to Black v. Coughlin, 76 F.3d. 72, 74 (2d. Cir. 1996), the Court held supervisory personnel may be considered "personally involved if "1. The defendant participated directly in the alleged constitutional violation; 2. The defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong; 3. The Defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom; 4. The Defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or 5. the Defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. In Plaintiff's case all of them can be applicable but the first one applies overwhelmingly.

Defendant's Uhler, Woodruff, Fitchette and Cook are not entitled to qualified immunity because of their defacto power, Giano v. Kelly, No. 98-CV-727 (C) 2000 WL 876855 at 23 (W.D. N.Y. May, 16, 2000) (held" Defendant's do not receive qualified immunity because their recommendations that has repeatedly been used to retain Plaintiff in Ad-seg status establish they were personally involved and thus liable, where they exercised de facto power over a Plaintiff's continued confinement". The Defendants in Plaintiff's case not only recommended Plaintiff be retained in Ad-Seg, they also responsible for the false information inserted into Plaintiff's Ad-seg reviews which substantial being the Plaintiff has never met or spoken with any Deputy Commissioner, all they had to make their determination on is the information provided to them by the Defendants. Furthermore, they Deputy Commissioners didn't remedy the wrong in most cases when they were made aware of it in Plaintiff's Ad-Seg statements, while they were aware unconstitutional acts were occurring. Also see H'Shaka v. O'Gorman 2020 WL 1188075 at 14

23

# CONCLUSION

Foregoing reasons, the Plaintiff respectfully ask the Court to grant Plaintiff's summary judgment in it's entirety.

Dated: August, 12, 2020
Malone' New York

Tyrone Walker

Tyrone Walker 94A5258
Upstate Correctional Facility
P.O. Box 2001
Malone, N.Y. 12953

24