# EXHIBIT

# #1

Directive 4933

| NEW YORK STATE **Corrections and Community Supervision**<br><br>**DIRECTIVE** | TITLE<br><br>**Special Housing Units** | NO.<br>4933 |
|---|---|---|
| | | DATE<br>04/18/2017 |

| SUPERSEDES<br>DIR# 4933 Dtd. 04/19/2016 | DISTRIBUTION<br>A B | PAGES<br>PAGE 1 OF 25 | DATE LAST REVISED<br>08/16/2018 |
|---|---|---|---|
| REFERENCES (Include but are not limited to)<br>7 NYCRR Chapter VI, Parts 300-305<br>Directive #4040, 4202, 4421, 4422, 4910, 4932, 4948, 4101 | APPROVING AUTHORITY | | |

Parts 300 - 305 appear in Title 7 NYCRR, Chapter VI.   Sections I-III only appear in this directive.

| Part 300 | General Provisions | - 1 |
| Part 301 | Special Housing Unit Admissions | - 2 |
| Part 302 | Admission Procedure | - 5 |
| Part 303 | Progressive Inmate Movement System (PIMS) | - 9 |
| Part 304 | Services | - 11 |
| Part 305 | Controls/Restrictions/Restraints | - 16 |

| Section I | Operations   - 20 |
| Section II | Special Housing Unit Supervision - 23 |
| Section III | Inspections - 23 |

## PART 300
## GENERAL PROVISIONS
### § 300.1 Purpose

(a)   To establish standards for the operation of special housing units (SHUs) at the Department's facilities.  Unless otherwise provided, the provisions contained herein apply to designated SHUs only.

(b)   Set forth herein are the minimum conditions of confinement for inmates admitted to SHUs pursuant to Part 301 of this directive.  These inmates shall be housed in an area designed to maximize facility safety and security.

(c)   Whenever the provisions of any section of this directive are inconsistent with the provisions of a Federal or State court order, such court order will be controlling.

### § 300.2 Definition

(a)   The Superintendent may, by written order, designate certain areas or cells as SHUs.  A copy of any such designation shall be transmitted to the Commissioner immediately for approval by the Commissioner or designee.

(b)   A SHU, in maximum security facilities, as well as in designated medium security facilities, shall consist of single or double-occupancy cells grouped so as to provide separation from the general population, and may be used to house inmates confined to such units pursuant to 7 NYCRR Part 301, as well as such other inmates as approved by the Commissioner or designee.

## PART 301

## SPECIAL HOUSING UNIT ADMISSIONS

**§ 301.1 Purpose:**  Inmates may be admitted to SHUs for any of the several situations described in this Part.

**§ 301.2 Disciplinary admissions**

(a)   Disposition of Superintendent's (Tier III) hearing for a designated period of time, as specified by the Hearing Officer (Directive #4932, "Chapter V, Standards Behavior & Allowances," Section 254.7).

(b)   Upon transfer from another facility's SHU while serving a disciplinary disposition rendered at the former facility.

**§ 301.3 Detention admissions**

(a)   Detention admissions may be used in the following cases:

(1)   In the case of an inmate who is awaiting initial appearance before or determination of a disciplinary hearing or Superintendent's hearing;

(2)   In cases where an inmate is received from another correctional facility and his or her record in the other facility raises a reasonable question as to whether he or she is presently ready to adhere to the Department's rules and policies governing inmate behavior; or

(3)   In cases where an inmate is awaiting transfer from Southport Correctional Facility or a double-celled SHU.

(b)   In the case of a detention admission that occurs upon receipt of a transferred inmate from another institution, the purpose of such detention shall be solely to ascertain the manner in which the inmate will conduct himself or herself in the present correctional facility; provided, however, that a disposition pursuant to a Superintendent's hearing in another facility may be carried out in the facility to which an inmate is transferred, and in such case the admission shall be considered to be a disciplinary admission and the provisions of subdivision (c) of this section shall not apply.

(c)   In the case of any detention admission, if a misbehavior report has been issued, the provisions of Directive #4932, Section 251-2.2, shall be applicable.  If a misbehavior report or a notice directing involuntary protective custody or administrative segregation has not been issued, the facility's Deputy Superintendent for Security or a Watch Commander shall review the detention admission inmate's status at least once every 24 hours.

**§ 301.4 Administrative segregation admissions**

(a)   This section applies to inmates assigned involuntarily to SHU after a hearing conducted pursuant to Directive #4932 Section 254 that result in a hearing disposition that sets forth specific reasons why administrative segregation is warranted.  The hearing shall be conducted within 14 days of an inmate's admission to administrative segregation, after issuance of an administrative segregation recommendation made by the employee who ascertained the facts or circumstances.

(b)  Administrative segregation admission results from a determination by the facility that the inmate's presence in general population would pose a threat to the safety and security of the facility.

(c)  An inmate in administrative segregation status will upon admission to SHU be placed in Level II of the Uniform Progressive Inmate Movement System (PIMS) Program and be afforded the opportunity to earn established PIMS incentives.

(d)  An inmate in administrative segregation status shall have such status reviewed every seven days for the first two months and at least every 30 days thereafter. Form #2170, "Administrative Segregation Review," shall be used to record the report(s), any recommendation and the decision. The procedure is as follows:

    (1)  A three-member committee consisting of a representative of the facility executive staff, a security supervisor, and a member of the guidance and counseling staff shall examine the inmate's institutional record and prepare and submit to the Superintendent or designee a report setting forth the following:

        (i)  Reasons why the inmate was initially determined to be appropriate for administrative segregation;

        (ii)  Information on the inmate's subsequent behavior and attitude; and

        (iii)  Any other factors that they believe may favor retaining the inmate in or releasing the inmate from administrative segregation.

    (2)  Upon receipt of the report and any written statement received from the inmate, the Superintendent shall, except where the Superintendent or designee refers the matter to central office pursuant to paragraph (3) below, make a determination to retain the inmate in or release the inmate from administrative segregation.

    (3)  Where the Deputy Commissioner for Correctional Facilities has notified the Superintendent that an inmate in administrative segregation is to receive central office review, the Superintendent or designee shall as part of every review thereafter, refer the committee report, and any written statement received from the inmate, to a three-member central office committee consisting of a representative from the Office of Facility Operations, a member of the Department's Office of Special Investigations, and an attorney from the Office of Counsel. The central office committee shall then complete its review and forward the paperwork along with its recommendation to the Deputy Commissioner for Correctional Facilities. Upon receipt of the materials from the central office committee, including any written statement received from the inmate, the Deputy Commissioner shall make the determination to retain the inmate in or release the inmate from administrative segregation.

    (4)  As part of every review, whenever a determination is made to continue the inmate in administrative segregation, the Superintendent or, as applicable, the Deputy Commissioner for Correctional Facilities, shall provide a notice to the inmate that states the reason(s) for the determination and includes the following statement:

    "A determination has been made to continue your administrative segregation status for the reason(s) stated in this notice. Prior to your next review, you may write to the Superintendent or designee to make a statement regarding the need for continued administrative segregation. The reason(s) stated in this notice, any written statement that you submit, as well as your overall custodial adjustment will be considered during the next scheduled review."

(e)   At any time when deemed appropriate, an inmate may be evaluated and recommended for return to general population at the current facility or transferred to another facility where it is determined the inmate may be programmed into general population.  Nothing in this subdivision shall be construed to terminate the administrative segregation status of an inmate who is subject to central office review in accordance with paragraph (3) of subdivision (d) of this section upon the inmate's transfer to another facility, absent written authorization from the Deputy Commissioner for Correctional Facilities.

**§ 301.5 Protective custody inmates:**  An inmate in protective custody status may be housed in a SHU. Inmates in this status shall upon admission be placed in the PIMS Level II and be afforded the opportunity to earn established PIMS incentives.  An inmate in this status shall be subject to reviews as outlined and in accordance with Directive #4948, "Protective Custody Status."

**§ 301.6 Keeplock admission**

(a)   An inmate in a medium or minimum security facility or Upstate Correctional Facility may be admitted to a special housing unit for reasons such as, but not limited to, the following:

   (1)   Awaiting disposition of a disciplinary (Tier II) or Superintendent's (Tier III) hearing;

   (2)   For confinement pursuant to a disposition of a disciplinary (Tier II) hearing or Superintendent's (Tier III) hearing; or

   (3)   Awaiting transfer to another facility.

(b)   An inmate in any correctional facility may be admitted to a special housing unit for confinement pursuant to a disposition of a disciplinary (Tier II) or a Superintendent's (Tier III) hearing, where the disposition included a determination that the inmate violated rule 106.11 for failure to comply with a direct order to provide a DNA sample.

(c)   When a Keeplock sanction is imposed and is served in a SHU cell, service of the sanction will be created at the rate of three days for every two days served in the SHU cell.

**§ 301.7 Other admissions**

(a)   An inmate may be admitted to a special housing unit for any other reason, with the approval of the Deputy Commissioner for Correctional Facilities.  The inmate shall be allowed the opportunity to be interviewed by an official designated by the Superintendent concerning the inmate's placement in a SHU.

(b)   When housed in SHU, such inmates shall upon admission be placed in Level II of the PIMS Program and be afforded the opportunity to earn established PIMS incentives.

**PART 302**

**ADMISSION PROCEDURE**

**§ 302.1 Guidelines:**  Whenever an inmate is admitted to a SHU, a security supervisor will be present and the inmate will:

(a)   Undergo a strip-frisk followed by a hand-held metal detector, portable metal detector and/or BOSS chair search in accord with the provisions outlined in Department directives concerning "Control of and Search for Contraband."

*Note:  An inmate being transferred from another facility shall not be strip-frisked upon admission without probable cause.  The metal detector search shall be conducted by the receiving facility.*

(b)　Admission Examinations and Assessments:

    (1)　Be medically evaluated.  Health Services staff will be informed immediately and the inmate will be examined by a registered nurse from the facility Health Services staff as soon as possible, but no later than 24 hours after admission.  The registered nurse will complete Form #3278MH, "Mental Health Screening for Reception/Classification, Transfers, SHU or Separate KL Unit, or Juvenile Separation Unit Admissions," Form #3278MED, "Health Screening for Reception/Classification, Transfers, SHU or Separate KL Unit, or Juvenile Separation Unit Admissions," Form #3278-PREA, "PREA Screening for Reception/Classification, Transfers, SHU or Separate KL Unit, or Juvenile Separation Unit Admissions."

       Those inmates who were involved in a fight, a use of force, or a use of chemical agent incident will be examined immediately.  When allegations of sexual assault are present, the inmate will be examined by Health Services staff immediately.

    (2)　A suicide prevention screening instrument will be completed by the SHU/Separate KL Unit Security Supervisor in accordance with Directive #4101, "Inmate Suicide Prevention" for all inmates immediately upon admission to any SHU or separate keeplock (KL) housing unit.  If an inmate is taken to the infirmary on the way to SHU/KL, the suicide prevention screening Form #3152-SHU-KL is not to be completed until the inmate is in the SHU or separate KL housing unit admission area.

(c)　Receive a mental health assessment by Office of Mental Health (OMH) staff within one working day of admission at all correctional facilities designated as OMH level 1 or level 2 and within 14 days of admission at all correctional facilities designated as OMH level 3 or 4 SHU.  Reference §304.5 of this Directive.  The inmate will receive a copy of all rules (in Spanish when applicable) pertaining to the unit and be permitted to discuss these rules with a member of the SHU staff.

(d)　Be assigned to a cell within the SHU.

    (1)　Each cell shall be heated adequately for comfort, as well as being lighted adequately to permit reading. Each cell shall be equipped with the following:

        (i)　One toilet and sink;

        (ii)　One mattress per occupant;

        (iii)　One bed per occupant;

        (iv)　One pillow per occupant; and

        (v)　One adequate storage container for clothes and personal belongings.

    (2)　An inventory of cell equipment will be taken in the presence of the inmate.

    (3)　A statement to the effect that all equipment listed is present and in an undamaged state shall be signed by the inmate and the Officer in charge of the SHU.  If the inmate refuses to sign, a statement to that effect will be affixed to the list, signed by the Officer.

**§ 302.2 Issue items (initial)**

(a)　Clothing

    (1)　All new admissions to the SHU shall be provided with a clean State-issue set of clothing from an established SHU inventory.  The following items shall be provided immediately after the required search:

    (i)     1 pair of pants;

    (ii)    1 shirt;

    (iii)   1 set of underwear (including bra for female inmates or those requiring due to gender identity); and

    (iv)   1 pair of slippers (where available; if not available, 1 pair of sneakers).

*Note: Inmates who have previously been issued and possess gender confirming undergarments (e.g., female underwear and bras for an inmate in a male classified correctional facility) due to their gender identity will have their underwear and bra returned to them following the required admission search. In cases where the underwear or bra are in a condition that prohibits its return to the inmate, staff will retrieve these items from the inmate's personal property for issuance to the inmate following the thorough searching of these items.*

(2)    After the inmate is secured in a cell, the following State-issue items shall be provided for both male and female inmates:

    (i)     1 sweat shirt;

    (ii)    1 pair of socks; and

    (iii)   1 pair of sneakers (if not already provided).

Female inmates shall be provided with basic feminine hygiene items as required.

*Note: Three additional State-issue pants, two additional State-issue shirts and three additional State-issue sets of underwear (including bras for female inmates or those requiring due to gender identity) and socks shall be provided within 72 hours of admission from the inmate's property.*

(3)    Subsequent to admission, the above-listed initial issue items (other than underwear and socks) may be replaced by the same State-issue items from the inmate's property. If replaced, the initial issue items shall be laundered and returned to the SHU inventory for future admissions.

(b)    Bedding/flatwork: Upon admission, each inmate will be issued the following State-issue items:

(1)    1 set sheets;

(2)    1 towel;

(3)    1 pillowcase;

(4)    1 washcloth; and

(5)    1 blanket.

(c)    Toilet articles: As soon as possible, but no more than 24 hours after admission, each inmate will be issued the following State-issue toilet articles, which will be replaced as needed:

(1)    1 bar soap (1 oz. size);

(2)    1 plastic comb;

(3)    1 toothbrush (mini);

(4)    1 roll toilet tissue; and

(5)    1 tube toothpaste.

(d)    Writing materials: Upon request, each inmate will be issued the following writing materials:

(1)    writing paper;

    (2)    envelopes; and

    (3)    mini pen (once issued, will only be replaced on an exchange basis).  Note:  Upon request of the inmate for the purpose of completing legal work (facilitating production of 3-5 carbon copies), a flexible barrel mini pen (if issued) shall be exchanged for a stiff barrel mini pen, unless a deprivation order has been issued.

(e)    Headphones/Earbuds (facility issue only, if cells are equipped with a jack);

*Note:  In facilities not equipped with jacks, inmates will be allowed to have their personal radios/tape players for use with an earplug, no tapes permitted.  Batteries may be purchased from the commissary.*

(f)    Personally owned items:  Inmates may request personally owned items as specified in this subdivision.  Permitted items will be thoroughly searched before delivery.

    (1)    As soon as possible, but no more than 24 hours after admission, inmates will be permitted the following personally owned items:

        (i)    1 pair eyeglasses, prescription only;

        (ii)    1 hearing aid, prescription only;

        (iii)    dentures;

        (iv)    prescription medicines as authorized by medical staff;

        (v)    denture cleanser (effervescent tablet form only; a cup may be issued for use); and

        (vi)    denture adhesive (one 2.4 Oz. tube only; to be issued on a use-and-exchange basis).

    (2)    Within 72 hours of admission, each inmate will be permitted the following personally owned items:

        (i)    1 religious book;

        (ii)    1 prayer rug;

        (iii)    1 religious pendant and chain or cord;

        (iv)    tarot cards;

        (v)    1 prayer shawl;

        (vi)    tefillin;

        (vii)    talit katan;

        (viii)    1 kufi, yarmulke, fez, khimar or tsalot-kob;

        (ix)    rosary or dhikr beads;

        (x)    1 plain wedding band;

        (xi)    photographs (maximum of 10);

        (xii)    personal mail, up to 20 letters of the inmate's choice;

        (xiii)    address book (no spiral binding);

        (xiv)    stamps;

        (xv)    1 calendar (no spiral binding);

        (xvi)    personal legal materials (i.e. papers, transcripts, briefs);

*Note: May be limited to materials related to active cases; quantity should not constitute a fire hazard; questions shall be referred to the Office of Counsel.*

    (xvii)    books, magazines and newspapers (maximum of 5);

    (xviii)   legal books and publications (maximum 15);

    (xix)    1 shampoo (issued only during shower);

    (xx)    1 shaving cream/soap (issued only during shower)

*Note: Inmates in double-occupancy special housing units shall be provided with State-issue shampoo and shaving cream while in PIMS Level I status.*

    (xxi)    one unsealed medicine bag;

    (xxii)   one rosette;

    (xxiii)   one small pouch of sacred herbs (excluding tobacco products); and

    (xxiv)   one knit cap, green.

*Note: on request, a Native American inmate will be provided one facility-issued disposable ashtray for smudging, to be replaced on a one-for-one basis.*

(g)    Denial of specific items:  If possession of any item specified in subdivisions (a)-(f) of this section is determined to present a threat to the safety and security of staff, inmates, or State property, an inmate may be deprived of specific items upon issuance of a deprivation order (see section 305.2).

(h)    Other property

    (1)    All other inmate property not mentioned above will be confiscated upon admission and securely stored in accord with the provisions of Department directives concerning "Inmate Property; Temporary Storage of Personal Belongings," until the inmate is released or transferred from the SHU.

    (2)    All items confiscated will be inventoried by the Officer in charge within five days of admission and the inventory sheet will be signed by the Officer and the inmate.  If the inmate refuses to sign, that refusal will be so noted and signed by a witnessing Officer. A copy of the signed inventory sheet will be given to the inmate.  To avoid claims of improper handling of property, the inmate should be permitted to view the inventory in process.  However, if it is determined by the area supervisor that the inmate's presence may pose a threat to the safety and security of the facility, permission may be denied upon issuance of a deprivation order (see section 305.2).

(i)    Correspondence:  Upon admission, each inmate in addition to the items authorized above or mandated by law will be granted the right to receive and send privileged or personal correspondence.

    (1)    Within 72 hours of admission, and every 30 days thereafter, an inmate may make a special stamp buy in accordance with the provisions of Directive #4422, "Inmate Correspondence Program."

    (2)    If an inmate has sufficient funds in his or her inmate account, the inmate may also purchase postage by attaching a disbursement form to the correspondence. (See Directive #4422)

(j)  Other privileges

   (1)  Visiting:  Except as a result of a visitation sanction at a Superintendent's proceeding or as otherwise provided by this Part, no inmate shall be deprived of the visiting privileges available to inmates in the general population.

      (i)  One non-legal visit per week will be permitted during visiting hours scheduled by the facility and may be increased in accordance with the PIMS (See Attachment A) (See Section 303.1).  There will be no limits on the number of legal visits, subject to reasonable scheduling.

      (ii)  Visits for persons in special housing units shall be in accordance with any special precautions deemed necessary or appropriate by the Superintendent of the facility.  Such special precautions may include, but are not limited to, restriction to noncontact visiting for all visits or with a specified visitor or visitors; denial of visiting with a specified visitor or visitors; or other special precautions to maintain the safety, security or good order of the Department or its correctional facilities.  However, no employee shall be permitted to monitor the content of conversation between an inmate and his or her legal or spiritual advisor.

      (iii)  An inmate serving a penalty of confinement to a special housing unit pursuant to Directive #4932, Section 254, shall be subject to the provisions regarding visitation contained in this Part, regardless of the location of actual confinement.

   (2)  Telephone calls to be completed in accordance with the PIMS (See Attachment A) (See Section 303.1).  Emergency calls and legal telephone calls as approved by the Superintendent, and if requested by the inmate, within 24 hours of an inmate's arrival at a new facility a staff person designated by the Superintendent, usually from the Guidance and Counseling Unit, shall make an arrival telephone call to a person of the inmate's choice to inform them of the inmate's transfer.

   (3)  No packages may be received at any time by a PIMS Level I or II inmate in a SHU except books, periodicals and legal materials.  PIMS Level III and IV may receive packages in accordance with the PIMS (See Attachment A) (See Section 303.1).

## PART 303

## PROGRESSIVE INMATE MOVEMENT SYSTEM (PIMS)

### § 303.1 Procedures

(a)  A uniform behavioral incentive program – PIMS has been established for all Special Housing Units (SHUs) with progressive increase in privileges in accordance with the PIMS level table (See Attachment A).  Upon admission to SHU, inmates will be assigned to the PIMS as follows:

   (1)  Disciplinary Admissions will begin at PIMS Level I, and their time in PIMS I shall be calculated as of the date their SHU sanction begins.

   (2)  Detention Admissions will begin at PIMS Level I, and their time in PIMS I shall be calculated as of the date of admission to SHU.

   (3)  Administrative Segregation Admissions will begin at PIMS Level II, and their time in PIMS II shall be calculated as of the date their administrative segregation hearing disposition begins.

(4)   Protective Custody Admissions will begin at PIMS Level II, and their time in PIMS II shall be calculated as of the date of admission to SHU.

(5)   Keeplock Admissions will begin at PIMS Level I, and their time in PIMS I shall be calculated as of the date their Keeplock sanction begins.

(6)   Other Admissions will begin at PIMS Level II, and their time in PIMS II shall be calculated as of the date of admission to SHU.

(7)   SHU to SHU Admissions will maintain the PIMS Level attained at the previous correctional facility SHU.

(b)   Inmates that complete a period free of regressions, deprivation orders, or misbehavior reports, will be eligible for the progressive increases in privileges by PIMS Level.

(c)   Actions resulting in regressions, deprivation orders, or misbehavior reports during the initial PIMS Level I period may result in a loss of privileges and the imposition of a new 30-day PIMS Level I period.

**§ 303.2 Additional in-cell items:**  Upon request of each PIMS Level II, III or IV eligible inmate, additional in-cell items (provided they are not restricted by the issuance of a deprivation order in accord with section 305.2) will be permitted as follows:

(a)   playing cards (one deck);

(b)   books, magazines or newspapers (not to exceed a total of 10 per inmate in the cell, excluding legal publications);

(c)   photos (personal, additional 10, not to exceed a total of 20 per inmate in the cell, no frames/albums);

(d)   stamps; and

(e)   skin cream, 1 oz. size.

**§ 303.3 Commissary purchase:**  Eligible PIMS Level I inmates will be permitted to make one commissary purchase per month of stamps only in a monetary amount not to exceed 50 percent of the monthly total permitted for general population.  Eligible PIMS Level II, III and IV inmates will be permitted to make one commissary purchase per month of those items listed below in a monetary amount not to exceed 50 percent of the monthly total permitted for general population inmates and in accordance with the PIMS (See Attachment A):

(a)   stamps (up to maximum buy and possession limits set forth in Directive #4422);

(b)   writing pad without spiral binding;

(c)   legal paper;

(d)   carbon paper;

(e)   legal folders without metal clips/fasteners;

(f)   shampoo (one container), not to be kept in cell;

(g)   shaving cream (one only, not to be kept in cell);

(h)   toothbrush, mini (one only);

(i)   toothpaste (one only);

(j)   deodorant, stick type only;

(k)   personal soap (if larger than 1 oz. size bar to be given at shower time);

(l)     skin cream (1 oz. size containers - up to 10 containers may be purchased per buy; 1 container in cell, others to be issued on use and exchange basis);

(m)    denture cleanser (effervescent tablet form only; a cup may be issued for use);

(n)     shower slippers;

(o)     knit cap (1 green);

(p)     playing cards (one deck);

(q)     batteries (for inmates allowed to possess personal radios/tape players)(one for one exchange by SHU Staff);

(r)     denture adhesive, 2.4 oz. tube (up to 2 tubes may be purchased per buy: one for use in cell, others to be issued on a use-and-exchange basis);

(s)     up to $5 non-cookable food (PIMS Level III only); and

(t)     up to $10 non-cookable food (PIMS Level IV only).

Note:  Shampoo and shaving cream/soap will be issued at shower time.

## PART 304

## SERVICES

§ 304.1 Purpose:  The following inmate support services are mandated and must be furnished at any time following admission unless deprived by issuance of a deprivation order in accord with section 305.2.

§ 304.2 Food:  Inmates confined in the SHU will be provided meals of the same type as the meals available to inmates in general population and in sufficient quantity to be nutritionally adequate, except as provided in this section.

(a)     All food items will be delivered to the inmates upon receipt from the food service area and in a manner that will ensure receipt of the food in an appropriate condition.

(b)     Inmates may be placed on a special management meal order for the following reasons:

   (1)     Throwing food while assigned to the SHU; and
   (2)     Refusing to obey a direct order at the time of meal distribution or refusing to obey a direct order to return a food container or utensil at the conclusion of a meal while assigned to SHU.

(c)     The Superintendent or designee (the Officer of the Day (OD) or higher ranking authority) may issue a written order (Form #2190, "Special Management Meal Order") placing an inmate reported to have engaged in conduct described in subdivision (b) of this section on a Special Management Meal Order (Form #2190).  Initial authorization may be given verbally but must be confirmed in writing within 24 hours with copies to the Commissioner, the Superintendent, and one copy to the inmate.  The order shall briefly state the reason(s) for the imposition of the Special Management Meal Order and contain the following notice to the inmate:  "You may write to the Deputy Superintendent for Security or designee to make a statement as to the need for the continued imposition of this Special Management Meal Order."

(d)   Each Special Management Meal Order (Form #2190) must be reviewed on a daily basis by the Deputy Superintendent for Security or, in his or her absence, the OD or higher ranking authority if the OD is not present at the facility (weekends or holidays), the Watch Commander will personally review the Special Management Meal Order and sign the form indicating approval or discontinuance. This review shall be documented by the reviewing Officer, who shall initial and date the order, adding any comments that are appropriate. The Special Management Meal Order (Form #2190) will be limited to a duration of seven days, or 21 consecutive meals. At the conclusion of that period, if not rescinded prior based on the daily review, the Superintendent will ensure that the inmate shall be provided meals of the same type as the meals available to inmates in general population.

(e)   Special Management Meal Orders will not be extended beyond the 7th day without permission of the Assistant Commissioner for Special Housing/Inmate Disciplinary Programs.

(f)   The Special Management Meal must consist of a sufficient quantity of wholesome and nutritious food. Such meal may be served in either a paper bag or Styrofoam tray.

(g)   Health Services and Food Services shall be notified in advance of the imposition of a Special Management Meal Order (Form #2190). Health Services shall review the inmate's Ambulatory Health Record (in accordance with HSPM Section 1.25), and sign the form prior to the commencement of a Special Management Meal Order to ensure that the use of the Special Management Meal Order is medically appropriate. A Physician, Nurse or Physician's Assistant, designated by the Facility Health Services Director, must examine into the state of health of the inmate within 24 hours of the commencement of the restriction and daily thereafter during the period of restriction.

(h)   The Superintendent shall give full consideration to any recommendation that may be made by such Physician, Nurse, or Physician's Assistant, shall forthwith report to the Commissioner any recommendation made by such person that is not carried out, and shall, in any event, make a full report, in writing, to the Commissioner at least once per week concerning the inmate's condition.

(i)   The Special Management Meal Order shall be suspended during the Passover holiday for an inmate who is designated as Jewish in accordance with Directive #4202, "Religious Programs and Practices."

§ 304.3 Exercise: All inmates confined in the SHU must be permitted outdoor exercise daily in accordance with the PIMS (See Attachment A), exclusive of the time it takes to go to and return from the exercise area, beginning on the day following admission.

(a)   Inmates normally will be offered the opportunity for outdoor exercise despite weather conditions. If during the exercise period the weather significantly deteriorates, the inmate may request and shall be permitted to return to his or her cell. If this occurs, the outdoor exercise opportunity for that day will be considered to have been satisfied.

(b)   Inclement weather items: Except at double-celled SHUs, coats and galoshes or rubbers will be maintained on the unit and will be provided to inmates during exercise periods in the event of cold or inclement weather.

(c)   On those rare occasions when the weather so reduces visibility that it significantly impacts the ability of security staff to visually observe the exercise area (i.e., fog, blizzard, etc.); exercise may be curtailed for the duration of the extreme weather conditions by issuance of a deprivation order in accord with section 305.2.

(d)   An inmate may be deprived of daily exercise by a deprivation order issued in accord with section 305.2. This shall be requested when the supervisor in charge of the SHU determines that an inmate presents a threat to the safety, security or good order of himself or herself, other persons, or State property, and the use of restraints will not adequately address the problem.

## § 304.4 Medical Services

(a)   A qualified medical practitioner (Physician, Physician's Assistant, Nurse Practitioner, Registered Nurse) will be required to examine each inmate upon admission to a SHU in accordance with section 302.1(b).

(b)   A qualified medical practitioner (as listed above) is required to visit the SHU once in every 24-hour period to examine into the state of health of the inmates confined in such unit.

(c)   Sick call will be conducted daily.

   (1)   The Officer in charge will prepare a list of all inmates who request to see a medical practitioner.
   (2)   Any inmate who requests to see a medical practitioner will be permitted an opportunity to do so in accord with all good security precautions.
   (3)   The medical encounter will be recorded in each inmate's medical file and in the appropriate SHU file.

(d)   If an inmate has a medical complaint, requests health services other than at sick call, or a medical emergency occurs, the facility Health Services unit will be contacted immediately. The response/action taken by Health Services staff shall be logged.

(e)   A qualified medical practitioner must examine the state of health of an inmate within 24 hours of the commencement of any special management meal, and daily thereafter during the period of the special management meal.

(f)   To the extent consistent with the safety and good order of the facility, staff shall respect an inmate's right to privacy during medical encounters and the confidential nature of communications between inmates and health care providers.

## § 304.5 Mental Health Services

(a)   Initial Assessment:   A mental health clinician (Psychiatrist, Psychologist, Social Worker, or Nurse Practitioner, who is licensed by the Department of Education and employed by the Office of Mental Health) shall initially assess all inmates placed in SHU or separate keeplock housing unit:

   (1)   Within one business day at an OMH level 1 or 2 facility; and
   (2)   Within 14 days at an OMH level 3 or 4 facility.

(b)   Ongoing Assessments:

   (1)   Inmates in SHU or a separate keeplock housing unit with a serious mental illness (SMI) who have not been diverted or removed to a residential mental health treatment unit shall be reassessed by a mental health clinician within 14 days of the initial assessment and at least every 14 days thereafter.
   (2)   Inmates in SHU or a separate keeplock housing unit not assessed with a SMI at the initial assessment shall be offered an interview with a mental health clinician:

      (i)   Within 14 days of their initial assessment and every 30 days thereafter at an OMH level 1 or 2 facility; and

(ii)        Within 30 days of their initial assessments and every 90 days thereafter at an OMH level 3 or 4 facility.

(c)     The Superintendent shall make a full report to the Commissioner at least once a week concerning the condition of an inmate with an SMI designation and any recommendation relative to mental health treatment or confinement made by the mental health clinician that is not carried out by the Superintendent.

## § 304.6 Personal hygiene

Each inmate shall have access to the following:

(a)     Showers:  Shall be provided in accordance with the PIMS (See Attachment A), for a minimum of five minutes per shower, exclusive of the time it takes to go to and return from the shower area. Use of shampoo is permitted.

(b)     Shaves:  Shall be provided in accordance with the PIMS (See Attachment A).  Shaving equipment will be on an issue basis and must be returned after use. Use of shaving cream/soap is permitted.

(c)     Hot water will be provided two times per day where hot water is not available in the cell.

(d)     Haircuts:  One per month if requested by inmate.

(e)     Cell-cleaning materials will be made available three times per week to permit inmates to adequately clean their cells and cell ventilation grates.

(f)     Inmates may be deprived of personal hygiene services by a deprivation order issued in accord with section 305.2 of this directive.

## § 304.7 Laundry:  All clothing items, bedding (excluding blankets), flatwork, and the washcloth will be submitted on a weekly basis in accordance with the facility laundry procedures and schedule. The towel will be exchanged one for one a minimum of two times per week except in those facilities that elect to exchange two towels once per week.  Any item issued to an inmate will be freshly laundered.

## § 304.8 Law Library Services:  The facility law library will provide a list of legal books, journals, and papers in the facility law library.  This list will be made available to the inmates in the SHU upon request.

(a)     An inmate may obtain legal material from the law library, subject to the following restrictions, by submitting a written request:

    (1)    A maximum of two items may be ordered at one time.
    (2)    The law library will deliver the requested items, if available, to the SHU within 24 hours of receiving the request.
    (3)    Inmates may retain said legal material for a period of not less than 16 hours nor more than 24 hours at a time.

(b)     Inmates may receive legal materials pursuant to procedures set forth in Department directives concerning "Law Libraries and Inmate Legal Assistance."

(c)     No inmate advisors or inmate law clerks will be permitted to visit the SHU.

(d)     All communications between inmates in the SHU and the law library will be monitored by facility staff.

(e)     All inmate legal materials going to or coming from the law library will be subject to search.

(f)  Whenever a "law library service" item is deemed to be improper or inappropriate, it shall be referred to the watch commander for a determination as soon as possible. The staff member doing this shall notify the inmate and record the action in the SHU log.

(g)  Inmates may be deprived of law library services by issuance of a deprivation order after consultation with the Office of Counsel.

§ 304.9 Notary public:  Notarial services will be provided to an inmate at least two times per week.

§ 304.10 Religious counseling

(a)  Counseling by a member of the facility's Ministerial Services staff will be provided upon the written request of an inmate.

(b)  The facility senior chaplain or a designated member of the Ministerial Services staff will be required to make a minimum of one round per week in the SHU.

(c)  No inmate religious advisor or assistant will be permitted to visit the SHU.

(d)  Attendance at congregate religious services will not be permitted.

§ 304.11 Counseling services:  Inmates who have displayed such adverse behavior as to warrant assignment to a SHU generally require counseling services to a greater extent than most inmates in general population.

(a)  An Offender Rehabilitation Coordinator will visit the SHU on a daily basis (excluding weekends and holidays) to provide appropriate counseling services.  This will include responding to inmate requests, Offender Rehabilitation Coordinator referrals, emergency services, and to see each new admission.

(b)  Counseling contacts will be noted in each inmate's guidance and counseling unit file and in the appropriate SHU file.

§ 304.12 Education:  Inmates in special housing units will be offered the opportunity to participate in a cell study program.  However, an inmate assigned to a disciplinary housing unit will be offered the opportunity to participate in a cell study program to the extent possible based upon the inmate's overall behavioral adjustment.  Education Offender Rehabilitation Coordinators, teachers or other appropriate staff members may visit the special housing inmates as needed to provide assistance to any inmate participating in a cell study program.

§ 304.13 General library services:  There shall be available to inmates in the SHU, general library materials in a quantity equal to at least two books and one magazine/periodical for each inmate. This reading material will be rotated in the special housing unit every 30 days.

(a)  Items selected from the general library shall be considered part of the maximum allowed as set forth in section 302.2(f) or 303.2(b), whichever is applicable.

(b)  Each facility will develop a system for the maintenance of an appropriate inventory record.

§ 304.14 Correspondence

(a)  Each inmate shall be permitted to send and to receive privileged and regular correspondence, in accordance with Directives #4421, "Privileged Correspondence" and #4422, "Offender Correspondence Program."  The inmate's ability to send or receive correspondence may not be limited by a deprivation order.

(b)   An inmate may at any reasonable time address a written communication to the Superintendent or the Commissioner.  When an inmate makes a request for permission to write such a communication, the responsible employee to whom the request is made shall: supply the inmate with necessary writing materials and an envelope; allow the inmate to write his or her communication in privacy; and forward it promptly to the addressee.

**§ 304.15 Inmate Grievance Program:**  Inmates assigned to the SHU will have access to the inmate grievance mechanism as follows:

(a)   Grievance forms will be made available upon request to an SHU Officer.

(b)   A staff representative of the inmate grievance resolution committee will visit the SHU a minimum of once per week, or more often if necessary or requested to do so by the supervisor in charge of the SHU, to interview the inmate and investigate the grievance.

(c)   Appropriate procedures as required by Directive #4040, "Inmate Grievance Program," will be implemented.

## PART 305

## CONTROLS/RESTRICTIONS/RESTRAINTS

**§ 305.1 Frisks:**  In accordance with the provisions of Directive #4910, "Control of & Search for Contraband," the following procedures will be followed in such designated special housing units.

(a)   Strip frisk.

    (1)   On initial entry to an SHU, an inmate will be strip-frisked.

    (2)   When an inmate is transferred from one facility disciplinary SHU to another facility disciplinary SHU, he may be strip-frisked on exiting the facility, but may not be strip-searched or strip-frisked without probable cause upon entry to the receiving facility and/or its SHU.

(b)   Pat frisk:  An inmate will be pat-frisked whenever he or she goes out of or returns to the SHU; and prior to and upon returning from any exercise periods, hearings, interviews, etc.

**§ 305.2 Deprivation order**

(a)   Deprivation orders will not be imposed as punishment, but only where there is a threat to the safety and security of staff, inmates, or State property.  Deprivation orders will be terminated when the threat has abated, as determined by security staff.

(b)   A deprivation order must be authorized by the OD or the Deputy Superintendent for Security Services or higher ranking authority.  Initial authorization may be given verbally but must be confirmed in writing within 24 hours with a copy to the Superintendent, and one copy to the inmate.

(c)   Each deprivation order must be reviewed on a daily basis by the Deputy Superintendent for Security or, in his or her absence, the OD or higher ranking authority.  If the OD is not present at the facility (weekends or holidays), the Watch Commander will personally review the deprivation order and sign the form indicating approval or discontinuance.  This review shall be documented by the reviewing Officer, who shall initial and date the order, adding any comments that are appropriate.  After seven days, deprivation orders will be reviewed, and can be renewed, by the Superintendent.

(d) The written order and any notice of renewal thereafter must briefly state the reason(s) for the deprivation and contain the following notice to the inmate: "You may write to the Deputy Superintendent for Security or his or her designee to make a statement on the need for continuing the deprivation order."

(e) Any deprivation order depriving an inmate of minimum standard items (e.g., bedding, clothing, etc.) for "mental health" or "psychiatric" reasons must be approved by an appropriate clinical professional or, in their absence, by the ranking facility health service professional.

(f) If there is an order depriving an inmate of in-cell water, the inmate's cell water shall be turned on for at least ten minutes, five times per day, as follows: approximately (30) minutes prior to the service of each meal, once at the beginning of tour I (nights), and once during tour III (evenings) in accordance with a schedule established by the Superintendent. Staff shall notify the inmate prior to turning on the water and record the times that the water is turned on and off in the unit activity log.  Additional beverages shall be provided if determined necessary by medical staff.

(g) The Office of Mental Health (OMH) will be notified of the issuance, renewal and termination of all deprivation orders issued to inmates on the OMH caseload.

*Note: Deprivation orders and renewals shall be recorded on Form #2187,"Deprivation Order," and Form #2187R, "Deprivation Order Renewal."*

## § 305.3 Use of restraints, generally

(a) Definition: For the purposes of this section, mechanically restrained means either:
   (1) Handcuffed in front with or without a waist chain; or
   (2) Handcuffed in back with or without a waist chain.

(b) Application of restraints:  An inmate assigned to SHU will be placed in mechanical restraints in accordance with the PIMS (See Attachment A) for inter unit movement  prior to exiting his or her cell.  If the inmate is escorted off the unit, the inmate shall be handcuffed in front with a waist chain.  In order to accommodate the restraint procedure, the inmate will be required to place his or her hands through the feed-up port, if available, or the partially opened cell door.

(c) Temporary Removal of Restraints:
   (1) Once outside the cell, restraints shall be removed to accommodate the following:
      (i) A request of a Physician or a Physician's Assistant (PA) when removal is necessary to permit medical treatment;
      (ii) A request of the Parole Board at a parole hearing;
      (iii) A request of a Judge or Magistrate; or
      (iv) An order of the Deputy Superintendent for Security Services or higher ranking authority.
   (2) Once outside the cell, restraints shall also be removed to accommodate the following, unless otherwise specified in a restraint order pursuant to section 305.4:
      (i) A scheduled shower, when the inmate can be secured in a shower room;

(ii) A scheduled period of exercise when the inmate can be secured in an exercise area; however, an inmate at Southport Correctional Facility will remain restrained (handcuffed in front with waist chain) in the exercise area while in PIMS Level I; or

(iii) A visit; however, an inmate at Southport Correctional Facility or any double celled SHU facility will remain restrained (handcuffed in front with waist chain) in the visiting area while in PIMS Level I.

(3) If mechanical restraints have been removed, they will be reapplied prior to return to the SHU cell.

## § 305.4 Restraint orders

(a) Any inmate assigned to an SHU who has a history of assaultive behavior and/or who presents a threat to the safety or security of himself/herself, other persons, or State property may be placed under a restraint order by the Deputy Superintendent for Security or, in his or her absence, the OD or higher ranking authority.

(b) A restraint order will be valid for no more than seven days and will be reviewed and may be renewed by the Superintendent or, in his or her absence, the OD.

(c) A copy of the restraint order must be forwarded to the Superintendent and the inmate within 24 hours. The order and any renewal thereafter must briefly state the reason(s) for the order or renewal and contain the following notice to the inmate: "You may write to the Deputy Superintendent for Security or designee to make a statement as to the need for continuing the restraint order."

(d) A restraint order will describe the types of restraints to be used and the manner in which they are to be applied (e.g. handcuffed in front or in back, with or without waist chain, with or without leg irons).

(e) If an inmate is under a restraint order directing that he or she be mechanically restrained whenever he or she leaves the SHU cell for any reason, the inmate will remain mechanically restrained during the entire period of time he or she is out of the SHU cell, except:

(1) Upon request of a Physician, Nurse Practitioner, or a Physician's Assistant (PA) when removal is necessary to permit medical treatment;

(2) Upon request of the Parole Board at a parole hearing;

(3) Upon the request of a Judge or Magistrate;

(4) When the inmate can be secured in a shower room during the scheduled shower period;

(5) When the inmate has been secured in the exercise area, unless the restraint order (or renewal) includes a written determination stating the reason(s) why the removal of restraints in the exercise area would, in the light of the particular circumstances relative to the affected inmate, present a threat to the safety or security of the inmate, other persons or State property. Such a determination, in any restraint order or renewal, shall only remain in effect for three days, unless approved in writing by the Superintendent or acting Superintendent, based upon his or her review of the relevant facts. Note: This paragraph does not apply to Southport Correctional Facility;

(6) Upon order of the Deputy Superintendent for Security Services or higher ranking authority; or

(7) When in a general population visiting room and not in a noncontact area.

(f)   When mechanical restraints are removed pursuant to subdivision (e) above, they will be reapplied as specified in the restraint order prior to return to the SHU cell.

*Note:  Restraint orders and renewals shall be recorded on Form #2186, "Restraint Orders," and Form #2186R, "Restraint Order Renewal."*

## § 305.5 Closing cell hatch covers

(a)   In those SHU cells that have only one solid door, the fixed vision panels will be maintained with the solid metal hatch coverings in an opened position, unless a deprivation order is issued.  A deprivation order to close such hatch coverings may be imposed only where there is a threat to the safety of staff, inmates or State property.

(b)   Feed-up hatches shall remain closed except during feed-up activities or when it is necessary to open the hatches to pass items to or from the inmate.

## § 305.6 Use of cell shields

(a)   A cell shield is a transparent cell front covering, equipped to provide adequate ventilation.

(b)   Cell shields may be ordered for good cause, including but not limited to the reasons listed below:

   (1)   Spitting through the cell door, or the throwing of feces, urine, food, or other objects through the cell door.

   (2)   The inmate refuses to keep his or her hands within the cell and/or otherwise attempts to assault or harass staff.

   (3)   The inmate is so disruptive as to adversely affect the proper operation of the unit.

(c)   Use of the cell shield shall be ordered by the Deputy Superintendent for Security or, in his or her absence, the OD or higher ranking authority.  The cell shield order shall be valid for no more than seven days and will be reviewed and may be renewed by the Superintendent or, in his or her absence, the OD.

(d)   A copy of the cell shield order shall be forwarded to the Superintendent and the inmate within 24 hours.  The order and any renewal thereafter shall briefly state the reason for the order or renewal and contain the following notice to the inmate: "You may write to the Deputy Superintendent for Security or designee to make a statement as to the need for continuing the cell shield order."

*Note:  Cell shield orders shall be recorded on Form #2188, "Cell Shield Order – SHU," and Form #2188R, "Cell Shield Order – SHU –Renewal."*

Sections I - III do not appear in Title 7

## I. OPERATIONS

A.   Special Housing Unit Operations Manual:  Each SHU shall operate in accordance with a SHU Operations Manual, which has been approved by the facility Superintendent.

   1.   The Operations Manual will be based on the provisions of this directive.

   2.   A copy of this directive (#4933, "Special Housing Units") shall be included in the SHU Operations Manual.

   3.   A copy of the SHU Operations Manual will be located within the SHU proper and is to be reviewed by every employee assigned therein, and will be maintained constantly available for reference purpose.

4.   A copy of the SHU Operations Manual and all revisions thereto will be forwarded to the Director of Special Housing in Central Office and maintained on file at that location.

B.   Sign-In/Out Log:  Each SHU will maintain an official log of all visitors to the unit.

1.   Each and every visitor will be required to place the following information in the log immediately upon entry to the SHU:

- Date
- Time entered unit
- Printed name and title
- Purpose of visit
- Signature
- Upon exit will enter time left unit

2.   Supervisors must make their log entries in red ink.

3.   Completed logs will be placed in secure storage in a location designated by the Superintendent.

C.   Unit Activity Log:  Each SHU will maintain an official chronological log of all activities occurring on the unit.  Contents will include but are not limited to the following:

1.   Names and titles of all employees assigned to the unit.  List date and tour of duty.

2.   Names and titles of all visitors to the unit, and including the specific purpose(s) of the visit.

3.   A record of inmate admissions to include the following:

a. Name and number,

b. Time admitted,

c. Supervisor who authorized admission,

d. Type of admission,

e. Disposition,

f. Escorting employees,

g. Officer(s) who conducted strip frisk, and

h. Supervising sergeant.

4.   A record of incidental inmate exit and entry including name and number, times, reasons for exit/entry, and names of escorting Officer(s).

5.   A record of inmate releases to include the following:

a. Name and number,

b. Time released, and

c. Reason (time expired, transfer, etc.)

6.   A record of occasions when a restraint order is applied to include:

a. Inmate name and number,

b. Time placed in restraint,

c. For what reason,

d. Time removed from restraint, and

e. Name and title of authorizing employee.

This does not include those inmates placed in restraint merely for escort off the unit.

7.  A record of all occasions when a deprivation order is imposed.

    This record will include the reasons for said deprivation and the name of the authorizing official.

8.  A record of all occasions when all hatch coverings are closed and the reasons therefore.

9.  A record of all occasions when "cell shields" are used and the reasons therefore.

10. A record of the starting and ending times of inmate recreation, inmate showers and inmate telephone calls.

11. A record that indicates the announcement of the presence of medical or mental health staff on the unit and that medical or mental health rounds were completed.

12. The names and numbers of inmates who receive medical attention or medication.*

13. The name and number of any inmate who refuses medical attention when it is felt that medical attention is required.

14. The name and number of any inmate who refuses a visit.

15. A record of all inmates on a special management meal, when served.

16. A record of all unusual incidents occurring on the unit.

17. A record of all inmate contacts with the Inmate Grievance Resolution Committee staff representatives.

18. A record of all contacts between Mental Health Staff and specific inmates to include all out-of-cell interviews that are completed or an indication if the inmate refused a scheduled interview.  The time out and end time of the out-of-cell interview shall also be recorded.*

19. A record of all contacts between Offender Rehabilitation Coordinators and specific inmates.*

    *Note:  For double-celled SHUs and Southport, routine medical encounters, routine mental health encounters, and routine Offender Rehabilitation Coordinator contacts may be recorded in an appropriate unit file.

20. A record of any occasion in which an employee enters an inmate's cell for other than a routine reason.

21. A record of each round conducted in accordance with Section III-A, below.

    Note:  Completed logs will be placed in secure storage in a location designated by the Superintendent.  Upon completion of an authorized removal of an individual or sign in/out logbook, a notation (in red ink) will be made explaining the reason for the removal along with the utilized auxiliary logbook number and page of the recorded minutes.

D. Cell Search Log:  Each SHU shall maintain a log for recording searches of inmate cells. This log shall include:

1.  Name and number of the inmate whose cell is searched;

2.  Date and time of search;

3.  Names of Officers conducting search;

4. List of contraband found;

5. Name of supervisor authorizing search;

6. List of any State or inmate property damaged; and

7. Cell integrity items including, but not limited to:  walls, floors, ceilings, sinks, vents, and bars, etc., have been inspected.  An entry will also be made indicating any deficiencies noted.

It is the duty of the supervisor assigned to the special housing unit to make periodic inspections of these logs to determine that they are current and that searches are made in a timely and reasonable manner.

E. PIMS Telephone Call Log:  Each SHU shall maintain a log for recording PIMS inmate telephone calls.  This log shall include;

1. Name, Number and cell location of the inmate;

2. Date and time of telephone call;

3. Name of Officer(s) supervising the telephone call;

4. PIMS Level of inmate; and

5. Notation indicating if the inmate accepted or declined the opportunity to make a telephone call.

F. Inmate File:  The supervisor in charge of the SHU will cause a file to be kept on each inmate assigned.  That file will contain:

- Cell Equipment Statement
- Disciplinary Dispositions
- Property Storage Receipts
- Deprivation Orders
- Restraint Orders
- Medical Order
- Suicide Prevention Screening Form
- Shield Orders
- Miscellaneous

G. Solid cell doors with expanded vision panels:  Designated cells in designated Special Housing Units will be equipped with solid cell doors with Expanded Vision Panels (EVP) to promote increased visibility and communication for inmates with serious mental illness (SMI).  Inmates designated with SMI who are placed in SHU should be placed in a cell equipped with EVP, keeping in the Department's efforts to provide visibility and communication, while maintaining a safe working environment for staff.

1. In those SHU cells that have EVP doors, the sliding transparent lexan vision panel will be maintained in a closed position when an inmate who has not been diagnosed as SMI is assigned to the cell.

2. In those SHU cells that have EVP doors, the sliding transparent lexan vision panel will be maintained in an open position when an inmate with SMI is assigned to the cell to facilitate increased visibility and communications.

   (a) A cell shield order will be required to close the sliding transparent lexan vision panel when an inmate with SMI is assigned to the cell and will be issued in accordance with Section 305.6, "Use of Cell Shields."

   (b) The sliding transparent lexan vision panel may be temporarily closed when it is necessary to move an inmate for other than routine reasons, e.g. when an inmate is being disruptive during movement or use of chemical agents.

## II. SPECIAL HOUSING UNIT SUPERVISION

A. <u>Unit Supervisor</u>:  A supervisor of the rank of Correction Sergeant (or higher) will be responsible for the supervision of the unit and at a minimum be present whenever:

    1.    An inmate is admitted;

    2.    An inmate is removed from his or her cell for other than routine reasons (showers, exercise, etc.);

    3.    An inmate who is under a restraint order is removed from his or her cell for any reason; and

    4.    In the discretion of the facility Watch Commander or higher authority, whenever an inmate is escorted from the unit for activities including, but not limited to, visits and routine infirmary visits.

Note: Items A-2, and 3 above do not apply when Keeplock or Protective Custody inmates are removed from their cells; the unit supervisor may exercise discretion in determining whether his or her presence is required.

B. <u>Unit Supervisor</u>:  The unit supervisor will be notified whenever a cell is entered by staff for other than routine reasons.  A record of such occurrence will be entered in the unit activity log.

C. <u>Watch Commander</u>:  The SHU, including the sign-in/out and chronological logs will be inspected daily by each Watch Commander during his or her tour of duty.  The Watch Commander will sign each log in red ink during his or her inspection.

D. <u>Facility Executive Staff</u>:  Superintendent and each member of the Executive Team shall visit the SHU at least once per week.  All on-duty facility Correction Captains, regardless of facility duty assignment, shall visit each SHU a minimum of once per day.

## III. INSPECTIONS:  Essential to good security practices, constant physical inspections will be conducted by security staff as follows:

A. <u>Rounds</u>:  Unit Officers will conduct rounds on all three shifts.  Rounds will be made at least every 30 minutes, but on an irregular basis.  Each inmate and cell will be observed to ensure that anyone in need of medical attention receives prompt care, that scheduled activities (e.g., showers and exercise) are being completed, to guard against misconduct, and to detect fire/safety hazards, etc.  Night time rounds will be conducted in a manner that is not disruptive to the unit and does not interfere with inmates asleep.

B. <u>Cells</u>:  Each SHU cell will be thoroughly inspected prior to and immediately after occupancy in order to prevent the presence of contraband and to ensure its good condition in addition to those inspections required in accordance with the provisions of Directive #4910, "Control of & Search for Contraband."  Discrepancies will be recorded in the SHU Log.  All inmate cell doors/gates will remain closed and locked at all times with the exception of  when the inmate is entering or exiting the cell or staff is conducting a search or frisk.

C. <u>Gates/Locks</u>:  Gates and locks will be examined and tested on a periodic basis, but not less than once per week.  The results of such examinations and tests shall be reported in writing to the Deputy Superintendent for Security.

D. <u>Bars</u>:  Bar checks will be conducted on a scheduled basis, but not less than once per week.  To ensure that all bars receive proper attention, the results of such examinations and tests shall be reported in writing to the Deputy Superintendent for Security.

DATE  04/18/2017

E. <u>Ventilation Grates</u>:  Each SHU cell ventilation grate shall be thoroughly inspected and cleaned prior to occupancy in order to prevent the presence of contraband and to ensure its good condition.  Periodically, the ventilation grate shall be inspected for contraband and to ensure that the inmate is keeping the grate clean.

F. <u>Exercise Areas</u>:  Each area will be physically inspected immediately before and after use, except for double-celled exercise areas, which will be physically inspected on a scheduled basis but not less than once per week.

G. <u>Inmates</u>:  Physical searches of inmates will be conducted as required in accord with the provisions of Directive #4910, "Control of & Search for Contraband."  Inmates who provide services to inmates in the Special Housing Unit (e.g., barber, maintenance, etc.) must be approved by the facility Deputy Superintendent for Security.  These inmate(s) shall be pat frisked and hand scanned upon entry and exit of the SHU unit.

H. <u>Items entering the SHU</u>:  All items entering the SHU area must be thoroughly searched by security staff (e.g., food carts, property, etc.).

| | | | SHU Program Privileges by PIMS Level | |
|---|---|---|---|---|
| | PIMS Level I | PIMS Level II | PIMS Level III | · PIMS Level IV (PIMS IV at Albion, Bedford Hills, Upstate & Southport Only) |
| Time Spent in Each PIMS Level (No regressions, deprivation orders or misbehavior reports) | 30 Days | 60 Days | 90 Days | Contingent on good behavior and positive programming |
| Daily Recreation (hrs. daily/traditional SHUs & Southport) | 1 hour | 1 hour | 1 hour · | 1 hour at Albion, Bedford Hills, & Southport on days when congregate rec is not offered |
| Daily Recreation (hrs. daily/ Upstate & S200s) | 2 hours | 2 hours | 2 hours | 2 hours at Upstate on days when congregate rec is not offered |
| Congregate Recreation (Albion, Bedford Hills, CPP/Upstate, & Southport) | N/A | N/A | 2 hours once per week | 2 hours 3x per week |
| Restraints | Cuffs w/waist chain | Cuffs w/waist chain | Cuffed in front | Cuffed in front |
| Telephone Call (15 minutes each) | None | One call during PIMS II | 1 call every 30 days | 1 call every 30 days |
| Visits (per week) | 1 visit | 1 visit | 2 visits | 2 visits |
| Headphones (or pers. radios where no jacks exist) | Yes | Yes | Yes | Yes |
| In-Cell Property  (Packages – Inmates will receive packages pursuant to Directive #4933, except PIMS III + IV will be allowed 1 package of Personal Clothes as listed, if not available in the inmate's property) | 4933 §302.2 | 4933 §303.2 | Personal Shorts & 1 pair sneakers | Pers. Shirt, Sweatshirt (non-hooded) & Sweatpants |
| Commissary | Stamps Only | 4933 §303.3 | Up to $5 non-cookable food/playing cards | Up to $10 non-cookable food/playing cards |
| Hygiene (Showers/Shaves per week) | 3 | 3 | 4 | 4 |

# EXHIBIT

# #2

Time Cut Forms

STATE OF NEW YORK - DEPARTMENT OF CORRECTIONAL SERVICES

CLINTON CORRECTIONAL FACILITY

### Interdepartmental Memorandum

**FROM:**     D. Artus, Superintendent

**TO:**     Walker, Tyrone 94A5258

**DATE:**     May 5, 2009

**SUBJECT:**     Time Cut

After speaking to you yesterday while on rounds yesterday, I reviewed your disciplinary record and have modified the following tier hearings by suspending the KL or SHU time for 180 days.

| Hearing Date | Penalty Suspended |
|---|---|
| 8/23/05 | 15 days KL |
| 11/1/05 | 15 days KL |
| 11/1/05 | 30 days KL |
| 6/5/07 | 15 days KL |
| 6/14/07 | 3 months SHU |

Dale Artus
Superintendent

DA/da
cc:     file
        Disciplinary Office

# STATE OF NEW YORK - DEPARTMENT OF CORRECTIONAL SERVICES

## CLINTON CORRECTIONAL FACILITY

### Interdepartmental Memorandum

**TO:**        WALKER, T.        94A5258        SHU 30

**FROM:**      D. Artus, Superintendent

**DATE:**      September 25, 2009

**SUBJECT:**   Your Communication Received September 21, 2009

I am in receipt of your letter of September 21, 2009 requesting a time cut.

I am reducing the SHU time of the hearing completed on August 30, 2008 by three months.

D. Artus
Superintendent

DA/de
cc:      Disciplinary Office
         File

CLINTON CORRECTIONAL FACILITY
CONFINEMENT COMMITTEE
# EVALUATION REPORT

TO:   CORRECTION SERGEANT _Cross_

FROM:  S.J. BROWN , DEPUTY SUPERINTENDENT FOR SECURITY

DATE: _10/15/12_

   The following inmate is being reviewed for early release and/or restoration of privileges in accordance with the facility fomp #403.

Name: _Walker, Tyrone_   DIN# _94A5258_   Location: _SHU-38_
Scheduled release date: _9/27/13 - SHU, Pkgs, Comm, Phone_

Please review the listed categories with appropriate officers most familiar with inmate's adjustment.

Effective   (E)               Unsatisfactory   (U)                    Needs Improvement   (NI)

Relationship with inmates:         _E_
Relationship with staff:           _E_
Overall attitude:                  _E_
Willingness to follow directions:  _E_
Comments:   _Inmate unlike fellows staff direction and is cooperative. He also has minor misbehavior reports, when he misbehaves, i.e. weapons, assault on staff. His demeanor is great while waiting or receiving a time cut. He does understand the significance of serious misbehavior, a time cut could be granted_

List staff who provided input:

Name: _Vicere McCasland_      Title: _CC_
Name: _John Farrell_         Title: _CC_
Name: _____      Title: _____
Name: _____      Title: _____

Sergeant: _____   Date: _10/17/12_

Sec/54

001460

# STATE OF NEW YORK - DEPARTMENT OF CORRECTIONAL SERVICES
## CLINTON CORRECTIONAL FACILITY
### Interdepartmental Memorandum

DATE: __8/12/10__

FROM: CONFINEMENT REVIEW COMMITTEE

TO: WALKER, T. 94-A-5258 SHU 30 Cell

SUBJECT: CONFINEMENT REVIEW

RE: MISBEHAVIOR REPORT DATED __12/4/09, 8/18/08 & 9/9/07__
TIER DESIGNATION __3s__
HEARING DATE __12/24/09, 8/30/08 & 9/28/07__

You have been reviewed by the Confinement Committee and approved. The below listed
sanctions are suspended for ~~180~~ days, pending your continued good behavior. *Suspend These Dispositions For 180 Days*

SANCTIONS: DATES: _____

S.H.U. Release Date: _____

KEEPLOCK Release Date: _____

COMMISSARY Release Date: _____

PACKAGES Release Date: _____

PHONE PROGRAM Release Date: _____

RECREATION Release Date: _____

TELEVISION Release Date: _____

S. Racette, Deputy Supt. of Security
Chairman, Confinement Review Committee

SER/sr
cc: Tier Office, IRC Office, Movement & Control, Commissary, Inmate Payroll,
Guidance Unit, B. Campbell, Ed. Supervisor, Package Room, SHU Officer, File



STATE OF NEW YORK
### DEPARTMENT OF CORRECTIONS
### AND COMMUNITY SUPERVISION

CLINTON CORRECTIONAL FACILITY

**BRIAN FISCHER**
COMMISSIONER

Box 2000
Dannemora, NY  12929-2000
518-492-2511

**THOMAS LAVALLEY**
SUPERINTENDENT

**DATE:**       October 22, 2012

**FROM:**      **CONFINEMENT REVIEW COMMITTEE**

**TO:**          Walker, Tyrone          94A5258          SHU - 38

**SUBJECT:**   **CONFINEMENT REVIEW**

**RE:**    MISBEHAVIOR REPORT DATED      <u>3/04/11</u>
          TIER DESIGNATION                      <u>3</u>
          HEARING DATE                           <u>3/22/11</u>

You have been reviewed by the Confinement Committee and approved.  The below listed
sanctions are suspended for ____ days, pending your continued good behavior.

SANCTIONS:          DATES:
S.H.U.                   Release Date:          <u>5/18/14</u>

KEEPLOCK              Release Date:          <u>5/18/14</u>

COMMISSARY           Release Date:          _____

PACKAGES             Release Date:          _____

PHONE PROGRAM        Release Date:          _____

RECREATION           Release Date:          _____

TELEVISION           Release Date:          _____

_____
S. Brown, Deputy Superintendent of Security
Chairman, Confinement Review Committee

SB/mlb
cc:  Tier Office, IRC Office, Movement & Control, Commissary, Guidance Unit, B.
Campbell, Ed. Supervisor, Package Room, SHU  Block Officer, File



STATE OF NEW YORK
## DEPARTMENT OF CORRECTIONS
## AND COMMUNITY SUPERVISION

CLINTON CORRECTIONAL FACILITY

**BRIAN FISCHER**
COMMISSIONER

Box 2000
Dannemora, NY 12929-2000
518-492-2511

**THOMAS LAVALLEY**
SUPERINTENDENT

**DATE:**          April 08, 2013

**FROM:**          **CONFINEMENT REVIEW COMMITTEE**

**TO:**            Walker, Tyrone          94A5258          SHU - 32

**SUBJECT:**       **CONFINEMENT REVIEW**

|  | RE: | MISBEHAVIOR REPORT DATED | 3/04/11 |
|---|---|---|---|
|  |  | TIER DESIGNATION | 3 |
|  |  | HEARING DATE | 3/22/11 |

You have been reviewed by the Confinement Committee and approved. The below listed sanctions are suspended for _____ days, pending your continued good behavior.

| SANCTIONS: | DATES: |  |
|---|---|---|
| S.H.U. | Release Date: | 4/18/14 |
| KEEPLOCK | Release Date: | N/A |
| COMMISSARY | Release Date: | 7/17/14 |
| PACKAGES | Release Date: | 7/17/14 |
| PHONE PROGRAM | Release Date: | 7/17/14 |
| RECREATION | Release Date: | N/A |
| TELEVISION | Release Date: | N/A |

_____

**S. Brown, Deputy Superintendent of Security**
**Chairman, Confinement Review Committee**

SB/mlb

cc:   Tier Office, IRC Office, Movement & Control, Commissary, Guidance Unit, B. Campbell, Ed. Supervisor, Package Room,   SHU   Block Officer, File



STATE OF NEW YORK

**DEPARTMENT OF CORRECTIONS
AND COMMUNITY SUPERVISION**

CLINTON CORRECTIONAL FACILITY

| **ANTHONY J. ANNUCCI**<br>**ACTING COMMISSIONER** | Box 2000<br>Dannemora, NY  12929-2000<br>518-492-2511 | **THOMAS LAVALLEY**<br>**SUPERINTENDENT** |

**DATE:**      June 10, 2013

**FROM:**      **CONFINEMENT REVIEW COMMITTEE**

**TO:**      **Walker, Tyrone**          94  A5258          **SHU - 32**

**SUBJECT:**   **CONFINEMENT REVIEW**

|  | **RE:** | **MISBEHAVIOR REPORT DATED** | 3/04/11 |
|  |  | **TIER DESIGNATION** | 3 |
|  |  | **HEARING DATE** | 3/22/11 |

You have been reviewed by the Confinement Committee and approved.  The below listed sanctions are suspended for _160_ days, pending your continued good behavior.

| **SANCTIONS:**<br>**S.H.U.** | **DATES:**<br>**Release Date:** | 3/18/14 |
| **KEEPLOCK** | **Release Date:** | N/A |
| **COMMISSARY** | **Release Date:** | 3/18/14 |
| **PACKAGES** | **Release Date:** | 3/18/14 |
| **PHONE PROGRAM** | **Release Date:** | 3/18/14 |
| **RECREATION** | **Release Date:** | N/A |
| **TELEVISION** | **Release Date:** | ~ |

_____ PSI

**S. Brown, Deputy Superintendent of Security**
**Chairman, Confinement Review Committee**

SB/mlb

cc:   Tier Office, IRC Office, Movement & Control, Commissary, Guidance Unit, B. Campbell, Ed. Supervisor, Package Room,  SHU   Block Officer, File



STATE OF NEW YORK

**DEPARTMENT OF CORRECTIONS
AND COMMUNITY SUPERVISION**

CLINTON CORRECTIONAL FACILITY

**ANTHONY J. ANNUCCI**
ACTING COMMISSIONER

Box 2000
Dannemora, NY 12929-2000
518-492-2511

**THOMAS LAVALLEY**
SUPERINTENDENT

**DATE:**      July 26, 2013

**FROM:**      **CONFINEMENT REVIEW COMMITTEE**

**TO:**      Walker, Tyrone      94A5258      SHU - 008

**SUBJECT:**   **CONFINEMENT REVIEW**

| | RE: | **MISBEHAVIOR REPORT DATED** | 3/04/11 |
| | | **TIER DESIGNATION** | 3 |
| | | **HEARING DATE** | 3/22/11 |

You have been reviewed by the Confinement Committee and approved.  The below listed sanctions are suspended for _90_ days, pending your continued good behavior.

| SANCTIONS: | DATES: | |
| --- | --- | --- |
| S.H.U. | Release Date: | 2/18/14 |
| KEEPLOCK | Release Date: | N/A |
| COMMISSARY | Release Date: | 2/18/14 |
| PACKAGES | Release Date: | 2/14/14 |
| PHONE PROGRAM | Release Date: | 2/18/14 |
| RECREATION | Release Date: | N/A |
| TELEVISION | Release Date: | N/A |

S. Brown, Deputy Superintendent of Security
**Chairman, Confinement Review Committee**

SB/mlb

cc:   Tier Office, IRC Office, Movement & Control, Commissary, Guidance Unit, B. Campbell, Ed. Supervisor, Package Room,  SHU  Block Officer, File



STATE OF NEW YORK
**DEPARTMENT OF CORRECTIONS
AND COMMUNITY SUPERVISION**
CLINTON CORRECTIONAL FACILITY
Box 2000
Dannemora, NY  12929-2000
518-492-2511

**ANTHONY J. ANNUCCI**
ACTING  COMMISSIONER

**THOMAS LAVALLEY**
SUPERINTENDENT

## M e m o r a n d u m

**TO:**          WALKER, T. 94A5258        SHU 28

**FROM:**      T. LaValley, Superintendent

**DATE:**      November 25, 2013

**SUBJECT:**   Long Term Case Review

As a result of a review of your case by the Long Term Case Review Committee, you will be granted a time cut of 30 (THIRTY) days SHU time.

T. LaValley
Superintendent

TLL/dme
cc:  S. Brown, Deputy Superintendent/Security
       Satellite Unit
       SHU Block Sergeant
       SHU Block Officers
       Program Committee
       IRC File
       Tier Office
       Inmate File
       LTCR File

Joint Case Management Review Release.doc

# EXHIBIT

# #3

Completion And Grades Forms For ART

# UPSTATE CORRECTIONAL FACILITY
## S. H. U. ART Program
## EDUCATION DEPARTMENT

**To:**   WALKER, Tyrone      **DIN:**   94A5258      **CELL:**   09-C2-33B

**From:** C. Orologio, ASAT/ORC  ART SHU Coordinator

**Date:** 5/1/2019

**Subject:  SHU ART Workbook Assignment(s)**

---

Your previous assignment(s) have been received, reviewed, and

(A) placed in your folder  --   _____ )

_Book 2 Post-Test ( 75 %)_   - Good Job!, You mixed a few of the definitions up.

(B) returned to you.   --   Book 2   - You keep these when completed.

Please complete the following assignment and return to the SHU ART Coordinator:

> ## _Assignment:_
>
> _Complete Book 3  Pre-Test_

Return the completed assignment to me no later than **Saturday, May 11, 2019**

cc: File

# UPSTATE CORRECTIONAL FACILITY
## S. H. U. ART Program
## EDUCATION DEPARTMENT

**To:**   WALKER, Tyrone          **DIN:**   94A5258          **CELL:**   09-C2-33B

**From:**  C. Orologio, ASAT/ORC  ART SHU Coordinator

**Date:** 5/14/2019

**Subject:  SHU ART Workbook Assignment(s)**

Your previous assignment(s) have been received, reviewed, and

(A) placed in your folder  --  _____ - ( _____ )

_Book 3 Post-Test ( 82 )_

(B) returned to you.   --   Book 3   -Please see notes

Please complete the following assignment and return to the SHU ART Coordinator:

> ### _Assignment:_
> _Complete BOTH Sides of the Post-Survey_

Return the completed assignment to me no later than **Friday, May 24, 2019**

cc: File

# UPSTATE CORRECTIONAL FACILITY
## S. H. U. ART Program
## EDUCATION DEPARTMENT

**To:**   WALKER, Tyrone          **DIN:**   94A5258          **CELL:**   09-C2-33B

**From:  C. Orologio, ASAT/ORC  ART SHU Coordinator**

**Date:** 5/15/2019

**Subject:  SHU ART Workbook Program Completion**

Congratulations, you have completed the SHU ART Wrokbook Program.  In the near future, I will have your Final Program Evaluation for you to sign.

If you have any questions, please contact me.

cc: File

NEW YORK DEPARTMENT OF CORRECTIONAL SERVICES

## INMATE PROGRESS REPORT

CORRECTIONAL FACILITY **Upstate**          NAME OF PROGRAM **Pre Aggression Workbook**

NAME: **Walker, Tyrone**     DIN # **94 A 5258**    HOUSING UNIT **9-C2-33** DATE: **5/15/19**

CHECK ONE:

| | |
|---|---|
| PAY INCREASE _____ | READING LEVEL **12** |
| PAY DECREASE _____ | GED OR H.S. DIP.  YES **✓**  NO __ |
| GENERAL EVALUATION _____ | DATE ENTERED PROG. **3/14/19** |
| FINAL EVALUATION **✓** | PAY ITEM NUMBER **788901** |

| | EXCELLENT | ABOVE AVERAGE | AVERAGE | BELOW AVERAGE | POOR |
|---|---|---|---|---|---|
| ATTENDANCE/PUNCTUALITY | | | X | | |
| INTEREST IN PROGRAM ASSIGNMENT | | | X | | |
| EFFORT AND INITIATIVE | | | X | | |
| ATTITUDE TOWARD PEERS | | | X | | |
| ATTITUDE TOWARD AUTHORITY FIGURES | | | X | | |
| FOLLOWS RULES AND SAFETY PRACTICES | | | X | | |
| ABILITY TO FOLLOW DIRECTIONS | | | X | | |
| QUALITY OF WORK | | | X | | |
| DISPLAYS SELF CONTROL | | | X | | |
| DEPENDABILITY | | | X | | |
| APTITUDE/EMPLOYABILITY | | | X | | |

EXPLAIN INMATE'S ACCOMPLISHMENTS WHILE IN YOUR PROGRAM OR WORK DETAIL:

I/M completed workbooks on Aggression, Conflict Management and Domestic Violence. He passed all tests associated with each workbook.

LIST JOB TITLES, OR SPECIAL SKILLS ACQUIRED:

GENERAL COMMENTS:
Follows directions well

_Tyrone Walker_
INMATE'S SIGNATURE

EMPLOYEES'S SIGNATURE          TITLE **ASAT/ORC**          DATE **5/15/19**

DISTRIBUTION: White -Guidance Unit, Yellow -Inmate, Pink -Evaluator

# EXHIBIT

# # 4

Proof of Lawsuits And Claims, Dep. S. Brown Memo's
Restraint Orders, Grievances, Picture of Weapon
Inmate Transfer History

2011 WL 4369116
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Tyrone **WALKER**, Plaintiff,

v.

Brian **FISCHER**, et al., Defendant.

No. 9:08–CV–1078 (TJM/ATB).
|
July 25, 2011.

**Attorneys and Law Firms**

Tyrone **Walker**, pro se.

Justin C. Levin, Assistant Attorney General, for Defendants.

**REPORT and RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate Judge.

**\*1** This matter was referred for Report and Recommendation, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c), by the Honorable Thomas J. McAvoy, Senior United States District Judge.

In his Amended and Supplemental Complaints (Dkt.Nos.42, 97), Plaintiff alleges that Defendants violated his rights under the Eighth and Fourteenth Amendments. Plaintiff seeks monetary and injunctive relief. Presently before this court is Defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56(b). (Dkt. No. 109). Plaintiff responded in opposition to the motion. (Dkt. No. 115). For the following reasons, the Court recommends granting Defendants motion, and dismissing the complaint in its entirety.

**I. *Background***

Plaintiff is an inmate in the custody and control of the New York State Department of Correctional Services ("DOCS"). [1] (Dkt. No. 42, Am.Compl.¶ 4). He is currently incarcerated at Clinton Correctional Facility ("Clinton"). (*Id.;* Dkt. No. 109–4, Pl.'s Dep. at 13 [2] ). He transferred to Clinton from Great Meadow Correctional Facility ("Great Meadow") on January 15, 2008. (Am.Compl.¶ 24).

Plaintiff alleges that Defendants violated his Eighth Amendment right to adequate medical care and Fourteenth Amendment right of equal protection under the law by depriving him of adequate medical treatment when other similarly situated inmates received such treatment. (Am. Compl. ¶¶ 131, 133; Supplemental Compl. ¶¶ 161–62). He also claims that the ice covering the recreation areas aggravate his medical conditions. [3] Additionally, Plaintiff claims that he was deprived of due process in violation of the Fourteenth Amendment when he was placed under a restraint order without being issued a misbehavior report. (Am.Compl.¶ 123). Finally, although Plaintiff does not explicitly state an Eighth Amendment cause of action arising from the restraint orders, the restraints may also implicate the Eighth Amendment as Plaintiff has claimed that prison officials placed him in restraints "as a form of punishment." (Pl.'s Dep. at 70).

**A. Plaintiff's Medical Conditions**

1. *Foot Pain*

Plaintiff was diagnosed with plantar fasciitis in November 2007 while he was incarcerated at Great Meadow. (Dkt. No. 111, Pl.'s Medical R. I at 84). Plantar fasciitis is an inflammation of the plantar fascia, which is a thick band of tissue that "runs across the bottom of the foot and connects the heal bone to the toes." (Johnson Decl. ¶ 19; Lashway Decl. ¶ 21). The condition causes pain in the feet. (Pl.'s Medical R. I at 84). Treatment options include rest, stretching, and orthotic shoe inserts. (Johnson Decl. ¶ 20; Lashway Decl. ¶ 22; Pl.'s Medical R. I at 84). Dr. Thompson, who diagnosed Plaintiff with plantar fasciitis at Great Meadow, noted that "orthotics would help with [the condition] and boots would also help give ... support to help this condition." (Pl.'s Medical R. I at 84).

**\*2** Plaintiff also claims that he suffers from Raynaud's Syndrome. (Am. Compl. ¶ 21; Pl.'s Dep. at 31). Raynaud's Syndrome "is a condition in which blood vessels in the hands and feet appear to overreact to cold." (Johnson Decl. ¶ 31; Lashway Decl. ¶ 33). Plaintiff says that his "feet become painfully cold when there is a slight decrease in temperature" even if his overall body temperature remains warm. (Am.Compl.¶ 21). Plaintiff admits that he has never been diagnosed with Raynaud's Syndrome and admits that there is no indication of it in his medical file, but he claims that a doctor and a physician have told him that he has it. (Pl.'s

Dep. at 31). He believes that medical boots will help with this condition too. (Pl.'s Dep. at 34).

Plaintiff wants to wear his medical boots at all times, or, at the very least, when he leaves his cell to go to recreation or to other call-outs within the facility. (Pl.'s Dep. at 42). He also wants to be able to keep the medical boots at the back of his cell so that he has access to them whenever he leaves his cell. (Pl.'s Dep. at 43–44). Currently, Plaintiff is allowed to wear his boots when he goes on "outside trips." (Defs. 7.1 Statement ¶ 12; Pl.'s 7.1 Statement ¶ 12). Clinton's medical staff concluded that the "boots were only medically necessary when he went on outside trips that required extensive walking." (Defs.' 7.1 Statement ¶ 11; *see also* Dkt. No. 111–1, Pl's Medical R. II at 165, 172, 182). Medical staff provided Plaintiff with orthotic inserts and painkillers, and they recommended exercises to ease his discomfort. (Defs.' 7.1 Statement ¶¶ 4–5, 7, 13; Pl.'s 7.1 Statement ¶¶ 4–5, 7, 11).

### 2. *Back Pain*

Plaintiff claims that he injured his back on February 18, 2009, while attempting "cherry picker" exercises [4] in his cell. (Dkt. No. 97, Pl.'s Supplemental Compl. ¶ 142). The next day, Plaintiff informed Defendant Amber Lashway, a nurse practitioner at Clinton during the events giving rise to this action, that he was experiencing back pain. (*Id.;* Lashway Decl. ¶ 57). Defendant Lashway prescribed Phenylgesic, which is a painkiller made from acetaminophen and phenyltolox. (Pl.'s Medical R. I at 96). Approximately one week later on February 27, 2009, Plaintiff told Defendant Lashway that the medication was "doing little to subside the pain in the back ...." (Pl.'s Supplemental Compl. ¶ 143). Defendant Lashway allegedly told Plaintiff to continue taking the Phenylgesic and that he would not be receiving stronger medication. *Id.*

Two months later, on April 30, 2009, Plaintiff complained again to Defendant Lashway about back pain. (Lashway Decl. ¶ 63; Pl.'s Supplemental Compl. ¶ 145). Defendant Lashway "concluded that [Plaintiff] ... was exhibiting drug-seeking behavior." (Lashway Decl. ¶ 64). Once again, Defendant Lashway told Plaintiff that he would not receive stronger medication, but continued the Phenylgesic and recommended a home exercise program for treating back pain. (Lashway Decl. ¶¶ 64–65; Pl.'s Supplemental Compl. ¶ 145). One of these exercises was supposedly "similar to the cherry pickers exercise." (Pl.'s Supplemental Compl. ¶ 145). After a couple of weeks of completing the other exercises successfully,

Plaintiff claims that he injured his back even more by "attempt[ing] to do the [exercise that was] like the cherry picker exercise ...." *Id.*

**\*3** Defendant Lashway conducted a followup examination of Plaintiff's back on May 28, 2009. (Lashway Decl. ¶ 67). She states that examination was normal and that "it revealed no functional deficits ." (Lashway Decl. ¶ 68; *see also* Dkt. No. 111–2, Pl.'s Medical R. III at 29). Plaintiff, however, claims that he was "experienc[ing] excruciating back pain." (Dkt. No. 115, Pl.'s 7.1 Statement ¶ 52). Plaintiff wanted an x-ray of his back but Defendant Lashway said that an x-ray was not medically indicated. (Lashway Decl. ¶ 69). Defendant Lashway, however, submitted a physical therapy consult to address Plaintiff's complaints. *Id.* ¶ 71. On June 2, 2009, Dr. Gerald Amatucci, [5] the Regional Medical Director, denied the consult "because of a lack of medical necessity at the time." *Id.* ¶ 73. On September 1, 2009, Defendant Lashway submitted another physical therapy consult, which was also denied "because of a lack of medical necessity." *Id.* ¶ 76. [6]

### 3. *Gastrointestinal Problems*

Plaintiff has complained of constipation, stomach cramps, and hemorrhoids. (Am. Compl. ¶¶ 42, 59, 61–63, 65, 67; Pl.'s Dep. at 48–49). He complains that the "Controlled A Diet," which is a high fiber diet that Plaintiff receives to treat constipation and hemorrhoids, consists of "bland food." (Pl.'s Dep. at 51; Dkt. No. 109–1, Defs.' 7.1 Statement ¶ 24; Dkt. No. 115, Pl.'s 7.1 Statement ¶ 24). He also claims that the diet consists of too much meat, insufficient wheat bread and fresh fruits, and overcooked vegetables. (Pl.'s Dep. at 51–52). Plaintiff states that this diet is "ineffective," and that the "Cold Alternative Diet" (also known as Kosher Diet) would better treat his digestive problems. (Pl.'s 7.1 Statement ¶¶ 25, 28). Rabbi Alec H. Friedman [7] is accused of denying Plaintiff's request for the Kosher Diet because Plaintiff is Muslim. (Defs.' Mem. of Law at 16; *see also* Dkt. No. 115–7, Pl.'s Exh. 30).

In addition to a high fiber diet, Plaintiff also receives Metamucil to ease his constipation, which Plaintiff admits has been "pretty effective." (Defs.' 7.1 Statement ¶¶ 21–23; Pl.'s 7.1 Statement ¶¶ 21–23; Pl.'s Dep. at 50). Defendants have also provided Plaintiff with ointment to treat his hemorrhoids, which Plaintiff acknowledges has helped "[c]onsiderably." (Defs.' 7.1 Statement ¶¶ 29–31; Pl.'s 7.1 Statement ¶¶ 29–31; Pl.'s Dep. at 50).

### 4. *Vision Problems*

Plaintiff's eyesight has deteriorated since his incarceration. (Pl.'s Dep. at 58). He states that he had 20/20 vision when he was arrested approximately twenty years ago, but he now needs bifocals. *Id.* Plaintiff also accuses Defendants of ignoring his light sensitivity. (Am.Compl.¶ 89). This sensitivity causes headaches and makes it difficult for Plaintiff to go to the recreation because the sunlight hurts his eyes. (*Id.;* Pl.'s Dep. at 59). He must also leave the lights off in his cell due to the sensitivity. (Pl.'s Dep. at 60). Plaintiff's requests for "photo-ray or tinted glasses" were denied. (Am.Compl.¶ 90).

### 5. *Dental Issues*

**\*4** Plaintiff accuses Defendants of ignoring his dental problems. (Am.Compl. ¶¶ 98–100). Plaintiff lost his partial dentures when he transferred to Clinton from Great Meadow in January 2008. (Am.Compl.¶ 98). He suffers from a receding gum line, which causes pain and swelling. *Id.* He was also scheduled to have this teeth cleaned but that has not occurred. *Id.* He claims that he has only seen a dentist once and that no treatment has been provided. (Pl.'s Dep. at 62).

### 6. *Colonoscopy*

Plaintiff alleges that Defendants were deliberately indifferent to his serious medical needs by delaying a colonoscopy. (Am.Compl.¶¶ 101–09). Plaintiff canceled a colonoscopy in September 2008 because he believed that Dr. Shah had lied to him regarding potential complications that might arise from the procedure. *Id.* ¶¶ 101–02. Plaintiff claims that his medical conditions increased the threat of colon cancer because he has a history of the disease in his family. *Id.* ¶ 72. He requested either another doctor or an alternative procedure shortly after canceling his procedure with Dr. Shah; but Plaintiff did not have a colonoscopy until March 2008. (*Id.* ¶ 103; Dkt. No. 115–7, Pl.'s Exh. 30).

### B. Recreation Area Conditions

Plaintiff complains that the floor of the recreation cages are completely covered with ice that is at least six inches thick, making his feet "extremely painfully cold" due to his Raynaud's Syndrome. (Am.Compl.¶ 33). While prison officials provide galoshes, Plaintiff states that they do not protect his feet. (Pl.'s Dep. at 55–56). He refrains from going to recreation because the snow and ice compound the problems with his feet. *Id.* at 57. Plaintiff requests medical boots to insulate his feet when he goes to recreation. (Am.Compl.¶ 33).

### C. Restraint Order

Plaintiff was placed on a restraint order on December 10, 2008, because he "made threatening statements regarding fighting in the S .H.U. Visiting Room with other S.H.U. inmates." (Dkt. No. 109–12, Racette Exh. D). Waist restraints, leg irons, and handcuffs were to remain on Plaintiff while he was in the visiting area. *Id.* Plaintiff states that he was never given a misbehavior report for this restraint order, violating his due process rights. (Am. Compl. ¶ 117; Pl.'s Dep. at 70). He also claims that the restraints were "too tight" and that prison officials were "trying to torture" him. (Pl.'s Dep. at 68). The leg irons also aggravate problems with his feet. *Id.* at 68–69. The restraint order was lifted on June 20, 2010. (Dkt. No. 109–12, Racette Decl. ¶ 18).

## II. *Legal Standard for Summary Judgment*

Summary judgment is appropriate where there exists no genuine issues of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). "Only disputes over ['material'] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994).

**\*5** The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party satisfies its burden, the non-moving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,* 467 F.3d at 273. In that context, the non-moving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matushita Electric Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Salahuddin v. Goord,* 467 F.3d at 272. "[I]n a *pro se* case,

the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (citing, *inter alia, Burgos v. Hopkins,* 14 F.3d at 790. "However, a *pro se* party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (citing *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)).

### III. *Personal Involvement*

#### A. Legal Standards

In order to hold an individual liable for damages in a section 1983 action, plaintiff must allege that the individual was "personally involved" in the constitutional violation of which he complains. *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006); *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.") The Second Circuit has detailed the various ways in which a defendant can be personally involved in a constitutional deprivation. *See Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986). A supervisory official is said to have been personally involved if that official directly participated in the infraction. *Id.* at 323. Personal involvement may be shown if, after learning of a violation through a report or appeal, the supervisory official failed to remedy the wrong. *Id.* Personal involvement may exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id.* at 323–24; *see also Iqbal v. Hasty,* 490 F.3d 143, 152–53 (2d Cir.2007) (citing *Colon v. Coughlin,* 58 F.3d 865, 873) (2d Cir.1995)), *rev'd on other grounds,* —— U.S. ——, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

**\*6** The "mere receipt of letters from an inmate by a [supervisory official] regarding a medical claim is insufficient to constitute personal liability." *Gonzales v. Wright,* No. 9:06–CV–1424 (JMH), 2010 WL 681323, at \*10 (N.D.N.Y. Feb.22, 2010) (Hood, J.) (citations omitted); *see also Booker v. Doe,* No. 9:06–CV–73 (GLS), 2008 WL 4527601, at \*7 (N.D.N.Y. Sept.30, 2008) (Sharpe, J.) ("It is now well-settled that the failure of a supervisory official to investigate a letter of protest written by an inmate is not sufficient to show

personal involvement."). Moreover, a supervisor's referral of a complaint to a subordinate for investigation does not constitute personal involvement. *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997); *see also Wright v. Genovese,* 694 F.Supp.2d 137, 161 (N.D.N.Y.2010) (Kahn, J.) (adopting magistrate judge's finding that an inmate's letter of complaint to a supervisor was insufficient to establish personal involvement by the supervisor because the supervisor referred the matter to a subordinate for decision and did not personally make any decisions regarding the inmate); *Vega v. Artus,* 610 F.Supp.2d 185, 199 n. 13 (N.D.N.Y.2009) (Suddaby, J.) ("Prison supervisors are entitled to refer letters of complaint to subordinates, and rely on those subordinates to conduct an appropriate investigation and response, without rendering the supervisors personally involved in the constitutional violations alleged in the letters of complaint."). However, personal liability may lie where a "supervisor's 'involvement went beyond merely the receipt of complaint letters,' to 'responding, explaining the treatment and defending the institution.' " *Woods v. Goord,* No. 01 Civ. 3255(SAS), 2002 WL 731691, at \*7–9 (S.D.N.Y. Apr.23, 2002) (Schendlin, J.) (internal citations omitted); *see also Rashid v. Hussain,* No. 95–Civ. 676, 1997 WL 642549, at \*3 (N.D.N.Y. Oct. 15, 1997) (Pooler, J.).

#### B. Analysis

##### 1. *Defendant Fischer*

Defendant Brian **Fischer** began serving as DOCS Commissioner on March 12, 2007. (Dkt. No. 109–7, **Fischer** Decl. ¶¶ 1, 3). He served as Acting Commissioner from January 1, 2007, to March 12, 2007. *Id.* ¶ 2. Plaintiff wrote a letter to Defendant **Fischer** on April 22, 2008, complaining about the deprivation of the medical boots. (Dkt. No. 109–7, **Fischer** Exh. A; Dkt. No. 115–3, Pl.'s Exh. 10). On November 10, 2009, Plaintiff wrote another letter to Defendant **Fischer** which "mention[ed] the crippling and painful effect of his back condition." (Supplemental Compl. ¶ 149; Dkt. No. 109–7, **Fischer** Exh. C). Defendant **Fischer** did not respond to these letters personally. (**Fischer** Decl. ¶ 18). Rather, Defendants Lester Wright and Lucien LeClaire responded to these letters on Defendant **Fischer's** behalf. (Dkt. No. 109–7, **Fischer** Exhs. C–E; Dkt. No. 115–3, Pl.'s Exh. 10; Supplemental Compl. ¶ 150). Due to the large volume of letters that Defendant **Fischer** receives from inmates or others on their behalf, Defendant **Fischer's** secretaries read these letters and forward them to other individuals who may respond on Defendant **Fischer's** behalf. (**Fischer** Decl. ¶¶ 11–15).

**\*7** Without more, even construing the facts in the light most favorable to Plaintiff, Plaintiff has failed to allege, let alone establish, any factual basis upon which a jury could reasonably conclude personal involvement by Defendant **Fischer**. Neither the mere receipt of a complaint nor the delegation to a subordinate to respond to the complaint are sufficient to establish personal involvement.

Accordingly, I recommend that Defendant **Fischer** be granted summary judgment.

### 2. *Defendant LaValley*

Plaintiff alleges that Defendant Thomas LaValley, who was Clinton's First Deputy Superintendent during the time of the events giving rise to this action, directed a formal complaint to another person for review. (Am.Compl.¶ 28). This allegation alone would be insufficient to subject Defendant LaValley to personal liability. The record, however, reveals several instances where Defendant LaValley responded to Plaintiff's formal complaints by explaining and defending the alleged constitutional deprivations. (Dkt. No. 109–5, Artus Exhs. A–C). These responses may be sufficient to subject Defendant LaValley to personal liability if the deprivations violated the Constitution. [8]

Accordingly, Defendant LaValley should not be granted summary judgment on this basis.

### 3. *Defendant Bezio*

Defendant Jeffrey Bezio, a sergeant at Clinton, argues that he was not personally involved in any constitutional violation because the denial of the medical boots did not violate the Constitution. (Defs.' Mem. of Law at 27). The standard, however, requires that the plaintiff allege personal involvement in the *"alleged* constitutional deprivations." *See Wright v. Smith,* 21 F.3d at 501 (emphasis added). Defendant Bezio is accused of denying Plaintiff the use of medical boots in violation of the Eighth and Fourteenth Amendments. (Am.Compl.¶ 25). Defendant Bezio, citing policy, admits to denying Plaintiff access to medical boots on at least one occasion. (Dkt. No. 109–6, Bezio Decl. ¶ 9). Thus, Plaintiff has sufficiently alleged Defendant Bezio's personal involvement in an *alleged* constitutional violation. [9]

Accordingly, Defendant Bezio should not be granted summary judgment on this basis.

### 4. *Defendant Artus*

Defendant Dale Artus was the Superintendent of Clinton during the time of the events giving rise to this action. (Dkt. No. 109–5, Artus Decl. ¶ 4). The record reveals a number of letters and grievances from Plaintiff to Defendant Artus, in which Plaintiff complained of the lack of medical treatment and other prison conditions. (*See generally* Artus Decl.). Plaintiff also claims that he complained to Defendant Artus personally when Defendant Artus "walked on the rounds." (Pl.'s Dep. at 95). Defendant Artus states that all complaints from Plaintiff were delegated to Defendant Artus's subordinates for review and action. (Artus Decl. ¶¶ 11, 13, 16, 18, 20, 28, 36, 38). Plaintiff concedes that Defendant Artus referred most, if not all, of these matters to subordinates. (Am. Compl. ¶¶ 28, 32; Supplemental Compl. ¶ 152).

**\*8** Other than to inform Plaintiff that his complaints were referred to subordinates for review, the record fails to reveal any responses from Defendant Artus that could subject him to personal liability. [10] (Dkt. No. 109–5, Artus Exhs. D, H, I; Dkt. No. 115–7, Pl.'s Exh. 32). Defendant Artus did not respond to any of the grievance appeals directly. (Dkt. No. 109–5, Artus Exhs. A, B, C; Dkt. No. 115–3, Pl.'s Exhs. 7, 9; Dkt. No. 115–4, Pl.'s Exh. 15; Dkt. No. 1155, Pl.'s Exh. 19; Dkt. No. 115–6, Pl.'s Exhs. 26–27; Dkt. No. 112–7, Pl.'s Exhs. 28, 38). Plaintiff argues that Defendant Artus responded to Grievance # CL–56794–08; but that response bears the signature of Defendant Thomas LaValley, who was then Clinton's First Deputy Superintendent. (Dkt. No. 109–5, Artus Exh. A.; Dkt. No. 109–10, LaValley Decl. ¶ 4). Thus, the record fails to show any personal involvement by Defendant Artus.

Accordingly, Defendant Artus should be granted summary judgment on this basis. [11]

### IV. *Eighth Amendment*

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual" punishment. The word "punishment" refers not only to deprivations imposed as a sanction for criminal wrongdoing, but also to deprivations suffered during imprisonment. *Estelle v. Gamble,* 429 U.S. 97, 102–03, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Punishment is "cruel and unusual" if it involves the unnecessary and wanton infliction of pain or if it is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Id.* at 102. In fulfilling this duty, prison officials must "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures

to guarantee the safety of the inmates.' " *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (quoting *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement. *Id.* at 832 (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). A viable Eighth Amendment claim must contain both an objective and a subjective component. *Farmer v. Brennan,* 511 U.S. at 834.

## A. Medical Indifference

### 1. *Legal Standards*

Deliberate indifference to a convicted prisoner's serious medical needs constitutes cruel and unusual punishment, in violation of the Eighth Amendment, as made applicable to the states through the Fourteenth Amendment. *Estelle v. Gamble,* 429 U.S. at 106. There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.*

The objective prong of the standard is satisfied "when (a) the prisoner was 'actually deprived of adequate medical care,' meaning prison officials acted unreasonably in response to an inmate health risk under the circumstances, and (b) 'the inadequacy in medical care is sufficiently serious.' " *Bellotto v. County of Orange,* 248 F. App'x 232, 236 (2d Cir.2007) (quoting *Salahuddin v. Goord,* 467 F.3d at 279–80). If the "unreasonable care" consists of a failure to provide any treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Smith v. Carpenter,* 316 F.3d 178, 185–86 (2d Cir.2003). When a prisoner alleges "a temporary delay or interruption in the provision of otherwise adequate medical treatment," the court must focus on the seriousness of the particular risk of harm that resulted from the "challenged *delay* or *interruption,* rather than the prisoner's *underlying medical condition* alone." *Id.* at 185 (emphasis in original). The standard for determining when a deprivation or delay in a prisoner's medical need is sufficiently serious, contemplates a condition of urgency that may result in degeneration of the patient's condition or extreme pain. *Bellotto v. County of Orange,* 248 F. App'x at 236 (citing *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) and *Smith v. Carpenter,* 316 F.3d at 187 (actual medical consequences are highly relevant)).

**\*9** The subjective prong of the deliberate indifference test is satisfied when an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan,* 511 U.S. at 847. A plaintiff is not required to show that a defendant acted or failed to act "for the very purpose of causing harm or with knowledge that harm will result," but must show that the official was aware of facts from which one could infer that "a substantial risk of serious harm" exists, and that the official drew that inference. *Id.* at 835, 837.

A plaintiff's disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 141 F.Supp.2d 303, 311 (S.D.N.Y.2011) (McMahon, J.). An inmate does not have the right to treatment of his choice. *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986). Even if the medical judgments of prison staff amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate. *Kellam v. Hunt,* No. 9:04–CV–1225 (LEK/GJD), 2007 WL 2764814, at \*6 (N.D.N.Y. Sept.20, 2007) (Kahn, J.). Moreover, "the fact that a course of treatment is unsuccessful does not ... establish medical malpractice.... *A fortiori,* it cannot support a finding of deliberate indifference since deliberate indifference requires a level of culpability beyond malpractice." *Ramos v. Artuz,* No. 00 Civ. 149, 2003 WL 342347, at \*9 (S.D.N.Y. Feb. 14, 2003) (Swain, J.). Finally, penological interests may also inform the decision on the type of care a prisoner receives. *See Estelle v. Gamble,* 429 U.S. at 103.

### 2. *Analysis*

Plaintiff alleges that he was denied adequate medical treatment for his foot and back pain, and digestive, vision, and dental problems. (*See generally* Am. Compl.; Supplemental Compl.). Even assuming that these conditions were sufficiently serious, a review of the record shows that Defendants did not act with deliberate indifference in responding to these medical needs. Rather, the record shows a number of disagreements between Plaintiff's wishes and the medical care Defendants' provided, which is insufficient to make a constitutional claim of deliberate indifference.

Moreover, in refusing to prescribe stronger back pain medication, Defendant Lashway was entitled to her own medical judgment that Plaintiff showed drug-seeking behavior. *See Wright v. Genovese,* 694 F.Supp.2d at 160 ("concern about prescribing narcotic pain medication, on which inmates with possible substance abuse issues could

become dependent, may inform a medical judgment about what drug to prescribe").

Additionally, Clinton's security staff had legitimate penological interests for refusing Plaintiff's request to keep his medical boots in his cell. They determined that doing so "present[ed] an unacceptable security threat to the safety of staff and other inmates." (Racette Decl. ¶ 34). Defendant Racette states that a boot that contains plastic instead of metal may still pose a threat because the "hard plastic" that is used to make the boots' support structures "could easily [be] fashion[ed] [into] a stabbing instrument," and that a plastic weapon poses a greater threat because metal detectors will not be able to detect it. *Id.* ¶¶ 37, 39–40. The record also shows that Plaintiff had been placed in restraints in March and April 2008 because he had "assaulted [and] seriously injured several [Clinton] staff members using weapons (shanks)" and "on numerous occasions [Plaintiff] made threats to staff." (Dkt. No. 115–7, Pl.'s Exh. 34). Therefore, depriving Plaintiff of his medical boots at all times served the legitimate penological purpose of protecting prison staff and other inmates.

**\*10** Plaintiff has also failed to show that Defendants acted with deliberate indifference to his vision problems. Citing an eye examination record, Plaintiff claims that he was diagnosed by an optometrist of having light sensitivity in May 2008. (Defs.' 7.1 Statement ¶ 69). That record, however, notes that Plaintiff had complained of light sensitivity, not that he was diagnosed with it. (Pl.'s Medical R. I at 76). Moreover, a subsequent eye examination in July 2008 makes no reference to light sensitivity at all. (Pl.'s Medical R. at 78). Plaintiff was told once again in December 2009 that the optometrist did not prescribe tinted glasses because the optometrist concluded that tinted glasses were not indicated despite Plaintiff's complaints. (Pl's Medical R. at 70). Notably, although Plaintiff has not received the tinted glasses that he desires, Plaintiff "repeatedly" been "issued eyeglasses to correct his vision." (Pl's 7.1 Statement ¶ 71).

Further, Plaintiff's claim that the failure to place him on the Kosher Diet resulted in "[s]evere internal hemorrhoids" in March 2009 is speculative. (Pl.'s Mem. of Law at 14). He offers no support for that proposition. At worst, any link between the denial of the Kosher Diet and the diagnosis of severe hemorrhoids might show medical malpractice, but not deliberate indifference. After reviewing the record, the Court concludes that Defendants were not deliberately indifferent to Plaintiff's gastrointestinal and hemorrhoid problems. Defendants provided a hemorrhoid ointment, fiber

supplements, and a high fiber diet. (Pl.'s Medical R. I at 162, 167, 173, 179; Pl.'s Medical R. II at 188; Pl.'s Medical R. III at 2, 49, 52). Plaintiff has admitted that the Metamucil has been "pretty effective" in alleviating his constipation and that the ointment has helped "[c]onsiderably" with his hemorrhoids. (Pl.'s Dep. at 50). While Plaintiff later refused the Controlled A Diet, claiming that it did not work (Pl.'s Medical R. III at 13), the Constitution does not require that Plaintiff receive the care of his choice. Rather, the Constitution requires only that an inmate receive adequate medical care.

In addition, Plaintiff cannot show the personal involvement of any Defendant in treating (or in failing to treat) his dental problems. Defendants submit—and Plaintiff admits—that "[d]ental professionals [at Clinton] receive professional supervision from the director of their discipline." (Defs.' 7.1 Statement ¶ 77; Pl.'s 7.1 Statement ¶ 77). When "an inmate complains about dental issues to medical staff, medical staff must refer such complaints to the dental department." (Defs.' 7.1 Statement ¶ 77; Pl.'s 7.1 Statement ¶ 77). Plaintiff admits —and the record shows—that Clinton's medical staff have referred his concerns to the dental department. (Pl.'s 7.1 Statement ¶ 80; *see also* Pl.'s Medical R. I at 12, 13, 135, 141, 147; Pl.'s Medical R. II at 106–07; Pl.'s Medical R. III at 47). As such, Defendants responded appropriately to Plaintiff's dental conditions, and Plaintiff cannot show the personal involvement of any Defendants in the alleged constitutional deprivations.

**\*11** Finally, there is no indication that the five-month delay in providing a colonoscopy was the result of Defendants' deliberate indifference to Plaintiff's serious medical needs. A genetic disposition to colon cancer is insufficient to constitute a serious medical condition because it is not a condition of urgency that may result in degeneration of the condition or extreme pain. Moreover, the delay did not expose Plaintiff to a greater risk of colon cancer. In fact, the colonoscopy did not reveal any cancer at all. *Id.*

Accordingly, Defendants should be granted summary judgment as to Plaintiff's medical indifference claims.

**B. Restraints**

*1. Legal Standards*

Pursuant to DOCS Directive 4933 § 305.4(a), "[a]ny inmate assigned to an [S.H.U.] who has a history of assaultive behavior and/or who presents a threat to the safety or security of himself/herself, other persons, or State property may be placed under a restraint order by the deputy superintendent

for security or, in his/her absence, the [officer of the day] or higher ranking authority." Prison officials have wide latitude to place restraints on inmates and only violate the Eighth Amendment if the imposed restraint is "totally without penological justification, grossly disproportionate, or involves the unnecessary and wanton infliction of pain." *Horne v. Coughlin,* 155 F.3d 26, 31 (2d Cir.1998) (citations omitted).

## 2. *Analysis*

In this case, the imposition of the restraint orders did not violate Plaintiff's rights under the Due Process Clause. Defendants intercepted a letter, dated December 4, 2008, that Plaintiff wrote to his brother where Plaintiff threatened to "kill one of these bitches in this box down with the police" and that the "only time [Plaintiff] can get at one of these bitches is on the visit because we out of restraints, so if you decide to ever come visit again be ready to get it on, I fight we all fight that's how we go." (Dkt. No. 109–12, Racette Exh. B). Later, in June 2009, the Deputy Superintendent of Elmira Correctional Facility also intercepted a letter where Plaintiff threatened to kill another inmate who was in a rival gang. (Dkt. No. 109–12, Racette Exh. C).

Defendants interpreted these letters as a threat to other inmates in Clinton's S.H.U. (Dkt. No. 109–12, Racette Decl. ¶¶ 7, 16–17). Plaintiff has been assigned to S.H.U. throughout his entire incarceration at Clinton. (Defs.' 7.1 Statement ¶ 8; Pl.'s 7.1 Statement ¶ 8). The initial restraint order on December 10, 2008, was placed on Plaintiff because he had "made threatening statements regarding fighting in the S.H.U. visiting room with other S.H.U. inmates." (Dkt. No. 109–12, Racette Exh. D). Each subsequent restraint order was issued for the same reason." *Id.*

Plaintiff contends he was not a threat to security. (Dkt. No. 115–1, Pl.'s Mem. of Law at 20–25). He argues that the first letter was a ploy that he had learned from a psychology book to create an urgent situation so that his brother would visit. *Id.* at 19–20. Plaintiff also claims that the second letter should not be admitted as evidence because he does not remember writing it, that it is undated, and that a deputy superintendent would not be in the position to intercept letters as a deputy superintendent would not work in the mail room. *Id.* at 24.[12] Even if Plaintiff's claims are true, he has not raised any issue of material fact that would permit a reasonable juror to conclude that Defendants acted "totally without penological justification," that the restraints were "grossly disproportionate," or that they "involve[d] the unnecessary

and wanton infliction of pain." While Plaintiff believes that he does not present a threat to other inmates in S.H.U ., Defendants were authorized to impose the restraint orders under DOCS regulations, and they did so for a legitimate, penological purpose (i.e. ensuring the safety of other persons) after intercepting correspondence that they interpreted as Plaintiff's threats to other inmates. Plaintiff was not required to wear restraints when he was in recreation or in his cell. (Pl.'s Dep. at 66; Dkt. No. 109–12, Racette Exh. D). The restraint orders were lifted in June 2010 after the inmate that Plaintiff had threatened to harm was transferred to another facility. (Racette Decl. ¶ 18; Pl.'s 7.1 Statement ¶ 95). Thus, there is no indication that the restraints were grossly disproportionate to the perceived threat.

**\*12** Accordingly, Defendants should be granted summary judgment on this basis.

## C. Ice in the Recreation Areas

### 1. *Legal Standards*

In order to state a valid conditions-of-confinement claim under the Eighth Amendment, a plaintiff must allege that: (1) the conditions were so serious that they constituted a denial of the "minimal civilized measure of life's necessities," and (2) prison officials acted with "deliberate indifference." *Wilson v. Seiter,* 501 U.S. 294, 297–99, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991) (cited in *Branham v. Meachum,* 77 F.3d 626, 630–31 (2d Cir.1996)).

To satisfy the objective element, the plaintiff must demonstrate that the conditions under which he or she was confined resulted "in unquestioned and serious deprivations of basic human needs." *Anderson v. Coughlin,* 757 F.2d 33, 35 (2d Cir.1985) (citing *Rhodes v. Chapman,* 452 U.S. at 347). The Eighth Amendment is implicated for example, "when inmates are denied 'essential food, medical care, or sanitation," or when conditions are such that the threat of violence among inmates is increased." *Morgan v. Ward,* 699 F.Supp. 1025, 1054 (N.D.N.Y.1988). Conditions of confinement are not cruel and unusual for Eighth Amendment purposes simply because they are "restrictive and even harsh." *Anderson v. Coughlin,* 757 F.2d at 35. Rather, many unpleasant aspects of prison life "are part of the penalty that criminal offenders pay for their offenses against society." *Id.* (citation omitted).

Satisfying the subjective element requires that the prisoner show that defendants acted with "deliberate indifference." *Wilson v. Seiter,* 501 U.S. at 302–03. A prison official

acts with deliberate indifference to inhumane conditions of confinement where he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." *Farmer v. Brennan,* 511 U.S. at 137.

In this Circuit, proof that an inmate was subjected "for a prolonged period to bitter cold" is sufficient to raise a triable issue of fact as to the objective prong. *Gaston v. Coughlin,* 249 F.3d 156, 164 (2d Cir.2001) (holding that summary judgment for defendants was precluded where prisoner was subjected to temperatures near or well below freezing in his cell for a five-month period); *see also Corselli v. Coughlin,* 842 F.2d 23 (2d Cir.1988) (holding that summary judgment for defendants was precluded where prisoner was subjected to bitter cold in cell for three months); *Wright v. McMann,* 37 F.2d 519, 526 (2d Cir.1967) (vacating a dismissal on the pleadings where the complaint alleged that prisoner was deliberately exposed to bitter cold for periods of twenty-one days or more while in solitary confinement).

But where an inmate has not been subjected to "bitter cold" for a "prolonged period," the Second Circuit has held that summary judgment for prison officials is appropriate. *See Trammell v. Keane,* 338 F.3d 155 (2d Cir.2003). In *Trammell,* the inmate was deprived of clothing and confined to his cell for a few weeks as a disciplinary measure. *Id.* at 159. The Second Circuit found that defendants were entitled to summary judgment because the inmate had failed to allege that his cell was open to the elements, lacked adequate heat, or that he had been subjected to "bitter cold." *Id.* at 165.

### 2. *Analysis*

**\*13** Here, Plaintiff argues that the recreation area was covered in ice, making it difficult for him to exercise because the cold would aggravate the pain in his feet. (Am. Compl. ¶ 33; Pl.'s Dep. at 55–57). Even if Plaintiff's allegations were true, he has failed to satisfy both the objective and subjective prongs of a conditions of confinement claim. Plaintiff was not exposed to "bitter cold" for a "prolonged period." He refrained from going to the recreation cages and there is nothing in the record to indicate that Defendants forced Plaintiff to be exposed to the cold. (Pl.'s Dep. at 57). Moreover, Plaintiff's admission that Defendants provided galoshes to insulate his feet belie any claim that Defendants acted with deliberate indifference to expose Plaintiff to inhumane conditions. *Id.* at 55–56. Finally, as discussed more fully above, Defendants did not provide Plaintiff with his

medical boots when he went to recreation because they were not medically necessary and they posed a potential threat to others. [13]

Accordingly, Defendants should be granted summary judgment on this basis.

### V. *Equal Protection Claims*

#### A. Legal Standards

The Equal Protection Clause of the Fourteenth Amendment provides that the government shall treat all similarly-situated people alike. *Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995) (citing *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)). A plaintiff alleging a violation of his equal protection rights must first show that he was treated differently than others similarly situated because of intentional or purposeful discrimination, typically against an identifiable or suspect class, such as race or religion. *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005). Then, the plaintiff must establish that the difference in treatment cannot survive the appropriate level of scrutiny. *Id.*

Strict scrutiny is used when "the classification drawn 'impermissibly ... operates to the peculiar disadvantage of a suspect class.' " *Disabled Am. Veterans v. U.S. Dep't of Veterans Affairs,* 962 F.2d 136, 141 (2d Cir.1992) (citing *Mass. Bd. of Ret. v. Murgia,* 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976) (footnotes omitted)). Suspect classes are those based on "race, alienage, or national origin, or those which discriminate against a group saddled ... [with] political powerlessness as to command extraordinary protection from the majoritarian political process." *Id.* Classifications based on religion are also "inherent[ly] suspect." *Robles v. Dennison,* 745 F.Supp.2d 244, 301 (W.D.N.Y.2010) (citing *City of New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976)). To survive strict scrutiny, the "State must demonstrate a compelling governmental interest and show that the law is the least restrictive means of furthering its interest." *City of Boerne v. Flores,* 521 U.S. 507, 534, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997).

**\*14** Alternatively, an equal protection claim can sometimes be sustained even if the plaintiff does not allege "class-based" discrimination and instead claims that he has been irrationally singled out as a "class of one." *Engquist v. Or. Dep't of Agric. .,* 553 U.S. 591, 601, 128 S.Ct. 2146, 170 L.Ed.2d 975 (2008) (internal quotations omitted). The Equal Protection Clause "secure[s] every person .... against intentional and arbitrary

discrimination" by state officials. *Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000) (*per curiam* )). Thus, in a "class of one" claim, the Equal Protection Clause requires a "rational basis for the difference in treatment." *Id.* (citing *Willowbrook v. Olech,* 528 U.S. at 564).

### B. Analysis

Plaintiff claims that the denial of adequate medical care for his feet and gastrointestinal problems, "constitute[ ] unequal protection of the law." (Am.Compl.¶ 133). [14] Plaintiff, who is black, was not permitted to wear medical boots while in the S .H.U. at Clinton. (Pl.'s Mem. of Law at 18). He argues that William Blake, a white inmate who also suffers from plantar fasciitis, was permitted to wear medical boots while in the S.H.U. at Great Meadow (Pl.'s Mem. of Law at 18; Dkt. No. 115–2 at 15, Blake Aff. ¶¶ 5–7). Plaintiff also appears to assert a "class of one" claim with regard to his gastrointestinal problems. He argues that a Muslim inmate, Dennis Nelson, received the Kosher Diet while incarcerated at Green Haven Correctional Facility ("Green Haven"). (Pl.'s Mem. of Law at 18; Nelson Aff. ¶ 4). But Plaintiff, who is also Muslim, was denied the Kosher Diet while incarcerated at Clinton. (Pl.'s Mem. of Law at 18).

Without more, Plaintiff has not shown that any *Clinton* officials treated him differently because of his membership in a suspect class or that *Clinton* officials intentionally or arbitrarily discriminated against him. [15] Personnel at Clinton would have no control over or responsibility for the medical care of inmates at other facilities; so a comparison of how isolated inmates at other institutions were treated does not support an equal protection claim against any Clinton official. Moreover, Plaintiff has neither shown nor alleged the personal involvement of Defendants **Fischer** and Wright, who are both DOCS officials, in any alleged violation of the Equal Protection Clause.

Accordingly, I recommend granting Defendants' motion for summary judgment as to Plaintiff's equal protection claims.

### VI. *Due Process Violations*

#### A. Legal Standards

To prevail on a procedural due process claim under section 1983, a plaintiff must show that he possessed a protected property or liberty interest, and that he was deprived of that interest without being afforded sufficient procedural safeguards. *See Tellier v. Fields,* 280 F.3d 69, 79–80 (2d

Cir.2000); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.1998). Due process generally requires that the state afford individuals "some kind of hearing" prior to depriving them of a liberty or property interest. *DiBlasio v. Novello,* 344 F.3d 292, 302 (2d Cir.2003).

**\*15** An inmate's protected liberty interest is implicated where the punishment at issue imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). The Second Circuit has refused to set a bright line rule on when confinement becomes atypical. Instead, "in order to determine whether a liberty interest has been affected, district courts are required to examine the circumstances of a confinement and to identify with specificity the facts upon which [their] conclusions [are] based." *Wright v. Coughlin,* 132 F.3d 133, 137 (2d Cir.1998) (citations omitted).

### B. Analysis

Here, the restraint orders required Plaintiff to be in restraints whenever he left his cell, except when he would go to recreation. (Pl.'s Dep. at 69–70; Dkt. No. 109–12, Racette Exh. D). Plaintiff argues that the restraint orders violated his due process rights because he did not receive a misbehavior report prior to being issued the restraint orders. (Am. Compl. ¶ 117; Pl.'s Dep. at 70). The Court concludes that Plaintiff does not have a liberty interest in being free from restraints while out of his cell. Placing a prison inmate in restraints does not impose the "atypical and significant hardship" envisioned in *Sandin. See, e.g., Brown v. Coughlin,* No. 93–CV–0633E(H), 1995 WL 643349, at \*3(W.D.N.Y. Oct.13, 1995) (Elfvin, J.) (concluding that an S.H.U. inmate "does not have a liberty interest in being unencumbered by mechanical restraints during his exercise period"). As such, Plaintiff's due process claim fails as a matter of law as he had no liberty interest that would trigger due process protections. [16]

Accordingly, I recommend granting Defendants summary judgment on this basis.

### VII. *Conclusion*

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that Defendants' motion for summary judgment (Dkt. No. 109) be **GRANTED** and the complaint **DISMISSED IN ITS ENTIRETY.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,*

984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec. of Health & Human Servs.,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b) (1); Fed.R.Civ.P. 6(a), 6(e), 72.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 4369116

Footnotes

1   On April 1, 2011, DOCS and the New York State Division of Parole were merged into one agency, named the New York State Department of Corrections and Community Supervision. Because the events relevant to this suit occurred before the merger, I will refer to New York State's corrections agency as "DOCS."

2   All references to page numbers will be to the page numbers assigned by the court's electronic docketing system.

3   Neither the Amended Complaint nor the Supplemental Complaint explicitly state an Eighth Amendment conditions of confinement cause of action. Defendants, however, have construed a conditions of confinement claim. (Dkt. No. 109–2, Defs.' Mem. of Law at 20–21). Accordingly, the Court will also analyze whether Defendants are entitled to summary judgment on a conditions of confinement claim. *See Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (holding that were a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and interpret them to raise the strongest arguments that they suggest.").

4   Plaintiff describes this exercise as "having your hands touching your toes." (Pl.'s Supplemental Compl. ¶ 142).

5   Dr. Amatucci is not a party to this action.

6   Plaintiff has admitted to paragraphs 69, 71, 73, and 76, of Defendant Lashway's Declaration. (*See* Pl.'s 7.1 Statement ¶¶ 53, 55, 58, 61).

7   Rabbi Friedman is not a party to this action.

8   Whether the deprivations violated the Constitution is discussed below. *See infra* Point IV(A).

9   Whether the deprivation of the medical boots violated the Constitution is discussed below. *See infra* Point IV(A).

10  Also contained in the record are memoranda from Defendant Artus to Plaintiff modifying Plaintiff's keeplock and S.H.U. confinement times. (Dkt. No. 115–6, Pl.'s Exh. 21). Those matters are not at issue in the pending action.

11  Plaintiff also argues that Defendants **Fischer,** LaValley, and Artus were personally involved by claiming that they used DOCS Directive 4933 to deny the medical boots. (Dkt. No. 115–1, Pl.'s Mem. of Law at 26). Plaintiff relies on their responses to interrogatories where they admit that the directive does not address every item that is prohibited in S.H.U. (*Id.;* Dkt. No. 115–4, Pl .'s Exh. 12; Dkt. No. 115–7, Pl.'s Exhs. 32, 33). It appears that Plaintiff is attempting to assert that those Defendants created or allowed a policy or custom under which unconstitutional practices occurred. Even after reading Plaintiff's papers liberally, however, there is no indication that the directive contributed to unconstitutional practices, especially when both Defendants **Fischer** and LaValley stated that exceptions to prohibited items may be allowed for medical reasons. (Dkt. No. 115–4, Pl.'s Exh. 12; Dkt. No. 115–7, Pl.'s Exh. 33).

12  It should be noted that the second letter bears the same salutation and signature as the first letter, which Plaintiff acknowledges writing. (Dkt. No. 109–12, Racette Exhs. B–C).

13  While deprivation of recreation privileges may state a constitutional claim, *see Williams v. Greifinger,* 97 F.3d 699, 704 (2d Cir.1996), Plaintiff was not deprived of recreation privileges. Rather, by his own admission, he chose to refrain from recreation because he was not provided with medical boots, which he feels would have kept his feet warm. Defendants, however, provided galoshes so that Plaintiff's feet would be insulated from the cold. Still, Plaintiff continued to refrain from recreation. Thus, any deprivation, would have been the result of a choice made by the Plaintiff, which is insufficient for an Eighth Amendment claim based on conditions of confinement. *See Willard v. Ramsey,* No. 07–CV–1156, 2010 WL 786296, at *3 n. 10 (N.D.N.Y. Mar. 2, 2010) (Mordue, C.J.) (holding meritless a prisoner's claim that his Eighth Amendment rights were violated by his conditions of confinement because the prisoner refused, after being offered, participation in recreation).

14  The Amended and Supplemental Complaints make conclusory allegations that the deprivation of adequate medical care for his visual, dental, and back problems, and that the issuance of the restraint order without due process of law, "constitute[ ] unequal protection of the law." (Am. Compl. ¶ 133; Suppl. Compl. ¶ 162). In responding to the summary judgment motion, however, Plaintiff has neither alleged nor offered any allegations or facts to suggest that the treatment for his visual, dental, and back problems violated the Equal Protection Clause. He has neither alleged nor shown that

others similarly situated received different care, or that prison officials acted irrationally when treating those problems. This court concludes that any equal protection claim with respect to these medical care issues is mis-pled and essentially duplicates plaintiff's claim that the defendants were deliberately indifferent to his medical needs. *See, e.g. Hardy v. Diaz,* 9:08–CV–1352 (GLS/ATB), 2010 WL 1633379, at *8 (N.D.N.Y. Mar. 30, 2010) (vague and duplicative equal protection claim based on delays in treatment for Hepatis C virus treated as part of Eighth Amendment deliberate indifference claim) (Report–Recommendation), adopted, 2010 WL 1633390 (N.D.N.Y. Apr.21, 2010); *Toney v. Goord,* 04–CV–1174 (TJM/ RFT), 2006 WL 2496859 at *10–11 (N.D.N.Y. Aug. 28, 2006). Finally, the alleged equal protection violation arising from the issuance of the restraint order should be analyzed under the Due Process Clause of the Fourteenth Amendment. *See infra* Point VI.

15    Plaintiff claims that Rabbi Friedman denied the request for the Kosher Diet because Plaintiff is Muslim. (Defs.' Mem. of Law at 16; *see also* Dkt. No. 115–7, Pl.'s Exh. 30). Rabbi Friedman, however, is not a defendant in this action.

16    Plaintiff argues that the restraints also violated DOCS Directive 4933 § 305.4(e). (Pl.'s Mem. of Law at 24). DOCS Directive 4933 § 305.4(e) (viii) states: "If an inmate is under a restraint order directing that he/she be mechanically restrained *whenever* (emphasis in original) he/she leaves the S.H.U. cell for any reason, the inmate will remain mechanically restrained during the entire period of time he/she is out of the SHU cell, except .... when in a general population visiting room and not in a noncontact area." Section 3054(e)(vii) was not violated because Plaintiff was placed in restraints while in the S.H.U. visiting room, not the general population visiting room. (*See also* Racette Exh. D; *see also* Dkt. No. 115–6, Pl.'s Exh. 20 (letter from Plaintiff and affidavit of Plaintiff's fiancée noting that the visits occurred in the S.H.U. visiting room)).

**End of Document**                                                  © 2019 Thomson Reuters. No claim to original U.S. Government Works.



2012 WL 1029614
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Tyrone **WALKER**, Plaintiff,

v.

Brian **FISCHER**, Commissioner of State of New
York Department of Correctional Services; Robert
Schattinger, Director of Nutritional Services,
State of New York Department of Correctional
Services; Dale Artus, Superintendent, Clinton
Correctional Facility; thomas lavalley, First
Deputy Superintendent, Clinton Correctional
Facility; Max Patnode, Deputy Superintendent
of Programs, Clinton Correctional Facility; Rabbi
Alec H. Friedmann, Jewish Chaplain, Clinton
Correctional Facility; David Lucia, Lieutenant,
Clinton Correctional Facility; V. Johnson, Facility
Health Services Director, Clinton Correctional
Facility; Kevin Hicks, Sergeant, Clinton Correctional
Facility; R. Trudeau, Correctional Officer, Clinton
Correctional Facility; and Imam Assallami Fadl,
Chaplain, Clinton Correctional Facility, Defendants.

No. 9:10–cv–01431 (MAD/DEP).
|
March 26, **2012**.

**Attorneys and Law Firms**

Tyrone **Walker**, Dannemora, NY, pro se.

Office of the New York State Attorney General, Megan M.
Brown, AAG, of Counsel, Albany, NY, for Defendants.

**MEMORANDUM–DECISION AND ORDER**

MAE A. D'AGOSTINO, District Judge.

**I. INTRODUCTION**

**\*1** Plaintiff filed a *pro se* civil rights complaint against
a broad array of corrections employees, alleging several
deprivations of his civil rights. In his complaint, Plaintiff
sets forth several claims alleging violations of his rights

under the Religious Land Use and Institutionalized Persons
Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc–1(a), as well
as the First, Eighth, and Fourteenth Amendments to the
United States Constitution. In a February 27, **2012** Report,
Recommendation and Order, Magistrate Judge Peebles
recommended that the Court grant in part and deny in part
Defendants' motion to dismiss and deny Plaintiff's motion
for leave to amend his complaint and join additional parties
without prejudice to renewal.

Currently before the Court are Plaintiff's objections to
Magistrate Judge Peebles' February 27, **2012** Report,
Recommendation and Order and his renewed motion to
amend and supplement his complaint.

**II. BACKGROUND**

**A. Plaintiff's complaint**

Plaintiff is a prison inmate entrusted to the care and custody
of the New York State Department of Corrections and
Community Supervision ("DOCCS"). *See* Dkt. No. 1 at ¶
4. At all times relevant to his claim, Plaintiff was confined
in a special housing unit ("SHU") cell within the Clinton
Correctional Facility ("Clinton"), located in Dannemora, New
York. *See id.* Plaintiff is a Muslim by faith, and suffers from
a gastrointestinal condition that causes him to experience
chronic constipation and severe internal hemorrhoids. *See
id.* at ¶ 18 and Exhibit "5." For these conditions, Plaintiff
receives hemorrhoidal cream periodically, is provided with
Metamucil, and has been placed on a Controlled "A" High
Fiber Diet. *See id.* at ¶ 18 and Exhibit "1."

Plaintiff's complaint, in large part, centers upon the alleged
failure of prison officials to meet his health and religious
dietary needs. Believing that the prescribed High Fiber Diet
did not provide him with adequate fiber, Plaintiff filed
Grievance No. CL–57436–08 on July 14, 2008, requesting
a Kosher or a Muslim Halal Diet, which, he claims, would
satisfy both his medical needs and religious beliefs. *See
id.* at ¶ 19. In response to his grievance, Plaintiff was
advised that the High Fiber Diet was created by the DOCCS
Division of Nutritional Services in accordance with DOCCS'
policies and complies with all state-wide mandates. *See id.*
As such, his grievance was denied. *See id.* and Exhibit "2."
Plaintiff appealed the denial of his grievance, and his appeals
were rejected by both the facility superintendent and by the
DOCCS Central Office Review Committee ("CORC"). *See
id.* at ¶ 19.

On July 29, 2008, Plaintiff received a communication from Brian LeCuyer, a Nurse Administrator at Clinton, advising him that if he was not satisfied with his existing diet, he should complete a refusal form requesting that he be removed from the diet and that he could speak with the appropriate religious official regarding his desire for a Kosher or Muslim Halal Diet. *See id.* at ¶ 20 and Exhibit "3." On July 30, 2008, Plaintiff wrote to the Assistant Director of Nutritional Services, reiterating his challenge to the adequacy of the High Fiber Diet, as set forth in Grievance No. CL–57436–08. *See id.* at ¶ 25 and Exhibit "4." Plaintiff did not receive a response to this communication. *See id.*

**\*2** On August 1, 2008, Plaintiff made a written request to Defendant Rabbi Alec H. Friedmann, the Jewish Chaplain at Clinton, requesting that he be placed on a Cold Alternative Diet, or Kosher Diet, to address his health issues, explaining that the diet would be consistent with his religious beliefs. *See id.* at ¶ 22 and Exhibit "5." On August 6, 2008, Defendant Friedmann wrote back to Plaintiff, denying his request and recommending that he instead accept a Religious Alternative Meal ("RAM"). *See id.* In that communication, Defendant Friedmann informed Plaintiff that the RAM would meet all of the biblical requirements of his chosen religion as a Muslim. *See id.* and Exhibit "5."

In September of 2008, after complaining to several prison officials concerning the diet denial, including Defendant Dale Artus, Superintendent of Clinton, Defendant Max Patnode, Clinton Superintendent of Programs, and Defendant Brian **Fischer**, DOCCS Commissioner, Plaintiff voluntarily removed himself from the Controlled "A" High Fiber Diet. *See id.* at ¶¶ 23–30 and Exhibit "12."

In his complaint, Plaintiff also complains that he was denied the opportunity to observe weekly religious Jumuah sermons, also referred to as Khutbah, by closed circuit television from his SHU cell. *See id.* at ¶¶ 35–42. In an effort to obtain access to those weekly religious sermons, Plaintiff filed grievances on October 21, 2008, July 1, 2010, and September 21, 2010; sent a complaint letter on July 28, 2008 to Defendant Artus; forwarded a written complaint to Defendant **Fischer** on August 25, 2008; sent three letters, dated February 10, 2009, February 23, 2009, and March 2, 2009, to Defendant Imam Assallami Fadl; and lodged a complaint, dated September 21, 2010, with Clinton Superintendent, Defendant Thomas LaValley. *See id.* and Exhibit "16–22."

Plaintiff further asserts a retaliation claim, alleging that after complaining about the failure of prison officials to provide

him with the requested diet and access to Jumuah sermons, he was moved from his cell location to another, where he experienced significantly worse conditions and was subjected to excessively frequent cell searches. *See id.* at ¶¶ 43–50.[1] Plaintiff also claims that his due process rights were violated in connection with his transfer to a different cell. *See id.*

Finally, Plaintiff claims that, on October 2, 2010, he was denied a request for a sweet breakfast[2] as part of his religious services and that he was provided different food from that offered to Muslim inmates in the general prison population in celebration of the Ramadan Feast. *See id.* at ¶¶ 68–70. Plaintiff claims that the religious feast provided to him in the SHU consisted of rice, fish, mess hall cabbage, and mess hall beans, and did not include other foods, such as lamb, bean pie, and chicken, which were provided to Muslims in the general population in celebration of the Ramadan Feast. *See id.* at ¶ 70. In anticipation of the 2010 religious feast, and after having been denied his sweet breakfast in 2009, Plaintiff wrote to Defendant LaValley on September 22, 2010 concerning the matter, hoping to preemptively avoid a similar denial for that year. *See id.* at ¶ 68 and Exhibit "48." On October 3, 2010, after not receiving his sweet breakfast as requested, Plaintiff filed a grievance and sent letters to Defendants **Fischer** and LaValley, complaining of the failure to provide him with the requested sweet breakfast. *See id.* at ¶ 70 and Exhibit "49."

**\*3** Plaintiff commenced this action on November 23, 2010. *See* Dkt. No. 1. In his complaint, Plaintiff asserts that his religious freedom rights under the RLUIPA and First Amendment were infringed because of Defendants' interference with his ability to practice his chosen religion, including through denial of a sweet breakfast and proper feast, the opportunity to observe Jumuah sermons, and the denial of a Kosher Diet. *See id.* Plaintiff further claims that he was unlawfully retaliated against for voicing his complaints and that he was subjected to cruel and unusual punishment. *See id.*

## B. Magistrate Judge Peebles' Report, Recommendation and Order

In his February 27, **2012** Report, Recommendation and Order, Magistrate Judge Peebles recommended that the Court dismiss several Defendants and several of Plaintiff's claims. *See* Dkt. No. 40. First, Magistrate Judge Peebles recommended that the Court grant Defendants' motion as to Defendant **Fischer** for his lack of personal involvement, but deny the motion as to Defendants Artus and LaValley on the same ground. *See id.* at 16–18. Second, Magistrate Judge Peebles recommended that the Court find that Plaintiff

failed to state a plausible First Amendment and RLUIPA deprivation claim associated with the refusal of prison officials to provide him with a Kosher Diet in lieu of the prescribed Controlled "A" High Fiber Diet. *See id.* at 20. Magistrate Judge Peebles found that "Plaintiff does not appear to contend that his Controlled 'A' Diet does not comport with his religious beliefs as a Muslim. Instead, he argues that the Cold Alternative (Kosher) Diet would also be consistent with his religious beliefs, and should be made available to him for health reasons." *See id.*

Third, Magistrate Judge Peebles found that Plaintiff was also asserting an Eighth Amendment deliberate indifference claim by alleging that the Controlled "A" High Fiber Diet did not meet his medical needs. *See id.* at 21–22. He recommended that the Court find that Plaintiff failed to allege facts sufficient to establish either the objective or subjective element of this claim. *See id.* at 23–27. Fourth, Magistrate Judge Peebles found that "Plaintiff's allegations regarding the denial of religious meals on two isolated occasions are insufficient to meet his burden of establishing [that] defendants' conduct infringes on his sincerely held religious beliefs under either the First Amendment or the RLIUPA." *See id.* at 32 (citations omitted). Further, the Report found that the fact that Plaintiff was not provided with the same Ramadan Feast meal as inmates in the general population does not trigger the protections of the First Amendment or the RLUIPA. *See id.* at 33. Magistrate Judge Peebles did, however, find that the portion of Plaintiff's free exercise claim stemming from the alleged ongoing refusal of prison officials to broadcast Jumuah sermons to his SHU cell "could be regarded as a sufficiently serious deprivation to state a plausible free exercise claim." *See id.* at 33–34 (citations omitted).

**\*4** Fifth, regarding Plaintiff's harassment claims against Defendants Hicks and Trudeau, Magistrate Judge Peebles found that most of Plaintiff's allegations amount to nothing more than taunting or threats, which are insufficient to support a cognizable section 1983 claim. *See id.* at 35–36. Further, the Report found that "the mere allegation that a false misbehavior report has been issued to an inmate similarly does not implicate unconstitutional conduct." *See id.* at 36–37 (citations omitted). Sixth, Magistrate Judge Peebles recommended that the Court find that Plaintiff's procedural due process claims against Defendant Lucia should be dismissed because the disciplinary penalty as a result of the charges leveled against him was never imposed, Plaintiff was not deprived of a cognizable liberty interest. *See id.* at 37–38.

Seventh, regarding Plaintiff's equal protection claim based on Defendants' refusal to provide him with the requested Kosher Diet, Magistrate Judge Peebles found that this claim should be dismissed because Plaintiff's "complaint lacks any factual allegations suggesting that the failure to provide [him] with the requested Kosher Diet was based upon intentional or purposeful discrimination directed at an identifiable suspect class." *See id.* at 39–40. Eighth, the Report recommended that the Court find that it is premature to grant Defendants qualified immunity at this juncture. *See id.* at 43.

Ninth, Magistrate Judge Peebles recommended that Plaintiff be given leave to amend with respect to the claims for which dismissal was recommended. *See id.* at 44. And, finally, Magistrate Judge Peebles denied Plaintiff's motion for leave to amend/join parties in light of his failure to satisfy the requirements set forth in Local Rule 7.1(a)(4). *See id.* at 46. Specifically, Magistrate Judge Peebles held that Plaintiff submitted a proposed pleading "which adds to, but does not replace, his amended complaint[,]" and that "various of the allegations set forth in the proposed amended complaint purport to alter factual allegations contained within plaintiff's initial complaint." *See id.*

**C. Plaintiff's objections**

On March 16, **2012**, the Court received Plaintiff's objections to Magistrate Judge Peebles' Report, Recommendation and Order. *See* Dkt. No. 41. In his objections, Plaintiff first argues that Magistrate Judge Peebles erred in finding that the denial of a Kosher Diet did not violate his First and Eighth Amendment rights or his rights under the RLUIPA. *See id.* at 7. [3] Plaintiff claims that the Report incorrectly provides that " 'Plaintiff does not appear to contend that his Controlled "A" Diet does not comport with his religious beliefs as a Muslim.' " *See id.* (quotation omitted). Citing to the exhibits attached to his complaint, Plaintiff alleges that " '[e]ating the High Fiber Diet as it is, is a substantial burden on me because this food is in violation of my religious belief, and it's not producing the results I need to maintain my health.' " *See id.* (quoting Dkt. No. 1–1 at Exhibit "4"). Plaintiff claims that the large amounts of meat contained in the High Fiber Diet are not processed in accordance with his religious beliefs, but meats contained in Kosher or Halal (permissible) Muslim meals would be. *See id.* at 8.

**\*5** Moreover, Plaintiff alleges that the fact that he remained on the High Fiber Diet for over one year and that his colonoscopy still showed that he had "several internal

hemorrhoids from his constipation and irregularity is proof the High Fiber Diet was ineffective and inadequate." *See id.* at 9. Plaintiff claims that the Court should focus not only on the "several internal hemorrhoids" when determining if he has a serious medical need, but on the fact that the ineffective treatment, causing these "perpetual" hemorrhoids, makes him more likely to get colon cancer in the future. *See id.* at 10.

Next, Plaintiff claims that the RLUIPA and the First Amendment's Free Exercise Clause provide that inmates must be given meals that conform to their religious beliefs. *See id.* at 11. Plaintiff alleges that, by denying him the only religious meal options that met his dietary needs as well as his religious beliefs violated his rights. *See id.* at 11–12. Finally, Plaintiff asks that the Court reserve decision on Magistrate Judge Peebles' Report, Recommendation and Order "until it can be accessed with the facts contained in the amended and supplemental complaint as a whole." *See id.* at 12–14.

## III. DISCUSSION

### A. Standard of review

When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). However, when a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that he presented] to the magistrate judge," the court reviews those recommendations for clear error. *O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 **WL** 933846, *1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1).

In a rule 12(b)(6) motion to dismiss, the court must accept as true all of the factual allegations in the complaint, which is deemed to include any written instrument attached to the complaint as an exhibit, any materials incorporated into it by reference, and any other documents that are integral to it. *See Sira v. Morton,* 380 F.3d 57, 67 (2d Cir.2004) (citations omitted). Moreover, the court must draw all reasonable inferences from those factual allegations in the plaintiff's favor. *See Hayden v. Paterson,* 594 F.3d 150, 160 (2d Cir.2010) (quotation omitted). Although a court's review of a motion to dismiss is generally limited to the facts presented in the pleading, the court may consider documents

that are "integral" to that pleading, even if they are neither physically attached to it nor incorporated by reference into the pleading. *See Mangiafico v. Blumenthal,* 471 F.3d 391, 398 (2d Cir.2006) (quoting *Chambers v. Time Warner, Inc. .,* 282 F.3d 147, 152–53 (2d Cir.2002)). Dismissal will only be granted by the court if it "appears beyond doubt that plaintiff can prove no set of facts in support of the claim which would entitle him to relief." *Branham v. Meachum,* 77 F.3d 626, 628 (2d Cir.1996).

*6 So read, the complaint must include "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A claim to relief is plausible on its face "when the [P]laintiff pleads fact[s] ... that allow [ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citation omitted).

When a dismissal is sought against a *pro se* litigant, the court will afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir.2006) (quotation and citations omitted). The submissions of a *pro se* litigant are to be construed liberally and interpreted "to raise the strongest arguments that they suggest." *Id.* at 475 (internal quotation and citations omitted).

### B. Plaintiff's First Amendment and RLUIPA claims

The First Amendment to the United States Constitution guarantees the right to free exercise of religion. *See* U.S. Const. amend. I; *Cutter v. Wilkinson,* 544 U.S. 709, 719, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005). As is true with regard to the First Amendment generally, the free exercise clause applies to prison inmates, subject to appropriate limiting factors. *See Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (holding that "[p]risoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause" (citing *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974)). Thus, for example, under accepted free exercise jurisprudence, inmates are guaranteed the right to participate in congregate religious services under most circumstances. *See, e.g., Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993) (citing cases).

The right of prison inmates to exercise their religious beliefs, however, is not absolute or unbridled, but instead is subject to valid penological concerns, including those relating to institutional security. *See O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987);

*Salahuddin,* 993 F.2d at 308. For example, a determination of whether an inmate's constitutional rights have been infringed by the refusal to permit his attendance at a religious service hinges upon the balancing of the inmate's First Amendment free exercise right against the institutional needs of officials tasked with the increasingly daunting task of operating prison facilities. This determination is "one of reasonableness, taking into account whether the particular [act] affecting [the] constitutional right ... is 'reasonably related to legitimate penological interests.' " *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (quoting *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987)).

Undeniably, the reach of the First Amendment's free exercise clause extends beyond mere attendance at congregate religious services to other aspects of prison life including, pertinently, that of an inmate's diet and participation in religious meals. *See McEachin v. McGuinnis,* 357 F.3d 197, 204–05 (2d Cir.2004); *Ford,* 352 F.3d at 597. Ordinarily, the Eighth Amendment establishes as a constitutional minimum the requirement that inmates be provided with nutritionally adequate meals; provided this threshold is met, prison officials otherwise retain considerable discretion in determining dietary constituents. *See Word v. Croce,* 169 F.Supp.2d 219, 226 (S.D.N.Y.2001). This requirement, however, is on occasion narrowed by the First Amendment's free exercise clause, which is broad enough to include an inmate's "clearly established" right "to a diet consistent with his or her religious scruples." *Ford,* 352 F.3d at 597; *see also Bass v. Coughlin,* 976 F.2d 98, 99 (2d Cir.1992). "Courts have generally found that to deny prison inmates the provision of food that satisfies the dictates of their faith does unconstitutionally burden their free exercise rights." *McEachin,* 357 F.3d at 203.

**\*7** In the present matter, Plaintiff sent a letter to Defendant Friedmann requesting that he be placed on the Cold Alternative Diet. *See* Dkt. No. 1–1 at 27. Defendant Friedmann responded that, because he is Muslim, he is not eligible for the Cold Alternative Diet. *See id.* at 28. Defendant Friedmann, however, informed Plaintiff that the Religious Alternative Meal ("RAM") meets "Biblical kosher standards," and, therefore, "meets Moslem dietary requirements." *See id.* Defendant Friedmann went on to explain to Plaintiff that the RAM diet is served in the Mess Hall and that, if he is keeplocked, Plaintiff can "obtain it by requesting the form from your Block CO." *See id.* Despite being presented with this option which would have satisfied Plaintiff's religious dietary requirements, Plaintiff declined the option.

"Courts have consistently held that DOCCS' Religious Alternative Meal is sufficient to sustain Muslim prisoners' good health without violating dietary laws and that a strictly Halal diet is not required." *DeBlasio v. Rock,* No. 9:09– CV–1077, 2011 **WL** 4478515, \*20 (N.D.N.Y. Sept.26, 2011) (citing *Muhammad,* 98 F.Supp.2d at 343–44 (collecting cases)). Even assuming that some parts of Plaintiff's High Fiber Diet did not comport with his religious beliefs, [4] as he claims in his objections, Plaintiff was offered a diet that meets his religious dietary requirements, but declined the offer. As such, Plaintiff has failed to state a plausible First Amendment and RLUIPA deprivation claim associated with the refusal of prison officials to provide him with a Kosher Diet in lieu of the prescribed Controlled "A" High Fiber Diet.

Moreover, Magistrate Judge Peebles correctly found that Plaintiff's allegations regarding the denial of religious meals —*i .e.,* sweet breakfast—on two isolated occasions and his contention that his Ramadan Feast menu was not identical to the menu offered to non-SHU inmates are insufficient to state a plausible claim that Defendants' conduct infringed on his sincerely held religious beliefs under either the First Amendment or the RLUIPA. *See Deblasio,* 2011 **WL** 4478515, at \*18. Significantly, Plaintiff does not claim that his Ramadan Feast menu was inconsistent with his religious beliefs, just that it was different than that which was offered to inmates in the general population. This claim clearly falls far short of establishing a First Amendment or RLUIPA violation.

The portion of Plaintiff's religious exercise claim growing out of the alleged ongoing refusal of prison officials to broadcast Jumuah sermons to his SHU cell, however, does plausibly allege a sufficiently serious deprivation to state a free exercise claim. *See, e.g., Crawford v. Clarke,* 578 F.3d 39, 43–44 (1st Cir.2009). [5] As such, the Court finds that Magistrate Judge Peebles correctly recommended that the Court should deny Defendants' motion as to this claim as to Defendants Fadl, Artus and LaValley.

### C. Eighth Amendment claims

**\*8** Plaintiff's claims relating to his meals are also asserted under the Eighth Amendment. The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. This prohibition includes any "unnecessary and wanton infliction of pain" on those who have been convicted of crimes. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citations

omitted). Nevertheless, the United States Supreme Court has recognized that not "every injury" a prisoner suffers "translates into constitutional liability for prison officials." *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

Prisons are required under the Eighth Amendment to provide for the basic human needs of those incarcerated, including "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983) (per curium) (citation and internal quotation marks omitted). The deprivation must be sufficient to create a serious danger to the health of the inmate. *See, e.g., Beckford v. Portuondo,* 151 F.Supp.2d 204, 213 (N.D.N.Y.2001) (finding a deprivation of two of three meals per day for eight days created an issue of material fact sufficient for Eighth Amendment claim to survive summary judgment); *Moss v. Ward,* 450 F.Supp. 591, 596–597 (W.D.N.Y.1978) (finding the denial of food for four consecutive days and reduced food for three days thereafter sufficient to violate prisoner's Eighth Amendment rights). Where a particular diet is medically required, denial of a smaller number of meals may be sufficient in some circumstances. *See Abdush–Shahid v. Coughlin,* 933 F.Supp. 168, 180 (N.D.N.Y.1996) (citing *Robles,* 725 F.2d at 15–16).

In the present matter, Plaintiff's Controlled "A" High Fiber Diet was prescribed for him by the medical personnel at Clinton. Although Plaintiff's complaint alleges that he suffers from constipation and internal hemorrhoids, the medical records demonstrate that he received constant medical attention for those conditions. *See* Dkt. No. 1–1 at Exhibit "1." Magistrate Judge Peebles correctly concluded that the complaint does not allege facts from which one could conclude that his medical conditions are sufficiently serious to meet the objective requirements of an Eighth Amendment claim. *See Lowman v. Perlman,* No. 9:06–CV–422, 2008 **WL** 4104554, *5 (N.D.N.Y. Aug.29, 2008); *Cabassa v. Gummerson,* No. 01–CV–1039, 2006 **WL** 1559215, *9–*10 (N.D.N.Y. Mar.30, 2006); *Kendall,* 2004 **WL** 1752818, at *6.

Further, even assuming that Plaintiff has met the objective element, Plaintiff has failed to allege facts suggesting a plausible claim that any Defendants were subjectively indifferent to his serious medical needs. Although Plaintiff complains that the Controlled "A" High Fiber Diet does not meet his needs because of the lack of peanut butter and the reduction of bread from twelve slices to eight, as well as the lack of desserts, Plaintiff does not point to any adverse

impact upon his health other than to allege, in conclusory terms, that his condition requires that he be provided with food with a higher fiber content than what he receives under the Controlled "A" High Fiber Diet. Defendant Johnson, however, responded to Plaintiff's requests by stating that he already receives a diet high in fiber, which is further supplemented by Metamucil and, therefore, that Plaintiff did not require additional fiber for his medical condition. *See Taylor v. Chalom,* No. 9:10–CV–1494, 2011 **WL** 6942891, *8 (N.D.N.Y. Dec. 13, 2011) (holding that when a plaintiff alleges nothing more than a mere disagreement with the treatment he received, the plaintiff has failed to satisfy the subjective element of the deliberate indifference test) (citations omitted).

*9 Based on the foregoing, the Court finds that Magistrate Judge Peebles corrected recommended that the Court should grant Defendants' motion as to Plaintiff's Eighth Amendment claims. At best, Plaintiff alleges malpractice against Defendants, which is insufficient to support an Eighth Amendment violation.

**D. Plaintiff's remaining claims**

In addition to the claims discussed above, Plaintiff also asserted harassment claims against Defendants Hicks and Trudeau, a due process claim against Defendant Lucia, and an equal protection claim based upon Defendants' refusal to provide him with the requested Kosher Diet. Magistrate Judge Peebles recommended that the Court dismiss each of these claims and Plaintiff did not object to his recommendation. Having reviewed these causes of action and Magistrate Judge Peebles' Report, Recommendation and Order, the Court finds that Magistrate Judge Peebles' correctly determined that Plaintiff failed to allege facts that plausibly state these causes of action.

**E. Amendment of the Complaint**

Following Defendants' motion to dismiss, Plaintiff moved for leave to amend his complaint and to join two additional parties. *See* Dkt. No. 36. In his motion, Plaintiff seeks to add Corrections Captain Facteau and Sergeant Delutis as new defendants, and to assert additional claims, including a retaliation claim based upon events not recounted in his initial complaint, and several of which he claims have occurred since the commencement of this action. *See id.*

Magistrate Judge Peebles denied Plaintiff's motion for leave to amend because of his failure to comply with Local Rule 7.1(a)(4). *See* Dkt. No. 40 at 46. Specifically,

Magistrate Judge Peebles found that Plaintiff's proposed amended pleading simply adds to, but does not replace his amended complaint and that Plaintiff's proposed amended complaint alters factual allegations contained within his initial complaint. *See id.* As such, Magistrate Judge Peebles recommended that the Court deny Plaintiff's motion to amend and/or supplement his complaint, and to join additional parties, without prejudice to renewal upon filing a pleading in conformity with the Local Rules. *See id.* at 47.

On the same day that Plaintiff filed his objections to Magistrate Judge Peebles' Report, Recommendation and Order, Plaintiff renewed his motion for leave to file an amended and supplemental verified complaint and to add additional defendants. *See* Dkt. No. 42. Despite Magistrate Judge Peebles' instruction regarding the requirements for filing an amended complaint, Plaintiff again fails to abide by the Local Rules. The renewed proposed amended pleading is nearly identical to the proposed amended pleading that Magistrate Judge Peebles found was not in conformity with the Local Rules. *Compare* Dkt. No. 36–2; *with* Dkt. No. 42–2. Plaintiff's renewed proposed amended pleading again fails to supersede the original pleading in all respects, and incorporates his original pleading. *See* Dkt. No. 42– 2. Plaintiff's renewed proposed amended pleading begins at paragraph eighty ("80")—where the original complaint ends —and asks the Court to change facts contained in the original complaint. *See id.* at ¶¶ 82–82.

**\*10** A motion to amend a pleading is governed by Rule 15(a) of the Federal Rules of Civil Procedure, which states that "[t]he court should freely give leave [to amend] when justice so requires." Fed.R.Civ.P. 15(a); *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). The Local Rules of the Northern District of New York provide, in pertinent part, that amended pleadings must be complete pleadings which will supersede the original in all respects. *See* N.D.N.Y. L.R. 7.1(a)(4). The Local Rules further state that a "party shall not incorporate any portion of its prior pleading into the proposed amended pleading by reference." *Id.* One of the purposes of the requirement that an amended complaint be itself a complete pleading, is to ensure that all of the allegations asserted against the defendant(s) are contained in a single document, thereby reducing the likelihood that

a party will overlook one or more allegations against him. Moreover, this requirement eliminates the confusing nature of "piecemeal" amended complaints. *See Chapdelaine v. Keller,* No. 9:95–CV–1126, 1999 **WL** 34998130, \*1 (N.D.N.Y. Sept.28, 1999) (citation omitted).

Based on the foregoing, the Court finds that Plaintiff's renewed proposed amended pleading is not a proper pleading because it is not a **complete pleading** which completely replaces his original complaint, as required by the Local Rules. As such, the Court denies Plaintiff's motion to amend and/or supplement his complaint without prejudice to renewal upon filing a complaint that is in conformity with the Local Rules.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions, Magistrate Judge Peebles' Report, Recommendation and Order and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Magistrate Judge Peebles' February 27, **2012** Report, Recommendation and Order is **ADOPTED in its entirety** for the reasons stated therein; and the Court further

**ORDERS** that Defendants' motion to dismiss is **GRANTED in part** and **DENIED in part;** and the Court further

**ORDERS** that Plaintiff's motion to amend and/or supplement his complaint is **DENIED without prejudice** to renewal; and the Court further

**ORDERS** that all further pretrial matters are referred to Magistrate Judge Peebles; and the Court further

**ORDERS** that the Clerk of the Court shall serve this Memorandum–Decision and Order on all parties in accordance with the Local Rules.

## IT IS SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2012 WL 1029614

Footnotes
1    Apparently, the cell searches, characterized by Plaintiff as excessive, revealed the presence of contraband on August 14, 18, 27, and 28, 2008, September 4, and 19, 2008, and November 18, 2008, as evidenced by the issuance of contraband receipts to Plaintiff. *See* Dkt. No. 1 at ¶ 59.

2    The sweet breakfast that Plaintiff refers to generally consists of a banana, a donut, coffee cake, soda, and other beverages. *See* Dkt. No. 1 at ¶ 70.

3    To avoid confusion, anytime the Court references a specific page number for an entry on the docket, it will cite to the page number assigned by the Court's electronic filing system.

4    The Court notes that Plaintiff's complaint does not state that the Controlled "A" High Fiber diet does not comport with his religious dietary needs. Plaintiff does, however, make this claim in the complaint letter he sent to Defendant Friedmann, which he attached as an exhibit to his complaint. *See* Dkt. No. 1–1 at 28.

5    The Court notes that, although Plaintiff has alleged a plausible free exercise claim, courts in the Second Circuit have granted motions for summary judgment as to similar claims, considering the burden placed on the prison officials in accommodating SHU inmates, the ability of SHU inmates to get counseling from a member of the ministerial staff on a weekly basis, and the prison's legitimate-penological interest in denying these requests. *See, e.g., Smith v. Artus,* No. 9:07–CV–1150, 2010 **WL** 3910086, \*22–\*23 (N.D.N.Y. Sept.30, 2010).

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

**Claim No. 115629**

## RELEASE

(THIS RELEASE WILL NOT BECOME BINDING UPON
CLAIMANT UNTIL CLAIM IS APPROVED AND PAID)

I, the undersigned, in consideration of the sum of Seventy-Five and 00/100

Dollars ($75.00), to me in hand, paid by the State of New York, the receipt whereof is hereby

acknowledged, do for myself, my heirs, executors, administrators and assigns, release and

discharge the said State of New York, its officers, agents and employees, from all claims,

demands and liability of every kind and nature, legal or equitable, occasioned by or arising out of

the facts set forth in the foregoing property claim, and in case any claim shall have been filed by

me with the Clerk of the Court of Claims for said damages at any time prior to the date of this

release, I consent and stipulate that an order may be made by the Court of Claims without notice

to me dismissing said claim upon the merits.

Payment is to be made to the order of me, Tyrone Walker, DIN No. #94A5258, and sent

to the Clinton Correctional Facility, 1156 Route 374, P.O. Box 2001, Dannemora, New York

12929.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this ___ day of

September, 2012

_Tyrone Walker_
Tyrone Walker          DIN No. #94A5258

STATE OF NEW YORK )
COUNTY OF CLINTON ) ss.:

On this ___ day of September, 2012, before me personally appeared Tyrone

Walker, DIN No. #94A5258, to me known and known to me to be the person described in and

who executed the foregoing release and acknowledged to me that he executed the same.

_____
Notary Public
Harry D. Durgan
Notary Public, State of New York
No. 01DU6008379
Qualified in Clinton County
Commission Expires ___



STATE OF NEW YORK

**DEPARTMENT OF CORRECTIONS**
**AND COMMUNITY SUPERVISION**

CLINTON CORRECTIONAL FACILITY
Box 2000
Dannemora, NY 12929-2000
518-492-2511

**BRIAN FISCHER**
COMMISSIONER

**THOMAS LAVALLEY**
SUPERINTENDENT

## Interdepartmental Communication

TO:        Walker, Tyrone        94A5258        SHU - 019

FROM:    S. Brown, Deputy Superintendent - Security

SUBJECT:    Your recent communication – Deprivation issue

DATE:    December 27, 2011

Your recent communication dated 12/21/11 regarding your complaint of being placed on a deprivation order has been received in my office for review and response.

On 12/19/11 you were found with a piece of plexiglass taped to the bottom of your foot classified as a weapon, which you deny is a weapon yet don't deny possession. Due to this and your previous history of aggression and assaultive behavior, you were placed on full restraints for all out of cell activity.

This will remain in effect pending the outcome of your disciplinary hearing, when it will be reevaluated.

S. Brown,
Deputy Superintendent – Security

SB/mlb

cc: File



STATE OF NEW YORK

### DEPARTMENT OF CORRECTIONS
### AND COMMUNITY SUPERVISION

CLINTON CORRECTIONAL FACILITY
Box 2000
Dannemora, NY 12929-2000
518-492-2511

- **BRIAN FISCHER**
  **COMMISSIONER**

**THOMAS LAVALLEY**
**SUPERINTENDENT**

## Interdepartmental Communication

TO: Walker, Tyrone          94A5258          SHU - 38

FROM: S. Brown, Deputy Superintendent - Security

SUBJECT: Your recent communication - Restraint order removal

DATE: July 16, 2012

Your recent communication dated 7/02/12 inquiring about the removal of the restraint order has been received in my office for review and response.

I am in receipt of your letter and disagree with your assessment of the weapon and your allegations that "this is a white racist savage act by the administration to make your life a living hell."

Your restraint order has been removed while in SHU and will remain on for out of SHU activity.

S. Brown,
Deputy Superintendent - Security

SB/mlb

cc: File





*Clinton*

FORM 2186 RENEWAL (7/01)
REF: 7 NYCRR 305.4

STATE OF NEW YORK - DEPARTMENT OF CORRECTIONAL SERVICES

## Great Meadow
Correctional Facility

### RESTRAINT ORDER RENEWAL

**RECOMMENDATION**

I recommend that inmate  Walker, Tyrone          , DIN    94A5258          be continued
under a restraint order from     01/13/08    to    01/20/08      because of the following reasons:
On 9/27/00 you assaulted & seriously injured several staff members using weapons (shanks). On 10-27-05 you made
threats to staff.

The restraint order was originally authorized from  9-27-00          to   10-03-00

I recommend ☐  do not recommend ☒  that this inmate be required to remain in restraints in the exercise
area in accordance with 7 NYCRR 305.4(e)(5). (If recommended, state reasons.)

_____ , Sergeant          Date  01/13/08

**RENEWAL AUTHORIZATION**

Restraint Order Renewal Approved ☑          Restraints in exercise area Approved ☐ *
                        Disapproved ☐                        Disapproved ☐

Reason for approval/disapproval:
I concur with the Sergeant's assessment and the need to protect correctional staff. It is noted that you have assaulted
staff in the past, and did in fact stab them. You are a dangerous individual who has the potential to attack staff at any
point in time and would probably find a reason to do so without this order. Staff safety will not be compromised.

Type(s) of restraints to be used/ manner of application:     Hand & Chain

_____ , Deputy Superintendent          Date  01/13/08
                            for Security Services

*NOTE: A determination that you are required to remain in restraints in the exercise area will expire three days
after the date of this authorization unless approved below by the Superintendent or Acting Superintendent.

*NOTICE TO INMATE: You may write to the Deputy Superintendent for Security or his/her designee to make
a statement as to the need for continuing this restraint order.*

**SUPERINTENDENT REVIEW**

Pursuant to 7 NYCRR 305.4(e)(5), I have reviewed the relevant facts pertaining to the order that you will re-
main in restraints in the exercise area. I have approved ☐ disapproved ☐ the determination that you remain
in restraints in the exercise area for the duration of this restraint order renewal for the following reason(s):

_____ , Superintendent          Date _____

Distribution: Superintendent, DSS, SHU Sergeant/Housing Unit, Guidance Unit, Inmate

000670

FORM 2186 RENEWAL (7/01)
REF 7NYCRR 305 4

STATE OF NEW YORK - DEPARTMENT OF CORRECTIONAL SERVICES

___Clinton___ Correctional Facility

## RESTRAINT ORDER RENEWAL

I recommend that inmate ___Walker___, DIN __94A5258__ be continued

under a restraint order from __12-22-08__ to __12-28-08__ because of the following reasons:

___Inmate Walker has made threatening statements___
___regarding fighting in the SHU Visiting Room with___
___another SHU inmate.___

The restraint order was originally authorized from __12-10-08__ to __12-15-08__.

I recommend ☐   do not recommend ☒ that this inmate be required to remain in restraints in the exercise area in accordance with 7NYCRR 305.4(e)(5). (If recommended, state reasons.)

RECOMMENDATION

___L Hicks___, Sergeant        Date __12-22-08__

Restraint Order Approved ☑          Restraint in exercise area Approved ☐ *
           Disapproved ☐                                    Disapproved ☐
Reason for approval/disapproval: _abuse_

RENEWAL AUTHORIZATION

Type(s) of restraints to be used/manner of application
_leg, hand restraints, waist chain_

___[signature]___ Deputy Superintendent   Date __12-26-08__
                for Security Services

*NOTE: A determination that you are required to remain in restraints in the exercise area will expire three days after the date of this authorization unless approved below by the Superintendent or Acting Superintendent.

NOTICE TO INMATE: You may write to the Deputy Superintendent for Security or his/her designee to make a statement as to the need for continuing this restraint order.

SUPERINTENDENT REVIEW

Pursuant to 7 NYCRR 305.4(E)(5), I have reviewed the relevant facts pertaining to the order that you will remain in restraints in the exercise area. I have approved ☐   disapproved ☐   the determination that you remain in restraints in the exercise area for the duration of this restraint order for the following reason(s):

_____, Superintendent        Date _____

000379

Distribution: Superintendent, DSS, SHU Sergeant / Housing Unit, Inmate

FORM 2186 RENEWAL (7/01)
REF: 7NYCRR 305.4

STATE OF NEW YORK - DEPARTMENT OF CORRECTIONAL SERVICES

_CLINTON_ Correctional Facility

## RESTRAINT ORDER  RENEWAL

**RECOMMENDATION**

I recommend that inmate _WALKER, T._ , DIN _97A5258_ be continued
under a restraint order from _3-7-11_ to _3/13/11_ because of the following reasons:
_BASED ON WALKERS' PAST HISTORY OF A SERIOUS ASSAULT ON_
_STAFF, AND RECENT INFO FROM A CONFIDENTIAL INFORMANT._
_WALKER IS PLANNING TO ASSAULT STAFF.  THE INFORMATION_
_WAS Received ON  2/28/11_

The restraint order was originally authorized from _2/28/11_ to _3/6/11_ .

I recommend ☐   do not recommend ☑ that this inmate be required to remain in restraints in the exercise
area in accordance with 7NYCRR 305.4(e)(5).  (If recommended, state reasons.)

_____

_____

_____

_P. Mosley_ ,Sergeant          Date _3-6-11_

**RENEWAL AUTHORIZATION**

Restraint Order Approved ☑          Restraint in exercise area  Approved ☑
          Disapproved ☐                              Disapproved ☑

Reason for approval/disapproval:
_Inmate has a history of serious assault_
_on staff.  Confidential information received indicates_
_inmate is planning to assault staff_

Type(s) of restraints to be used/manner of application:

_____

_____

_____

_____ ,Deputy Superintendent   Date _3/6/11_
                              for  Security Services

*NOTE: A determination that you are required to remain in restraints in the exercise area will expire three days after
the date of this authorization unless approved below by the Superintendent or Acting Superintendent.

*NOTICE TO INMATE: You may write to the Deputy Superintendent for Security or his/her designee to make
a statement as to the need for continuing this restraint order.*

**SUPERINTENDENT REVIEW**

Pursuant to 7 NYCRR 305.4(E)(5), I have reviewed the relevant facts pertaining to the order that you will
remain in  restraints in the exercise area. I have approved ☐   disapproved ☐   the determination that
you remain in restraints in the exercise area for the duration of this restraint order for the following reason(s):

_____

_____

_____

_____ , Superintendent          Date _____

Distribution: Superintendent,  DSS, SHU Sergeant / Housing Unit, Inmate

Sec./154-A

( ⊘/ )

32



FORM 2186 RENEWAL (7/01)
REF: 7NYCRR 305.4

STATE OF NEW YORK - DEPARTMENT OF CORRECTIONAL SERVICES

Clinton _____ Correctional Facility

DEC 27 2011

## RESTRAINT ORDER

**RECOMMENDATION**

I recommend that inmate _Walker, T._ , DIN _94A5258_ be placed on a restraint order from _12-20-11_ to _12-25-11_ because of the following reasons: . Inmate Walker was found to have a weapon in his possession during a cell search on 12-19-11. It was taped to the bottom of his foot.

I recommend [X]  do not recommend [ ] that this inmate be required to remain in restraints in the exercise area in accordance with 7 NYCRR 305.4(e)(5). (If recommended, state reasons.)

Inmate Walker was found to have a weapon taped to the bottom of his foot during a cell search on 12-19-11. To ensure the safety of staff, it is recommended that he remain in restraints during rec.

_____ , Sergeant   Date _12/20/11_

**INITIAL AUTHORIZATION**

Restraint Order Approved [X]        Restraints in exercise area  Approved [X]
Disapproved [ ]                                         Disapproved [ ]

Reason for approval/disapproval:
Due to most resent incident involving the possession of a plastic weapon taped on his foot put restraints to remain on during all out of cell activity.

Type(s) of restraints to be used/manner of application:
LEG IRONS, WAIST REST., & HANDCUFFS

_____ DSS , Deputy Superintendent   Date _12/20/11_
for Security Services

*NOTE: A determination that you are required to remain in restraints in the exercise area will expire three days after the date of this authorization unless approved below by the Superintendent or Acting Superintendent.

NOTICE TO INMATE: You may write to the Deputy Superintendent for Security or his/her designee to make a statement as to the need for continuing this restraint order.

**SUPERINTENDENT REVIEW**

Pursuant to 7 NYCRR 305.4(e)(5), I have reviewed the relevant facts pertaining to the order that you will remain in restraints in the exercise area. I have approved [X]  disapproved [ ]  the determination that you remain in restraints in the exercise area for the duration of this restraint order for the following reason(s):

Due to cell search conducted on 12-19-11 in which a weapon was recovered from the bottom of your boot, this order is to ensure safety + security.

_____ , Superintendent   Date _12/20/11_

## STATE OF NEW YORK — DEPARTMENT OF CORRECTIONAL SERVICES

### CLINTON CORRECTIONAL FACILITY

**Grievance No.**

CL-59696-10

# INMATE GRIEVANCE COMPLAINT

2/24/10

Date

Name **TYRONE WALKER**     Dept. No. **94A5258**     Housing Unit **SHU - 30**

Program     AM     PM

(Please Print or Type — This form must be filed within 21 calendar days of Grievance Incident)*

**Description of Problem:** (Please make as brief as possible)

On 12/10/08 I was placed on a restraint order under the guise, I wrote a letter indicating I wanted to fight on the visit. Therefore, I was to remain on the visit in full-restraints. After being on this restraint order for a whole year I finally went on a visit on 2/7/10. The visiting room area Supervisor was not aware, I was supposed to be in restraints for the whole visiting period, and removed the restraints. The area Supervisor had a memo indicating I was to be separated from inmate Samms, So inmate Samms was placed in A.P.P.U. visiting room and I was placed in the SHU visiting room with no restraints on with other inmates. I complied with all rules and regulations and did not have any problems on the visit. Dep Racette stated I was supposed to be separated from inmate Samms; being that I was placed on a restraint order without due process it's unconstitutional, then on top of that. The basis for the restraint order has shown to be unsubstantiated and not warranted because the matter was easily addressed.

Grievant Signature _____     Hearing Date: _____

Grievance Clerk _____

Advisor Requested?     ☐ Yes   ☐ No     Who: _____

**Action requested by inmate:**

Therefore, in light of all these unjust practices, I would like the restraint order completely removed.

This Grievance has been informally resolved as follows: _____

_____

This informal resolution is accepted: _____

(To be completed only if resolved prior to hearing)

Grievant Signature _____     Date: _____

If unresolved, you are entitled to a hearing by the Inmate Grievance Resolution Committee (IGRC).

* An exception to the time limit may be requested under Directive #4040, section 701.6(g).

I.G.R.C./2a

# GRIEVANCE CONTINUATION SHEET

**DATE:**_____          *GRIEVANCE No.:*_____

**NAME:**_____          CODE-24          *HOUSING UNIT*_____
                                 ***DEPT.***
                          **Grievance Continuation**

**(CL-59696-10)**

by the administration and I did not engage in no physical confrontation with no inmate in the SHU visiting room. This also supports my many appeal statements indicating, I had absolutely no intention of fighting anyone on the visit, Dep Racette stated his staff made a mistake on the day of my visit. The restraints were supposed to remain on me, and they will remain on for future visits, when he made rounds in SHU on 2/11/10. Yet, I have not received a copy of the restraint order to support his statement, from the 2/8/10 date to present. I have not received a restraint. The restraint order indicating I need to be on restraints at all. According to the directive if I don't receive a copy of the restraint order the restraint order does not exist, and if a restraint order is reinstated there has to be a whole new reason for it.

Therefore, in light of all these unjust practices, I would like the restraint order completely removed.

Grievant is advised that all the paperwork was completed and submitted for renewal of restraint order. If the grievant visited without restraints it was a mistake. Grievant was under a restraint order at the time of the visit.

Date returned to inmate: _____     I.G.R.C. Members: _____

Chairperson: _____

*Return within 7 days and check appropriate boxes.*

[✓] I disagree with IGRC response and wish to appeal to the Superintendent.

[ ] I have reviewed deadlocked responses. Pass-Thru to Superintendent.

[ ] I agree with the IGRC response and wish to appeal to the Superintendent.

[ ] I apply to the IGP Supervisor for review of dismissal.

Grievant's Signature: _Tyrone Waller_     Date: March 1, 2012

Grievance Clerk's Receipt: _____     Date: _____

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

To be completed by Grievance Clerk

Grievance Appealed to the Superintendent: _____
                                                Date

Grievance forwarded to the Superintendent for action: _____
                                                           Date

*An exception to the time limit may be requested under Directive #4040, section 701.6(g).

| STATE OF NEW YORK DEPARTMENT OF CORRECTIONAL SERVICES | Grievance No. CL – 59696-10 | Date Filed 2/24/10 |
|---|---|---|
| | Facility CLINTON CORRECTIONAL FACILITY | Policy Designation Inst. |
| INMATE GRIEVANCE PROGRAM DALE A. ARTUS SUPERINTENDENT | Title of Grievance IMPROPER RESTRAINT ORDER | Class Code 24 |
| | Superintendent's Signature   DSP | Date 3/12/10 |
| Grievant: WALKER, T | Din # 94A5258 | Housing Unit SH-30 |

A Security Supervisor was assigned to investigate. The grievant was interviewed. He provided no new information or witnesses.

It was determined that staff failed to enforce a restraint order during visits on the grievant. This appears to have been done due to a lack of communication. No incident occurred due to this oversight however, this does not provide grounds to rescind the restraint order based on his uneventful behavior of that day.

Staff oversight was found but does not appear intentional.

JF/cc

## APPEAL STATEMENT

If you wish to refer the above decision of the Superintendent, please sign below and return this copy to your Inmate Grievance clerk. You have seven (7) calendar days from receipt of this notice to file your appeal.* Please state why you are appealing this decision to the C.O.R.C. There is no justification for the restraint order to exist being that it's being done without due process and I have demonstrated everything I expressed

Tyrone Walker
Grievant's Signature

3-16-10
Date

Grievance Clerk's Signature

Date

* An exception to the time limit may be requested under Directive #4040, section 701.6(g)

## STATE OF NEW YORK - DEPARTMENT OF CORRECTIONAL SERVICES
## CLINTON CORRECTIONAL FACILITY

### Interdepartmental Communication

**Date: 4/01/10**

**From:**   I.G.R.C.

**To:**   T. WALKER-94A5258

**Subject:  RESTRAINTS OUTSIDE CELL / SHU**

This is to advise you that, per **Directive #4933 page-14 Section ( d ) :** which states in part; *A restraint order will describe the types of restraints to be used and the manner in which they are to be applied ( e.g. Handcuffed in front or in back, with or without waist chain, or without leg irons ).*

Further, **Directive #4933 page-14 Section- ( e ) :** which states in part; *If an inmate is under a restraint order directing that he be mechanically restrained* <u>WHENEVER</u> *he* <u>LEAVES the SHU CELL FOR ANY REASON</u>, *the inmate will remain mechanically restrained during the entire period of time he is out of the SHU cell.*



STATE OF NEW YORK

DEPARTMENT OF CORRECTIONAL SERVICES
THE HARRIMAN STATE CAMPUS - BUILDING 2
1220 WASHINGTON AVENUE
ALBANY, N.Y. 12226-2050

BRIAN FISCHER
COMMISSIONER

# MEMORANDUM

FROM:        Karen Bellamy, Director, Inmate Grievance Program

SUBJ:        Receipt of Appeal

```
T WALKER        ‹ 94A5258        Date 04/23/2010
**CLINTON CF**
     Your grievance CL-59696-10 entitled
     Improper Restraint Order
     was rec'd by CORC on 03/24/2010
```

------------------------------------------------------------

. A disposition will be sent to you after the grievance is reviewed by CORC.

| | | Grievance Number<br>CL-59696-10 | Desig./Code<br>I/24 | Date Filed<br>2/24/10 |
|---|---|---|---|---|
| | STATE OF NEW YORK<br>DEPARTMENT OF<br>CORRECTIONAL SERVICES | Facility<br>Clinton Correctional Facility | | |
| | | Title of Grievance<br>Improper Restraint Order | | |
| INMATE GRIEVANCE PROGRAM<br>CENTRAL OFFICE REVIEW COMMITTEE | | Director's Signature | | Date<br>5/5/10 |

5/5/10

## GRIEVANT'S REQUEST UNANIMOUSLY DENIED AS WITHOUT MERIT

Upon full hearing of the facts and circumstances in the instant case, the action requested herein is hereby denied as without merit. CORC upholds the determination of the Superintendent for the reasons stated.

CORC notes that the grievant's concerns regarding his restraint order on 12/10/08 were addressed in its prior decision CL-58481-09, dated 4/22/09. CORC also notes that the restraints were inadvertently removed during a visit on 2/7/10, and that the facility administration has taken appropriate action to avoid future similar errors. It is noted that the grievant's restraint order was in effect on 2/7/10 and was renewed on 2/8/10. The Deputy Superintendent of Security (DSS) indicates copies of renewals are routinely forwarded to inmates, and CORC advises the grievant to contact the DSS if he did not receive a copy of the 2/8/10 renewal. CORC has not been presented with any compelling evidence that the renewals were not processed in accordance with Directive #4933, and advises the grievant to maintain proper discipline in order to avoid future similar difficulties.

With respect to the grievant's appeal, CORC asserts that inmates can write to the DSS to make a statement as to the need for continuing a restraint order, as specified in Directive #4933.

JA/mf
----------------------------------------------------------------------------------------------------
----------------------------------------------------------------------------------------------------

STATE OF NEW YORK DEPARTMENT OF CORRECTIONAL SERVICES

CLINTON CORRECTIONAL FACILITY

Interdepartmental Communication


TO:       Captain Facteau

FROM:     M. Vann, Assistant Deputy Superintendent/Programs

DATE:     March 4, 2010

SUBJECT: Grievance # CL59696-10


I was Officer of the Day from February 5, 2010 to February 11, 2010. On February 7, 2010, Lt. Kramer, WCO, advised me that Samms, 07-A-4065, SHU – 15 and Walker, 94-A-5258, SHU – 30, both had a visit that day and are enemies and needed to be kept separate. He stated he had called Captain Facteau for permission to separate them by placing Samms in the APPU visiting room and Walker in the SHU visiting room. He asked if I had any objection to that arrangement, which I had none.

At no time did Lt. Kramer or anyone ask me for permission to have restraints removed from Walker. I did not authorize, nor was I aware, that the restraint order was not followed.


M. Vann
Assistant Deputy Superintendent

MV/cad

xc:  file


000399

STATE OF NEW YORK - DEPARTMENT OF CORRECTIONAL SERVICES
## CLINTON CORRECTIONAL FACILITY

Interdepartmental Communication

Date: 3 - 10 -10

TO: LT KRAMER

FROM: Sgt H. WARNER

SUBJECT: SHU VISIT 2-7-10

On 2-7-10 I Sgt H. Warner escorted inmate Walker 94A5258 to the SHU visiting room, I was not advised that Walker was on a restraint order. Had I been advised of the restraint order Walker would have remained in restraints during his visit. The only matter I was made aware of was that inmate Sanders had been threatened by Walker and that these two inmates needed to be separated while visiting. I was therefore ordered to place inmate Sanders in the A.P.P.U visiting room to separate Sanders and Walker.

Respectfully Submitted

Sgt H. Warner

000397

FORM 1015A (REV 6/99)          STATE OF NEW YORK - DEPARTMENT OF CORRECTIONAL SERVICES

**MEMORANDUM**

TO: LT. Kramer                                    DATE: 3-9-10

FROM: CO. M. Defayette

SUBJECT: SHU Visit on 2-7-10

On 2-7-10, I CO M Defayette was assigned to the SHU
visitroom. Inmate Walker #94A5258 had a visit in the SHU Visitroom.
Inmate Samms #07A4065 also had a visit, and was placed in
the APPU Visit room, seperating Inmates Walker and Samms.
I was unaware of Inmate Walker's restraint order. He was not
in restraints in the visit area.

Respectfully Submitted
CO. M. Defayette
M. Defayette

000398

## NEW YORK STATE DEPARTMENT OF CORRECTIONAL SERVICES

### CLINTON CORRECTIONAL FACILITY

#### Interdepartmental Communication

TO:         Captain, J. Facteau

FROM:       Lieutenant, R. Kramer

SUBJECT:    CL-49696 Walker, 94A5258 SHU-30

DATE:       3-8-10 Interview time 8:00pm

Sir:

      I interviewed the above inmate in front of his cell. He maintained that due to the fact that he was not in restraints for a visit on 2-7-10 and no issues arose in result that he should be removed from the restraining order. He provided no new information or witnesses ending the interview.

      I received memos from the escorting Supervisor Sgt. Warner and the SHU visit Officer Defayette for the date in question. Both had no knowledge that a restraint order existed for Walker to remain in restraints during a visit and verified that during the visit that Walker was not in restraints. The only information they received was to separate Walker from inmate Samms 07A4065 an admin. Seg. inmate during the visit which was done.

      In conclusion it appears communication was not relayed in regards to this inmate's restraint order in the visiting room. I have informed all parties involved that in the future we must insure that this information is passed on to insure this restraint order is followed. Although an oversight occurred and fortunately no incident evolved this grievance is no justification to remove the order as Grievant wishes.

Respectfully,

R. Kramer, LT.

000396

2-6-10

1³⁰   Visiting
145   Visiting
2⁰⁰   Visiting
2¹⁵   Visiting
225   5 min
230   SHU Visit Closed

2-7-10

9⁰⁰   M. Defayette on duty
9⁰⁵   Inmate Walker 94A5258 arrives ① visitor
9¹⁵   Inmate Woods 09A1870 arrives ① visitor
9³⁰   Visiting - Inmate Samms is placed into APPU
       Visit room per W/C

945   Visiting
10⁰⁰   Visiting
10¹⁵   Visiting
10³⁰   Visiting
10⁴⁵   MVann ADP rounds
10⁴⁵   Visiting
11⁰⁰   Visiting
11¹⁵   Visiting
11²⁰   Inmate Woods to bathroom
11³⁰   Visiting
1145   Visiting
12⁰⁰   Visiting
12:00   Inmate Walker + Bathroom

12¹⁵   Visiting
1230   Visiting
1245   Visiting
1⁰⁰   Visiting
1¹⁵   Visiting
1³⁰   Visiting
145   Visiting
2⁰⁰   Visiting
2¹⁵   Visiting

000400

CLINTON CORRECTIONAL FACILITY
INMATE GRIEVANCE COMPLAINT
DATE FILED
RECEIVED
WANTS
DEPRIVATION
PROBE
REMOVED
24
CL-6017-99-12
DATE FILED JAN 03 2012

Tyrone Walker, 94A5358, S.HU-19   December 33, 2011

I received a restraint order today authorized by S. Brown.
Stating while in the recreation cage I'm to remain in full restraint
in the recreation cage. The reason for this restraint order stem from
fact I possessed a one and three quarters by three quarters inch
piece of a plastic mirror. This plastic mirror do not have a sharp point
or any sharp edges. In fact, I had it on the bottom of my foot with
over 200lbs. of pressure on it and it never cut me. Yet, this small mirror
resulted in a misbehavior report and I was issued a charge with
possessing a dangerous weapon. From looking at it, it's obvious this
mirror was not a weapon, and could not cause bodily harm to anyone.
Therefore, I would like this restraint order removed in it's
entirety. I want it discontinued so I don't have to wear restraints
in the yard cage. With the restraints on in the recreation cage
I am unable to exercise I can't run, do push-ups, sit-ups, jumping
jacks or any meaningful exercise in these restraints. If I slip or
lose my balance I can seriously hurt myself in the recreation cage,
and no one will be there to help me. Yesterday and today when
I went to recreation in the steel restraints (waist/waist) chain, handcuffs
and shackles) in the below freezing temperatures the steel restraints
was extremely cold on my person. I never did anything in the
recreation cage, going to the recreation cage or coming from the
recreation cage that warrant the restraints to remain on while in the
recreation cage. Furthermore, I'm going to the shower three days
a week, _____, and the restraints are removed while in the
shower and reapplied when I leave the shower to return to my

127

cell. Being that the procedure of applying and removing the restraints is the exact same when I go to recreation as when I go to the shower there is no reason to keep them on me in the recreation cage as it's not kept on me in the shower. The only reason to keep them on me is to deprive me meaningful exercise and retaliate against me for current lawsuits in the court. Being that I cannot wear my medical boots in the cell it's not a plausible option to exercise in the cell, also having a radiator in the cell makes the heat and dry air a barrier in working out. Sgt Deluth's is a witness to the use and purpose of a tiny mirror that is used in S.H.U., in order to utilize it I have to hold it by the tip of my finger and look into it with one eye to view myself or view anyone on the company sticking it out the gate, I've done this numerous times to call the Sgt/Deluth's when he was in the front of the company, going into his office or coming out of his office when I locked on one company for over 9 months, I do not identify it as a weapon and it cannot be used as a weapon it is to small, but I do acknowledge it's considered contraband, however, that do not warrant me having to wear restraints in the recreation yard, therefore, this grievance is based on the fact I do not want to on a restraint order period and I don't want to have restraints on in the recreation cage, even if it was a weapon it didn't have nothing to do with the recreation and do not warrant a restraint order while in the recreation cage. In addition to all that, this grievance is not a mere expression of my views on the matter it is a fact of the law that what is taking place is a violation of my Eighth Amendment Constitution Right to be free from

2.

128

3\. cruel and unusual punishment. The Deputy Superintendent of Security is deliberately indifferent to my exercise needs and being quite unprofessional, Therefore, like I said I want the restraints removed while in the recreation cage.

Tyrone Walker

129

**I.G.R.C. Response:**

## CL-61799-12          Code-24

*Grievant is advised that pursuant to Directive #4040 III E which states in part "some grievances request actions that are "NOT" obtainable via IGP." Restraint orders fall into this category. Grievant is advised that he may write the Deputy Superintendent for Security or his designee to make a statement as to the need for continuing this restraint order.*

Date returned to inmate: 1/4/12          I.G.R.C. Members: _____

Chairperson: _____

*Return within 7 days and check appropriate boxes.*

☑ I disagree with IGRC response and wish to appeal to the Superintendent.

☐ I have reviewed deadlocked responses. Pass-Thru to Superintendent.

☐ I agree with the IGRC response and wish to appeal to the Superintendent.

☐ I apply to the IGP Supervisor for review of dismissal.

Grievant's Signature: Tyrone Walker          Date: 1-7-12

Grievance Clerk's Receipt: _____          Date: _____

To be completed by Grievance Clerk

Grievance Appealed to the Superintendent: _____
                                                   Date

Grievance forwarded to the Superintendent for action: _____
                                                              Date

*An exception to the time limit may be requested under Directive #4040, section 701.6(g).

I.G.R.C./2b

130

Form 2133 (Rev. 6/06)

| STATE OF NEW YORK DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION | Grievance No. CL-61799-12 | Date Filed 1/3/12 |
|---|---|---|
| | Facility CLINTON CORRECTIONAL FACILITY | Policy Designation Inst. |
| INMATE GRIEVANCE PROGRAM | Title of Grievance REMOVED DEPRIVATION ORDER | Class Code 24 |
| T. LaValley SUPERINTENDENT | Superintendent's Signature | Date 1/25/12 |
| Grievant: WALKER, T | Din # 94A5258 | Housing Unit SH- 38 |

The grievant states that he is on full restraints for all out of cell activity and wants the deprivation order removed. The grievant was found with a piece of plexiglas mirror taped to the bottom of his foot during a frisk of his S.H.U. cell. This item was deemed a weapon and he received an additional 4 months S.H.U. sanction.

The grievant was placed on a full restraint order for all out of cell activity due to this and his extensive history of staff assaults. The deprivation order was directed by the D.S.S. and reviewed and approved by the Superintendent. The deprivation order for full restraints for all out of cell activity was rescinded on 1/15/12. While this grievance is unobtainable via I.G.P., no merit could be found of any malfeasance by staff and the deprivation was in compliance with directive. Grievance denied.

SB/cc

**APPEAL STATEMENT**

If you wish to refer the above decision of the Superintendent, please sign below and return this copy to your Inmate Grievance clerk. You have seven (7) calendar days from receipt of this notice to file your appeal.* Please state why you are appealing this decision to the C.O.R.C. The mirror is not a weapon and inmates in S.H.U. in the past have not been placed on a restraint order for a weapon, and I have an isolated incident of assault on staff not an extensive history

_Tyrone Walker_
Grievant's Signature

_1-26-12_
Date

_____
Grievance Clerk's Signature

_____
Date

*An exception to the time limit may be requested under Directive #4040, section 701.6(g)

131

Walker, T   94-A-5258                    8-3-30

| STATE OF NEW YORK DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION | Grievance Number UST-54294-14 | Desig./Code I/16 | Date Filed 6/25/14 |
|---|---|---|---|
| | Associated Cases | | |
| | Facility Upstate Correctional Facility | | |
| INMATE GRIEVANCE PROGRAM CENTRAL OFFICE REVIEW COMMITTEE | Title of Grievance CAD Meal | | |

10/22/14

## GRIEVANT'S REQUEST UNANIMOUSLY ¦ ENIED

Upon full hearing of the facts and circumstances in the instant case, and upon recommendation of Department's Counsel, the action requested herein is hereby denied. CORC upholds the determination of the Superintendent for the reasons stated.

CORC notes that there is no religious requirement to provide the Cold Alternative Diet (CAD) to inmates of the Muslim faith, and that the courts have determined the meatless alternative diet offered by the Department meets the religious dietary needs of Muslim inmates.

With respect to the grievant's appeal, CORC advises him to address religious concerns to the Coordinating Chaplain for the most expeditious means of resolution.

MPS/rjq
-----------------------------------------------------------------------------------------------------------------------------
-----------------------------------------------------------------------------------------------------------------------------

This document has been electronically signed by Jeffery A. Hale

CLINTON CORRECTIONAL FACILITY

NAME: Walker                                    NUMBER. 94A5258

DATE 12/19/11      TIME Approx 4:30 pm   TIER 11-0307      CELL#

LOCATION FOUND
ON Inmate Walker Taped to skin under (R) Bottom of foot

ITEM DESCRIPTION.
Broken mirror    1 3/4" x 3/4"

FOUND BY: C. Benware                    PHOTO BY: R. Moller

FOUND BY: C. Benware

EXHIBIT

#5

Judge McAvoy Decision And Order

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

TYRONE WALKER,

                          Plaintiff,

                                                    9:12-CV-0807
        v.                                          (TJM/CFH)

THOMAS LAVALLEY; et al.,

                          Defendants.

---

APPEARANCES:                          OF COUNSEL:

TYRONE WALKER
94-A-5258
Plaintiff, pro se
Upstate Correctional Facility
P.O. Box 2001
Malone, NY 12953

HON. ERIC T. SCHNEIDERMAN            KRISTEN M. QUARESIMO, ESQ.
New York Attorney General            Ass't Attorney General
Attorney for Defendants
The Capitol
Albany, NY 12224

THOMAS J. McAVOY
Senior United States District Judge

## DECISION and ORDER

## I.      INTRODUCTION

        Pro se plaintiff Tyrone Walker commenced this civil rights action in May, 2012

asserting claims arising out of his confinement at Clinton Correctional Facility ("Clinton C.F.").

Dkt. No. 1. Among the constitutional violations alleged in the complaint, plaintiff claims that

he was subjected to restraint orders without due process and in violation of his right to Equal

Protection, and confined under conditions constituting cruel and unusual punishment. *Id.* at

4-34.[1]

Defendants filed a motion for summary judgment pursuant to Rule 56 of the Federal

Rules of Civil Procedure in September, 2013. Dkt. No. 40. Shortly thereafter, in a Decision

and Order filed October 10, 2013, United States Magistrate Judge Christian F. Hummel

granted plaintiff's motion to amend his complaint to assert supplemental claims regarding the

December, 2011 restraint order placed against plaintiff by defendant Delutis. See Dkt. No.

44. Defendants filed an answer to plaintiff's supplemental complaint, and also filed a

supplemental memorandum of law in support of their motion for summary judgment. Dkt.

No. 58.[2]

Presently pending before this Court is plaintiff's motion seeking preliminary injunctive

relief. Dkt. No. 56.

## II.    DISCUSSION

Preliminary injunctive relief "'is an extraordinary and drastic remedy, one that should

not be granted unless the movant, by a clear showing, carries the burden of persuasion.'"

Moore v. Consolidated Edison Co. of New York, Inc., 409 F.3d 506, 510 (2d Cir. 2005)

(quoting Mazurek v. Armstrong, 520 U.S. 968, 972 (1997)). The standard a court must utilize

in considering whether to grant a request for injunctive relief is well-settled in this Circuit.

Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd., 598 F.3d 30, 35,

---

[1] Plaintiff alleges that he was subjected to excessive noise, provided inadequate clothing, and exposed to friable asbestos. See generally Dkt. No. 1. Plaintiff also alleges that he was retaliated against and that his rights under the First Amendment and the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc et seq., were violated. See id. at 35-39.

[2] Defendants' motion for summary judgment (Dkt. No. 40) has been referred to Magistrate Judge Hummel for consideration and issuance of a report-recommendation. Outstanding discovery motions (Dkt. Nos. 54, 60) will also be addressed by Magistrate Judge Hummel.

38 (2d Cir. 2010).  To prevail on a motion for preliminary injunctive relief, a plaintiff must demonstrate irreparable harm and either a substantial likelihood of success on the merits of the claim, or sufficiently serious questions going to the merits and a balance of hardships tipping decidedly in his favor.  *Id.* at 35; *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 405-06 (2d Cir. 2011).  However, when the moving party seeks a "mandatory injunction that alters the status quo by commanding a positive act," the burden is even higher.  *Id.*; *see Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996).  Thus, a mandatory preliminary injunction "should issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief."  *Citigroup Global Markets*, 598 F.3d at 35 n.4 (internal quotation marks omitted).[3]

"'A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction.'"  *Bisnews AFE (Thailand) Ltd. v. Aspen Research Group Ltd.*, 437 Fed. App'x 57, 58 (2d Cir. 2011) (quoting *Faiveley Transport Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009)).  Speculative, remote or future injury is not the province of injunctive relief.  *Los Angeles v. Lyons*, 461 U.S. 95, 111-12 (1983).  Rather, a plaintiff seeking to satisfy the irreparable harm requirement, must demonstrate that "absent a preliminary injunction [he or she] will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm.  *Bisnews AFE (Thailand)*, 437 Fed. App'x at 58 (quoting *Faiveley*, 559 F.3d at 118).

---

[3] Under the Prison Litigation Reform Act, preliminary injunctive relief in any civil action with respect to prison conditions must be narrowly drawn, extend no further than necessary to correct the harm, and be the least intrusive means necessary to correct that harm.  *See* 18 U.S.C. § 3626(a)(2).  In considering an application for prospective relief, the court is required to give substantial weight to any adverse impact such relief may have on public safety or on the operation of the criminal justice system.  *See* 18 U.S.C. § 3626(a)(1)(A).

By his motion, plaintiff seeks "a preliminary injunction to stop being subject to restraints in the exercise area whenever the Defendants feel like it, with an illegal restraint order and to be afforded adequate clothing for exercise purposes." Dkt. No. 56-1 at 2; *see also* Dkt. No. 56 at 23. Plaintiff states that his requests for warm clothing have been denied by defendants, and claims that he is therefore unable to exercise outdoors during the winter months. *See* Dkt. No. 56 at 1-9.[4] In addition, plaintiff claims that he is denied adequate exercise as a result of being held in full restraints while in the exercise yard. *Id.* at 10-13.

Defendants have responded in opposition to plaintiff's motion. Dkt. No. 58. Defendants maintain that plaintiff has failed to demonstrate either irreparable harm or a likelihood of success on the merits of his claims, and urge denial of his motion. *Id.* at 9-13.

In a letter dated March 4, 2014, plaintiff advised that he had been transferred from Clinton Correctional Facility to Upstate Correctional Facility. Dkt. No. 66. "It is settled in this Circuit that a transfer from a prison facility moots an action for injunctive relief against the transferring facility.'" *Sweeper v. Taylor*, 383 Fed. App'x 81, 82 (2d Cir. 2010) (quoting *Prins v. Coughlin*, 76 F.3d 504, 506 (2d Cir. 1996)); *see also Thompson v. Choinski,* 525 F.3d 205, 209 (2d Cir. 2008) (same). In light of plaintiff's transfer to Upstate Correctional Facility, his claims for injunctive relief against defendants, all of which arose at Clinton Correctional Facility, are moot and his motion must be denied.

III.   **CONCLUSION**

   **WHEREFORE**, it is hereby

   **ORDERED** that plaintiff's motion for preliminary injunctive relief (Dkt. No. 56) is

---

[4] Plaintiff states that he is not able to exercise in his cell because of the "dry air from the radiator" and because he is not allowed to wear his medical boots in his cell. *See* Dkt. No. 56 at 1-2.

4

**DENIED**; and it is further

     **ORDERED** that the Clerk shall serve a copy of this Decision and Order on the parties.

**IT IS SO ORDERED**.

Dated:  March 21 , 2014

Thomas J. McAvoy
Senior, U.S. District Judge

5

EXHIBIT

# 6

12-4-15 and 2-16-16 Ad-Seg Reviews, Security
Classification And CMC documents, All Defendants
Interrogatories #7, M's behavior Reports

STATE OF NEW YORK - DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION
SIXTY-DAY ADMINISTRATIVE SEGREGATION REVIEW
**UPSTATE CORRECTIONAL FACILITY**

| Form 2170 (11/02)<br>Ref. 7 NYCRR<br>301 4(d) | | Directed Central<br>Office Review? |
|---|---|---|

NAME: **WALKER, TYRONE**          DIN: **94A5258**   REVIEW DATE **12/4/15**

Directed Central Office Review?  [X] Yes   [ ] No

Date placed in administrative segregation: 1/17/14   Date Hearing held: 2/26/14

**A. Summary report of the facility three-member committee:**

**Reasons why offender was initially determined to be appropriate for administrative segregation:** Inmate Walker's past is marked with assaults and brutality showing a deprived indifference to human life. Inmate Walker entered DOCS custody on July 26, 1994 to serve a 47 ½ year to life sentence from Kings County for Attempted Robbery 1st and Criminal Possession of Weapon 2nd. He also was convicted in New York County of two counts of Murder 2nd and one count each of Attempted Robbery 1st, Criminal Possession of a Weapon 2nd and Criminal Possession of Weapon 3rd. Walker was also sentenced on July 22, 1996 to life in federal prison without the possibility of parole for a capital murder offense and on narcotic related charges. On September 22, 2000 while in E and F yard at Green haven Correctional Facility, inmate Walker, without provocation, violently attacked Deputy Superintendent of Security Schneider and Corrections Officer Mitchetti, seriously injuring both staff members. Inmate Walker had armed himself with two homemade weapons described as one flat piece of metal; 10 ½" x ¾" and sharpened at one end and one ice pick type weapon 6" long. Both weapons were secured to each hand by leather thongs. He used these weapons to stab both staff members about the head, chest and back causing serious puncture wounds. Walker subsequently received a Tier 3 Misbehavior Report and sanctions as follows: Assault on staff and Weapons. He received 35 months and 22 days of SHU, loss of package, commissary, phones and loss of 36 months good time. In addition to the Departmental sanctions, on July 9, 2001 inmate Walker pled guilty to the Dutchess County Court to attempted Murder 1st, receiving a sentence of 15 years to life. During Walker's Federal trial, while housed in county jail, he had escape plots/attempts, and attempted to hire a "hit man" to kill a government witness. Inmate Walker also assaulted a Deputy and attempted to take his keys. He also smuggled a razor blade to Federal Court as well as assaulting another inmate by stabbing him 18 times.

**Information on the offender's subsequent behavior and attitude:** Inmate Walker arrived in DOCCS custody in July 1994. Walker transferred here to Upstate Correctional Facility SHU on March 4, 2014 from Clinton Correctional Facility. While incarcerated he has incurred 27 Misbehavior Reports including, but not limited to: Weapon, Drugs, Smuggling, Demonstration , Assault on Staff, Direct Order, Altered Item, Creating Disturbance and Threats. This type of history in conjunction with his propensity for violence cannot be taken lightly. Inmate Walker is single celled and under high security at Upstate Correctional Facility which greatly minimizes and restricts his opportunity to act out. Inmate Walker has spent the majority of his time in SHU confinement and has not completed any of his recommended programs. Although Mr. Walker has a High School Diploma from 1987, he continues with Academic Cell Study for academic enrichment and is currently studying Psychology.  Since his last review Walker has maintained a positive disciplinary record. His interaction with staff in the last review period has been appropriate. Acting DSS Zemiak met with Walker regularly on rounds, and states that his demeanor was appropriate.  Security staff for Walker indicate that he is quiet and causes no problems. On 12/1/2015, this writer met with inmate Walker to discuss his Administrative Segregation Review.  Walker's cell appeared neat and tidy and he appeared well groomed. Walker states he spends his days reading and writing. The pilot incentive program was discussed and subject has received family phone calls on a regular basis. Inmate is appropriate with all staff and there is no additional information to report.

**Other factors which may favor retaining the offender in or releasing the offender from administrative segregation:** Clearly, Inmate Walker has demonstrated a propensity for assaultive and dangerous behavior in the correctional facility and the community.  Walker's willingness to enact extreme violence on staff and other inmates has proven his presence in general confinement of any correctional facility an extreme risk to staff and inmates, as well as the safety and security and good order of the facility.

| _____ ORC | T. Qom | Tibchette, DSP | 12/9/15 |
|---|---|---|---|
| Guidance Offender Rehabilitation Coordinator | Security Supervisor | Committee Chairman   Date | DATE |

If Central Office review has not been directed, skip to C, below, for Superintendent's decision.

**B. Summary report and recommendation of the Central Office three-member committee:**

See Attached.

| _____ | _____ | _____ | 4/4/16 |
|---|---|---|---|
| Staff - Inspector General | Staff - Counsel | Chairman - Facility Operations | Date |

**C. Decision of the (Superintendent) (Deputy Commissioner for Correctional Facilities):**          See Attached.

[ ]   Release from Administrative Segregation.

[X]   A determination has been made to continue your Administrative Segregation for the following reasons:

Prior to your next sixty-day review, you may write to the Superintendent or designee to make a statement regarding the need for continued Administrative Segregation. The reason(s) stated in this notice, any written statement that you submit, as well as your overall custodial adjustment will be considered during the next scheduled review.

| _____ | _____ | 4-6-16 |
|---|---|---|
| (Superintendent) (Deputy Commissioner for Correctional Facilities) | Date | |

Attach offender's statement(s) and additional pages as necessary.

c.    IRC
      Guidance Offender File

Walker v. Bellnier et al
(17-CV-1008)                                                             OAG 000268

Summary report and recommendation for the Central Office three-member committee

December 22, 2015:

Inmate Tyrone Walker (94-A-5258) is currently serving an aggregate sentence of 47½ years to Life for Murder (2 Counts), Attempted Murder, Robbery, Attempted Robbery, and Criminal Possession of Weapon (3 Counts).

At age 17, prior to first coming to New York State custody, Walker was designated a Youthful Offender for Attempted Criminal Possession of Stolen Property. In 1994, and again in 1997, Walker was convicted for a series of muggings, during which he fired a gun, killing an individual during one. In 2000, while in DOCCS custody at Green Haven Correctional Facility, Walker brutally attacked a Deputy Superintendent and a Correction Officer with stabbing-type weapons. One weapon was six inches long and the other was ten inches long, both with leather thongs. He stabbed each victim multiple times.

According to Walker, he had no issues with the Deputy Superintendent, but went into a "blind rage".

Walker has over 27 misbehavior reports for incidents including but not limited to: Possession of a Weapon (on four occasions), Drugs, Smuggling (on three occasions), Demonstration, Assault on Staff, Making Threats, Harassment, and Possession of an Altered Item (on three occasions). His most recent Tier hearing was in March 2014, for having a weapon, bribery/extortion, having property in an unauthorized location, and having an altered item. Walker has a unique propensity for obtaining and crafting weapons. One such incident occurred at Clinton Correctional Facility because he didn't want to be moved and believed that if he had a disciplinary infraction his transfer would be cancelled.

Walker maintains appropriate communication with staff and does not discuss his placement in Administrative Segregation. He has had no problems with staff and maintains a clean cell and person. Walker participates in the Pilot Incentives Program and receives additional exercise time, additional visitations, personal clothing, and a weekly phone call.

It is the recommendation of the committee that Walker remain in Administrative Segregation at this time. The decision is based on Walker's ability to obtain and fashion deadly weapons; his prior use of violence in an attempt to manipulate his pending transfer and the unpredictability of when such a future incident might occur; and his long history of violent and aggressive behavior. The committee encourages Walker to continue exhibiting appropriate behavior in order to earn additional incentives while in Administrative Segregation.

STATE OF NEW YORK - DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION
SIXTY-DAY ADMINISTRATIVE SEGREGATION REVIEW
**UPSTATE CORRECTIONAL FACILITY**

| Form 2170 (11/02) | | Directed Central Office Review? |
| Ref: 7 NYCRR | | ☒ Yes |
| 301.4(d) | | ☐ No |

NAME: **WALKER, TYRONE**   DIN: **94A5258**   REVIEW DATE **1/25/16**

Date placed in administrative segregation: **1/17/14**   Date Hearing held: **2/26/14**

**A. Summary report of the facility three-member committee:**

**Reasons why offender was initially determined to be appropriate for administrative segregation:** Inmate Walker's past is marked with assaults and brutality showing a deprived indifference to human life. Inmate Walker entered DOCS custody on July 26, 1994 to serve a 47 ½ year to life sentence from Kings County for Attempted Robbery 1st and Criminal Possession of Weapon 2nd. He also was convicted in New York County of two counts of Murder 2nd and one count each of Attempted Robbery 1st, Criminal Possession of a Weapon 2nd and Criminal Possession of Weapon 3rd. Walker was also sentenced on July 22, 1996 to life in federal prison without the possibility of parole for a capital murder offense and on narcotic related charges. On September 22, 2000 while in E and F yard at Green Haven Correctional Facility, inmate Walker, without provocation, violently attacked Deputy Superintendent of Security Schneider and Corrections Officer Mitchetti, seriously injuring both staff members. Inmate Walker had armed himself with two homemade weapons described as one flat piece of metal; 10 ½" x ¾" and sharpened at one end and one ice pick type weapon 6" long. Both weapons were secured to each hand by leather thongs. He used these weapons to stab both staff members about the head, chest and back causing serious puncture wounds. Walker subsequently received a Tier 3 Misbehavior Report and sanctions as follows: Assault on Staff and Weapons. He received 35 months and 22 days of SHU, loss of package, commissary, phones and loss of 36 months good time. In addition to the Departmental sanctions, on July 9, 2001 inmate Walker pled guilty to the Dutchess County Court to attempted Murder 1st, receiving a sentence of 15 years to life. During Walker's Federal trial, while housed in county jail, he had escape plots/attempts, and attempted to hire a "hit man" to kill a government witness. Inmate Walker also assaulted a Deputy and attempted to take his keys. He also smuggled a razor blade to Federal Court as well as assaulting another inmate by stabbing him 18 times.

**Information on the offender's subsequent behavior and attitude:** Inmate Walker arrived in DOCCS custody in July 1994. Walker transferred here to Upstate Correctional Facility SHU on March 4, 2014 from Clinton Correctional Facility. While incarcerated he has incurred 27 Misbehavior Reports including, but not limited to: Weapon, Drugs, Smuggling, Demonstration , Assault on Staff, Direct Order, Altered Item, Creating Disturbance and Threats. This type of history in conjunction with his propensity for violence cannot be taken lightly. Inmate Walker is single celled and under high security at Upstate Correctional Facility which greatly minimizes and restricts his opportunity to act out. Inmate Walker has spent the majority of his time in SHU confinement and has not completed any of his recommended programs. Although Mr. Walker has a High School Diploma from 1987, he continues with Academic Cell Study for academic enrichment and is currently studying Psychology. Since his last review Walker has maintained a positive disciplinary record. his interaction with staff in the last review period has been appropriate. On 1/27/16, DSS Woodruff and this writer met with inmate Walker to discuss his Administrative Segregation placement . Walker implemented his case plan this review period and he identified two goals. The first goal was to maintain/improve family contact and he  supported this goal by writing letters and weekly phone calls. His second goal was to further his education. The Pilot Incentive program was discussed and Walker was asked questions and was appropriate for the duration of the interview.

**Other factors which may favor retaining the offender in or releasing the offender from administrative segregation:** Clearly, Inmate Walker has demonstrated a propensity for assaultive and dangerous behavior in the correctional facility and the community. Walker's willingness to enact extreme violence on staff and other inmates has proven his presence in general confinement of any correctional facility an extreme risk to staff and inmates, as well as the safety and security and good order of the facility.

| _____ | _____ | _____ | 1/26/16 |
| Guidance Offender Rehabilitation Coordinator | Security Supervisor | Committee Chairman | Date |

If Central Office review has not been directed, skip to C, below, for Superintendent's decision.

**B. Summary report and recommendation of the Central Office three-member committee:**

See Attached.

| _____ | _____ | _____ | 4/6/14 |
| Staff - Inspector General | Staff - Counsel | Chairman - Facility Operations | Date |

**C. Decision of the (Superintendent) (Deputy Commissioner for Correctional Facilities):**   See Attached.

☐   Release from Administrative Segregation.

☒   A determination has been made to continue your Administrative Segregation for the following reasons:

Prior to your next sixty-day review, you may write to the Superintendent or designee to make a statement regarding the need for continued Administrative Segregation. The reason(s) stated in this notice, any written statement that you submit, as well as your overall custodial adjustment will be considered during the next scheduled review.   4-6-16

_____

(Superintendent) (Deputy Commissioner for Correctional Facilities)   Date

Attach offender's statement(s) and additional pages as necessary

c   IHC
   Guidance Offender File

**Administrative Segregation Review –2-16-16:**

Inmate Tyrone Walker (94-A-5258) is currently serving an aggregate sentence of 47½ years to Life for Murder (2 Counts), Attempted Murder (2 counts), Robbery (2 Counts), Attempted Robbery, and Criminal Possession of Weapon (3 Counts).

At age 17, prior to first coming to New York State custody, inmate Walker was designated a Youthful Offender for Attempted Criminal Possession of Stolen Property. In 1994, and again in 1997, he was convicted for a series of muggings. During one of these he fired a gun and killed an individual. In 2000, while in DOCCS custody, inmate Walker brutally attacked a Deputy Superintendent and a Correction Officer with stabbing-type weapons. One weapon was six inches long, the other ten inches long both with leather thongs. He stabbed each victim multiple times. According to inmate Walker, he had no issues with the Deputy Superintendent, but went into a "blind rage".

Inmate Walker was placed in Administrative Segregation in January 2014, after completing his disciplinary disposition. He has over 27 misbehavior reports including but not limited to: for Possession of a Weapon (4), Drugs, Smuggling (3), Demonstration, Assault on Staff, Making Threats, Harassment, and Possession of an Altered Item (3).

His most recent Tier hearing was in March 2014, for having a weapon, bribery/extortion, having property in an unauthorized location, and having an altered item. Walker has proven his ability to obtain and craft weapons and to manipulate his environment: he purposefully obtained or created a weapon in February 2014, while still at Clinton Correctional Facility after he found out he was being transferred to Upstate Correctional Facility. He knew possession of such contraband would result in a Tier III disciplinary action and believed that this would cause his transfer to be cancelled.

On rounds inmate Walker smiles, talks, and interacts appropriately with managerial and line staff, although he has been found using drag lines (used to smuggle contraband) which he turns over readily. He talks to a lot of inmates, especially during exercise time. His cell is clean and he has good personal hygiene. Inmate Walker participates in the Pilot Incentives Program and receives additional exercise time, visitations, clothing, and a weekly phone call. He has not complained about placement in Administrative Segregation or otherwise, but has expressed an interest in taking classes. His case plan was reviewed in January 2016.

At this time the Committee continues to believe that it is in the best interests of inmate Walker, the facility, and the population that he remain in Administrative Segregation. Inmate Walker's ability to obtain and fashion extremely dangerous weapons, his attempt to manipulate the system, and his unpredictable violence all indicate that he would be a threat to the security and safety of himself, the facility and the population if placed in general population. Consequently, the Committee recommends inmate Walker's continued placement in Administrative Segregation at this time.

```
04/17/19   SRCL016   INITIAL SECURITY CLASSIFICATION GUIDELINE - MALE   *RCLASS*
NAME WALKER, TYRONE                                DATE RECEIVED 07/26/1994
DOB  02/02/1969      DIN 94A5258       NYSID 05658237R      FBI 681357HA8
```

### 1. PUBLIC RISK SCORE

```
                                                                    SCORE
A) CRIMINAL BEHAVIOR
   INSTANT OFFENSE: WEAPON: 1 < YES > FORCIBLE CONTACT: 4 < DEATH   >  5
   OTHER OFFENSE:   WEAPON: . <      > FORCIBLE CONTACT: . <        >  0
   CRIME/YEAR COMMITTED:  CRIM SALE CONTR SUBSTANCE 5TH /1990

B) TIME TO EARLIEST RLSE: Z < HISTORIC >60 > ADDTL TIME: 0 < NONE  >  7
C) ESCAPE: ..           ABSCONDANCE:  .    BAIL JUMP:  .
   AWOL (MILITARY): .   TWO+ SERIOUS: .   NONE/NEVER ON SUPERVISION: 0
   SUCCESSFUL PRE-TRIAL RELEASE:  ..                                  0
D) STREET STABILITY: LOW                                             2
                                             PUBLIC RISK TOTAL:  14
```

### 2. INSTITUTIONAL RISK SCORE

```
A) PRIOR DOCS INSTITUTIONAL ADJUSTMENT: NO PRIOR DOCS RECORD         1
B) STREET STABILITY: LOW                                            2
                                    INSTITUTIONAL RISK TOTAL:   3
```

### OTHER SECURITY CHARACTERISTICS

```
   11 < VIOL. AGAINST AUTHORITIES   >    .. < _____ >
   .. < _____ >         .. < _____ >
   .. < _____ >         .. < _____ >
```

### EXPLANATION OF OTHER SECURITY CHARACTERISTICS

```
< 11 ID, IND # 00122-2000 WHILE INCARCERATED AT GREENHAVEN CF, 9-27-00,  >
<    STABBED 2 SECURITY EMPLOYEES W/SHIV                                  >
< .....................................................................  >
```

```
GUIDELINE RECOMMEND:  01 < MAX A >    PLACEMENT RECOMMEND:  01 < MAXIMUM 01 >
```

### OVERRIDE REASON

```
          < ........................ >
```

```
          PLACEMENT DECISION:  01 < MAXIMUM 01 >

   COUNSELOR ID:  1966 < P RICHARD        >   DATE:  05 / 16 / 2002
```

```
   *** ABOVE INFORMATION IS THE RESULT OF AN UPDATED INITIAL ***
```

```
DISTRIBUTION:  GUIDANCE & COUNSELING UNIT (1)
```

OAG 000013

```
09/26/19    SINQ003        INMATE SECURITY CLASSIFICATION      *FPMS*      PAGE 002

DIN 94A5258        NAME WALKER, TYRONE                              NYSID 05658237R
```

## CURRENT CLASSIFICATION

```
DATE  03/03/14      SEC CLASS MAX 01      TYPE  R      OMH LEV  6      05/20/14
                                                       MED LEV  3      01/14/18
PUB      INST      OVERRIDE REASON
```

OTHER SECURITY
CHARACTERISTICS

EXPLAIN SECURITY CHARACTERISTICS:

## INITIAL CLASSIFICATION

```
DATE 01/21/98        SEC CLASS MAX 01                  OMH LEV  7      MED LEV  2
PUB 14    INST  3    OVERRIDE REASON
```

OTHER SECURITY      VIOL. AGAINST AUTHORITIES
CHARACTERISTICS

EXPLAIN SECURITY CHARACTERISTICS:
   11 IO, IND # 00122-2000 WHILE INCARCERATED AT GREENHAVEN CF, 9-27-00,
   STABBED 2 SECURITY EMPLOYEES W/SHIV

SHSC013   INMATE SECURITY/OMH/SMI/MEDICAL CLASSIFICATIONS

CURRENT CLASSIFICATION

SEC CLASS: MAX 01   03/03/14 TYPE: R   OMH: 6    /  /      MEDICAL: 3   01/14/18

PRIOR CLASSIFICATIONS

| SEC CLASS | TYP SOURCE | OMH/SMI/CELL | SOURCE | MEDICAL | | SOURCE |
|-----------|------------|--------------|--------|---------|---|--------|
| --- | | --- | | 3 | 01/14/18 | C840BLB |
| --- | | --- | | 3 | 07/16/17 | C840CAF |
| --- | | --- | | 3 | 09/25/16 | C840CAF |
| --- | | --- | | 3 | 02/11/16 | C840CAF |
| --- | | --- | | 3 | 02/10/16 | C840CAF |
| --- | | --- | | 3 | 05/15/15 | C840CAF |
| --- | | 6   05/20/14 OOMHBAK | | - | | |
| --- | | --- | | 3 | 02/15/14 | C020BNF |
| --- | | --- | | 3 | 12/28/12 | C020D3B |
| MAX 01 | 07/21/11 R CCLMBRL | --- | | - | | |
| --- | | --- | | 3 | 06/27/11 | C020JCC |
| --- | | --- | | 3 | 06/10/10 | C020KAP |
| --- | | 6   04/06/10 OOMHSJN | | - | | |
| MAX 01 | 03/08/10 R CCLMBRL | --- | | - | | |
| --- | | --- | | 3 | 07/10/09 | C020PTE |

INITIAL CLASSIFICATION

SEC CLASS: MAX 01  01/21/98  I   OMH: 7__ 07/26/94      MEDICAL: 2  07/26/94
```

IG UNIT

01 28 01  MON 12:12 FAX 518 485 1821

FORM 1172 (REV. 8/85)    STATE OF NEW YORK - DEPARTMENT OF CORRECTIONAL SERVICES

OFFICE OF THE INSPECTOR GENERAL

## CENTRAL MONITORING CASE DESIGNATION

DATE __8-27-96__

FACILITY ___Green Haven___

NAME: __Walker, Tyrone__

DIN #: __94A5258__

DCJS #: __5658237R__

INFORMATION: You have been designated a Central Monitoring Case pursuant to Department Directive #0701, Central Monitoring Cases and Review Procedures.

REASON:      You require close supervision because of the following criteria:

| III-A-5 | III-A-1 |
| III-B-6 | III-D |
| III-B-7 | III-B-8 |

Contact your Correction Counselor, if you require assistance in filing an appeal of this designation.

I DO / DO NOT wish to appeal my designation as a Central Monitoring Case. I have been advised of the appeal process this date.

_____        _____                    _____
DATE                   NAME                                DATE

_____
COUNSELOR/ANALYST  Name & Signature

Copy returned to I.G. Office

DISTRIBUTION:
White      -I.G. Folder
Blue       -D.S.P.
Green      -Inmate
Canary     -Classification & Move.
Pink       -D.S.S.
Goldenrod  -Central Files

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

TYRONE WALKER,

*Plaintiff,*

-against-

JOSEPH BELLNIER; JAMES A. O'GORMAN; DONALD
UHLER; PAUL P. WOODRUFF; JOANNE FITCHETTE;
MELISSA A. COOK,

*Defendants.*

**RESPONSE BY
WOODRUFF TO
PLAINTIFF'S
INTERROGATORIES**

17-CV-1008

GTS/CFH

---

The Defendant, Paul Woodruff, by his attorney, Letitia James, Attorney General of the

State of New York, Lynn M. Knapp, Assistant Attorney General, of Counsel, pursuant to Federal

Rule of Civil Procedure 33(b), responds to plaintiff's interrogatories dated September 18, 2019 as

follows:

2.     What is the date you started as a member of the Ad-Seg Review Committee for the

Plaintiff?

**Response:   I transferred to Upstate Correctional Facility ("Upstate") in

January 2016 and that is when I became a member of the Ad-Seg Review Committee.**

3.     What is your academic level of education?

**Response:   Defendant objects to this request as it is irrelevant, and an

unwarranted invasion of personal privacy designed to annoy and harass this defendant and**

is not likely to lead to the discovery of admissible evidence. **Notwithstanding and without waiving said objections, I have completed some college credits.**

5.    Plaintiff's Administrative Review states Plaintiff had no issues with the Deputy Superintendent, but went into a blind rage and stabbed him multiple times, is that a true statement?

**Response: A review of the paperwork indicates that inmate Walker "attacked without provocation".**

5(a).   If yes, do you have any documentation or proof to support that?

**Response:     Yes.**

5(b).   If no, why is it stated in Plaintiff's Ad-Seg statement?

**Response:     n/a**

5(c).   If yes, who said it?

**Response:     The paperwork is from Greenhaven. I am not sure who wrote up the paperwork.**

6.    The Plaintiff's 8-17-16 Ad-Seg Review wasn't completed until 2-10-17 and the Plaintiff did not receive it until 2-17-17, why did it take Plaintiff 6 months to receive that review?

**Response:     Plaintiff has been in Ad-Seg for many years prior to 2016. I had no direct role in plaintiff receiving his Ad-Seg reviews from Central Office.**

7.    Plaintiff's 6-16-17 Ad-Seg review state, plaintiff obtained or created a weapon to manipulate the prison, so he could stay at Clinton and have hi transfer cancelled because he believed  if he had a possession of a weapon charge that would cancel a transfer, is this statement true?

**Response:     I have no such knowledge.**

2

7(a).   If yes, do you have any documentation to support that?

Response:    **I do not have such documentation.**

7(b).   If yes, is the Plaintiff notified in advance when he is going to be transferred?

Response:    **I have no such knowledge.**

7(c).   If no, why is it stated in Plaintiff's Ad-Seg statement?

Response:    **I have no such knowledge.**

10.   Why did the Plaintiff receive 9 Ad-Seg reviews on January 22, 2019.

Response:    **I have no such knowledge.**

10(a).   Is there a justifiable reason for receiving 9 Ad-Seg reviews in regard to Directive 4933 Ad-Seg section?

Response:    **I do not know.**

14.   Did the Defendant Bellnier write a memorandum discontinuing the pilot incentive program around 4-18-2017?

Response:    **Someone did issue a memorandum discontinuing the pilot incentive program, but I am not sure who authored the memorandum.**

16.   If the Plaintiff threatened to cause physical harm to any correctional staff, would the Plaintiff be issued a misbehavior report?

Response:    **Yes.**

17.   In the last 18 years has the Plaintiff threatened to cause physical harm to any correctional staff?

Response:    **In the four (4) years that I have known inmate Walker, I do not believe that he has threatened to cause physical harm to any correctional staff.**

3

17(a).  If yes, when, what was the date?

      **Response:**    **n/a**

17(b).  If yes, who the Plaintiff threatened?

      **Response:**    **n/a**

17(c).  If yes, is there any documentation to support such a claim?

      **Response:**    **n/a**

19.  Has the Plaintiff received time-cuts when he was in S.H.U. for disciplinary reasons before being placed in Ad-Seg status?

      **Response:**    **I have no knowledge of plaintiff's status before he was in Upstate.**

20.  Do high security CERT movement inmates receive any notification in advance when they are going to be transferred?

      **Response:**    **Defendant objects to this request in that it is irrelevant and unlikely to lead to the discovery of admissible evidence. Defendant also objects to this request in that it could impair the security of the facility and the safety of corrections staff and inmates. Notwithstanding and without waiving said objections, I cannot answer this question as it deals with security issues within the facility.**

20(a).  Is the Plaintiff a CERT movement inmate?

      **Response:**    **Defendant objects to this request in that it is irrelevant and unlikely to lead to the discovery of admissible evidence. Defendant also objects to this request in that it could impair the security of the facility and the safety of corrections staff and**

inmates. **Notwithstanding and without waiving said objections, I cannot answer this question as it deals with security issues within the facility.**

21.    Do a Plexiglas completely covering cell bars on a solid cell door constitute as a cell shield?

**Response:    No.**

21(a).  If no, what do it constitute as?

**Response:    At Upstate, it is the physical plan of the facility. Every cell in Upstate is equipped with solid doors and an expanded vision panel.**

DATED:     Albany, New York
                June 18, 2020

LETITIA JAMES
Attorney General of the State of New York
The Capitol
Albany, New York 12224-0341
By: *Lynn M. Knapp*
Lynn M. Knapp
Assistant Attorney General, of Counsel
Bar Roll No. 507430
Telephone: 518-776-2598
Email: Lynn.KnappBlake@ag.ny.gov

TO:    Tyrone Walker, 94 A 5258
          *Plaintiff pro se*
          Upstate Correctional Facility
          PO Box
          Malone, NY 12953

5

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

TYRONE WALKER,

*Plaintiff,*

-against-

JOSEPH BELLNIER; JAMES A. O'GORMAN; DONALD
UHLER; PAUL P. WOODRUFF; JOANNE FITCHETTE;
MELISSA A. COOK,

*Defendants.*

**RESPONSE BY
BELLNIER TO
PLAINTIFF'S
INTERROGATORIES**

17-CV-1008

GTS/CFH

---

The Defendant, Joseph Bellnier, by his attorney, Letitia James, Attorney General of the

State of New York, Lynn M. Knapp, Assistant Attorney General, of Counsel, pursuant to Federal

Rule of Civil Procedure 33(b), responds to plaintiff's interrogatories dated September 18, 2019 as

follows:

2.      What is the date you started as a member of the Ad-Seg review Committee for the

Plaintiff?

**Response: Deny knowledge or information with which to respond.**

3.      What is your academic level of education?

**Response: Defendant objects to this request as it is irrelevant, and an

unwarranted invasion of personal privacy designed to annoy and harass this defendant and

is not likely to lead to the discovery of admissible evidence. Notwithstanding and without

waiving said objections, I attended college but did not obtain a full degree.**

5.    Plaintiff's Administrative Review states Plaintiff had no issues with the Deputy Superintendent, but went into a blind rage and stabbed him multiple times, is that a true statement?

**Response:    Plaintiff was originally in Ad-Seg before being transferred to Upstate Correctional Facility ("Upstate") because he stabbed the Deputy Superintendent of Security at Greenhaven Correctional Facility ("Greenhaven"). I am unclear exactly what plaintiff is asking here, but his Ad-Seg status was based on his prior assault.**

5(a).    If yes, do you have any documentation or proof to support that?

**Response:    I do not have custody or control over any such records.**

5(b).    If no, why is it stated in Plaintiff's Ad-Seg statement?

**Response:    Deny knowledge or information with which to respond.**

5(c).    If yes, who said it?

**Response:    Deny knowledge or information with which to respond.**

6.    The Plaintiff's 8-17-16 Ad-Seg Review wasn't completed until 2-10-17 and the Plaintiff did not receive it until 2-17-17, why did it take Plaintiff 6 months to receive that review?

**Response:    Deny knowledge or information with which to respond.**

7.    Plaintiff's 6-16-17 Ad-Seg review state, plaintiff obtained or created a weapon to manipulate the prison, so he could stay at Clinton and have his transfer cancelled because he believed if he had a possession of a weapon charge that would cancel a transfer, is this statement true?

**Response:    Deny knowledge or information with which to respond.**

7(a).    If yes, do you have any documentation to support that?

**Response:    I do not have custody or control over any such records.**

2

7(b).  If yes, is the Plaintiff notified in advance when he is going to be transferred?

      **Response:**   **Deny knowledge or information with which to respond.**

7(c).  If no, why is it stated in Plaintiff's Ad-Seg statement?

      **Response:**   **Deny knowledge or information with which to respond.**

8.     What do the Plaintiff have to do in order to be release from Ad-Seg?

      **Response:**   **I believe that plaintiff would have to obtain a recommendation from the Deputy Commissioner at Central Office.**

10.    Why did the Plaintiff receive 9 Ad-Seg reviews on January 22, 2019.

      **Response:**   **Deny knowledge or information with which to respond.**

10(a).  Is there a justifiable reason for receiving 9 Ad-Seg reviews in regard to Directive 4933 Ad-Seg section?

      **Response:**   **Deny knowledge or information with which to respond.**

13(b)  Has the Plaintiff ever received a misbehavior report in the last 18 years that resulted with Plaintiff having a cell shield on his cell?

      **Response:**   **Deny knowledge or information with which to respond, but all cells at Upstate have solid doors with thick glass. Upstate does not utilize cell shields.**

14.    Did the Defendant Bellnier write a memorandum discontinuing the pilot incentive program around 4-18-2017?

      **Response:**   **Deny knowledge or information with which to respond.**

16.    If the Plaintiff threatened to cause physical harm to any correctional staff, would the Plaintiff be issued a misbehavior report?

      **Response:**   **Yes.**

17.    In the last 18 years has the Plaintiff threatened to cause physical harm to any correctional staff?

        **Response:**    **Deny knowledge or information with which to respond.**

17(a).  If yes, when, what was the date?

        **Response:**    **Deny knowledge or information with which to respond.**

17(b).  If yes, who the Plaintiff threatened?

        **Response:**    **Deny knowledge or information with which to respond.**

17(c).  If yes, is there any documentation to support such a claim?

        **Response:**    **Deny knowledge or information with which to respond.**

19.    Has the Plaintiff received time-cuts when he was in S.H.U. for disciplinary reasons before being placed in Ad-Seg status?

        **Response:**    **Deny knowledge or information with which to respond.**

20.    Do high security CERT movement inmates receive any notification in advance when they are going to be transferred?

        **Response:**    **Defendant objects to this request in that it is irrelevant and unlikely to lead to the discovery of admissible evidence.  Defendant also objects to this request in that it could impair the security of the facility and the safety of corrections staff and inmates.  Notwithstanding and without waiving said objections, deny knowledge or information with which to respond.**

20(a).  Is the Plaintiff a CERT movement inmate?

        **Response:**    **Defendant objects to this request in that it is irrelevant and unlikely to lead to the discovery of admissible evidence.  Defendant also objects to this**

4

request in that it could impair the security of the facility and the safety of corrections staff and inmates.  Notwithstanding and without waiving said objections, deny knowledge or information with which to respond.

21.    What is the exact dated in which you left the position as Deputy Commissioner overseeing Plaintiff's Ad-Seg status and the Acting Deputy Commissioner O'Gorman took your place?

Response:    Deny knowledge or information with which to respond.

22.    Do a Plexiglas completely covering cell bars on a solid cell door constitute as a cell shield?

Response:    At Upstate, every cell is equipped with solid doors with thick glass.  The facility does not utilize cell shields.

DATED:        Albany, New York
              June 19, 2020

                            LETITIA JAMES
                            Attorney General of the State of New York
                            The Capitol
                            Albany, New York 12224-0341
                            By: *Lynn M. Knapp*
                            Lynn M. Knapp
                            Assistant Attorney General, of Counsel
                            Bar Roll No. 507430
                            Telephone: 518-776-2598
                            Email: Lynn.KnappBlake@ag.ny.gov

TO:    Tyrone Walker, 94 A 5258
       *Plaintiff pro se*
       Upstate Correctional Facility
       PO Box 2001
       Malone, NY 12953

5

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

TYRONE WALKER,

|  |  |  |
|---|---|---|
|  | *Plaintiff,* | **RESPONSE OF UHLER** |
|  |  | **TO PLAINTIFF'S** |
| -against- |  | **INTERROGATORIES** |

JOSEPH BELLNIER; JAMES A. O'GORMAN; DONALD             17-CV-1008
UHLER; PAUL P. WOODRUFF; JOANNE FITCHETTE;
MELISSA A. COOK,                                    GTS/CFH

*Defendants.*

---

The Defendant, Donald Uhler, by his attorney, Letitia James, Attorney General of the State

of New York, Lynn M. Knapp, Assistant Attorney General, of Counsel, pursuant to Federal Rule

of Civil Procedure 33(b), responds to plaintiff's interrogatories dated September 18, 2019 as

follows:

       2.      What is the date you started as a member of the Ad-Seg Review Committee for the

Plaintiff?

       **Response**:      **I served as the Deputy Superintendent of Security from October**

**2009 to May 2014 and during that time I served as part of the Ad-Seg Review Committee.**

       3.      What is your academic level of education?

       **Response**:      **Defendant objects to this request as it is irrelevant, and an**

**unwarranted invasion of personal privacy designed to annoy and harass this defendant and**

**in that it could impair the security of the facility and the safety of corrections staff and inmate. Notwithstanding and without waiving said objections, I do not know.**

21.   Do Plexiglas over the cell bars constitute as a cell shield when the Plexiglas completely covers the solid door?

**Response:   I do not know.**

21(a).   If no, what do that constitute as?

**Response:   I do not know.**

DATED:      Albany, New York
            June 18, 2020

LETITIA JAMES
Attorney General of the State of New York
The Capitol
Albany, New York 12224-0341
By: *Lynn M. Knapp*
Lynn M. Knapp
Assistant Attorney General, of Counsel
Bar Roll No. 507430
Telephone: 518-776-2598
Email: Lynn.KnappBlake@ag.ny.gov

TO:   Tyrone Walker, 94 A 5258
      *Plaintiff pro se*
      Upstate Correctional Facility
      PO Box 2001
      Malone, NY 12953

5

**Response:** **I am not sure, but I have personally written plaintiff a ticket for harassment on June 1, 2017. In response to this ticket, plaintiff received thirty (30) days keeplock.**

17(a). If yes, when, what was the date?

**Response:** **I have no such knowledge.**

17(b). If yes, who the Plaintiff threatened?

**Response:** **I have no such knowledge.**

17(c). If yes, is there any documentation to support such a claim?

**Response:** **I do not know.**

19. Has the Plaintiff received time-cuts when he was in S.H.U. for disciplinary reasons before being placed in Ad-Seg status?

**Response:** **I do not know.**

20. Do high security CERT movement inmates receive any notification in advance when they are going to be transferred?

**Response:** **Defendant objects to this request in that it is irrelevant and unlikely to lead to the discovery of admissible evidence. Defendant also objects to this request in that it could impair the security of the facility and the safety of corrections staff and inmate. Notwithstanding and without waiving said objections, I do not know.**

20(a). Is the Plaintiff a CERT movement inmate?

**Response:** **Defendant objects to this request in that it is irrelevant and unlikely to lead to the discovery of admissible evidence. Defendant also objects to this request**

4

5.      Plaintiff's Administrative Review states Plaintiff had no issues with the Deputy Superintendent, but went into a blind rage and stabbed him multiple times, is that a true statement?

**Response:   Plaintiff was originally in Ad-Seg before being transferred to Upstate Correctional Facility ("Upstate") because he stabbed the Deputy Superintendent of Security at Greenhaven Correctional Facility ("Greenhaven"). I am unclear exactly what plaintiff is asking here, but his Ad-Seg status was based on his prior assault.**

5(a).   If yes, do you have any documentation or proof to support that?

**Response:      I do not possess such records.**

5(b).   If no, why is it stated in Plaintiff's Ad-Seg statement?

**Response:      Deny knowledge or information with which to respond.**

5(c).   If yes, who said it?

**Response:      I had no part in plaintiff's original Ad-Seg determination and do not have direct knowledge of this incident.**

6.      The Plaintiff's 8-17-16 Ad-Seg Review wasn't completed until 2-10-17 and the Plaintiff did not receive it until 2-17-17, why did it take Plaintiff 6 months to receive that review?

**Response:      Deny knowledge or information with which to respond.**

7.      Plaintiff's 6-16-17 Ad-Seg review state, plaintiff obtained or created a weapon to manipulate the prison, so he could stay at Clinton and have hi transfer cancelled because he believed if he had a possession of a weapon charge that would cancel a transfer, is this statement true?

**Response:      Deny knowledge or information with which to respond.**

7(a).   If yes, do you have any documentation to support that?

2

**Response:**    **See response above.**

7(b).   If yes, is the Plaintiff notified in advance when he is going to be transferred?

**Response:**    **Deny knowledge or information with which to respond.**

7(c).   If no, why is it stated in Plaintiff's Ad-Seg statement?

**Response:**    **Deny knowledge or information with which to respond.**

8.    What do the Plaintiff have to do in order to be release from Ad-Seg?

**Response:**    **Plaintiff would have to obtain a recommendation from the Deputy Commissioner at Central Office.**

10.    Why did the Plaintiff receive 9 Ad-Seg reviews on January 22, 2019.

**Response:**    **Deny knowledge or information with which to respond.**

10(a).   Is there a justifiable reason for receiving 9 Ad-Seg reviews in regard to Directive 4933 Ad-Seg section?

**Response:**    **Deny knowledge or information with which to respond.**

13(b)   Has the Plaintiff ever received a misbehavior report in the last 18 years that resulted with Plaintiff having a cell shield on his cell?

**Response:**    **Deny knowledge or information with which to respond.  Note that all cells at Upstate have solid doors with thick glass.  Upstate does not utilize cell shields.**

14.    Did the Defendant Bellnier write a memorandum discontinuing the pilot incentive program around 4-18-2017?

**Response:**    **I believe this to be true.**

16.    If the Plaintiff threatened to cause physical harm to any correctional staff, would the Plaintiff be issued a misbehavior report?

3

**Response:**   **Yes.**

17.   In the last 18 years has the Plaintiff threatened to cause physical harm to any correctional staff?

**Response:**   **Deny knowledge or information with which to respond.**

17(a).  If yes, when, what was the date?

**Response:**   **Deny knowledge or information with which to respond.**

17(b).  If yes, who the Plaintiff threatened?

**Response:**   **Deny knowledge or information with which to respond.**

17(c).  If yes, is there any documentation to support such a claim?

**Response:**   **Deny knowledge or information with which to respond.**

19.   Has the Plaintiff received time-cuts when he was in S.H.U. for disciplinary reasons before being placed in Ad-Seg status?

**Response:**   **Upon information and belief, I believe this to be true.**

20.   Do high security CERT movement inmates receive any notification in advance when they are going to be transferred?

**Response:**   **Defendant objects to this request in that it is irrelevant and unlikely to lead to the discovery of admissible evidence. Defendant also objects to this request in that it could impair the security of the facility and the safety of corrections staff and inmates.**

20(a).  Is the Plaintiff a CERT movement inmate?

**Response:**   **Defendant objects to this request in that it is irrelevant and unlikely to lead to the discovery of admissible evidence. Defendant also objects to this request**

4

is not likely to lead to the discovery of admissible evidence. Notwithstanding and without waiving said objections, I completed two years of college.

5.     Plaintiff's Administrative Review states Plaintiff had no issues with the Deputy Superintendent, but went into a blind rage and stabbed him multiple times, is that a true statement?

**Response:**     **Plaintiff was originally in Ad-Seg before he came to Upstate Correctional Facility ("Upstate") because he stabbed the Deputy Superintendent of Security at Greenhaven Correctional Facility ("Greenhaven"). I am unclear exactly what plaintiff is asking here, but his Ad-Seg status was based on his prior assault.**

5(a).    If yes, do you have any documentation or proof to support that?

**Response:**     **I do not have custody or control of such documentation.**

5(b).    If no, why is it stated in Plaintiff's Ad-Seg statement?

**Response:**     **I do not know.**

5(c).    If yes, who said it?

**Response:**     **I had no part in plaintiff's original Ad-Seg determination. I have no direct knowledge of this incident.**

6.     The Plaintiff's 8-17-16 Ad-Seg Review wasn't completed until 2-10-17 and the Plaintiff did not receive it until 2-17-17, why did it take Plaintiff 6 months to receive that review?

**Response:**     **Plaintiff had been in Ad-Seg for many years prior to 2016. I had no direct role in plaintiff receiving his Ad-Seg reviews from Central Office.**

7.     Plaintiff's 6-16-17 Ad-Seg review state, plaintiff obtained or created a weapon to manipulate the prison, so he could stay at Clinton and have hi transfer cancelled because he

believed if he had a possession of a weapon charge that would cancel a transfer, is this statement true?

> **Response:** **I have no knowledge of what plaintiff is referring to.**

7(a). If yes, do you have any documentation to support that?

> **Response:** **I do not have custody or control of documentation.**

7(b). If yes, is the Plaintiff notified in advance when he is going to be transferred?

> **Response:** **I have no knowledge of what plaintiff is referring to.**

7(c). If no, why is it stated in Plaintiff's Ad-Seg statement?

> **Response:** **I have no knowledge of what plaintiff is referring to.**

8. What do the Plaintiff have to do in order to be release from Ad-Seg?

> **Response:** **As far as I know, the only way for plaintiff to be released from Ad-Seg is by a recommendation from the Deputy Commissioner at Central Office.**

10. Why did the Plaintiff receive 9 Ad-Seg reviews on January 22, 2019.

> **Response:** **I do not know.**

10(a). Is there a justifiable reason for receiving 9 Ad-Seg reviews in regard to Directive 4933 Ad-Seg section?

> **Response:** **I do not know.**

13(b) Has the Plaintiff ever received a misbehavior report in the last 18 years that resulted with Plaintiff having a cell shield on his cell?

> **Response:** **Not to my knowledge, however, all Upstate cells have solid doors with thick glass. We do not utilize cell shields at Upstate.**

14.     Did the Defendant Bellnier write a memorandum discontinuing the pilot incentive program around 4-18-2017?

   **Response:     I believe this to be true.**

16.     If the Plaintiff threatened to cause physical harm to any correctional staff, would the Plaintiff be issued a misbehavior report?

   **Response:     Yes.**

17.     In the last 18 years has the Plaintiff threatened to cause physical harm to any correctional staff?

   **Response:     I have no personal knowledge of this.**

17(a).  If yes, when, what was the date?

   **Response:     I have no personal knowledge of this.**

17(b).  If yes, who the Plaintiff threatened?

   **Response:     I have no personal knowledge of this.**

17(c).  If yes, is there any documentation to support such a claim?

   **Response:     I have no personal knowledge of this.**

19.     Has the Plainitff received time-cuts when he was in S.H.U. for disciplinary reasons before being placed in Ad-Seg status?

   **Response:     Upon information and belief, I believe this to be true.**

20.     Do high security CERT movement inmates receive any notification in advance when they are going to be transferred?

   **Response:     Defendant objects to this request in that it is irrelevant and unlikely to lead to the discovery of admissible evidence. Defendant also objects to this request**

4

in that it could impair the security of the facility and the safety of corrections staff and inmates. Notwithstanding and without waiving said objections, I cannot answer this question as it deals with security issues within the facility.

20(a).   Is the Plaintiff a CERT movement inmate?

**Response:**   Defendant objects to this request in that it is irrelevant and unlikely to lead to the discovery of admissible evidence. Defendant also objects to this request in that it could impair the security of the facility and the safety of corrections staff and inmates.

21.   Do a Plexiglas completely covering cell bars on a solid cell door constitute as a cell shield?

**Response:**   No.

21(a).   If no, what do it constitute as?

**Response:**   At Upstate, it is the physical plan of the facility. Every cell in Upstate is equipped with solid doors with thick glass.

DATED:   Albany, New York
        June 19, 2020

LETITIA JAMES
Attorney General of the State of New York
The Capitol
Albany, New York 12224-0341
By: *Lynn M. Knapp*
Lynn M. Knapp
Assistant Attorney General, of Counsel
Bar Roll No. 507430
Telephone: 518-776-2598
Email: Lynn.KnappBlake@ag.ny.gov

TO:     Tyrone Walker, 94 A 5258
        *Plaintiff pro se*
        Upstate Correctional Facility
        PO Box 2001
        Malone, NY 12953

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

TYRONE WALKER,

|                                      |                           |
| ------------------------------------ | ------------------------- |
| *Plaintiff,*                         | **RESPONSE OF**           |
|                                      | **O'GORMAN TO**           |
| -against-                            | **PLAINTIFF'S**           |
|                                      | **INTERROGATORIES**       |
| JOSEPH BELLNIER; JAMES A. O'GORMAN; DONALD |                     |
| UHLER; PAUL P. WOODRUFF; JOANNE FITCHETTE; | 17-CV-1008          |
| MELISSA A. COOK,                     |                           |
|                                      | GTS/CFH                   |
| *Defendants.*                        |                           |

---

The Defendant, James O'Gorman, by his attorney, Letitia James, Attorney General of the

State of New York, Lynn M. Knapp, Assistant Attorney General, of Counsel, pursuant to Federal

Rule of Civil Procedure 33(b), responds to plaintiff's interrogatories dated September 18, 2019 as

follows:

2.      What is the date you started as a member of the Ad-Seg Review Committee for the

Plaintiff?

**Response:  I do not recall the date.**

3.      What is your academic level of education?

**Response:   Defendant objects to this request as it is irrelevant, and an**

**unwarranted invasion of personal privacy designed to annoy and harass this defendant and**

**is not likely to lead to the discovery of admissible evidence.**

in that it could impair the security of the facility and the safety of corrections staff and inmates.

      21.    Do a Plexiglas completely covering cell bars on a solid cell door constitute as a cell shield?

      **Response:**    **No.**

    21(a).  If no, what do it constitute as?

      **Response:**    **At Upstate, it is the physical plan of the facility.  Every cell in Upstate is equipped with solid doors with thick glass.**

      22.    When is the dated you started as Deputy Commissioner?

      **Response:**    **I became Acting Deputy Commissioner in September 2017 and was promoted to Deputy Commissioner in April 2018.**

DATED:    Albany, New York
              June 19, 2020

                                  LETITIA JAMES
                                  Attorney General of the State of New York
                                  The Capitol
                                  Albany, New York 12224-0341
                                  By: *Lynn M. Knapp*
                                  Lynn M. Knapp
                                  Assistant Attorney General, of Counsel
                                  Bar Roll No.  507430
                                  Telephone: 518-776-2598
                                  Email: Lynn.KnappBlake@ag.ny.gov

TO:    Tyrone Walker, 94 A 5258
        *Plaintiff pro se*
        Upstate Correctional Facility
        PO Box 2001
        Malone, NY 12953

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

TYRONE WALKER,

*Plaintiff,*

-against-

JOSEPH BELLNIER; JAMES A. O'GORMAN; DONALD
UHLER; PAUL P. WOODRUFF; JOANNE FITCHETTE;
MELISSA A. COOK,

*Defendants.*

**RESPONSE BY COOK TO
PLAINTIFF'S
INTERROGATORIES**

17-CV-1008

GTS/CFH

The Defendant, Melissa Cook, by her attorney, Letitia James, Attorney General of the State

of New York, Lynn M. Knapp, Assistant Attorney General, of Counsel, pursuant to Federal Rule

of Civil Procedure 33(b), responds to plaintiff's interrogatories dated September 18, 2019 as

follows:

2.   What is the date you started as a member of the Ad-Seg Review Committee for the

Plaintiff?

**Response:  I have not been a member of the Ad-Seg Review Committee.**

3.   What is your academic level of education?

**Response:   Defendant objects to this request as it is irrelevant, and an**

**unwarranted invasion of personal privacy designed to annoy and harass this defendant and**

**is not likely to lead to the discovery of admissible evidence. Notwithstanding and without**

**waiving said objections, I have a bachelor's degree.**

5.     Plaintiff's Administrative Review states Plaintiff had no issues with the Deputy Superintendent, but went into a blind rage and stabbed him multiple times, is that a true statement?

Response:     **I have read that statement, but have no personal knowledge of the incident.**

5(a).   If yes, do you have any documentation or proof to support that?

Response:     **I do not have any such documentation.**

5(b).   If no, why is it stated in Plaintiff's Ad-Seg statement?

Response:     **I have no such knowledge.**

5(c).   If yes, who said it?

Response:     **I have no such knowledge.**

6.     The Plaintiff's 8-17-16 Ad-Seg Review wasn't completed until 2-10-17 and the Plaintiff did not receive it until 2-17-17, why did it take Plaintiff 6 months to receive that review?

Response:     **I have no such knowledge.**

7.     Plaintiff's 6-16-17 Ad-Seg review state, plaintiff obtained or created a weapon to manipulate the prison, so he could stay at Clinton and have hi transfer cancelled because he believed if he had a possession of a weapon charge that would cancel a transfer, is this statement true?

Response:     **I have no such knowledge.**

7(a).   If yes, do you have any documentation to support that?

Response:     **I do not have any such documentation.**

7(b).   If yes, is the Plaintiff notified in advance when he is going to be transferred?

Response:     **I have no such knowledge.**

2

7(c).    If no, why is it stated in Plaintiff's Ad-Seg statement?

**Response:     I have no such knowledge.**

8.    What do the Plaintiff have to do in order to be release from Ad-Seg?

**Response:     I do not know.**

10.    Why did the Plaintiff receive 9 Ad-Seg reviews on January 22, 2019.

**Response:     I do not know.**

10(a).    Is there a justifiable reason for receiving 9 Ad-Seg reviews in regard to Directive 4933 Ad-Seg section?

**Response:     I do not know.**

13(b)    Has the Plaintiff ever received a misbehavior report in the last 18 years that resulted with Plaintiff having a cell shield on his cell?

**Response:     I do not know.**

14.    Did the Defendant Bellnier write a memorandum discontinuing the pilot incentive program around 4-18-2017?

**Response:     I know that the pilot program was discontinued, but I do not know when or by whom.**

16.    If the Plaintiff threatened to cause physical harm to any correctional staff, would the Plaintiff be issued a misbehavior report?

**Response:     Yes.**

17.    In the last 18 years has the Plaintiff threatened to cause physical harm to any correctional staff?

FORM 2171B (1/12)
Side 2

STATE OF NEW YORK - DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION

_Clinton_ _____ **Correctional Facility**

## INMATE MISBEHAVIOR REPORT ♦ INFORME DE MAL COMPORTAMIENTO DEL RECLUSO

| 1. NAME OF INMATE (Last, First) ♦ NOMBRE DEL RECLUSO (Apellido, Nombre) | NO. ♦ NÚM. | HOUSING LOCATION ♦ CELDA |
|---|---|---|
| Walker, Tyrone | 94A5258 | SHU14 Cell 28 |

| 2. LOCATION OF INCIDENT ♦ LUGAR DEL INCIDENTE | INCIDENT DATE ♦ FECHA | INCIDENT TIME ♦ HORA |
|---|---|---|
| SHU 14 Cell 28 | 2/27/14 | 925/Approx Am |

**3. RULE VIOLATION(S) ♦ VIOLACIÓN/ES**

113.10 Possession of a Weapon, 113.11 Altered item, 113.22 Possession of an article in an unauthorized area, 103.10 An inmate shall not bribe or attempt to bribe any person,

**4. DESCRIPTION OF INCIDENT ♦ DESCRIPCIÓN DEL INCIDENTE**

On 2/27/14 at approximately 925/am I was doing rounds in SHU14. While on 3 company, inmate Walker 94A5258 in 28 cell stopped me and said, I found this when I was cleaning my cell. He then handed me a half moon shaped piece of metal that had been sharpen to a point. I asked him where he found it he said, on the floor. He then said to me since he did a good deed their should be an award for his good behavior. I immediately left the company with the weapon and notified Sgt. Hartman who was the area supervisor. The weapon was 1¼" in length and ⅛" wide. Inmate Walker has been in SHU14 cell 28 since August 15, 2013. Weapon was photographed and secured in evidence locker in accordance with Directive 4910A. Because of your actions you are in violation of the above listed rules.

| REPORT DATE ♦ FECHA | REPORTED BY ♦ NOMBRE DE LA PERSONA QUE HACE EL INFORME | SIGNATURE ♦ FIRMA | TITLE ♦ TÍTULO |
|---|---|---|---|
| 2/27/14 | D. Lucia | _signature_ | Captain |

**5. ENDORSEMENTS OF OTHER EMPLOYEE WITNESSES (if any)**       SIGNATURES:

ENDOSOS DE OTROS EMPLEADOS TESTIGOS (si hay)       FIRMAS:   1. _____

2. _____                    3. _____

**NOTE: Fold back Page 2 on dotted line before completing below.**

| DATE AND TIME SERVED UPON INMATE  2-28-14 | NAME AND TITLE OF SERVER |
|---|---|
| FECHA HORA DADO AL RECLUSO | NOMBRE Y TÍTULO DEL QUE ENTREGA |

You are hereby advised that no statement made by you in response to the charges or information derived therefrom may be used against you in a criminal proceeding. ♦ Por este medio se le informa que no se puede usar ninguna declaración hecha por usted como respuesta al cargo o la información derivada de ella en una demanda criminal.

### NOTICE ♦ AVISO

**REVIEWING OFFICER (DETACH BELOW FOR VIOLATION HEARING ONLY)**

You are hereby notified that the above report is a formal charge and will be considered and determined at a hearing to be held. ♦ Por este medio se le notifica que el informe anterior es un carge formal el cual se considerará y determinará en una audiencia a celebrarse.

The inmate shall be permitted to call witnesses provided that so doing does not jeopardize institutional safety or correctional goals. ♦ Se le permitirá al recluso llamar testigos con tal de que al hacerlo no pondrá en peligro la seguridad de la institución o los objetivos del Departamento.

If restricted pending a hearing for this misbehavior report, you may write to the Deputy Superintendent for Security or his/her designee prior to the hearing to make a statement on the need for continued prehearing confinement. ♦ Si está restringido pendiente a una audiencia por este informe de mal comportamiento, puede escribirle al Diputado del Superintendente para Seguridad o su representante antes de la audiencia para que haga una declaración acerca de la necesidad de continuar bajo confinamiento, previo a la audiencia.

Distribution: WHITE - Disciplinary Office   CANARY - Inmate (After review) ♦ Distribución: BLANCA - Oficina Disciplinaria   AMARILLA - Recluso (después de la resión)

# EXHIBIT

# #7

6-27-16 Ad-Seg Review, Visiting Log, Disposal
Form For Property, Plaintiff's 3-26-2019 Ad-Seg
Review And Statement 1-30-17 Ad-Seg Review

STATE OF NEW YORK - DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION
SIXTY-DAY ADMINISTRATIVE SEGREGATION REVIEW
**UPSTATE CORRECTIONAL FACILITY**

Form 2170 (11/02)
Ref: 7 NYCRR
301.4(d)

**NAME: WALKER, TYRONE**      DIN: **94A5258**   REVIEW DATE: **6/27/16**

Date placed in administrative segregation: 1/17/14   Date Hearing held: 2/26/14

Directed Central Office Review?
[X] Yes
[ ] No

**A. Summary report of the facility three-member committee:**

**Reasons why offender was initially determined to be appropriate for administrative segregation:** Inmate Walker's past is marked with assaults and brutality showing a deprived indifference to human life. Inmate Walker entered DOCS custody on July 26, 1994 to serve a 47 ½ year to life sentence from Kings County for Attempted Robbery 1st and Criminal Possession of Weapon 2nd. He also was convicted in New York County of two counts each of Attempted Robbery 1st, Criminal Possession of a Weapon 2nd and Criminal Possession of Weapon 3rd. Walker was also sentenced on July 22, 1996 to life in federal prison without the possibility of parole for a capital murder offense and on narcotic related charges. On September 22, 2000 while in E and F yard at Green haven Correctional Facility, inmate Walker, without provocation, violently attacked Deputy Superintendent of Security Schneider and Corrections Officer Mitchetti; seriously injuring both staff members. Inmate Walker had armed himself with two homemade weapons described as one flat piece of metal; 10 ½" x ¾" and sharpened at one end and one ice pick type weapon 6" long. Both weapons were secured to each hand by leather thongs. He used these weapons to stab both staff members about the head, chest and back causing serious puncture wounds. Walker subsequently received a Tier 3 Misbehavior Report and sanctions as follows: Assault on Staff and Weapons. He received 35 months and 22 days of SHU, loss of package, commissary, phones and loss of 36 months good time. In addition to the Departmental sanctions, on July 9, 2001 inmate Walker pled guilty to the Dutchess County Court to attempted Murder 1st, receiving a sentence of 15 years to life. During Walker's Federal trial, while housed in county jail, he had escape plots/attempts, and attempted to hire a "hit man" to kill a government witness. Inmate Walker also assaulted a Deputy and attempted to take his keys. He also smuggled a razor blade to Federal Court as well as assaulting another inmate by stabbing him 18 times.

**Information on the offender's subsequent behavior and attitude:** Inmate Walker arrived in DOCCS custody in July 1994. Walker transferred here to Upstate Correctional Facility SHU on March 4, 2014 from Clinton Correctional Facility. While incarcerated he has incurred 27 Misbehavior Reports including, but not limited to: Weapon, Drugs, Smuggling, Demonstration , Assault on Staff, Direct Order, Altered Item, Creating Disturbance and Threats. This type of history in conjunction with his propensity for violence cannot be taken lightly. Inmate Walker is single celled and under high security at Upstate Correctional Facility which greatly minimizes and restricts his opportunity to act out. Inmate Walker has spent the majority of his time in SHU confinement and has not completed any of his recommended programs. Although Mr. Walker has a High School Diploma from 1987, he continues with Academic Cell Study for academic enrichment and is currently studying Psychology. Since his last review Walker has maintained a positive disciplinary record. Mr. Walker's interactions with staff in the last review period has been appropriate. ORC Cook met with Inmate Walker to discuss his Administrative Segregation placement on 6/27/16. Walker continue to work on his identified two goals in his case plan. These goals are to improve family communication and continue his education. Inmate Walker has been participating in the "call home" program and has been speaking to his daughter and his two brothers. During this interview Walker stated he wanted the Administrative Segregation Panel to know that he didn't get a misbehavior report at Clinton CF in order to get transferred to Upstate CF SHU.

**Other factors which may favor retaining the offender in or releasing the offender from administrative segregation:** Clearly, Inmate Walker has demonstrated a propensity for assaultive and dangerous behavior in the correctional facility and the community. Walker's willingness to enact extreme violence on staff and other inmates has proven his presence in general confinement of any correctional facility an extreme risk to staff and inmates, as well as the safety and security and good order of the facility.

_M .CPO_                _B. Basta Act. NSP_   _6/29/16_
Guidance Offender Rehabilitation Coordinator   Security Supervisor   Committee Chairman   Date

If Central Office review has not been directed, skip to C, below, for Superintendent's decision.

**B. Summary report and recommendation of the Central Office three-member committee:**

See Attached

Staff - Inspector General   Staff - Counsel   Chairman - Facility Operations   Date   _10/18/4_

**C. Decision of the (Superintendent) (Deputy Commissioner for Correctional Facilities):**

[ ]   Release from Administrative Segregation.
[X]   A determination has been made to continue your Administrative Segregation for the following reasons:
See Attached

Prior to your next sixty-day review, you may write to the Superintendent or designee to make a statement regarding the need for continued Administrative Segregation. The reason(s) stated in this notice, any written statement that you submit, as well as your overall custodial adjustment will be considered during the next scheduled review.

_____   _10/19/16_   _____
(Superintendent) (Deputy Commissioner for Correctional Facilities)   Date

Attach offender's statement(s) and additional pages as necessary.

c.   IRC
Guidance Offender File

3/13/14 Missy gave me Ad Seg to type for 1st time for this inmate.

## Administrative Segregation Committee Review –7-5-16:

Inmate Tyrone Walker (94-A-5258) is currently serving an aggregate sentence of 47½ years to Life for two counts of Murder, Attempted Murder, Robbery, Attempted Robbery, and three counts of Criminal Possession of Weapon.

At age 17, prior to first coming to New York State custody, inmate Walker was designated a Youthful Offender for Attempted Criminal Possession of Stolen Property. In 1994, and again in 1997, he was convicted for a series of muggings. During one of these he fired a gun and killed an individual. In 2000, while in DOCCS custody, inmate Walker brutally attacked a Deputy Superintendent and a Correction Officer using a shank and ice pick . One weapon was six inches long, the other ten inches long, and were secured to his wrists with leather thongs. He stabbed each victim multiple times. According to inmate Walker, he had no issues with the Deputy Superintendent, but went into a "blind rage".

Inmate Walker was placed in Administrative Segregation in January 2014, after completing his disciplinary disposition. He has over 27 misbehavior reports including for Possession of a Weapon (4), Drugs, Smuggling (3), Demonstration, Assault on Staff, Making Threats, Harassment, and Possession of an Altered Item (3). His most recent Tier hearing was in March 2014, for having a weapon, bribery/extortion, having property in an unauthorized location, and having an altered item.  Several of these incidents occurred in the restrictive and secure setting of the Special Housing Unit.

On rounds inmate Walker interacts with security and line staff, talking and engaging appropriately. Recently, staff tried to help him take advantage of his commissary privileges which didn't work because of a large encumbrance against his account. This was understandable upsetting to him. Staff is attempting to rectify the issue. He continues to maintain a cell clean and good personal hygiene. Inmate Walker participates in the Pilot Incentives Program and receives additional exercise time, visitations, clothing, and a weekly phone call which he takes advantage of, talking mainly with his daughter. He has talked about his placement in Administrative Segregation, and recently expressed that he would like to be placed in General Population.

Inmate Walker has had good behavior over the past few evaluation periods and he is encouraged to continue with this, his self-studies, and his healthy communication with family members. Despite this good trend, the Committee recommends that he remain in Administrative Segregation at this time. Inmate Walker's ability to obtain and fashion extremely dangerous weapons, his attempt to manipulate the system, and his unpredictable violence all indicate that he would be a threat to the security and safety of himself, the facility and the population if placed in general population.

Walker, T
94A5258
C Section Administrative Segregation
July, 2016

I concur with the Committees' recommendation that your placement in a less restrictive setting would pose a danger to staff and other inmates.

```
06/16/20      SVPR001      VISITOR/PACKAGE SYSTEM      *FPMS*      PAGE 010
                              VISITOR LOG

 DIN: 94A5258   NAME: WALKER, TYRONE

============================================================================

VISITOR ID: 900000001608288 WALKER, NATHANIEL
150 MOELLER ST 170S
BINGHAMTON              NY   13904
   RELATIONSHIP: SIBLING


                          VISITOR DATES/TYPES

     02/22/14 - VISIT RM      08/27/06 - VISIT RM      09/17/05 - VISIT RM
     05/29/05 - ATTEMPTD      10/15/00 - VISIT RM


VISITOR ID: 000000000193412 WALKER, NATHANIEL
150 MOELLER ST 1705
BINGHAMTON              NY   13904
   RELATIONSHIP: SIBLING


                          VISITOR DATES/TYPES

     02/01/20 - VISIT RM      02/02/19 - VISIT RM      02/03/18 - VISIT RM


VISITOR ID: 900000002656671 WALKER, NATHANIEL F JR
11 HOAR ST
ELLENVILLE              NY   12748
   RELATIONSHIP: NIECE/NEPHW


                          VISITOR DATES/TYPES

     08/01/06 - VISIT RM


VISITOR ID: 900000001367675 WALKER, SHAHEEDRA
45 PARK AVE
MONTICELLO              NY   00000
   RELATIONSHIP: CHILD


                          VISITOR DATES/TYPES

     07/09/16 - VISIT RM      05/03/14 - VISIT RM      08/17/12 - VISIT RM
     05/01/08 - VISIT RM      11/07/07 - VISIT RM      08/27/06 - VISIT RM
     09/17/05 - VISIT RM      05/29/05 - ATTEMPTD      01/19/03 - VISIT RM
     12/22/02 - VISIT RM      11/10/02 - VISIT RM      07/25/99 - VISIT RM


VISITOR ID: 000000000086294 WALKER, SHAHEEDRA N
5669 CAXTON COURT
VIRGINIA BEACH          VA   23462 1609
   RELATIONSHIP: CHILD


                          VISITOR DATES/TYPES

     03/11/17 - VISIT RM
```

```
06/16/20      SVPR001      VISITOR/PACKAGE SYSTEM     *FPMS*      PAGE 009
                              VISITOR LOG

   DIN: 94A5258    NAME: WALKER, TYRONE

==============================================================================

  VISITOR ID: 900000000963363 TODD, CHERELLE
  1 EDWARDS PLACE
  ELLENVILLE            NY   12428
     RELATIONSHIP: CHILD


                         VISITOR DATES/TYPES


     06/26/97 - VISIT RM
```

```
  VISITOR ID: 900000000963361 WALKER, BOBBY
  2 NEVINS ST
  ELLENVILLE            NY   12428
     RELATIONSHIP: SIBLING


                         VISITOR DATES/TYPES


     07/09/16 - VISIT RM      05/03/14 - VISIT RM      02/22/14 - VISIT RM
     08/17/12 - VISIT RM      08/16/10 - VISIT RM      05/01/08 - VISIT RM
     08/13/07 - VISIT RM      09/17/05 - VISIT RM      05/29/05 - ATTEMPTD
     01/19/03 - VISIT RM      12/22/02 - VISIT RM      11/10/02 - VISIT RM
     02/20/00 - VISIT RM      01/23/00 - VISIT RM      07/25/99 - VISIT RM
     12/27/98 - VISIT RM      08/25/98 - VISIT RM      03/19/98 - VISIT RM
     06/26/97 - VISIT RM
```

```
  VISITOR ID: 000000000045863 WALKER, BOBBY
  2 NEVINS ST
  ELLENVILLE            NY   12428
     RELATIONSHIP: SIBLING


                         VISITOR DATES/TYPES


     02/02/19 - VISIT RM      02/03/18 - VISIT RM      04/23/17 - VISIT RM
     04/09/17 - VISIT RM
```

```
  VISITOR ID: 000000000096181 WALKER, DVORA
  2 NEVINS ST
  ELLENVILLE            NY   12428
     RELATIONSHIP: NIECE/NEPHW


                         VISITOR DATES/TYPES

     04/23/17 - VISIT RM      04/09/17 - VISIT RM
```

FORM 2068 (10/08)
PLEASE PRINT CLEARLY

STATE OF NEW YORK - DEPARTMENT OF CORRECTIONAL SERVICES
**AUTHORIZATION FOR DISPOSAL OF PERSONAL PROPERTY**

Inmate complete section 1, sections 2, 3 and 4 as applicable, and sign at 5. _____ Correctional Facility

| 1. | Inmate Name Tyrone Walker | DIN# 94A5258 | Location 8 Bldg A-2-48 B |
|---|---|---|---|

2. I hereby (authorize disposal) (request review) of item(s) not permitted/surplus personal property in the following manner:

| Quantity | Article/Bag | Reason not permitted | Circle choice |
|---|---|---|---|
| 3 | Draft Bags      50 Books Choose to send home | | A - B - C - D |
| | 145 Pounds Weight | | A - B - C - D |
| | | | A - B - C - D |
| | | | A - B - C - D |
| | | | A - B - C - D |
| | | | A - B - C - D |

A   - Ship at my expense to _____

B*  - Send out via visitor   NAME Bobby Walker 2 Nevins St. Ellenville, N.Y. 12428
VISITOR'S NAME                        ADDRESS

C   - Donate to charitable org.   NAME _____   ADDRESS _____

D   - Destroy at facility

* The item will be held a maximum of 14 days pending arrival of a visitor. Circle your second choice for disposition in case visitor does not come or accept item.

3. I request approval to transfer my *clear-case* ___ radio, ___ headphone-radio, ___ tape player, ___ radio/tape combo per Dir. #4920
To inmate: Name _____ DIN# _____ Date _____
Mfg. _____ Type _____ Ser. # _____

4. Inmates with clear-case televisions must complete BOTH PARTS A&B of this section. (See Dir. 4921)
   A. If I am transferred to a TV facility I request my TV be shipped to the new facility at my expense  Y___  N___
   B. If "NO" in Part "A" above - OR - if I am not transferred to a TV facility, I request that my TV: (check 1)
      ☐ Be disposed of as specified in Section 2 above OR
      ☐ Be transferred to inmate:   Name _____ DIN _____
      Mfg. _____ Ser.# _____

5. Tyrone Walker   DIN 94A5258   Date 4-10-17
   (Inmate's signature)
   ☐ Inmate refused to make a choice after being informed by employee witness.
   _____ Title _____ Date _____
   (Witness's signature)
   Item(s) reviewed as requested and ☐ allowed ☐ disallowed.  Reason _____
   (sign) _____ Title _____ Date _____

6. ☐ Disposition ordered by DSS, FDS, SUPT  ☐ Destroy  ☐ Donate to _____
   (sign) _____ Title _____ Date _____
   ☐ The above articles were disposed of as indicated by: (sign) _____ Date _____
   Comments: _____
   ☐ Radio/tape player transfer is   ☐ Approved  ☐ Denied
   (sign) _____ Title _____ Date _____
   ☐ Received by visitor (visitor's signature) X Bobby Walker   Date _____
   ☐ Shipped at the inmate's expense as requested on _____

FORM 20 3 (5/16)
PLEASE PRINT CLEARLY

STATE OF NEW YORK – DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION
**AUTHORIZATION FOR DISPOSAL OF PERSONAL PROPERTY**

Inmate complete section 1, sections 2, 3, and 4 as applicable and sign at 5. _Upstate_ Correctional Facility

1. Inmate Name _Walker Tyrone_   DIN _94A5258_   Location _8 B 48 Tz_

2. I hereby (authorize disposal) (request review) of item(s) not permitted/surplus personal property in the following manner:

| Quantity | Article/Bag | Reason not permitted | Circle choice |
|---|---|---|---|
| 3 - | Bags personal property 145/165 | | A – B – C – D |
| | | | A – B – C – D |
| | | | A – B – C – D |
| | | | A – B – C – D |
| | | | A – B – C – D |

A* - Ship at my expense to _2 Nevins St Ellenville NY_
　　　　　　　　　　　　　　　NAME　　　　　　　　　　　　　　　ADDRESS

*If option A is chosen, the inmate must chose a second disposal option in the event that they do not have sufficient available spendable funds. Circle your second choice for disposition.

B** - Send out via visitor _Bobby Walker   2 Nevins St_
　　　　　　　　　　　VISITOR'S NAME　　　　　　　　　　　ADDRESS

** The item will be held a maximum of 14 days pending arrival of a visitor. Circle your second choice for disposition in case visitor does not come or accept item.

C - Donate to charitable org. _____   _____
　　　　　　　　　　　　　　　　　NAME　　　　　　　　　　　ADDRESS

D - Destroy at facility

3. I request to transfer my clear-case ____ radio, ____ headphone-radio, ____ tape player, ____ radio/ tape combo per Dir. #4920

To inmate: Name _____ DIN _____ Date _____

Mfg. _____ Type _____ Ser. # _____

4. Inmate with clear-case televisions must complete BOTH PARTS A&B of this section (See Dir. #4921)
　A. If I am transferred to a TV facility I request my TV be shipped to the new facility at my expense   Y __ N __
　B. If "NO" in Part "A" above – OR – if I am not transferred to a TV facility, I request that my TV: (check 1)
　　____ Be disposed of as specified in section 2 above OR
　　____ Be transferred to inmate: Name _____ DIN _____
　　Mfg. _____ Ser. # _____

5. _____ DIN _____ DATE _____
　(Inmate's signature)
　____ Inmate refused to make a choice after being informed by employee witness.
　_____ Title _____ DATE _____
　(Witness's signature)
　Items(s) reviewed as requested and ____ allowed ____ disallowed   Reason _____
　(sign) _____ Title _____ Date _____

6. ____ Disposition ordered by DSS, FDS, SUPT ____ Destroy ____ Donate to _____
　(sign) _____ Title _____ Date _____
　The above articles were disposed of as indicated by: (sign) _____ Date _____
　Comments: _____
　____ Radio/tape player transfer is ____ Approved ____ Denied
　(sign) _____ Title _____ Date 4/33/17
　____ Received by visitor (visitor's signature): X _Denise Brown_
　____ Shipped at the inmate's expense as requested on _____

DISTRIBUTION:　Original – IRC File　　1st Copy – Package Room, Facility File　　2nd Copy – Package Room – Inmate File　　3rd Copy - Inmate

Form 2170 (07/17)
Photocopy Locally
as Needed

Ref: 7 NYCRR
301.4(d)

STATE OF NEW YORK - DEPARTMENT OF CORRECTIONAL SERVICES

## ADMINISTRATIVE SEGREGATION REVIEW
## UPSTATE CORRECTIONAL FACILITY

| Directed Central Office Review? | |
|---|---|
| ☑ | Yes |
| ☐ | No |

NAME:  **WALKER, TYRONE**        DIN:  **94A5258**        REVIEW DATE:  **03/26/2019**

Date placed in administrative segregation: <u>1/17/2014</u>        Date hearing held: <u>2/26/2014</u>

**A.  Summary report of the facility three-member committee:**

<u>Reasons why inmate was initially determined to be appropriate for administrative segregation:</u>

On September 22, 2000 while in E and F yard at Green Haven Correctional Facility, inmate Walker, without provocation, violently attacked Deputy Superintendent of Security Schneider and Corrections Officer Mitchetti, seriously injuring both staff members.  Inmate Walker had armed himself with two homemade weapons described as one flat piece of metal; 10 ½" x ¾" and sharpened at one end and one ice pick type weapon 6" long.  Both weapons were secured to each hand by leather thongs.  He used these weapons to stab both staff members about the head, chest and back causing serious puncture wounds.  Walker subsequently received a Tier 3 Misbehavior Report and extensive sanctions.  In addition to the Departmental sanctions, on July 9, 2001 inmate Walker pled guilty in Dutchess County Court to attempted Murder 1st, receiving a sentence of 15 years to life to be served consecutively.

<u>Information on the inmate's subsequent behavior and attitude:</u>

ORC met with Inmate Walker on 3/12/2019 to discuss his Administrative Segregation.  He acted appropriately during the interview.  There are no changes to inmate Walker's status since his last month's Administrative Segregation Report.  Inmate Walker continues to participate in Cell Study.  He has been enrolled in Cell Study since 07/28/14 even though he received his high School Diploma in 1987.   His last visit was on 2/2/2019.  His last phone call was on 1/26/2019.  Inmate Walker has not received a Misbehavior Report since 6/1/17.  He wrote a statement for your review which I have attached.  He continues to exercises daily.

<u>Other factors which may favor retaining the inmate in or releasing the inmate from administrative segregation:</u>

Walker's past is marked with assaults and brutality showing an indifference to human life.  Walker entered DOCS custody on July 26, 1994 to serve a 47 ½ year to life sentence from Kings County for Attempted Robbery 1st and Criminal Possession of Weapon 2nd two counts of Murder 2nd and one count each of Attempted Robbery 1st, Criminal Possession of a Weapon 2nd and Criminal Possession of Weapon 3rd.  Walker was also sentenced on July 22, 1996 to life in federal prison without the possibility of parole for a capital murder offense and on narcotic related charges.  During Walker's Federal trial, while housed in county jail, he plotted to escape and attempted to hire a "hit man" to kill a government witness, assaulted a Deputy and attempted to take his keys.  He also smuggled a razor blade to Federal Court and assaulted another inmate by stabbing him 18 times.

Inmate Walker has demonstrated a propensity for assaultive and dangerous behavior during his incarceration and in his criminal history.  Walker's ability to enact extreme violence on staff and other inmates has shown that his placement in Administrative Segregation is appropriate and greatly reduces the risk his behavior presents to staff and inmates, as well as the safety and security of the facility.

| _____ | _____ | _____ | 3-13-19 |
|---|---|---|---|
| Offender Rehabilitation Coordinator | Security Supervisor | Committee Chairman | Date |

**If Central Office review has not been directed, skip to C, below, for Superintendent's decision.**

B.  Summary report and recommendation of the Central Office three-member committee: _____

_____

_____

| _____ | _____ | _____ | _____ |
| Staff - Inspector General | Staff - Counsel | Chairman - Facility Operations | Date |

C.  **Decision of the (Superintendent) (Deputy Commissioner for Correctional Facilities):**
     Release from administrative segregation.☐   A determination has been made to continue your administrative segregation for
the following reasons:  _____

_____

_____    Present placement is appropriate.   _____

_____

Prior to your next review, which is scheduled for _____, you may write to the Superintendent or designee
to make a statement regarding the need for continued administrative segregation.  The reason(s) stated in this notice, any
written statement that you submit, as well as your overall custodial adjustment will be considered during the next
scheduled review.

_____          04/19/2019
(Superintendent) (Deputy Commissioner for Correctional Facilities)          Date

Attach inmate's statement(s) and additional pages as necessary

## WALKER, Tyrone (94-A-5258)
### Administrative Segregation Summary Report and Recommendation of the Central Office Three-member Committee held on March 26, 2019

Tyrone Walker (94-A-5258) is serving an aggregate sentence of 47½ years to Life for Murder in the 2nd Degree (2 counts), Attempted Murder in the 1st Degree, Attempted Robbery in the 1st Degree, Robbery in the 1st Degree, Criminal Possession of a Weapon in the 2nd Degree and Criminal Possession of a Weapon in the 3rd Degree (VFO).

In February 1993, inmate Walker was arrested for violent crimes he had committed in both Kings and New York Counties, where, during one of these incidents, he shot and killed a person. In 1996, a federal court sentenced him to life without parole for capital murder. During his federal trial, he attempted to escape and attempted to hire someone to murder a government witness. He also assaulted a deputy in an escape attempt and separately assaulted another inmate by stabbing him 18 times.

While incarcerated in September 2000, Inmate Walker brutally attacked, stabbed and injured a Green Haven Correctional Deputy Superintendent and Correction Officer with sharp weapons attached to each of his wrists. The weapons were six and ten inches long respectively. He stabbed each victim multiple times, causing serious injuries. Inmate Walker's vicious assault resulted in disciplinary sanctions and a conviction for Attempted Murder in the 1st Degree. He received an indeterminate sentence of 15 years to Life in prison. His sentences run consecutively.

Inmate Walker was placed in Administrative Segregation in January 2014 after completing his disciplinary confinement. He has been found guilty of numerous misbehavior reports for Possession of a Weapon, Drugs, Smuggling, Demonstration, Assault on Staff, Making Threats, Harassment, and Possession of an Altered Item, among others. Inmate Walker's last misbehavior report was on June 1, 2017. The subsequent disciplinary hearing was held on June 13, 2017 – where he was found guilty of interference, harassment, and disobeying a direct order.

As reported in prior reviews, Inmate Walker is regularly seen on rounds. His interactions with staff and other inmates are appropriate. Inmate Walker is often observed writing. His cell and person hygiene remain appropriate. No medical or mental health concerns were raised during the current review period. Inmate Walker is a PIMS level 3 and while he uses many of the privileges afforded, he has not received any visitors or made any calls during the current review period.

In the current review period, Inmate Walker wrote a letter dated March 13, 2019. He feels that two prior reviews mischaracterized his feelings toward the Deputy Superintendent for Security (DSS). He notes that he likes and appreciates the DSS for always trying to do the right thing and would not want to hurt/injure him in any way. Inmate Walker notes that he prefers to fight with his "brain and pen now that's my only weapon."

5.

when I don't get my way, I never raise my voice, I'm always happy to see him, I'm respectful and we never have no problem. He said it's not outwardly, he has been doing this for a long time it's in my body language he can tell 1 percent of the time when he tell me something I don't like, I responded he in the wrong business he should have been a mind reader, we laughed and I didn't take offense at all to that baseless statement. He still a person I actually like and although he is a defendant I will let the state settle with him, because it's not personal and I have no desire to harm him financially at all. So when it mention (my Ad-Seg review) about my medical boots, Law Library (Carbeane) and everything else the D.S.S. speak about, the part he doesn't mention is he the one that fixed the issue. The fact I owe to much money I couldn't go to commissary, it's the D.S.S. that spoke in Albany to allow me to have money sent in and they only take half so I could go to Ad-Seg commissary, and recently because of my gastrointestinal problems and the fact I just lost over 20 lbs. he said he going to see if they will let me get the commissary again. I lost 20lbs. of muscle because I exercise when I can to maintain my health the best I can.

So the idea I would want to harm the D.S.S. is ridiculous if anything I would give him a hug if anything. If there was more people like him, I would never be in Sit.U. or Ad-Seg period. I would never blame the D.S.S. for the acts of the staff; especially when I see the D.S.S. make an effort to right the wrong. So these blind, unsubstantiated statement should cease. I know you probably figure because ya'll gave me 9 late reviews years late I'll probably won't read them, so you could just slide ridiculous statements in there and then later act like it was true and I just never responded to it. Give me a meaningful review based on facts. Because making the D.S.S. a target of my anger is not realistic, also if you read my chapter you will see I don't do anger it's bad for your health. I fight with my brain and pen now that's my only weapon. D.S.S. can't always assist me but just because he do his job when he can, I can careless if he lie to help you he helps me way more.

Tyrone Walker

The committee continues to recommend that Inmate Walker remain in Administrative Segregation. His significant history of violence, both outside and inside prison, continues to endanger staff as well as other inmates if he were released to a less restrictive setting.

STATE OF NEW YORK - DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION
SIXTY-DAY ADMINISTRATIVE SEGREGATION REVIEW
**UPSTATE CORRECTIONAL FACILITY**

Form 2170 (11/02)
Ref: 7 NYCRR
301.4(d)

Directed Central Office Review?
[X] Yes
[ ] No

NAME: **WALKER, TYRONE**   DIN: **94A5258**   REVIEW DATE: **1/30/17**
Date placed in administrative segregation: **1/17/14**   Date Hearing held: **2/26/14**

**A. Summary report of the facility three-member committee:**

**Reasons why offender was initially determined to be appropriate for administrative segregation:** Inmate Walker's past is marked with assaults and brutality showing a depraved indifference to human life. Inmate Walker entered DOCS custody on July 26, 1994 to serve a 47 ½ year to life sentence from Kings County for Attempted Robbery 1st and Criminal Possession of Weapon 2nd. He also was convicted in New York County of two counts of Murder 2nd and one count each of Attempted Robbery 1st, Criminal Possession of a Weapon 2nd and Criminal Possession of Weapon 3rd. Walker was also sentenced on July 22, 1996 to life in federal prison without the possibility of parole for a capital murder offense and on narcotic related charges. On September 22, 2000 while in E and F yard at Green haven Correctional Facility, inmate Walker, without provocation, violently attacked Deputy Superintendent of Security Schneider and Corrections Officer Mitchetti, seriously injuring both staff members. Inmate Walker had armed himself with two homemade weapons described as one flat piece of metal, 10 ½" x ¾" and sharpened at one end and one ice pick type weapon 6" long. Both weapons were secured to each hand by leather thongs. He used these weapons to stab both staff members about the head, chest and back causing serious puncture wounds. Walker subsequently received a Tier 3 Misbehavior Report and sanctions as follows: Assault on Staff and Weapons. He received 35 months and 22 days of SHU, loss of package, commissary, phones and loss of 36 months good time. In addition to the Departmental sanctions, on July 9, 2001 inmate Walker pled guilty to the Dutchess County Court to attempted Murder 1st, receiving a sentence of 15 years to life. During Walker's Federal trial, while housed in county jail, he had escape plots/attempts, and attempted to hire a "hit man" to kill a government witness. Inmate Walker also assaulted a Deputy and attempted to take his keys. He also smuggled a razor blade to Federal Court as well as assaulting another inmate by stabbing him 18 times.

**Information on the offender's subsequent behavior and attitude:** ORC met with Inmate Walker on 2/2/2017 to discuss his administrative segregation. Inmate Walker has spent the majority of his time in SHU confinement and as such is not eligible for recommended programs. Although Mr. Walker has a High School Diploma from 1987, he continues with Academic Cell Study for academic enrichment and has been studying multiple subjects. Since his last review, Walker has maintained a positive disciplinary record and his last misbehavior report was on 2/27/2014. Mr. Walker's interactions with staff in the last review period have been appropriate. Walker continue to work on his identified two goals in his case plan. These goals are to finish writing his book and to exercise daily to keep his mind and body healthy. Inmate Walker has been participating in the "call home" program and has been speaking to his daughter weekly which he looks forward to and seems to have improved Inmate Walker's attitude and outlook. Walker also has been enjoying watching movies outside his cell. All staff state that Walker's overall behavior has been satisfactory.

**Other factors which may favor retaining the offender in or releasing the offender from administrative segregation:** Inmate Walker has demonstrated a propensity for assaultive and dangerous behavior during his incarceration and in his criminal history. Walker's ability to enact extreme violence on staff and other inmates has shown that is placement in Administrative Segregation is appropriate and greatly reduces the risk his behavior presents to staff and inmates, as well as the safety and security of the facility and good order of the facility.

_____ ORC   _____   _____   C. Fitchette   2/9/17
Guidance Offender Rehabilitation Coordinator / Security Supervisor   Committee Chairman   Date

If Central Office review has not been directed, skip to C, below, for Superintendent's decision.

**B. Summary report and recommendation of the Central Office three-member committee:**   See Attached

_____   _____   _____   7/21/17
Staff - Inspector General   Staff - Counsel   Chairman - Facility Operations   Date

**C. Decision of the (Superintendent) (Deputy Commissioner for Correctional Facilities):**

[ ]   Release from Administrative Segregation.
[XX]   A determination has been made to continue your Administrative Segregation for the following reasons:
_____ * See below * _____

Prior to your next sixty-day review, you may write to the Superintendent or designee to make a statement regarding the need for continued Administrative Segregation. The reason(s) stated in this notice, any written statement that you submit, as well as your overall custodial adjustment will be considered during the next scheduled review.   7/31/17

_____   _____
(Superintendent) (Deputy Commissioner for Correctional Facilities)   Date

Attach offender's statement(s) and additional pages as necessary.

c.   IRC
     Guidance Offender File

* Your release from Administrative Segregation would pose a threat to the safety and security of the institution.

**WALKER, Tyrone  [94-A-5258]**
**Administrative Segregation Summary Report and Recommendation of the**
**Central Office Three-member Committee held on February 24, 2017**

Inmate Tyrone Walker, 94-A-5258, continues to serve an aggregate sentence of 47½ years to Life for Murder in the 2nd Degree (2 counts), Attempted Murder in the 1st Degree, Attempted Robbery in the 1st Degree, Robbery in the 1st Degree, Criminal Possession of a Weapon in the 2nd Degree and Criminal Possession of a Weapon in the 3rd Degree (VFO).

Before coming into New York State custody in 1994, inmate Walker had been adjudicated a youthful offender for Attempted Criminal Possession of Stolen Property. In February 1993, inmate Walker was arrested for violent crimes he committed in both Kings and New York Counties, where, during one of these incidents, he shot and killed a person.

In September 2000, while confined at the Green Haven Correctional Facility, inmate Walker brutally attacked, stabbed and injured a Deputy Superintendent and a Correction Officer with sharp weapons attached to each of his wrists. One weapon was six inches long, the other ten inches in length. Each victim was stabbed multiple times and each sustained serious injuries. this attack was nothing more than "blind rage" from inmate Walker's perspective. Apart from the administrative disciplinary sanction imposed for this behavior, inmate Walker's vicious assault resulted in his being convicted of Attempted Murder in the 1st Degree in Dutchess County, New York; for this he received an indeterminate sentence of 15 years' to Life imprisonment.

Inmate Walker was placed in Administrative Segregation in January 2014 after completing his disciplinary confinement. He has incurred over 27 misbehavior reports for behaviors such as Possession of a Weapon, Drugs, Smuggling, Demonstration, Assault on Staff, Making Threats, Harassment, and Possession of an Altered Item. His most recent disciplinary matter in March 2014 concerned his having a weapon, bribery/extortion, having property in an unauthorized location and possessing an altered item.
Inmate Walker continues to interact in an appropriate manner with security and line staff. He continues to maintain a cell clean and good personal hygiene. Inmate Walker participates in the Pilot Incentives Program

Inmate Walker has had maintained appropriate behavior over the past few evaluation periods and he is encouraged to continue with this, his self-studies, his goal of writing a book and his communication with family members; however, the Committee concurs with the facility's recommendation that he remain in Administrative Segregation at this time. Inmate Walker's ability to obtain and fashion extremely dangerous weapons, his attempt to manipulate the system, and his unpredictable and most extreme violence all indicate that he poses a continued threat to the security and safety of himself, the facility and the population therein if placed in general population at this time.

Form 2170B (01/15)
Réf.:
7NYCRR 301.4(d)

STATE OF NEW YORK - DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION   Photocopy locally as needed
PILOT INCENTIVE PROGRAM FOR ADMINISTRATIVE SEGREGATION INMATES
SUBJECT TO 60 DAY CENTRAL OFFICE REVIEW

_____UPSTATE_____ Correctional Facility

Name: Walker, Tyrone DIN: 94A5258 Date placed in administrative segregation: 1/17/14

This form should accompany every 60 day review of the Administrative Segregation status of an inmate who is subject to Central Office review and who has been in such status for at least one year (Note: The form should be completed regardless of whether a committee is recommending to the Deputy Commissioner that the inmate be released from or retained in Administrative Segregation).

The granting of an incentive is a privilege and no inmate has a right to receive or to continue to receive an incentive. An incentive provided herein may be revoked at any time for any reason. Factors for granting or denying one or more incentives include, but are not limited to, the inmate's current custodial adjustment; overall adjustment to confinement status (e.g., attitude, cell standards, and self hygiene); the physical configuration of the housing unit, the reason for the inmate's Administrative Segregation and other security concerns. The specific times when incentives will be offered will depend on the operational needs of the housing unit.

|  | | Facility Committee | Central Office Committee |
|---|---|---|---|
| 1. Out-of-cell time in a location within the housing unit where the inmate can be secured (e.g., room with a RESTART chair, Therapeutic Cubicle, etc.) to view TV programming not to exceed 2 hours per session. The sessions shall be offered... | Once per week | ☐ | ☐ |
|  | Once per month | ☑ | ☑ |
|  | Other timeframe as described below: | ☐ | ☐ |
| 2. Opportunity to purchase designated food items from the Commissary. The designated commissary food items can only be given to the inmate and consumed while the inmate is in the RESTART chair or Therapeutic Cubicle. Any uneaten food shall be discarded. | | ☑ | ☑ |
| 3. One additional hour of exercise within a secure individual exercise area on a daily, weekly or other basis as described. | | ☑ | ☑ |
| 4. One additional visit... | Per week | ☑ | ☑ |
|  | Per month | ☐ | ☐ |
|  | Other timeframe as described below: | ☐ | ☐ |
| 5. One personal pair of one or more of the following... | Sneakers | ☐ | ☐ |
|  | Shorts | ☐ | ☐ |
|  | Sweatpants | ☐ | ☐ |
| 6. One phone call on a monitored "call home" program telephone, not to exceed 30 minutes. The telephone call shall be permitted... | Once per week | ☐ | ☐ |
|  | Once per month | ☑ | ☑ |
|  | Other timeframe as described below: | ☐ | ☐ |
| 7. No incentives at this time | | ☐ | ☐ |

**Facility three-member committee**

| Correction Counselor | Security Supervisor | Committee Chairperson | Date |
|---|---|---|---|
| TV Smith | Meady | J. Fitchette | 2/9/17 |

**Central Office three-member committee**

| Staff Inspector General | Staff Counsel | Chairperson Facility Operations | Date |
|---|---|---|---|
| | | | 7/31/17 |

Deputy Commissioner Correctional Facilities Determination: Remain in Administrative Seg.

Agree with incentive

Signature _____   Date 7/31/17

# EXHIBIT

# # 8

2-26-2019 Ad-Seg Review

Form 2170 (07/17)
Photocopy Locally
as Needed
Ref. 7 NYCRR
301.4(d)

Upstate C.F. Executive Of
MAR 25 '19 11:09

STATE OF NEW YORK - DEPARTMENT OF CORRECTIONAL SERVICES

**ADMINISTRATIVE SEGREGATION REVIEW**
**UPSTATE CORRECTIONAL FACILITY**

| Directed Central Office Review? |
|---|
| ☑ Yes |
| ☐ No |

NAME:  **WALKER, TYRONE**        DIN:  **94A5258**        REVIEW DATE:  **02/26/2019**

Date placed in administrative segregation: 1/17/2014        Date hearing held: 2/26/2014

**A.  Summary report of the facility three-member committee:**

**Reasons why inmate was initially determined to be appropriate for administrative segregation:**
On September 22, 2000 while in E and F yard at Green Haven Correctional Facility, inmate Walker, without provocation, violently attacked Deputy Superintendent of Security Schneider and Corrections Officer Mitchetti, seriously injuring both staff members.  Inmate Walker had armed himself with two homemade weapons described as one flat piece of metal; 10 ½" x ¾" and sharpened at one end and one ice pick type weapon 6" long.  Both weapons were secured to each hand by leather thongs.  He used these weapons to stab both staff members about the head, chest and back causing serious puncture wounds.  Walker subsequently received a Tier 3 Misbehavior Report and extensive sanctions.  In addition to the Departmental sanctions, on July 9, 2001 inmate Walker pled guilty in Dutchess County Court to attempted Murder 1st, receiving a sentence of 15 years to life to be served consecutively.

**Information on the inmate's subsequent behavior and attitude:**
ORC met with Inmate Walker on 2/13/2019 to discuss his Administrative Segregation.  He acted appropriately during the interview.  His last visit was on 2/2/2019.  He continues to participate in Cell Study.  He has been enrolled in Cell Study since 07/28/14 even though he received his high School Diploma in 1987.  His last phone call was on 1/26/2019.  He has not received a Misbehavior Report since 6/1/17.  He wrote a statement for your review which I have attached.  He continues to exercises daily.

**Other factors which may favor retaining the inmate in or releasing the inmate from administrative segregation:**
Walker's past is marked with assaults and brutality showing an indifference to human life.  Walker entered DOCS custody on July 26, 1994 to serve a 47 ½ year to life sentence from Kings County for Attempted Robbery 1st and Criminal Possession of Weapon 2nd two counts of Murder 2nd and one count each of Attempted Robbery 1st, Criminal Possession of a Weapon 2nd and Criminal Possession of Weapon 3rd.  Walker was also sentenced on July 22, 1996 to life in federal prison without the possibility of parole for a capital murder offense and on narcotic related charges.  During Walker's Federal trial, while housed in county jail, he plotted to escape and attempted to hire a "hit man" to kill a government witness, assaulted a Deputy and attempted to take his keys.  He also smuggled a razor blade to Federal Court and assaulted another inmate by stabbing him 18 times.

Inmate Walker has demonstrated a propensity for assaultive and dangerous behavior during his incarceration and in his criminal history.  Walker's ability to enact extreme violence on staff and other inmates has shown that his placement in Administrative Segregation is appropriate and greatly reduces the risk his behavior presents to staff and inmates, as well as the safety and security of the facility.

_____        _____        _____        2/13/19
Offender Rehabilitation Coordinator        Security Supervisor        Committee Chairman        Date

If Central Office review has not been directed, skip to C, below, for Superintendent's decision.

B.  Summary report and recommendation of the Central Office three-member committee: _____

_____

_____

_____          _____          _____     _____
Staff - Inspector General                    Staff - Counsel                    Chairman - Facility Operations          Date

C.  Decision of the (Superintendent) (Deputy Commissioner for Correctional Facilities):
        Release from administrative segregation.  A determination has been made to continue your administrative segregation for
the following reasons:  Based on the information contained in
this review imits Walkers placement is
appropriate
_____

Prior to your next review, which is scheduled for _____ March _____, you may write to the Superintendent or designee
to make a statement regarding the need for continued administrative segregation.  The reason(s) stated in this notice, any
written statement that you submit, as well as your overall custodial adjustment will be considered during the next
scheduled review.

_____          _____
(Superintendent) (Deputy Commissioner for Correctional Facilities          Date

Attach inmate's statement(s) and additional pages as necessary

**WALKER, Tyrone (94-A-5258)**
**Administrative Segregation Summary Report and Recommendation of the**
**Central Office Three-member Committee held on February 26, 2019**

Tyrone Walker (94-A-5258) is serving an aggregate sentence of 47½ years to Life for Murder in the 2nd Degree (2 counts), Attempted Murder in the 1st Degree, Attempted Robbery in the 1st Degree, Robbery in the 1st Degree, Criminal Possession of a Weapon in the 2nd Degree and Criminal Possession of a Weapon in the 3rd Degree (VFO).

In February 1993, inmate Walker was arrested for violent crimes he had committed in both Kings and New York Counties, where, during one of these incidents, he shot and killed a person. In 1996, a federal court sentenced him to life without parole for capital murder. During his federal trial, he attempted to escape and attempted to hire someone to murder a government witness. He also assaulted a deputy in an escape attempt and separately assaulted another inmate by stabbing him 18 times.

While incarcerated in September 2000, Inmate Walker brutally attacked, stabbed and injured a Green Haven Correctional Deputy Superintendent and Correction Officer with sharp weapons attached to each of his wrists. The weapons were six and ten inches long respectively. He stabbed each victim multiple times, causing serious injuries. Inmate Walker's vicious assault resulted in disciplinary sanctions and a conviction for Attempted Murder in the 1st Degree. He received an indeterminate sentence of 15 years to Life in prison. His sentences run consecutively.

Inmate Walker was placed in Administrative Segregation in January 2014 after completing his disciplinary confinement. He has been found guilty of numerous misbehavior reports for Possession of a Weapon, Drugs, Smuggling, Demonstration, Assault on Staff, Making Threats, Harassment, and Possession of an Altered Item, among others. Inmate Walker's last misbehavior report was on June 1, 2017. The subsequent disciplinary hearing was held on June 13, 2017 – where he was found guilty of interference, harassment, and disobeying a direct order.

Inmate Walker's cell condition and personal hygiene are both good. Inmate Walker's interactions with staff are appropriate. Inmate Walker met with his Offender Rehabilitation Coordinator on February 13, 2019. Inmate Walker's ORC reported that Mr. Walker acted appropriately throughout the process.

The Office of Mental health reports no concerns for Inmate Walker this reporting period. Medical staff likewise reported no concerns for Inmate Walker. Inmate Walker, in a letter written dated January 26, 2019, complains of gastrointestinal pain, constipation, and hemorrhoids. A colonoscopy has been scheduled for Inmate Walker.

Inmate Walker is a PIMS level III and utilizes his phone call and visitation privileges. Inmate Walker's last visit was on February 2, 2019.

The committee continues to recommend that Inmate Walker remain in Administrative Segregation. His significant history of violence, both outside and inside prison, continues to endanger staff as well as other inmates if he were released to a less restrictive setting.

# EXHIBIT

# # 9

DSS Admissions And Responses, Uhler's Affidavit
Secretary Of State

STATE OF NEW YORK
COURT OF CLAIMS

TYRONE WALKER, #94A5258
       Claimant,

V.

STATE OF NEW YORK
       Defendant.

NOTICE OF STIPULATION
FOR ADMISSIONS AS TO
MATTERS OF FACT

C.P.L.R. 3123

Claim No. 129433

Hon. Richard E. Sise

    Claimant Tyrone Walker request that defendant P. Woodruff, Deputy Superintendent of Security, within 2p days after service of this request, make the following admissions for the purpose of this action and subject to all pertinent objections to admissibility which may be interposed at the trial. This request is made Pursuant to New York Civil Procedure Law Rules (C.P.L.R.) 3123. The Admissions are as follows:

1. You did inform Claimant that the Plexiglas on his cell door will not be removed for security reasons.

2. Directive 4933 govern the Plexiglas use on the cell door.

3. You don't have authority to implement your own rules outside of what's stated in directive 4933; in respect to the use of the plexiglas on the cell door.

4. The Claimant has not violated any of the rules that allows for an inmate to have a cell shield on his cell door according to directive 4933;

5. The Claimant has spoken to you before on your rounds in S.Hill. that you perform weekly in respect to having the plexiglas removed or having holes put in it so he could have some confidentiality when talking with

medical staff

6. Claimant have expressed his desire for the Plexiglas to be removed from his cell door being he is not under a cell shield order.

7. You have consistently told Claimant the plexiglas is not going to be removed.

8. According to directive 4933 the plexiglas over the cell bars constitute as a cell shield.

9. The security reasons you claim the Plexiglas is on the door has to be stated in the directive 4933 or rule book in order to be valid.

10. The security reasons you claim the Plexiglas is on the cell door cannot be something you just make up.

11. Without ventilation in the cell, if the ventilation system is broke is a health hazard.

12. The ventilation system has been broke on B-gallery in 8 Building in 2016.

13. The holes in the plexiglas according to the directive 4933 concerning cell shield provide ventilation in the cell.

14. There is no holes in the plexiglas thats over the cell door bars in 8 building S.H.U. cells.

15. The plexiglas is removable on the S.H.U. cell doors.

16. The plexiglas is kept in place with a lock on the outside of the door.

17. The lock on the cell door can be unlocked and the plexiglas can be removed from the door without any difficulty.

2

18. You keep the plexiglas on the cell doors in S.H.U. to protect your correctional staff and nurses from having something thrown on them from inmates.

19. There are inmates at Upstate Correctional Facility who are unruly and uncontrollable in the S.H.U.

20. You have permission and support from your bosses in Albany to have the plexiglas on the cell doors in the S.H.U.

21. There is no reason for the cell shield (plexiglas) over the cell bars that exist, that's not mentioned in 4933.

22. The only reasons you have for the plexiglas over the cell bars is stated in 4933.

23. All the cells at Upstate Correctional Facility in the S.H.U. has the plexiglas over the cell bars.

24. You sit on the review committee for Tyrone Walker's Administrative Segregation Reviews.

25. When Tyrone Walker make a statement based on his Administrative Segregation Status, you read the statement, contribute a response if necessary and once the review is complete on your part you sign the administrative segregation review paper.

26. You feel your correctional staff and nurses safety is more important than an inmates confidentiality, that's why you won't order the plexiglas on the cell door removed.

27. The plexiglas is about three-quarters of an inch thick.

28. Tyrone Walker is housed in S.H.U. for Administrative Segregation reasons and not disciplinary reasons.

3

The basis for claimants request stem from the fact he has a substantial need of the admissions for the preparations of this case, he is indigent and is unable to obtain it without undue hardships, and this is the proper method of obtaining Admissions according to C.P.L.R. 3123.

Respectfully Submitted

Tyrone Walker

STATE OF NEW YORK : COURT OF CLAIMS

TYRONE WALKER,

                      Claimant,

                -against-

THE STATE OF NEW YORK,

                    Defendant.

**DEFENDANT'S RESPONSE
TO CLAIMANT'S NOTICE
TO ADMIT**
Claim No.: 129433

The defendant by and through its attorney, Honorable Eric T. Schneiderman, Attorney General of the State of New York, Thomas R. Monjeau, of counsel, hereby responds to claimant's undated Notice to Admit which was received in this office on September 6, 2017, as follows:

Defendant objects to each and every request for admissions as such request is directed to P. Woodruff who is an employee of the Defendant and not a party. As such Claimant's request for admissions is palpably improper and, as such, the admissions sought are beyond the scope of a notice to admit as, pursuant to CPLR 3123(a) the purpose of a notice to admit is to obtain admissions confirming matters where there can be no substantial dispute at trial. *Berg v Flower Fifth Avenue Hospital*, 102 AD2d 760; *Hodes v City of New York*, 165 AD2d 168; *Lewis v Hertz Corporation*, 193 AD2d 470.

1. Deny

2. Deny

3. Deny

4. Deny

5. Deny

6. Deny

7. Deny

8. Deny

9. Deny

10. Deny

11. Deny

12. Deny

13. Deny

14. Deny

15. Deny

16. Deny

17. Deny

18. Admit

19. Admit

20. Deny

21. Deny

22. Deny

23. Deny

24. Deny

25. Deny

26. Deny

Printed [Reproduced] on Recycled Paper

**27.** Deny

**28.** Deny

DATED:  Albany, NY
             September 20, 2017

                                ERIC T. SCHNEIDERMAN
                                Attorney General
                                Attorney for Defendant
                                New York State Office
                                 of the Attorney General
                                The Capitol
                                Albany, New York  12224
                                Telephone:  (518) 776-2303

                        By: _____
                                THOMAS R. MONJEAU
                                Assistant Attorney General


TO:     Tyrone Walker, DIN 94-A-5258
         Upstate Correctional Facility
         P.O. Box 2000
         309 Bare Hill Road
         Malone, N.Y.  12953

Printed [Reproduced] on Recycled Paper

STATE OF NEW YORK :   COURT OF CLAIMS

TYRONE WALKER

Claimant,

**AFFIDAVIT**
CLAIM NO. 129433

- against -

THE STATE OF NEW YORK ,

Defendant.

STATE OF NEW YORK )

COUNTY OF FRANKLIN)

DONALD UHLER, being duly sworn deposes and says:

1.     I am the Superintendent at Upstate Correctional Facility in Malone, New York. Prior to becoming Superintendent I was the Deputy Superintendent of Security (DSS) at Upstate Correctional Facility from October 2, 2009 to May 20, 2014.

2.     Upstate Correctional Facility is a Special Housing facility which houses inmates serving SHU sentences or Keep Lock sentences and inmates who are in statewide Administrative Segregation. There are of a small number of general population inmates that are the facility work force. Tyrone Walker was housed at this facility because he was designated to be in Administrative Segregation based upon the nature of his crime and his violent history pre-incarceration and during his incarceration. During the period of his incarceration at Upstate CF he was kept in a SHU cell.

3.     It is my understanding that claimant is alleging that a cell shield was improperly utilized on his cell and was done without notice, hearing misbehavior report or deprivation order while he was incarcerated at Upstate Correctional Facility in a SHU cell.

1

4. Claimant is incorrect. All of the SHU cells at Upstate CF have solid doors with an expanded vision panel. The panel does not interfere with the cell ventilation or obstruct visibility out of the cell. There is no requirement to obtain a deprivation order for it.

5. Claimant incorrectly refers to Directive 4933 Part 305.5. This section governs SHU cells which do not have Expanded Vision Panels and is not applicable to claimant. The proper reference for the claimant's cell as Upstate Correctional Facility is Directive 4933 Section 1 Operations (F) which governs cells with Expanded Vision Panels. A copy of the Directive is attached.

6. The directive, in pertinent part, reads as follows:

I. OPERATIONS

F. Solid cell doors with expanded vision panels: Designated cells in designated Special Housing Units will be equipped with solid cell doors with expanded vision Panels(EVP) to promote increased visibility and communication for inmates with serious mental illness (SMI). Inmates designated with SMI who are placed in SHU should be placed in a cell equipped with EVP, keeping the Department's efforts to provide visibility and communication, while maintaining a safe working environment for staff.

1. In those SHU cells that have EVP doors, the sliding transparent lexan vision panel will be maintained in a closed position when an inmate has not been diagnosed as SMI is assigned to the cell.

7. The claimant was not designated or diagnosed SMI and therefore his placement in a cell with an EVP which was maintained in a closed position was proper and in accordance with DOCCS policies and procedures

DONLAD UHLER

Sworn to before me this

2? day of february , 20 18

Notary Public

Donna J. Melville
Notary Public State of New York
New York State No. 01MA6221161
County of Franklin
My Commission Expires on 06/24/20 18

Printed [Reproduced] on Recycled Paper

Tyrone Walker 94A5258
Upstate Correctional Facility
P.O. Box 2001
Malone, N.Y. 12953

January, 18, 2017

Rossana Rosado Acting Secretary of State
State of New York Department of State
One Commerce Plaza
99 Washington Avenue
Albany, N.Y. 12231-0001

RE: F.O.I.L. Request for Date of Revised Regulations Registration

Dear Secretary of State:

As it regards the above-referenced, I am requesting information in respects to NYS D.O.C.C.S "7 NYCRR Chapter VI Section 1. Operations Section "F". Please, inform me of the date this section was added and submitted to the Secretary of state for filing registering, in accord with executive law section 102(1)(9).

Furthermore, please inform me of any cost/fees for copies if required, at your earliest convenience.

State of New York

JAN 19 2017

Department of State
Secretary of State

Respectfully Submitted.

Tyrone Walker

Tyrone Walker 94A5258
Upstate Correctional Facility
P.O. Box 2001
Malone, N.Y. 12953

STATE OF NEW YORK
DEPARTMENT OF STATE
ONE COMMERCE PLAZA
99 WASHINGTON AVENUE
ALBANY, NY 12231-0001
WWW.DOS.NY.GOV

ANDREW M. CUOMO
GOVERNOR

ROSSANA ROSADO
SECRETARY OF STATE

February 7, 2017

Tyrone Walker
94A5258
Upstate Correctional Facility
P.O. Box 2001
Malone, NY 12953

Re: F2017-57

Dear Mr. Walker:

On January 19, 2017, we received your Freedom of Information Law request, regarding:

NYS D.O.C.C.S. "7 NYCRR Chapter VI Section 1: Operations Section "F." Please, inform me of the date this section was added and submitted to the Secretary of State for filing registering, in accord with executive law section 102 (1)(a).

Your request was not reasonably described, as there is no such regulation within Title 7 of the New York Code, Rules, and Regulations ("NYCRR"). Title 7 contains the regulations of the Department of Corrections and Community Supervision (D.O.C.C.S.). Chapter VI pertains to Special Housing Units but does not contain a Section 1 or a section titled "Operations."

On that basis we must deny your request, However, we will certainly reconsider your request if you are able to modify it in a way that allows us to reasonably identify and locate the records you seek.

We hope you find this information helpful.

Sincerely,

Kelly Walsh
Assistant Records Access Officer

# EXHIBIT

# # 10

6-17-2019 And 7-16-2019 Ad-Seg Reviews

Form 2170 (07/17)
Photocopy Locally
as Needed

Ref: 7 NYCRR
301.4(d)

STATE OF NEW YORK - DEPARTMENT OF CORRECTIONAL SERVICES

**ADMINISTRATIVE SEGREGATION REVIEW**
**UPSTATE** CORRECTIONAL FACILITY

| Directed Central Office Review? | |
|---|---|
| ☑ | Yes |
| ☐ | No |

NAME:  **WALKER, TYRONE**       DIN:   **94A5258**       REVIEW DATE:   **06/17/2019**

Date placed in administrative segregation: 1/17/2014       Date hearing held: 2/26/2014

**A. Summary report of the facility three-member committee:**

**Reasons why inmate was initially determined to be appropriate for administrative segregation:**

On September 22, 2000 while in E and F yard at Green Haven Correctional Facility, inmate Walker, without provocation, violently attacked Deputy Superintendent of Security Schneider and Corrections Officer Mitchetti, seriously injuring both staff members. Inmate Walker had armed himself with two homemade weapons described as one flat piece of metal; 10 ½" x ¾" and sharpened at one end and one ice pick type weapon 6" long. Both weapons were secured to each hand by leather thongs. He used these weapons to stab both staff members about the head, chest and back causing serious puncture wounds. Walker subsequently received a Tier 3 Misbehavior Report and extensive sanctions. In addition to the Departmental sanctions, on July 9, 2001 inmate Walker pled guilty in Dutchess County Court to attempted Murder 1st, receiving a sentence of 15 years to life to be served consecutively.

**Information on the inmate's subsequent behavior and attitude:**

ORC met with Inmate Walker on 6/13/19 to discuss his Administrative Segregation. He acted appropriately during the interview. He successfully completed the ART workbook program on 05/19/19. He continues to participate in Cell Study as well even though he received his High School Diploma in 1987. His last visit was on 2/2/2019. His last phone call was on 05/26/19. Inmate Walker has not received a Misbehavior Report since 6/1/17. He submitted a statement for your review.

**Other factors which may favor retaining the inmate in or releasing the inmate from administrative segregation:**

Walker's past is marked with assaults and brutality showing an indifference to human life. Walker entered DOCS custody on July 26, 1994 to serve a 47 ½ year to life sentence from Kings County for Attempted Robbery 1st and Criminal Possession of Weapon 2nd two counts of Murder 2nd and one count each of Attempted Robbery 1st, Criminal Possession of a Weapon 2nd and Criminal Possession of Weapon 3rd. Walker was also sentenced on July 22, 1996 to life in federal prison without the possibility of parole for a capital murder offense and on narcotic related charges. During Walker's Federal trial, while housed in county jail, he plotted to escape and attempted to hire a "hit man" to kill a government witness, assaulted a Deputy and attempted to take his keys. He also smuggled a razor blade to Federal Court and assaulted another inmate by stabbing him 18 times.

Inmate Walker has demonstrated a propensity for assaultive and dangerous behavior during his incarceration and in his criminal history. Walker's ability to enact extreme violence on staff and other inmates has shown that his placement in Administrative Segregation is appropriate and greatly reduces the risk his behavior presents to staff and inmates, as well as the safety and security of the facility.

_____       _____       _____       _____
Offender Rehabilitation Coordinator        Security Supervisor        Committee Chairman        Date

If Central Office review has not been directed, skip to C, below, for Superintendent's decision.

B.  Summary report and recommendation of the Central Office three-member committee: _____

_____

_____

_____          _____          _____          6/17/19
Staff - Inspector General                Staff - Counsel                 Chairman - Facility Operations            Date

C.  Decision of the (Superintendent) (Deputy Commissioner for Correctional Facilities):
     Release from administrative segregation. X  A determination has been made to continue your administrative segregation for

the following reasons: __INMATE   WALKERS   PLACEMENT   IN   ADMINISTRATIVE__

__SEGREGATION   IS   APPROPRIATE   AT   THIS   TIME   BASED   ON   ALL__

__THE   INFORMATION   IN   THIS   REVIEW__

_____

Prior to your next review, which is scheduled for _____July_____, you may write to the Superintendent or designee
to make a statement regarding the need for continued administrative segregation.  The reason(s) stated in this notice, any
written statement that you submit, as well as your overall custodial adjustment will be considered during the next
scheduled review.

_____          7/3/19
(Superintendent) (Deputy Commissioner for Correctional Facilities)          Date

Attach inmate's statement(s) and additional pages as necessary

WALKER, Tyrone (94-A-5258)
Administrative Segregation Summary Report and Recommendation of the
Central Office Three-member Committee held on June 17, 2019

Tyrone Walker (94-A-5258) is serving an aggregate sentence of 47½ years to Life for Murder in the 2nd Degree (2 counts), Attempted Murder in the 1st Degree, Attempted Robbery in the 1st Degree, Robbery in the 1st Degree, Criminal Possession of a Weapon in the 2nd Degree and Criminal Possession of a Weapon in the 3rd Degree.

In February 1993, inmate Walker was arrested for violent crimes he had committed in both Kings and New York Counties, where, during one of these incidents, he shot and killed a person. In 1996, a federal court sentenced him to life without parole for capital murder. During his federal trial, he attempted to escape and attempted to hire someone to murder a government witness. He also assaulted a deputy in an escape attempt and separately assaulted another inmate by stabbing him 18 times.

While incarcerated in September 2000, Inmate Walker brutally attacked, stabbed and injured a Green Haven Correctional Deputy Superintendent and Correction Officer with sharp weapons attached to each of his wrists. The weapons were six and ten inches long respectively. He stabbed each victim multiple times, causing serious injuries. Inmate Walker's vicious assault resulted in disciplinary sanctions and a conviction for Attempted Murder in the 1st Degree. He received an indeterminate sentence of 15 years to Life in prison. His sentences run consecutively.

Inmate Walker was placed in Administrative Segregation in January 2014 after completing his disciplinary confinement.

Inmate Walker has made it clear that he would like to be removed from Administrative Segregation. In a letter dated June 13, 2019 to the Review Committee, inmate Walker rebutted the assertion that he expresses entitlement and anger. He stated that he completed ART – which was recommended by the committee in December 2018 – with ease. Completion of the ART program is a positive step for inmate Walker, but by no means justifies release from administrative segregation in itself.

In his letter, inmate Walker noted that these reviews often highlight his skill at building weapons and inclination toward violence. He rightly points out his notable instances of violence (the underlying offense for his conviction, conspiring to murder a witness, and his assault on Correctional staff) all occurred more than 20 years ago. However, his close supervision over the subsequent years has arguably prevented continued violence.

Rather than reflect on the lessons of ART he stated that he passed "with ease". Rather than see ASAT as another opportunity for personal growth, he stated that he doesn't need ASAT because "I don't have a drug problem anyway." (It nevertheless should be noted that ASAT does not have a workbook program and inmate Walker will not be participating in the program at this time.) The only staff member he named in his letter was derided as corrupt – a sign that he has a problem communicating respectfully. He closed his letter

with the entitled inference that if he received a meaningful review he would be released from administrative segregation.

This committee asks facility staff to remain observant and to carefully examine their stated position during these reviews. During this review, inmate Walker's letter again expressed entitlement and frustration.

Security staff continues to express concern that inmate Walker has a short fuse and only with great effort restrains himself when angry. Inmate Walker's current counselor (ORC) spoke with the committee and stated that he has not observed any anger issues or sense of frustration and entitlement from inmate Walker. However, inmate Walker had significant issues with his prior counselor and his supervision had to be reassigned last year.

Facility staff noted that inmate Walker is smart enough to communicate appropriately when he wants something, and that he is capable of manipulation.  Despite that ability, Walker repeatedly misses the mark when communicating with this committee. Release from Administrative segregation for inmate Walker will require a level of humility and remorse that has thus far not been demonstrated. There is no formula or benchmark for such a demonstration – only personal growth. This is a high bar to demand for release form administrative segregation, but the cost of an untimely release could be the lives of other inmates or correctional staff.

While the Committee recognizes the conundrum inherent in requiring a demonstration of growth and non-violent problem-solving while continuing administrative segregation due to the risk of violence "inherent" in the subject, we are unable to recommend step-down to a less restrictive environment.

Inmate Walker should remain in administrative segregation at this time.

Form 2170 (07/17)
Photocopy Locally
as Needed

Ref: 7 NYCRR
301.4(d)

STATE OF NEW YORK - DEPARTMENT OF CORRECTIONAL SERVICES

**ADMINISTRATIVE SEGREGATION REVIEW**
**UPSTATE** CORRECTIONAL FACILITY

Directed Central
Office Review?
☑ Yes
☐ No

NAME:   **WALKER, TYRONE**        DIN:   **94A5258**        REVIEW DATE:   **07/16/2019**

Date placed in administrative segregation: 1/17/2014        Date hearing held: 2/26/2014

**A.  Summary report of the facility three-member committee:**

**Reasons why inmate was initially determined to be appropriate for administrative segregation:**

On September 22, 2000 while in E and F yard at Green Haven Correctional Facility, inmate Walker, without provocation, violently attacked Deputy Superintendent of Security Schneider and Corrections Officer Mitchetti, seriously injuring both staff members. Inmate Walker had armed himself with two homemade weapons described as one flat piece of metal; 10 ½" x ¾" and sharpened at one end and one ice pick type weapon 6" long. Both weapons were secured to each hand by leather thongs. He used these weapons to stab both staff members about the head, chest and back causing serious puncture wounds. Walker subsequently received a Tier 3 Misbehavior Report and extensive sanctions. In addition to the Departmental sanctions, on July 9, 2001 inmate Walker pled guilty in Dutchess County Court to attempted Murder 1st, receiving a sentence of 15 years to life to be served consecutively.

**Information on the inmate's subsequent behavior and attitude:**

ORC met with Inmate Walker on 7/9/19 to discuss his Administrative Segregation. He acted appropriately during the interview. He successfully completed the ART workbook program on 05/19/19. He continues to participate in Cell Study as well even though he received his High School Diploma in 1987. His last visit was on 2/2/2019. His last phone call was on 05/26/19. Inmate Walker has not received a Misbehavior Report since 6/1/17. He did not wish to make or include a statement for your review.

**Other factors which may favor retaining the inmate in or releasing the inmate from administrative segregation:**

Walker's past is marked with assaults and brutality showing an indifference to human life. Walker entered DOCS custody on July 26, 1994 to serve a 47 ½ year to life sentence from Kings County for Attempted Robbery 1st and Criminal Possession of Weapon 2nd two counts of Murder 2nd and one count each of Attempted Robbery 1st, Criminal Possession of a Weapon 2nd and Criminal Possession of Weapon 3rd. Walker was also sentenced on July 22, 1996 to life in federal prison without the possibility of parole for a capital murder offense and on narcotic related charges. During Walker's Federal trial, while housed in county jail, he plotted to escape and attempted to hire a "hit man" to kill a government witness, assaulted a Deputy and attempted to take his keys. He also smuggled a razor blade to Federal Court and assaulted another inmate by stabbing him 18 times.

Inmate Walker has demonstrated a propensity for assaultive and dangerous behavior during his incarceration and in his criminal history. Walker's ability to enact extreme violence on staff and other inmates has shown that his placement in Administrative Segregation is appropriate and greatly reduces the risk his behavior presents to staff and inmates, as well as the safety and security of the facility.

| | | | |
|---|---|---|---|
| Offender Rehabilitation Coordinator | Security Supervisor | Committee Chairman | Date |

**If Central Office review has not been directed, skip to C, below, for Superintendent's decision.**

B.  Summary report and recommendation of the Central Office three-member committee: _____

_____

_____

| _____ | _____ | _____ | _____ |
| Staff - Inspector General | Staff - Counsel | Chairman - Facility Operations | Date |

C.  **Decision of the (Superintendent) (Deputy Commissioner for Correctional Facilities):**

☐    Release from administrative segregation. ☒ A determination has been made to continue your administrative segregation for

the following reasons: _____ _climate_ _Walkers_ _placement_ _in_ _administ.._

_Segregtn_ _in_ _appropi_ _of_ _this_ _tim_ _____

_____

Prior to your next review, which is scheduled for _____ _Aug_ _____, you may write to the Superintendent or designee
to make a statement regarding the need for continued administrative segregation.  The reason(s) stated in this notice, any
written statement that you submit, as well as your overall custodial adjustment will be considered during the next
scheduled review.

_____        _____
(Superintendent) (Deputy Commissioner for Correctional Facilities)        Date

Attach inmate's statement(s) and additional pages as necessary

**WALKER, Tyrone (94-A-5258)**
**Administrative Segregation Summary Report and Recommendation of the**
**Central Office Three-member Committee held on July 16, 2019**

Tyrone Walker (94-A-5258) is serving an aggregate sentence of 47½ years to Life for Murder in the 2nd Degree (2 counts), Attempted Murder in the 1st Degree, Attempted Robbery in the 1st Degree, Robbery in the 1st Degree, Criminal Possession of a Weapon in the 2nd Degree and Criminal Possession of a Weapon in the 3rd Degree (VFO).

In February 1993, inmate Walker was arrested for violent crimes he had committed in both Kings and New York Counties, where, during one of these incidents, he shot and killed a person. In 1996, a federal court sentenced him to life without parole for capital murder. During his federal trial, he attempted to escape and attempted to hire someone to murder a government witness. He also assaulted a deputy in an escape attempt and separately assaulted another inmate by stabbing him 18 times.

While incarcerated in September 2000, Inmate Walker brutally attacked, stabbed and injured a Green Haven Correctional Deputy Superintendent and Correction Officer with sharp weapons attached to each of his wrists. The weapons were six and ten inches long respectively. He stabbed each victim multiple times, causing serious injuries. Inmate Walker's vicious assault resulted in disciplinary sanctions and a conviction for Attempted Murder in the 1st Degree. He received an indeterminate sentence of 15 years to Life in prison. His sentences run consecutively.

Inmate Walker was placed in Administrative Segregation in January 2014 after completing his disciplinary confinement. He has been found guilty of numerous misbehavior reports for Possession of a Weapon, Drugs, Smuggling, Demonstration, Assault on Staff, Making Threats, Harassment, and Possession of an Altered Item, among others. Inmate Walker's last misbehavior report was on June 1, 2017. The subsequent disciplinary hearing was held on June 13, 2017 – where he was found guilty of interference, harassment, and disobeying a direct order.

Inmate Walker keeps his cell in good order and maintains good personal hygiene. Inmate Walker has had maintained appropriate behavior and it is reported that he continues with his self-studies. OMH staff and medical raised no concerns during this report period.

Inmate Walker's interactions with staff are appropriate. Inmate Walker's personal hygiene and cell condition are also appropriate. Inmate Walker is currently a PIMS level III. Inmate Walker utilizes his phone and visitation privileges, his last visitor being on July 14, 2018. He successfully completed the ART workbook program on 5/19/2019. He continues to participate in Cell Study.

Administrative segregation remains the appropriate placement for Inmate Walker. His propensity for building weapons, committing severe violence, and networking with other inmates make him a high risk to staff and other inmates in a less restrictive environment. Administrative segregation remains an appropriate placement.

EXHIBIT

# 11

3-26-2019   Ad-Seg Review (See #7)

EXHIBIT

# 12

11-6-18 And 12-3-19 Ad-Seg Reviews, 11-1-2018 Ad-Seg
Statement, Controlled "A" High Fiber Diet, Rabbi
Denying Kosher Diet

Upstate C.F. Executive Offi
DEC 4 '18 PM 3:30

STATE OF NEW YORK - DEPARTMENT OF CORRECTIONAL SERVICES

ADMINISTRATIVE SEGREGATION REVIEW
UPSTATE CORRECTIONAL FACILITY

Form 2170 (07/17)
Photocopy Locally
as Needed

Ref. 7 NYCRR
301 4(2)

Directed Central
Office Review?
☑ Yes
☐ No

NAME: WALKER, TYRONE        DIN: 94A5258        REVIEW DATE: 11/06/18

Date placed in administrative segregation: 1/17/2014        Date hearing held: 2/26/2014

A. Summary report of the facility three-member committee:

**Reasons why inmate was initially determined to be appropriate for administrative segregation:**
On September 22, 2000 while in E and F yard at Green Haven Correctional Facility, inmate Walker, without provocation, violently attacked Deputy Superintendent of Security Schneider and Corrections Officer Mitchetti, seriously injuring both staff members. Inmate Walker had armed himself with two homemade weapons described as one flat piece of metal, 10 ¼" x ¾" and sharpened at one end and one ice pick type weapon 6" long. Both weapons were secured to each hand by leather thongs. He used these weapons to stab both staff members about the head, chest and back causing serious puncture wounds. Walker subsequently received a Tier 3 Misbehavior Report and extensive sanctions. In addition to the Departmental sanctions, on July 9, 2001 inmate Walker pled guilty in Dutchess County Court to attempted Murder 1st, receiving a sentence of 15 years to life to be served consecutively.

**Information on the inmate's subsequent behavior and attitude:**
ORC met with inmate Walker on 11/2/2018 to discuss his Administrative Segregation. Mr. Walker acted appropriately during the interview. He wrote a statement for your consideration which has been attached for your review. Mr. Walker did not utilize his phone call privilege this past review session. His last visit was on 7/14/18. He continues to participate in Cell Study. He has been enrolled in Cell Study since 01/30/18 even though he received his high School Diploma in 1987. Inmate Walker has not received a Misbehavior Report since 6/1/17.

**Other factors which may favor retaining the inmate in or releasing the inmate from administrative segregation:**
Walker's past is marked with assaults and brutality showing an indifference to human life. Walker entered DOCS custody on July 26, 1994 to serve a 47 ½ year to life sentence from Kings County for Attempted Robbery 1st and Criminal Possession of Weapon 2nd two counts of Murder 2nd and one count each of Attempted Robbery 1st, Criminal Possession of a Weapon 2nd and Criminal Possession of Weapon 3rd. Walker was also sentenced on July 22, 1996 to life in federal prison without the possibility of parole for a capital murder offense and on narcotic related charges. During Walker's Federal trial, while housed in county jail, he plotted to escape and attempted to hire a "hit man" to kill a government witness, assaulted a Deputy and attempted to take his keys. He also smuggled a razor blade to Federal Court and assaulted another inmate by stabbing him 18 times.
Inmate Walker has demonstrated a propensity for assaultive and dangerous behavior during his incarceration and in his criminal history. Walker's ability to enact extreme violence on staff and other inmates has shown that his placement in Administrative Segregation is appropriate and greatly reduces the risk his behavior presents to staff and inmates, as well as the safety and security of the facility.

_____        _____        _____   11/6/18
Offender Rehabilitation Coordinator        Security Supervisor        Committee Chairman        Date

If Central Office review has not been directed, skip to C, below, for Superintendent's decision.

B. Summary report and recommendation of the Central Office three-member committee: _____

_____

_____

_____

_____        _____        _____        _____
Staff - Inspector General            Staff - Counsel              Chairman - Facility Operations .          Date

C.  Decision of the (Superintendent) (Deputy Commissioner for Correctional Facilities):
☐     Release from administrative segregation. ☐  A determination has been made to continue your administrative segregation for
the following reasons: _____ _Based on the information provided you placement_
_in administrative segregation is appropriate._

_____

_____

Prior to your next review, which is scheduled for ____Dec____, you may write to the Superintendent or designee
to make a statement regarding the need for continued administrative segregation. The reason(s) stated in this notice, any
written statement that you submit, as well as your overall custodial adjustment will be considered during the next
scheduled review.

_____                    _____
(Superintendent) (Deputy Commissioner for Correctional Facilities                Date

Attach inmate's statement(s) and additional pages as necessary.

### Administrative Segregation Summary Report and Recommendation
### of the Central Office Three-Member Committee
### for inmate Tyrone Walker (94-A-5258)

#### Review Date: November 6, 2018

Inmate Tyrone Walker, 94-A-5258, continues to serve an aggregate sentence of 47½ years to Life for Murder in the 2nd Degree (2 counts), Attempted Murder in the 1st Degree, Attempted Robbery in the 1st Degree, Robbery in the 1st Degree, Criminal Possession of a Weapon in the 2nd Degree and Criminal Possession of a Weapon in the 3rd Degree (VFO).

Prior to DOCCS' custody in 1994, inmate Walker had been adjudicated a youthful offender for Attempted Criminal Possession of Stolen Property. In February 1993, inmate Walker was arrested for violent crimes he had committed in both Kings and New York Counties, where, during one of these incidents, he shot and killed a person.

In 1996, a federal court sentenced him to life without parole for capital murder. During his Federal trial, he plotted to escape and attempted to hire someone to murder a government witness. He also assaulted a deputy in an escape attempt and separately assaulted another inmate by stabbing him 18 times using a razor blade he had smuggled into Court.

In September 2000, while confined at the Green Haven Correctional Facility, inmate Walker brutally attacked, stabbed and injured a Deputy Superintendent and a Correction Officer with sharp weapons attached to each of his wrists. One weapon was six inches and the other ten inches in length. He stabbed each victim multiple times, and each sustained serious injuries. Apart from the administrative disciplinary sanction imposed for this behavior, inmate Walker's vicious assault resulted in a conviction for Attempted Murder in the 1st Degree in Dutchess County, New York. He received an indeterminate sentence of 15 years to Life in prison. His sentences are to be served consecutively.

Inmate Walker was placed in Administrative Segregation in January 2014 after completing his disciplinary confinement. He has incurred nearly 30 misbehavior reports for such infractions as Possession of a Weapon, Drugs, Smuggling, Demonstration, Assault on Staff, Making Threats, Harassment, and Possession of an Altered Item. His most recent disciplinary matters include interference, harassment and direct order in June, 2017 and, in March 2014, having a weapon, bribery/extortion, having property in an unauthorized location and possessing an altered item.

Inmate Walker maintains good personal hygiene and his cell is acceptable. He is a PIMS Level III, but has not utilized his phone call privilege during this past review session. His last visit was on July 14, 2018. He continues to participate in Cell Study and has been enrolled in that program since January 30, 2018 (even though he received his High School diploma in 1987). OMH staff see inmate Walker on rounds and report no issues.

Inmate Walker wrote a statement dated November 1, 2018, which was reviewed and considered by the Committee. He has expressed a desire to be removed from

Administrative Segregation and voiced concerns relating to his health and diet. Concerns relating to his health and diet should be addressed to facility and medical staff.

The Committee believes that inmate Walker still poses a serious risk for violence. He has demonstrated a propensity for extreme assaultive and explosive violent behavior which can manifest itself without warning or provocation. His propensity for building weapons and committing severe violence make him a high risk to staff and other inmates if he was placed in a less restrictive environment. He shows no remorse for his prior vicious acts and, as documented in his written submission, continues to blame others for his conduct.

In light of the foregoing, it is the opinion of the three-member Committee that inmate Walker continues to pose a serious and imminent risk to the safety, security and good order of the facility and his placement in administrative segregation significantly reduces that risk. It is, therefore, the recommendation of the Committee that inmate Walker remain in administrative segregation at this time.

Form 2170 (07/17)
Photocopy Locally
as Needed

Ref: 7 NYCRR
301.4(d)

STATE OF NEW YORK - DEPARTMENT OF CORRECTIONAL SERVICES

**ADMINISTRATIVE SEGREGATION REVIEW**
**UPSTATE CORRECTIONAL FACILITY**

Directed Central
Office Review?
☑  Yes
☐  No

NAME:  **WALKER, TYRONE**        DIN:  **94A5258**        REVIEW DATE:  **12/3/19**

Date placed in administrative segregation: 1/17/2014        Date hearing held:  2/26/2014

**A.  Summary report of the facility three-member committee:**

<u>Reasons why inmate was initially determined to be appropriate for administrative segregation:</u>
On September 22, 2000 while in E and F yard at Green Haven Correctional Facility, inmate Walker, without provocation, violently attacked Deputy Superintendent of Security Schneider and Corrections Officer Mitchetti, seriously injuring both staff members.  Inmate Walker had armed himself with two homemade weapons described as one flat piece of metal; 10 ½" x ¾" and sharpened at one end and one ice pick type weapon 6" long.  Both weapons were secured to each hand by leather thongs.  He used these weapons to stab both staff members about the head, chest and back causing serious puncture wounds.  Walker subsequently received a Tier 3 Misbehavior Report and extensive sanctions.  In addition to the Departmental sanctions, on July 9, 2001 inmate Walker pled guilty in Dutchess County Court to attempted Murder 1st, receiving a sentence of 15 years to life to be served consecutively.

<u>Information on the inmate's subsequent behavior and attitude:</u>

On 11/27/19, this writer met with Inmate Walker to discuss his Administrative Segregation placement.  Inmate Walker acted appropriately during the interview.  He did not wish to make a statement and reported no changes at this time.  He continues to participate in Cell Study as well even though he received his High School Diploma in 1987.  He has not received a visit since his last review.  An Administrative Segregation phone call did not take place this month based on the family's failure to contact the facility.  He did place a PIMS level III phone call to his brother, Bobby Walker, on 11/14/2019.  Inmate Walker has not received a Misbehavior Report since 6/1/17.

<u>Other factors which may favor retaining the inmate in or releasing the inmate from administrative segregation:</u>
Walker's past is marked with assaults and brutality showing an indifference to human life.  Walker entered DOCS custody on July 26, 1994 to serve a 47 ½ year to life sentence from Kings County for Attempted Robbery 1st and Criminal Possession of Weapon 2nd two counts of Murder 2nd and one count each of Attempted Robbery 1st, Criminal Possession of a Weapon 2nd and Criminal Possession of Weapon 3rd.  Walker was also sentenced on July 22, 1996 to life in federal prison without the possibility of parole for a capital murder offense and on narcotic related charges.  During Walker's Federal trial, while housed in county jail, he plotted to escape and attempted to hire a "hit man" to kill a government witness, assaulted a Deputy and attempted to take his keys.  He also smuggled a razor blade to Federal Court and assaulted another inmate by stabbing him 18 times.

Inmate Walker has demonstrated a propensity for assaultive and dangerous behavior during his incarceration and in his criminal history.  Walker's ability to enact extreme violence on staff and other inmates has shown that his placement in Administrative Segregation is appropriate and greatly reduces the risk his behavior presents to staff and inmates, as well as the safety and security of the facility.

_____        _____        _____ DSS 12-7-19    11/27/19
Offender Rehabilitation Coordinator        Security Supervisor        Committee Chairman        Date

**If Central Office review has not been directed, skip to C, below, for Superintendent's decision.**

B.  Summary report and recommendation of the Central Office three-member committee: _____

_____

_____

_____        _____        _____    _____
Staff - Inspector General              Staff - Counsel              Chairman - Facility Operations        Date

C.  Decision of the (Superintendent) (Deputy Commissioner for Correctional Facilities):
       Release from administrative segregation.      A determination has been made to continue your administrative segregation for
the following reasons: _____ climate Walking placement is appropriate
_____ at the time _____

_____

_____


Prior to your next review, which is scheduled for _____, you may write to the Superintendent or designee
to make a statement regarding the need for continued administrative segregation.  The reason(s) stated in this notice, any
written statement that you submit, as well as your overall custodial adjustment will be considered during the next
scheduled review.

_____    , _____
(Superintendent) (Deputy Commissioner for Correctional Facilities)       Date


Attach inmate's statement(s) and additional pages as necessary

WALKER, Tyrone  [94-A-5258]
Administrative Segregation Summary Report and Recommendation of the
Central Office Three-member Committee.

The Administrative Segregation Central Office Committee was convened on December 3, 2019 to conduct the legislatively mandated review of Inmate Tyrone Walker's, 94-A-5258, placement in Administrative Segregation.

During the current reporting period staff reported that inmate Walker's hygiene and cell were appropriate. Inmate Walker is seen by mental health daily on rounds and no mental health or medical concerns have been reported. He was interviewed on 10/28/2019 and did not wish to make a statement about his administrative segregation status. Inmate Walker continues to participate in Cell Study. He is a PIMS level III but has not received a visit since his last review period. He placed a phone call to a friend on 10/27/2019.

During this review period Inmate Walker continued to interact in an appropriate manner with executive, line staff and inmates. However, he still exhibits signs of volatility in that it appears he has anger management issues but nothing that necessitates the facility taking disciplinary action. He also often complains about his Kosher diet, he either doesn't like it or is never satisfied with his meal tray. Although less than ideal his cell and personal hygiene is appropriate. He participates in the Department's Incentives Program taking advantage of recreational time, phone and visits but in this period, he did not receive a visit or a phone call. He did make a call to his brother Bobby Walker, on 11/14/19. He engages in Cell Study as well even though he received his High School Diploma in 1987. His last misbehavior report was on June 1, 2017, for interference, harassment and failing to obey a direct order. He received a 30 day keep lock sanction which ended July 3, 2017. Facility staff reported that nothing has changed since his last review. Both mental and medical health staff did not note any concerns during this period.

Inmate Walker's past is marked brutality and assaultive behavior with an indifference to human life. This behavior continued even during his incarceration. He is serving an aggregate sentence of 47½ years to Life for Murder in the 2nd Degree (2 counts), Attempted Murder in the 1st Degree, Attempted Robbery in the 1st Degree, Robbery in the 1st Degree, Criminal Possession of a Weapon in the 2nd Degree and Criminal Possession of a Weapon in the 3rd Degree (VFO).

Before coming into New York State custody in 1994, inmate Walker had been adjudicated a youthful offender for Attempted Criminal Possession of Stolen Property. In February 1993, inmate Walker was arrested for violent crimes he committed in both Kings and New York Counties, where, during one of these incidents, he shot and killed a person.

In September 2000, while confined at the Green Haven Correctional Facility, inmate Walker brutally attacked, stabbed and injured a Deputy Superintendent and a Correction Officer with sharp weapons attached to each of his wrists. One weapon was six inches long, the other ten inches in length. Apart from the administrative disciplinary sanction imposed for this behavior, inmate Walker's vicious assault resulted in his being convicted of Attempted Murder in the 1st Degree in Dutchess County, New York; for this he received an indeterminate sentence of 15 years' to Life imprisonment.

**WALKER, Tyrone  [94-A-5258]**
**Administrative Segregation Summary Report and Recommendation of the**
**Central Office Three-member Committee**

Inmate Walker was placed in Administrative Segregation in January 2014 after completing his disciplinary confinement. He has incurred over 27 misbehavior reports for behaviors such as Possession of a Weapon, Drugs, Smuggling, Demonstration, Assault on Staff, Making Threats, Harassment, and Possession of an Altered Item.

The Committee recommends that inmate Walker remain in Administrative Segregation. His resourcefulness, manipulative nature, disdain for authority and the volatility of his character continues to pose a threat to the operation of a correctional facility.

TO: Ad-Seg Review Committee

FROM: Tyrone Walker 94A5258 9 Bldg. C-2-42

DATE: 8a November, 1, 2018

RE: Ad-seg Review Committee Statement

I'm requesting that the Ad-Seg Review Committee respond to my 12-27-17, 9-16-18 and this Ad-Seg review statement. Ya'll do not address any of my issues that's set forth in my Ad-Seg Statement. Namely, the question as to what can I do to be removed from Ad-Seg status and be admitted back into general population. For well over 3 year I've been submitting Ad-Seg statements and they are being completely ignored.

My issues should addressed. My 8-14-18 ad-seg review was not received until Oct-23-18 and it was a month and a week late. It's also stamped by the facility saying when they received it on that day at 10:03 A.M. The counselor mistakenly stated I wanted to reiterate my verbal comments on Ad-Seg that I made the previous month, in which responded to concerning commissary which is an obvious reality, if I don't have any money I cannot go to the commissary. However, what I told the counselor is that I would like you to respond to my statement that's attached in the 9-11-18 review that he noted was attached to the 9-11-18 review but I didn't have attached when I received your response. This is the third ad seg statement I'm submitting and I would like all three of them addressed all have valid issues concerning my Ad-Seg status, my access to the courts, my health and situations concerning S.Hill. which is all valid issues evolving Ad-Seg. It's not necessary to write all of the statements over being you never addressed any of the issues and possess all the statements.

I'm being subject to a rote, perfunctory, and sham review process in which you are repeatedly putting blantantly false information in my Ad-seg review, not addressing my issues in my statements and rubber stamping my continued Ad-seg status.

Currently, I'm dealing with inadequate medical care for my gastrointestinal problems. I existed on Metamucil (fiber supplement) for my constipation. I have a family history of colon cancer on both sides of my family. After 15 years the Metamucil is no longer available and they issue fibercon which is not working. So I had to get back on a high fiber diet to receive an adequate amount of fiber, after being off of it for 9 years. However the Doctor Kuma refuse to provide me with an adequate high fiber diet. He provided me with a controlled "A" (Low fat, Low Sodium, and High Fiber Diet) standard diet. This diet is low fat, so instead of receiving 12 slices of wheat bread a day, I receive 4 slices of wheat bread a day, sometimes less than 4 slices. The bulk of the fiber in a high fiber diet is in the wheat bread. In order for me to receive an adequate diet for my condition the Doctor has to state specificially Controlled "A" full portion, because I don't have a weight issue, I exercise and try to maintain my my health as much as possible. This matter has been referred to Dep. Woodruff who sought process to sending the letter to Doctor Kum. Doctor Kuma disregarded Woodruff and delegated the matter to the nurse Administrator who said the constipation problem has to be addressed with the Doctor. Meanwhile, that's why the Doctor put me on the high fiber diet, but he's not addressing the pressing issue that while on the diet for a few months now, I'm not using the bath regularly. I go every two, three and four days in one instance, and I'm constipated I have severe internal hemorrhoids which is in my medical records from both X-rays acquired in both colonoscopy examinations, It's hurting to go to the bathroom and every time I do go my hemorrhoids is bleeding and it's sore and I have to use the hemorrhoid ointment that they giving me. My medical record support all the facts stated yet, the Doctor won't even address it.

The I have psoriasis and the Doctor tells me it will never go away, prescribe ointment for six weeks, that expired a month ago and he won't give me a call-out to refill my prescription and I'm sitting in this cell dealing with alot of unnecessary pain and may have polyps that's cancerous. Don't try to kill me like that just give me the full portion controlled "A" adequate diet.

Tyrone Walker

FORM 3273 (Oct. 2016)   STATE OF NEW YORK - DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION
OFFICE OF NUTRITIONAL SERVICES

## THERAPEUTIC DIET REQUEST FORM AND ATTENDANCE AGREEMENT

NAME: _Walker Irene_   DIN: _94A5-23D_

FACILITY CODE: _870_   REQUEST DATE: _6/25/_   HOUSING LOCATION: _9 C 42D_
9-c-42B

CHECK ONE: _✓_ DIET REQUEST  OR  _____ DIET CANCELLATION (RETURN TO GENERAL DIET / MENU)

***To request a different therapeutic diet than listed below, you must consult with the Regional Dietitian assigned to your facility.***

CHECK THE REQUESTED THERAPEUTIC DIET / MENU listed below:

| | | RMU USE ONLY |
|---|---|---|
| _____ | **CLEAR LIQUID**  Check one: _____ 24 hours _____ 48 hours _____ 72 hours | _____ REGULAR |
| _____ | **FULL LIQUID**  EXPIRATION DATE _____ | _____ PUREED |
| _____ | **SOFT**  EXPIRATION DATE _____ | |

_____ **CONTROLLED A** (enhanced fiber, low fat, low cholesterol, reduced sodium)
_____ **CONTROLLED B** (Controlled A and limited carbohydrate; _____ check to request an evening snack*)
_____ **Pro 1A** (controlled protein, reduced sodium)
_____ **Pro 1B** (Pro 1A and limited carbohydrate; _____ check to request an evening snack*)
_____ **Pro 2A** (controlled protein, reduced sodium, reduced potassium, reduced phosphorous)
_____ **Pro 2B** (Pro 2A and limited carbohydrate; _____ check to request an evening snack*)
_____ **Pro 3A** (Moderate protein, reduced sodium, reduced potassium, reduced phosphorous)
_____ **Pro 3B** (Pro 3A and limited carbohydrate; _____ check to request an evening snack*)

*Evening snack must be requested individually based on need and is available only with "B" diets.

AUTHORIZED HEALTH CARE PROVIDER'S SIGNATURE: _____

NOTE: Nutritional Services / Food Service may return this form if it is incomplete and / or has a signature that is not legible.

### THERAPEUTIC DIET MEALS – INMATE ATTENDANCE AGREEMENT

A therapeutic diet has been prescribed for you by your health care provider.  Your diet meals will be provided by the food service department after the completed Therapeutic Diet Request Form and Attendance Agreement has been received.

The therapeutic diet menu is designed to include a minimum of 3 meals per day and is based on the general menu.  You will receive many of the same foods offered on the general menu.  Food items are changed only when necessary.

Your prescribed therapeutic diet will not benefit you when diet meals are missed.  Therefore, **attendance at mealtime for therapeutic diets is mandatory.  If you miss more than three (3) diet meals per week (7 days), you may receive counseling, disciplinary action, or your participation in the diet meals program may be cancelled.**

If you are housed in a satellite area such as SHU, keep lock, etc., and do not attend meals in the mess hall, you are responsible for requesting to receive your therapeutic diet meals through Security Services or other appropriate facility personnel.

If you have health-related questions or wish to cancel your diet please contact your health care provider.  Questions regarding the diet menu or diet meal preparation should be directed to the food service supervisor.

**Your signature confirms that you have read and understand the Therapeutic Diet Meals Attendance Agreement and will comply** with the agreement described above and any diet policies and procedures specific to your current facility.

**A refusal to sign this agreement will be considered a refusal of the therapeutic diet.**

INMATE'S SIGNATURE: _____   DIN: _94A5 2-D_

WITNESS: _____   DATE: _6/25/9_

Distribution:   **Original** - Inmate Health Record      **Copy** - Food Service Supervisor

001433

STATE OF NEW YORK - DEPARTMENT OF CORRECTIONAL SERVICES
CLINTON CORRECTIONAL FACILITY
MEMORANDUM

TO:        Walker, T          94A5258          SH-UU-032

FROM:      Rabbi Alec H. Friedmann, Jewish Chaplain

DATE:      August 6, 2008

SUBJECT:   Cold Alternative Diet

Your religious preference is Muslim.  You are therefore not eligible to receive the Cold Alternative Diet.

I am delighted to inform you that the RAM - Religious Alternative Diet meets Biblical kosher standards.  It has on it halal chicken and fish. No meat is served.  The RAM diet therefore meets Moslem dietary requirements.

The RAM Diet is the Alternate diet served on the Mess Hall.  If you are keep locked you can obtain it by requesting the form from your Block CO.

This will allow you to eat and be satisfied as to your religious requirements.

Rabbi Alec H. Friedmann
Jewish Chaplain

cc:   FSA
      File

EXHIBIT

# 13

Disciplinary Record And Unusual Incident Reports

```
09/26/19   SDCP008       INMATE DISCIPLINARY HISTORY      *FPMS*      PAGE 006

INMATE ID#: 94A5258 WALKER, TYRONE                    LOCATION: UPSTATE SC

--------------------------------------------------------------------------------
TIER 2  INCIDENT: 06/01/17 09:55 AM  ORC  COOK, M A        UPSTATE SC
        HEARING : 06/13/17 10:27 AM  LT   SPINNER, J A      UPSTATE SC
107.10 INTERFERENCE       107.11 HARASSMENT      106.10 DIRECT ORDER
    30 D KEEPLOCK    :AFTER LCRED    20D    SERVICE DTES 06/13/17 07/03/17
    30 D PACKAGE    COMMISSARY   PHONE     SERVICE DTES 06/13/17 07/13/17
--------------------------------------------------------------------------------
TIER 3  INCIDENT: 02/27/14 09:25 AM  CAPT D.LUCIA          CLINTON GEN
        HEARING : 03/25/14 12:55 PM  CAPT BISHOP           UPSTATE SC
        APPEAL  : 06/18/14 AFFIRMED  DIR  PRACK            CENTRAL OFF
103.10 BRIBERY/EXTORT      113.10 WEAPON         113.11 ALTERED ITEM
113.22 PROP UNAUTH LOC
 3 M      SHU          PACKAGE    COMMISSARY  SERVICE DTES 02/27/14 05/27/14
 3 M      PHONE                              SERVICE DTES 02/27/14 05/27/14
 3 M      GOOD TIME
--------------------------------------------------------------------------------
TIER 3  INCIDENT: 01/17/14 09:00 AM  SRIN S.B.DUCAN        UPSTATE SC
      REHEARING : 06/11/14 02:45 PM  CHO  GUTWEIN          CENTRAL OFF
        APPEAL  : 09/05/14 AFFIRMED  DIR  PRACK            CENTRAL OFF
999.99 ADMIN SEG
          AD SEG CONF                      SERVICE DTES 01/17/14
--------------------------------------------------------------------------------
TIER 3  INCIDENT: 03/30/12 09:05 AM  CO   C. BEAUDETTE     CLINTON GEN
        HEARING : 04/04/12 04:50 PM  LT   J.MILLER AC      CLINTON GEN
        DIS.REV : 06/10/13          DSS  CRC              CLINTON GEN
113.22 PROP UNAUTH LOC    114.10 SMUGGLING
    30 D PACKAGE    COMMISSARY  PHONE                SUSPD TO 12/07/13
--------------------------------------------------------------------------------
TIER 3  INCIDENT: 12/19/11 04:30 PM  CO   BENWARE          CLINTON GEN
        HEARING : 01/03/12 02:10 PM  LT   J MILLER - A/C   CLINTON GEN
        APPEAL  : 03/01/12 AFFIRMED  DIR  PRACK            CENTRAL OFF
        DIS.REV : 11/25/13          SUPT LONG TERM REV    CLINTON GEN
113.10 WEAPON         107.20 FALSE INFO.
 2 M      SHU                              SERVICE DTES 11/18/13 01/18/14
         29 D PACKAGE   COMMISSARY  PHONE  SERVICE DTES 01/17/14 02/15/14
         30 D SHU                                     SUSPD TO 12/07/13
 3 M      1 D PACKAGE   COMMISSARY  PHONE            SUSPD TO 12/07/13
 4 M      GOOD TIME
--------------------------------------------------------------------------------
TIER 3  INCIDENT: 03/04/11 10:46 AM  CO   M. SPEAR         CLINTON GEN
        HEARING : 03/22/11 03:05 PM  CAPT S LACY           CLINTON GEN
        APPEAL  : 05/16/11 AFFIRMED  DIR  PRACK            CENTRAL OFF
        DIS.REV : 07/26/13          DSS  CRC              CLINTON GEN
113.24 DRUG USE
 2 M      SHU                              SERVICE DTES 09/18/13 11/18/13
 2 M      PACKAGE      COMMISSARY  PHONE   SERVICE DTES 11/17/13 01/17/14
 1 M      SHU          PACKAGE    COMMISSARY  PHONE      SUSPD TO 10/24/13
 3 M      GOOD TIME
--------------------------------------------------------------------------------
TIER 3  INCIDENT: 12/24/09 12:15 PM  CO   T. FOLEY         CLINTON GEN
        HEARING : 01/06/10 07:09 PM  CAPT S.LACY           CLINTON GEN
106.10 DIRECT ORDER
          COUNSEL     /
--------------------------------------------------------------------------------
TIER 3  INCIDENT: 08/18/08 10:10 AM  CO   R. TRUDEAU       CLINTON GEN
        HEARING : 08/30/08 12:15 PM  LT   D.LUCIA          CLINTON GEN
        APPEAL  : 10/20/08 MODIFIED  DIR  BEZIO            CENTRAL OFF
        DIS.REV : 08/12/10          DSS  CRC              CLINTON GEN

NOTE: ONLY COMPLETED HEARINGS ARE SHOWN
```

001437

Case 9:17-cv-01008-GTS-CFH   Document 79-4   Filed 08/18/20   Page 196 of 231

--------------------------------------------------------------------------------
103.10 BRIBERY/EXTORT     113.16 UNAUTH VALUABLE    114.10 SMUGGLING
  6 M      SHU                                              SUSPD TO 03/23/10
  6 M      RECREATION   PACKAGE     COMMISSARY   PHONE      SUSPD TO 02/08/11
--------------------------------------------------------------------------------
TIER 3   INCIDENT: 09/09/07 08:18 AM   CO   G.WARNER        GRT MEAD GEN
         HEARING : 09/28/07 10:52 AM   OTHR FSA PAGANO      GRT MEAD GEN
         APPEAL  : 11/30/07 AFFIRMED   ADIR PRACK           CENTRAL OFF
         DIS.REV : 08/12/10            DSS  CRC             CLINTON GEN
104.12 DEMONSTRATION      104.13 CREATE DISTURB   106.10 DIRECT ORDER
  3 M      SHU          PACKAGE     COMMISSARY   PHONE      SUSPD TO 02/08/11
  3 M      GOOD TIME
--------------------------------------------------------------------------------
TIER 3   INCIDENT: 06/01/07 07:00 PM   CO   J.BOMBARD       GRT MEAD GEN
         HEARING : 06/14/07 10:16 AM   CHO  HARVEY          GRT MEAD GEN
         APPEAL  : 08/13/07 AFFIRMED   ADIR VENETTOZZI      CENTRAL OFF
114.10 SMUGGLING
  3 M      SHU          PACKAGE     COMMISSARY   PHONE      SUSPD TO 09/12/07
  3 M      GOOD TIME
--------------------------------------------------------------------------------
TIER 2   INCIDENT: 06/01/07 03:49 PM   CO   A.WHITE         GRT MEAD GEN
         HEARING : 06/05/07 01:46 PM   LT   GOODMAN         GRT MEAD GEN
113.11 ALTERED ITEM       113.15 UNAUTH EXCHANGE
        15 D KEEPLOCK    PACKAGE     COMMISSARY   PHONE      SUSPD TO 09/03/07
             CONFISCATE  /
--------------------------------------------------------------------------------
TIER 2   INCIDENT: 10/27/05 04:15 PM   CO   R.LIVINGSTON    GRT MEAD GEN
         HEARING : 11/01/05 02:00 PM   LT   JUCKETT         GRT MEAD GEN
         APPEAL  : 11/08/05 AFFIRMED   DSP  CARPENTER       GRT MEAD GEN
         DIS.REV : 05/06/09            SUPT D.ARTUS         CLINTON GEN
104.13 CREATE DISTURB     107.10 INTERFERENCE     107.11 HARASSMENT
102.10 THREATS
        30 D PACKAGE     COMMISSARY   PHONE      SERVICE DTES 09/26/13 10/26/13
        15 D PKG-INV     COMM-INV     PHONE-INV  SERVICE DTES 10/26/13 11/10/13
        30 D KEEPLOCK                            SUSPD TO 08/03/09
        15 D KEEP-INV                            SUSPD TO 08/04/09
--------------------------------------------------------------------------------
TIER 2   INCIDENT: 10/25/05 07:50 PM   CO   R.LIVINGSTON    GRT MEAD GEN
         HEARING : 11/01/05 01:39 PM   LT   JUCKETT         GRT MEAD GEN
         APPEAL  : 11/08/05 AFFIRMED   DSP  CARPENTER       GRT MEAD GEN
         DIS.REV : 10/22/12            DSS  CRC             CLINTON GEN
104.13 CREATE DISTURB     107.10 INTERFERENCE
         7 D PACKAGE     COMMISSARY   PHONE      SERVICE DTES 11/10/13 11/17/13
         7 D KEEPLOCK                            SUSPD TO 01/20/13
             COUNSEL     /
--------------------------------------------------------------------------------
TIER 2   INCIDENT: 08/05/05 09:02 PM   CO   JONES           GRT MEAD GEN
         HEARING : 08/23/05 01:45 PM   LT   JUCKETT         GRT MEAD GEN
         APPEAL  : 08/25/05 AFFIRMED   DSP  CARPENTER       GRT MEAD GEN
         DIS.REV : 04/08/13            DSS  CRC             CLINTON GEN
107.11 HARASSMENT
        30 D KEEPLOCK                            SUSPD TO 11/21/05
        15 D PACKAGE     COMMISSARY   PHONE      SUSPD TO 11/21/05
             COUNSEL     /
--------------------------------------------------------------------------------
TIER 3   INCIDENT: 09/27/00 02:36 PM   SGT  TIERNEY         GRN HAVN GEN
         HEARING : 10/10/00 02:48 PM   HO   HARVEY          GRT MEAD GEN
         APPEAL  : 11/29/00 AFFIRMED   DIR  SELSKY          CENTRAL OFF

NOTE: ONLY COMPLETED HEARINGS ARE SHOWN

001438

```
09/26/19    SDCP008        INMATE DISCIPLINARY HISTORY      *FPMS*      PAGE 008

INMATE ID#: 94A5258 WALKER, TYRONE                         LOCATION: UPSTATE SC

------------------------------------------------------------------------------
100.11 ASSAULT ON STAFF
12 M        SHU-CC      PKG-CC       COMM-CC     SERVICE DTES 09/27/00 09/27/01
12 M        PHONE-CC                             SERVICE DTES 09/27/00 09/27/01
12 M        GOOD TIME
------------------------------------------------------------------------------
TIER 3  INCIDENT: 09/27/00 02:15 PM  LT   KEYSER           GRN HAVN GEN
        REPORTED: 09/28/00
        HEARING : 10/10/00 02:41 PM  HO   HARVEY           GRT MEAD GEN
        APPEAL  : 11/30/00 AFFIRMED  DIR  SELSKY           CENTRAL OFF
        DIS.REV : 04/08/13           DSS  CRC              CLINTON GEN
100.11 ASSAULT ON STAFF
35 M   22 D SHU                                  SERVICE DTES 09/27/10 09/18/13
35 M   30 D PACKAGE     COMMISSARY   PHONE       SERVICE DTES 09/27/10 09/26/13
36 M        GOOD TIME
------------------------------------------------------------------------------
TIER 3  INCIDENT: 09/27/00 02:05 PM  CO   WILLIAMS         GRN HAVN GEN
        HEARING : 10/10/00 02:30 PM  HO   HARVEY           GRT MEAD GEN
        APPEAL  : 12/08/00 AFFIRMED  DIR  SELSKY           CENTRAL OFF
100.11 ASSAULT ON STAFF    113.10 WEAPON
99 M 639 D SHU          PACKAGE      COMMISSARY  SERVICE DTES 09/27/00 09/27/10
99 M 639 D PHONE                                 SERVICE DTES 09/27/00 09/27/10
60 M        GOOD TIME
------------------------------------------------------------------------------
TIER 2  INCIDENT: 02/28/00 10:15 AM  CO   TREECE           GRN HAVN GEN
        HEARING : 03/04/00 01:23 PM  LT   SINNOTT          GRN HAVN GEN
        DIS.REV : 04/13/00           FDS  BLIDEN           GRN HAVN GEN
106.10 DIRECT ORDER     109.10 OUT OF PLACE    109.12 MOVEMENT VIO.
        15 D RECREATION                                    SUSPD TO 05/13/00
             COUNSEL    /                \
------------------------------------------------------------------------------
TIER 2  INCIDENT: 02/16/00 09:25 AM  CO   R. DEACON        GRN HAVN GEN
        HEARING : 02/22/00 12:49 PM  LT   SINNOTT          GRN HAVN GEN
106.10 DIRECT ORDER     115.10 SEARCH/FRISK
        30 D KEEPLOCK                            SERVICE DTES 03/05/00 04/04/00
        30 D PACKAGE    COMMISSARY   PHONE       SERVICE DTES 02/26/00 03/27/00
------------------------------------------------------------------------------
TIER 2  INCIDENT: 01/26/00 07:45 PM  CO   F.EGAN           GRN HAVN GEN
        HEARING : 01/30/00 02:18 PM  LT   NAGY             GRN HAVN GEN
        DIS.REV : 04/13/00           FDS  BLIDEN           GRN HAVN GEN
107.11 HARASSMENT       106.10 DIRECT ORDER    109.12 MOVEMENT VIO.
        9 D KEEPLOCK                             SERVICE DTES 04/04/00 04/13/00
        21 D KEEPLOCK                                       SUSPD TO 04/29/00
        30 D PACKAGE    COMMISSARY   PHONE                  SUSPD TO 04/29/00
------------------------------------------------------------------------------
TIER 2  INCIDENT: 01/08/00 11:50 PM  CO   D. RODIE         GRN HAVN GEN
        HEARING : 01/27/00 08:40 AM  LT   WILK             GRN HAVN GEN
        APPEAL  : 03/17/00 AFFIRMED  FDS  BLIDEN           GRN HAVN GEN
104.13 CREATE DISTURB   107.11 HARASSMENT      106.10 DIRECT ORDER
102.10 THREATS          112.20 DELAY COUNT
        30 D KEEPLOCK   PACKAGE      COMMISSARY SERVICE DTES 01/27/00 02/26/00
        30 D PHONE                              SERVICE DTES 01/27/00 02/26/00
------------------------------------------------------------------------------
TIER 2  INCIDENT: 09/03/99 08:30 PM  CO   MIAKISZ          GRN HAVN GEN
        HEARING : 09/08/99 09:51 AM  LT   SCHNEIDER        GRN HAVN GEN
121.11 UNAUTH CALL
        15 D PHONE                              SERVICE DTES 09/08/99 09/23/99
        10 D KEEPLOCK                                       SUSPD TO 12/07/99

NOTE: ONLY COMPLETED HEARINGS ARE SHOWN
```

```
09/26/19   SDCP008      INMATE DISCIPLINARY HISTORY      *FPMS*    . PAGE 009

INMATE ID#: 94A5258 WALKER, TYRONE                  LOCATION: UPSTATE SC
```

---------------------------------------------------------------------
```
     15 D PHONE                                        SUSPD TO 12/07/99
```
---------------------------------------------------------------------
```
TIER 2  INCIDENT: 02/24/99 01:30 PM  CO   D. MCMORRIS      GRN HAVN GEN
        HEARING : 03/06/99 10:58 AM  LT   NAGY            GRN HAVN GEN
106.10 DIRECT ORDER       109.12 MOVEMENT VIO.
     10 D KEEPLOCK                        SERVICE DTES 03/06/99 03/16/99
     10 D KEEPLOCK                                    SUSPD TO 06/04/99
```
---------------------------------------------------------------------
```
TIER 2  INCIDENT: 04/30/98 12:00 PM  CO   G. MITCHETTI     GRN HAVN GEN
        HEARING : 05/05/98 10:44 AM  LT   HAUBERT         GRN HAVN GEN
104.13 CREATE DISTURB   106.10 DIRECT ORDER
      8 D KEEPLOCK                        SERVICE DTES 04/30/98 05/08/98
     30 D COMMISSARY   PHONE             SERVICE DTES 05/07/98 06/06/98
```
---------------------------------------------------------------------
```
TIER 2  INCIDENT: 04/15/98 04:05 PM  CO   R. WEMPLE        GRN HAVN GEN
        HEARING : 04/22/98 10:44 AM  LT   HAUBERT         GRN HAVN GEN
113.23 CONTRABAND       114.10 SMUGGLING     116.10 LOSS/DAMAGE PROP
     15 D RECREATION   PACKAGE     COMMISSARY SERVICE DTES 04/22/98 05/07/98
     15 D PHONE                             SERVICE DTES 04/22/98 05/07/98
```
---------------------------------------------------------------------
```
TIER 2  INCIDENT: 03/13/98 11:20 AM  CO   A. JIMENEZ       GRN HAVN GEN
        HEARING : 03/20/98 07:30 AM  LT   HAUBERT         GRN HAVN GEN
        APPEAL  : 03/31/98 AFFIRMED  FDS  BLIDEN/ACTING    GRN HAVN GEN
106.10 DIRECT ORDER
      4 D KEEP-PREHEAR                     SERVICE DTES 03/13/98 03/17/98
     25 D RECREATION                       SERVICE DTES 03/20/98 04/14/98
```
---------------------------------------------------------------------
```
TIER 2  INCIDENT: 08/19/97 10:45 AM  CO   D. CRAWFORD      GRN HAVN GEN
        HEARING : 08/23/97 10:20 AM  LT   PELC            GRN HAVN GEN
109.10 OUT OF PLACE      181.10 HEARING DISP
      7 D KEEPLOCK                         SERVICE DTES 08/19/97 08/26/97
     15 D PACKAGE      COMMISSARY   PHONE  SERVICE DTES 09/11/97 09/26/97
     30 D RECREATION                                 SUSPD TO 11/21/97
```
---------------------------------------------------------------------
```
TIER 2  INCIDENT: 07/29/97 07:30 AM  CO   B. FORMAN        GRN HAVN GEN
        HEARING : 08/12/97 10:38 AM  LT   HAUBERT         GRN HAVN GEN
106.10 DIRECT ORDER      110.10 NO ID CARD      124.16 MESSHALL VIOL
      1 D KEEP-PREHEAR                     SERVICE DTES 07/29/97 07/30/97
     30 D RECREATION   PACKAGE     COMMISSARY SERVICE DTES 08/12/97 09/11/97
     30 D PHONE                             SERVICE DTES 08/12/97 09/11/97
```
---------------------------------------------------------------------
```
TIER 2  INCIDENT: 11/29/96 12:15 PM  CO   R. DEMARAIS      GRN HAVN GEN
        HEARING : 12/03/96 11:10 AM  LT   HAUBERT         GRN HAVN GEN
124.12 UTENSILS
     15 D RECREATION                                 SUSPD TO 02/02/97
        COUNSEL    /
```
---------------------------------------------------------------------
```
TIER 3  INCIDENT: 09/30/96 03:15 PM  CO   MAC CAULEY, S.   DWNSTATE REC
        HEARING : 10/06/96 11:09 AM  LT   D. GREEN        DWNSTATE REC
        APPEAL  : 12/04/96 AFFIRMED  DIR  SELSKY          CENTRAL OFF
113.10 WEAPON           113.11 ALTERED ITEM
     40 D SHU                               SERVICE DTES 10/06/96 11/15/96
```
---------------------------------------------------------------------

NOTE: ONLY COMPLETED HEARINGS ARE SHOWN

***SUCCESSFUL PRINT COMPLETION***

001440

09/26/19     SUNS001      *** UNUSUAL INCIDENTS ***      *FPMS*      PAGE 004

DIN: 94A5258    NAME: WALKER, TYRONE
                                                    NYSID: 05658237R

CURRENT LOCATION: UPSTATE SC

---

DATE: 02/27/14   TIME:  09:25      CCC LOG NO.     234410
FACILITY: CLINTON GEN          LOCATION: CELL

INCIDENT TYPE: CONTRABAND          WEAPON - CUTTING INSTRUMENT
    ROLE:   PERPETRATOR
FORCE USED:                        WEAPON USED:

---

DATE: 12/19/11   TIME:  16:30      CCC LOG NO.     222330
FACILITY: CLINTON GEN          LOCATION: CELL

INCIDENT TYPE: CONTRABAND          WEAPON - CUTTING INSTRUMENT
    ROLE:   PERPETRATOR
FORCE USED:                        WEAPON USED:

---

DATE: 08/18/08   TIME:  10:05      CCC LOG NO.     205785
FACILITY: CLINTON GEN          LOCATION: SHU-DISCIPLN

INCIDENT TYPE: CONTRABAND               CASH
    ROLE:   PERPETRATOR
FORCE USED:                        WEAPON USED:

---

DATE: 09/27/00   TIME:  14:10      CCC LOG NO.     168321
FACILITY: GRN HAVN GEN         LOCATION: YARD

INCIDENT TYPE: ASSAULT             ON STAFF - SECURITY/LE
    ROLE:   PERPETRATOR
FORCE USED:  BATON                 WEAPON USED:   SHANK

INCIDENT TYPE: CONTRABAND          WEAPON - SHANK
    ROLE:   PERPETRATOR
FORCE USED:                        WEAPON USED:

INCIDENT TYPE: DISRUPTIVE BEHAVIOR      REFUSED STRIP FRISK
    ROLE:   PERPETRATOR
FORCE USED:   BODY HOLD            WEAPON USED:

INCIDENT TYPE: STAFF USE OF WEAPONS     BATON
    ROLE:   PERPETRATOR
FORCE USED:                        WEAPON USED:

---

DATE: 10/18/96   TIME:  09:03      CCC LOG NO.     136401
FACILITY: DWNSTATE REC         LOCATION: SHU-DISCIPLN

INCIDENT TYPE: ASSAULT                  ON INMATE
    ROLE:   SUSPECT
FORCE USED:                        WEAPON USED:

09/26/19      SUNS001      *** UNUSUAL INCIDENTS ***      *FPMS*      PAGE 005

   DIN: 94A5258    NAME: WALKER, TYRONE                        NYSID: 05658237R

   CURRENT LOCATION: UPSTATE SC

DATE:  09/30/96   TIME:    15:15      CCC LOG NO.      135927
FACILITY: DWNSTATE REC            LOCATION:  CELL

INCIDENT TYPE: CONTRABAND              WEAPON - CUTTING INSTRUMENT
   ROLE:   PERPETRATOR
FORCE USED:                           WEAPON USED:

001442

# EXHIBIT

# # 14

Misbehavior Report And Locator System Sheet

FORM 2171A (Rev. 3/93)

STATE OF NEW YORK - DEPARTMENT OF CORRECTIONAL SERVICES

*Green Haven Correctional*

Facility

### INMATE MISBEHAVIOR REPORT

1) Name of Inmate *Walker    Tyrone*    No. *94A5258*    Housing Location *E 267*

   Last    First

2) Location of Incident *E - F Yard*    Incident Date *9-27-00*    Incident Time *Approx 2:15 pm*

3) Rule Violation(s) *113.10 Possess weapon by description.*
   *100.11 Inmate shall not assault staff member*

4) Description of Incident *During An inmate attack on P.S.S. Schneider*
*in E & F yard  Officer Mitchetti responded. Not*
*knowing inmate Walker 94A5258 was Armed with two*
*shanks, one flat metal and one round metal both sharpened*
*to a point And one in each hand. Mitchetti*
*approached Walker And at that time Walker*
*Lunged at Mitchetti and stabbed him twice in*
*the head. Officer Mitchetti had to be*
*treated at An outside hospital for his injuries.*

*9-28-00*    *Keyser*    *[signature]*    *Lt*

Report Date    Reported By (Print)    Signature    Title

5) Endorsements of other employee witnesses (if any)   SIGNATURES: 1. _____

2. _____    3. _____

**NOTE: Fold back Page 2 on dotted line before completing below.**

6) Were other inmates involved?    Yes (No)    If yes, give name & # _____

7) At the time of this incident was inmate under prior confinement/restriction    Yes (No) or
   As a result of this incident was inmate confined/restricted    Yes (No) *Already Confined on prior lockup*
   Yes ✓    No _____

8) Was inmate moved to another Housing Unit?
   If yes, (a) Current Housing Unit *Great Meadow C.F*    (b) Authorized by _____

9) Was physical force used?  Yes (No)    (If yes, file Form 2104)

Area Supervisor Endorsement _____

DISTRIBUTION: White - Disciplinary Office
Yellow - Inmate (After Review)

STATE OF NEW YORK — DEPARTMENT OF CORRECTIONAL SERVICES
9/28/00              GREEN HAVEN GENERAL
                     HEARING RECORD SHEET

                              REVIEW OFFICER    CAPT MORTON
                              REVIEW DATE       09/28/00
                              TIER  3           C.R. DATE NONE.
                                                M.E. DATE LIFE
                                   DIN 94A5258 LOCATION GRT MEAD GEN
                                                REPORT DATE  09/28/00

1) NAME WALKER, TYRONE
2) INCIDENT DATE  09/27/00   INCIDENT TIME  02:15 PM        F-1-1
3) INMATE WAS NOT  CONFINED
4) INMATE           RELEASED AT REVIEW
(A) SERVING OFFICER  CO. _Braxton_      SERVING TIME  2:30 pm
    SERVING DATE  9/28/00
(B) RELEASED FROM PREHEARING CONFINEMENT? ___ DATE AUTHORIZED __/__/__
    AUTHORIZED PERSON _____
6) ASSISTANT NAME _____    INTERVIEW TIME __:__
7) INTERVIEW DATE  __/__/__               (IF APPLICABLE)
8) EXTENSION NUMBER _____
9) IF APPLICABLE, CHECK REQUIRED DRUG TESTING FORMS PROVIDED TO INMATE
   PURSUANT TO DIRECTIVE 4937 OR 4938
      TEST REQUEST FORMS ____    TEST PROCEDURE FORMS ____
      TEST RESULT FORMS ____     APPENDIX C ____    OTHER (SPECIFY) _____
0) INMATE ____ ENGLISH SPEAKING
   A) IF NOT, WERE CHARGES TRANSLATED AND SERVED TO INMATE? ____
   B) INTERPRETOR AT HEARING ____ DATE  10/3/00  TIME  8:15 am END:DATE  10/0/00  TIME  2:41 pm
1) HEARING BEGIN:DATE  10/3/00  TIME  8:15 am END:DATE  10/10/00  TIME  2:41 pm AT THE HEARING
2) CHARGES: SPECIFY INMATE'S PLEA TO THE CHARGES CONSIDERED AT THE HEARING
   CHARGE                                        REPORTED BY        INMATE'S
   NUMBER     DESCRIPTION OF CHARGES                                PLEA
   100.11     ASSAULT ON STAFF                    LT  KEYSER        Guilty
   113.10     WEAPON                              LT  KEYSER        Guilty


SIGNATURE OF INMATE  _Tyrone Walker_
                DATE  10/5/00    TIME  10:32 am
3) WITNESSES;  IF NONE REQUESTED, CHECK HERE ____
                                     TESTIFIED            IN INMATE'S PRESENCE
   A) REQUESTED BY INMATE  Sinclair  92A7418   Y__ N__    Y__ N__ See form
                           C.F. Kher           Y__ N__    Y__ N__ See 2176
                           C.O. Williams       Y__ N__    Y__ N__
                           C.O. Micletti       Y__ N__    Y__ N__
                                               Y__ N__    Y__ N__
                                                          IN INMATE'S PRESENCE
   B) REQUESTED BY HEARING OFFICER  TESTIFIED
                                               Y__ N__    Y__ N__  See 2176
                                               Y__ N__    Y__ N__
                                               Y__ N__    Y__ N__
                                               Y__ N__    Y__ N__

*NOTE*  IF ANY WITNESS IS DENIED OR IF A REQUESTED WITNESS TESTIFIES OUTSIDE
        THE PRESENCE OF THE INMATE CHARGED, AND/OR THE INMATE IS NOT PERMITTED
        TO REVIEW TESTIMONY OF SUCH WITNESS, FORM 2176 EXPLAINING THE REASON
        FOR THAT DETERMINATION MUST BE GIVEN TO THE INMATE AND INCLUDED AS
        PART OF THE RECORD.

HEARING OFFICER SIGNATURE: _____

**SUCCESSFUL PRINT COMPLETION**

09/29/00        STATE OF NEW YORK - DEPARTMENT OF CORRECTIONAL SERVICES   PAGE   2
                              GRT MEAD GEN

                    SUPERINTENDENT   HEARING DISPOSITION RENDERED
DCP004                                                    HEARING DATE: 10/10/00

DIN: 94A5258 NAME: WALKER, TYRONE

A. STATEMENT OF EVIDENCE RELIED UPON:

I relied on Misbehavior report dated 9/28/00 written by Lt. Kyser at app. 2:15 pm charging you with an attack on Staff which alleges that during your knife attack on Rule violation 100.11 Assault on Staff, he attempted to intervene in the area. I also relied on D.S.S. Schneider, C.O. Micketti responded. While he attempted to intervene in the head and neck area. I also relied on attack you stabbed C.O. Micketti twice in the head and neck area to C.O. Micketti this the following: 1.) Medical information indicating 2 separate lacerations to your head. 2.) Your plea of guilty to the 100.11 Assault on Staff rule violation and your admission that you stabbed C.O. Micketti because in his attempt to help Dep Schneider he came at you with a stick. 3.) You previously had pled guilty for possession of the additional weapon used by you in this attack, therefore, I am dismissing the additional weapon charge as duplicative.

B. REASONS FOR DISPOSITION:

Assault on Staff cannot and will not be tolerated under any circumstances. However, in this case, C.O. Micketti was responding to your vicious and brutal attack on D.S.S. Schneider. In attempting to help Dep Schneider, C.O. Micketti was attacked by you and stabbed twice in the head area. This penalty is being imposed in the hope that it will deter you from this conduct in the future. A mental Health evaluation was conducted by me in connection with your hearing and for possible mitigation of penalty.

C. SPECIAL INSTRUCTION ON VISITATION OR CORRESPONDENCE RESTRICTIONS, REFERRALS
   OR SPECIAL EVENT LOSS:

I HAVE RECEIVED A COPY OF THIS HEARING DISPOSITION DATED: 10/10/00

_____          _Tyrone Walker_   10/10/00  2:41 p
HEARING OFFICER SIGNATURE             INMATE SIGNATURE   DATE & TIME RECEIVED

YOU ARE HEREBY NOTIFIED OF THE FOLLOWING APPEAL PROCEDURES:

____ FOR TIER II HEARINGS-APPEAL TO SUPERINTENDENT WITHIN 72 HOURS.

__X_ FOR TIER III HEARINGS-APPEAL TO COMMISSIONER WITHIN 30 DAYS.

***PRINT COMPLETION***

09/29/00
DCP004

STATE OF NEW YORK — DEPARTMENT OF CORRECTIONAL SERVICES    PAGE   1
SUPERINTENDENT  HEARING DISPOSITION RENDERED

TAPE NUMBER _1239.00_

GRT MEAD GEN

LOCATION: OF-01-01S

DIN: 94A5258 NAME: WALKER, TYRONE

INCIDENT DATE & TIME:      09/27/00   02:15 PM   TIER 3   #2
REPORT DATE:              09/28/00               BY: CAPT MORTON
REVIEW DATE:              09/28/00

DELIVERY DATE & TIME:     9/29/00  3:30 pm  BY: T BRAYTON

HEARING START DATE & TIME: 10/5/00 10:21 A  BY: CHO Hang

HEARING END DATE & TIME:  10/10/00 2:41 P  BY: CHO Hang

| CHARGE NUMBER | DESCRIPTION OF CHARGES | REPORTED BY | DISPOSITION |
|---|---|---|---|
| 100.11 | ASSAULT ON STAFF | LT  KEYSER | Guilty |
| 13.10 | WEAPON | | Not guilty |

RECEIVED

REVIEWED
BY

ANY GUILTY DISPOSITION WILL RESULT IN A MANDATORY DISCIPLINARY SURCHARGE IN THE
AMOUNT OF FIVE($5.00) DOLLARS BEING ASSESSED AUTOMATICALLY AGAINST THE INMATE.

| PENALTY CODE | DESCRIPTION | PENALTY MO DAYS | START DATE | RELEASE DATE | SUSPEND MO DAYS | DEFERRED MO DAYS | RESTITUTION $$$$ . ¢¢ |
|---|---|---|---|---|---|---|---|
| ADOO | SHU | 36 | 9/27/00 | 9/27/13 | | | |
| EOOO | Loss of Packages | 36 | 9/27/00 | 9/27/13 | | | |
| FOOD | Loss of Commissary | 36 | 9/27/10 | 9/27/13 | | | |
| GOOO | Loss of Phone | 36 | 9/27/10 | 9/27/13 | | | |
| HOOO | Recd Loss Goodtime 3 yrs | | | | | | |

```
12/27/12        SLOC010           LOCATOR SYSTEM        *FPMS*        PAGE 013
                              CHRONOLOGICAL HISTORY DISPLAY
                                   02 CLINTON GEN
    DIN 94A5258        NYSID 05658237R    FACILITY CLINTON GEN      LOCATION SH-UU-038
    NAME WALKER, TYRONE                           DOB 02/02/69    SEX M    E/R NB


    EFFECTIVE    DATE        SENDING       RECEIVING FAC/   TRANSACTION
     DATE       ENTERED      FACILITY    OUTCOUNT LOCATION     TYPE        CELL

    07/26/94    07/26/94                 DWNSTATE REC    NEW COMMIT      03-0H-016
    09/12/94    09/12/94    DWNSTATE REC GRN HAVN GEN    TRANSFER OUT    03-0B-006
    09/12/94    09/12/94    DWNSTATE REC GRN HAVN GEN    TRANSFER IN     0H-04-166
    10/03/94    10/03/94    GRN HAVN GEN DWNSTATE GEN    INTRANS SENT    0G-04-145
    10/03/94    10/04/94    GRN HAVN GEN DWNSTATE REC    INTRANS RECV    XN-OC-ELL
    10/03/94    10/04/94    DWNSTATE REC NEW YORK        COURT TRIP      XN-OC-ELL
    10/14/94    10/14/94                 DWNSTATE REC    OUTCOUNT RET    03-0A-018
    10/17/94    10/17/94    DWNSTATE REC GRN HAVN GEN    INTRANS SENT    03-0A-018
    10/17/94    10/17/94    DWNSTATE REC GRN HAVN GEN    INTRANS RECV    0F-02-224
    10/27/94    10/27/94    GRN HAVN GEN DWNSTATE GEN    INTRANS SENT    0F-02-224
    10/27/94    10/27/94    GRN HAVN GEN AUBURN DEPOT    INTRANS RECV    0D-08-011
    10/28/94    11/01/94    AUBURN DEPOT FEDERAL CUST    COURT TRIP      0D-08-011
    08/26/96    08/26/96    AUBURN DEPOT GRN HAVN GEN    INTRANS RECV    0H-33-40S
    09/11/96    09/11/96    GRN HAVN GEN DWNSTATE REC    INTRANS SENT    0H-33-40S
    09/11/96    09/11/96    GRN HAVN GEN DWNSTATE REC    INTRANS RECV    XN-OC-ELL
    09/11/96    09/11/96    DWNSTATE REC NEW YORK        COURT TRIP      XN-OC-ELL
    09/12/96    09/12/96                 DWNSTATE REC    OUTCOUNT RET    01-0F-001
    11/15/96    11/15/96    DWNSTATE REC GRN HAVN GEN    INTRANS SENT    02-0E-019
    11/15/96    11/15/96    DWNSTATE REC GRN HAVN GEN    INTRANS RECV    0E-33-41S
    01/14/97    01/14/97    GRN HAVN GEN DWNSTATE REC    INTRANS SENT    0E-52-71S
    01/14/97    01/14/97    GRN HAVN GEN DWNSTATE REC    INTRANS RECV    01-0G-006
    01/24/97    01/24/97    DWNSTATE REC NEW YORK        COURT TRIP      01-0G-006
    04/10/97    04/10/97                 DWNSTATE REC    OUTCOUNT RET    02-0E-034
    05/09/97    05/09/97    DWNSTATE REC GRN HAVN GEN    INTRANS SENT    02-0E-034
    05/09/97    05/09/97    DWNSTATE REC GRN HAVN GEN    INTRANS RECV    0G-33-41S
    09/27/00    09/27/00    GRN HAVN GEN EASTERN GEN     INTRANS SENT    0E-52-67S
    09/27/00    09/27/00    GRN HAVN GEN GRT MEAD GEN    INTRANS RECV    0F-01-01S
    12/29/00    12/29/00    GRN HAVN GEN GRT MEAD GEN    TRANSFER IN     0F-01-01S
    05/01/01    05/01/01    GRT MEAD GEN SHAWANGUNK      INTRANS SENT    0F-01-01S
    05/01/01    05/01/01    GRT MEAD GEN SHAWANGUNK      INTRANS RECV    SH-00-005
    05/04/01    05/04/01    SHAWANGUNK   GRT MEAD GEN    INTRANS SENT    SH-00-005
    05/04/01    05/04/01    SHAWANGUNK   GRT MEAD GEN    INTRANS RECV    0F-01-01S
    07/06/01    07/06/01    GRT MEAD GEN SHAWANGUNK      INTRANS SENT    0F-01-02S
    07/06/01    07/06/01    GRT MEAD GEN SHAWANGUNK      INTRANS RECV    SH-00-005
    07/11/01    07/11/01    SHAWANGUNK   GRT MEAD GEN    INTRANS SENT    SH-00-005
    07/11/01    07/11/01    SHAWANGUNK   GRT MEAD GEN    INTRANS RECV    0F-01-01S
    01/15/08    01/15/08    GRT MEAD GEN CLINTON GEN     INTRANS SENT    0F-01-12S
    01/15/08    01/15/08    GRT MEAD GEN CLINTON GEN     INTRANS RECV    SH-UU-013
    01/16/08    01/16/08    GRT MEAD GEN CLINTON GEN     TRANSFER IN     SH-UU-013
```

NOTE: THIS REPORT WAS RECONSTRUCTED USING HISTORICAL INMATE MOVEMENT DATA FROM
        COMPUTER RECORDS, AND IS ONLY AS ACCURATE AS IT WAS MAINTAINED BY THE
        FACILITY FOR THIS TIME PERIOD.

EXHIBIT

# 15

Ad-Seg Hearing Disposition

STATE OF NEW YORK  -  DEPARTMENT OF CORRECTIONAL SERVICES
UPSTATE CORRECTIONAL FACILITY

SUPERINTENDENT HEARING DISPOSITION RENDERED

DIN: 94A5258       NAME: WALKER, TYRONE       HEARING DATE: 06/11/14

A. STATEMENT OF EVIDENCE RELIED UPON:

1. Administrative segregation recommendation of Senior investigator Duncan which states that Inmate Walker was received by the Department of Corrections and Community Supervision on July 26, 1994 with a 47.5 years to life sentence from Kings County for attempted robbery $1^{st}$ and criminal possession of a weapon $2^{nd}$. Inmate Walker was also convicted in New York County of two counts of murder $2^{nd}$ and criminal possession of a weapon $2^{nd}$ and one count of attempted robbery $1^{st}$ one count of criminal possession of a weapon $2^{nd}$ and criminal possession of a weapon $3^{rd}$. Inmate Walker was also sentenced on July 22, 1996 to a federal sentence of life without the possibility of parole for a capital murder and other narcotics related charges.

On September 27, 2000 while in E7F yard at Green Haven Correctional Facility Inmate Walker without provocation violently attacked Deputy Superintendent of Security Schneider and Correction Officer Michetti, seriously injuring both staff members. During this incident Inmate Walker had armed himself with two homemade weapons one was a 10.5" by ¾" flat piece of metal sharpened on one end and a 6" long ice pick type weapon which were secured to each hand by leather thongs. The weapons were used to stab both staff members about the :ad, chest and back causing serious puncture wounds. While being admitted to the Special Housing Unit Inmate Walker punched Correction Officer Austin on the left side of the head. Inmate Walker received three misbehavior reports and sanctions including 99 Months and 639 days SHU, Loss of Packages, Commissary and Phones and 60 Months Recommended loss of good time, 35 Months 22 days SHU, Loss of Packages, Commissary and Phones 36 Months Recommended loss of good time and 12 Months SHU, Loss of Packages, Commissary and Phones and 12 Months Recommended loss of good time. In addition to the sanctions from the department on July 9, 2001 Inmate Walker pled guilty in Dutchess County Court to attempted murder $1^{st}$ and received 15 years to Life.

Inmate Walker has accumulated eight Tier 3 and 16 Tier 2 Misbehavior reports from September 30, 1996 until March 30, 2012. In addition to the numerous disciplinary sanctions within the Department a Confidential Letter written by the United States Attorney's Office to the Bureau of Prisons outlines Inmate Walker's history of violence before and during his federal trial and while housed in County Jail and State Corrections. This includes but is not limited to a history, of escape plots/attempts, attempts to hire a "hitman" to kill a government witness, assaulting a Deputy and attempting to take his keys, smuggling a razor blade to Federal Court as well as assaulting another inmate by stabbing him 18 times.

Furthermore as written in his own words Inmate Walker writes "On another note, my abilities is serious I .. 1 fight extremely well, I'm considered one of the most dangerous prisoners in the state because I don't play if I do something." Based on this statement Inmate Walker continues to be a threat to both staff and inmates.

Inmate Walker has shown a penchant for serious violence both in the correctional setting and in the community. His willingness to enact extreme violence on staff, the community and other inmates has proven his presence in general confinement of any correctional facility is an extreme risk to staff and inmates as well as the . safety, security and good order of the facility and it is recommended he be placed into Administrative Segregation.

2. Testimony of Senior Investigator Duncan stating that a review of Inmate Walker's institutional record and based on the nature of the attack on DSS Schneider and Officer Michetti Inmate Walker has been deemed a severe security risk to the safety of any facility and Superintendent Lavalley was not involved in the recommendation for administrative segregation.

3. Confidential testimony of Senior Investigator Duncan stating that confidential documents outline the nature of the conduct he was involved in including escape attempts and the arrangements to kill a witness.

4. Testimony of Inmate Walker stating that he is being treated like he was serving a disciplinary sanction and feels his administrative segregation is punitive in nature with document introduced at the hearing.

Walker v. Bellnier et al                                              OAG 000035
(17-CV-1008)

5. Confidential documents outlining that Inmate Walker attempted to hire a "hit man" to kill a government witness in the case who testified against them, Inmate Walker attempted to escape from state and county correctional facilities, Inmate Walker attempted to smuggle hand cuff keys in a state correctional facility, threatened witnesses with physical harm, Inmate Walker attempted to smuggle a razor blade to federal court, Inmate Walker assaulted an inmate at county jail stabbing him 18 times and Inmate Walker has committed cold-blooded execution style murders.

B. REASON FOR DETERMINATION: Substantial evidence shows that Inmate Walker executed a savage assault on staff while housed within a correctional facility which included the stabbing of staff with weapons secured to his hands inflicting severe injuries, and has had numerous institutional violations over the years of his incarceration in addition to his conduct while housed in federal custody which demonstrate a grave risk to the institutional safety and safety of both inmates and staff alike.  Administrative segregation is being imposed to prevent any further assaultive behavior toward staff and inmates, and to insulate staff and inmates alike from this sort of brutal attack and to ensure the safety and good order of any correctional facility Inmate Walker may be housed in.


I HAVE RECEIVED A COPY OF THIS HEARING DISPOSITION DATED: *06/11/14*

_Eric Gutwein_ CHO  , _Unable to sign_  , _06/11/14_  _2:45 PM_
HEARING OFFICER SIGNATURE          INMATE SIGNATURE              DATE & TIME RECIEVED

YOU ARE HEREBY NOTIFIED OF THE FOLLOWING APPEAL PROCEDURES:

__X__   FOR TIER III HEARING-APPEAL TO COMMISSIONER WITHIN 30 DAYS.

# EXHIBIT

# # 16

DSS Admissions # 15

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

TYRONE WALKER,

<div align="center"><em>Plaintiff,</em></div>

-against-

JOSEPH BELLNIER; JAMES A. O'GORMAN; DONALD
UHLER; PAUL P. WOODRUFF; JOANNE FITCHETTE;
MELISSA A. COOK,

<div align="center"><em>Defendants.</em></div>

_____

<div align="right">

**FURTHER RESPONSE
BY WOODRUFF TO
PLAINTIFF'S REQUEST
FOR ADMISSIONS**

17-CV-1008

GTS/CFH

</div>

The Defendant, Paul Woodruff, by his attorney, Letitia James, Attorney General of the

State of New York, AAG Lynn M. Knapp, of Counsel, further responds to Plaintiff's request for

admissions dated September 18, 2019 as follows:

1.      The Plaintiff has received time-cuts when he was serving disciplinary time before

he was placed in Administrative Segregation Status.

   **Response:      I do not know of inmate Walker receiving any time cuts, so I am

unable to admit or deny.**

3.      The Plaintiff was never issued a misbehavior report and deprivation order for a cell

shield while he existed in S.H.U. the last 18 years.

   **Response:      Deny.**

15.      The Plaintiff has personally expressed his gratitude to you for all the times you've

righted a wrong he was subjected to and in instance where you extended towards him like when

you let him send out his property on the visit and the property could have been disposed of because the Plaintiff didn't send it out in a timely fashion.

**Response:** **Admit only that Plaintiff has expressed gratitude to me on certain past occasions.**

DATED:     Albany, New York State
           June 18, 2020

                              LETITIA JAMES
                              Attorney General of the State of New York
                              The Capitol
                              Albany, New York 12224-0341
                              By: *Lynn M. Knapp*
                              Lynn M. Knapp
                              Assistant Attorney General, of Counsel
                              Bar Roll No. 507430
                              Telephone: 518-776-2598
                              Email: Lynn.KnappBlake@ag.ny.gov

TO:    Tyrone Walker, 94 A 5258
       *Plaintiff pro se*
       Upstate Correctional Facility
       PO Box 2001
       Malone, NY 12953

2

# EXHIBIT

# # 17

DSS Admissions # 1a, 4, 13, 26, 27

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

TYRONE WALKER,

*Plaintiff,*

-against-

JOSEPH BELLNIER; JAMES A. O'GORMAN; DONALD
UHLER; PAUL P. WOODRUFF; JOANNE FITCHETTE;
MELISSA A. COOK,

*Defendants.*

**ADDITIONAL
RESPONSE TO NOTICE
TO ADMIT**

17-CV-1008

---

The Defendant, P. Woodruff, by his attorney, Letitia James, Attorney General of the State of New York, respond to plaintiff's request for admissions, dated July 3, 2019, as follows:

1.      Each of the following documents, attached to this request is genuine: and true:

a.      The Plaintiff's Admissions and Your (P. Woodruff) September, 20, 2017 response are true copies of Plaintiff's Admissions and your response, attached as Exhibit 1.

**Response**: Admit, to the best of my knowledge.

b.      The Plaintiff's Medical records in his complaint exhibit 10 are true copies of Plaintiff's medical records in Plaintiff's medical records.

**Response:** Admit, to the best of my knowledge.

c.      The Plaintiff's copy of your memorandum dated 4-20-17 in my complaint in Exhibit 4 is a true copy of your memorandum.

**Response:** Admit, to the best of my knowledge.

4.      The Plaintiff has never been on a retraint order at Upstate Correctional Facility in over 5 years.

**Response:**   Admit that during the four years that I have been at Upstate Correctional Facility ("Upstate"), plaintiff has not been on a restraint order.

13.     The Plaintiff is locking in a cell with plexiglas over the cell bars and the Plaintiff is not under a deprivation order.

**Response:**  Admit. All cells in Upstate have plexi-glass over the cell bars.

14.     The directive 4933 in 2016 and the revised version in 2017 do not contain language that's different in respect to Ad-Seg inmates treatment in S.H.U.

**Response:**  Refer to the Directives as the best evidence of their content.

15.     The Defendants are required to adhere to Directive 4933 when they deal with Ad-Seg inmates.

**Response:**  Refer to the Directive as the best evidence of its contents.

19.     The Directive 4933 permits for inmates in SHU for disciplinary reasons to receive time cuts.

**Response:**  Refer to the Directive as the best evidence of its content.

20.     Ad-Seg inmates do not receive time cuts.

**Response:** Admit.

21.     The Directive 4933 setforth minimum conditions of confinement for inmates admitted to S.H.U.

**Response:**  Refer to the Directive as the best evidence of its content.

2

22.    The Directive 4933 allow inmates to receive minimum 3 showers a week for 5 minutes, but at Upstate Correctional Facility the Plaintiff is afforded at least 4 showers a week for at least 10 minutes at a time, while he exist on level 3 status.

**Response:** Refer to the Directive as the best evidence of its content.

26.    The cell door plexiglas can be opened if it's unlocked.

**Response:** Admit. Notwithstanding said admission, pursuant to Directive 4933, no cell door plexi-glass is left unlocked on any inmates cell door at Upstate.

27.    The plexiglas is removable so it's not part of the cell door.

**Response:** Admit. Notwithstanding said admission, refer to Directive 4933.

32.    The Plaintiff has never requested for a transfer from Upstate Correctional Facility.

**Response:** Admit. Notwithstanding said admission, plaintiff has never personally asked me to be transferred from Upstate. Additionally, this is outside my scope of authority.

33.    The Plaintiff has acquired 1 misbehavior report that was a tier II in a period of over 5 years.

**Response:** Admit.

35.    The Directive 4933 do not forbid Plaintiff from being able to receive privileges that disciplinary inmates don't have.

**Response:** Refer to the Directive as the best evidence of its content.

36.    The Plaintiff currently receive privileges as an Ad-Seg inmate, that's not afford to disciplinary inmates.

**Response:** Admit. Notwithstanding said admission, a counselor takes plaintiff out of his cell for phone calls.

3

42.    You have a personal responsibility to uphold the state and federal constitution of your land.

**Response:** Admit that I carry out my duties at Upstate in a responsible and lawful manner.

53.    You have told the Plaintiff, there is nothing he can say or do that will have you recommend Plaintiff be released from Ad-Seg.

**Response:** Deny.

56.    The Plaintiff is respectful and never yelled or raised his voice in a conversation with you.

**Response:** Deny.

58.    The Plaintiff has completed the ART Program with satisfactory evaluations and grade.

**Response:** Deny.

77.    There is a security list the Plaintiff is on inwhich he exist in the top 5, in terms of a threat to security, and inmates.

**Response:** Deny.

78.    At upstate correctional facility the Plaintiff is treated like any other inmate.

**Response:** Admit.

79.    In Directive 4933 on the first page it states sections I-III only appear in this directive.

**Response:** Refer to the Directive as the best evidence of its content.

4

80.    Sections I-III in directive 4933 are not a part of the directive and was not filed with

the secretary of state.

**Response:** Deny knowledge or information with which to respond.

90.    The Plaintiff is not able to participate in Jumuah (Friday sermon) service while in

S.H.U.

**Response:** Admit. Notwithstanding said admission, this is pursuant to Directive

4933.

DATED:    Albany, New York
          January 10, 202

                         LETITIA JAMES
                         Attorney General of the State of New York
                         Attorney for Defendant P. Woodruff
                         The Capitol
                         Albany, New York 12224-0341
                         By: *s/ Lynn M. Knapp*
                         Lynn M. Knapp
                         Assistant Attorney General, of Counsel
                         Bar Roll No. 507430
                         Telephone: 518-776-2598
                         Email: Lynn.KnappBlake@ag.ny.gov

TO:    Tyrone Walker, 94-A-5258
       *Plaintiff pro se*
       Upstate Correctional Facility
       309 Bare Hill Road
       Malone, NY 12953

5

EXHIBIT

# 18

Ad-Seg Reviews

Form 2170 (07/17)
Photocopy Locally
as Needed

Ref 7 NYCRR
.301.4(d)

STATE OF NEW YORK - DEPARTMENT OF CORRECTIONAL SERVICES

## ADMINISTRATIVE SEGREGATION REVIEW
## UPSTATE CORRECTIONAL FACILITY

| Directed Central Office Review? | |
|---|---|
| ☑ | Yes |
| ☐ | No |

NAME:  **WALKER, TYRONE**        DIN:   **94A5258**        REVIEW DATE:   **4/21/20**

Date placed in administrative segregation: 1/17/2014          Date hearing held:  2/26/2014

### A.  Summary report of the facility three-member committee:

**Reasons why inmate was initially determined to be appropriate for administrative segregation:**

On September 22, 2000 while in E and F yard at Green Haven Correctional Facility, inmate Walker, without provocation, violently attacked Deputy Superintendent of Security Schneider and Corrections Officer Mitchetti, seriously injuring both staff members. Inmate Walker had armed himself with two homemade weapons described as one flat piece of metal; 10 ½" x ¾" and sharpened at one end and one ice pick type weapon 6" long. Both weapons were secured to each hand by leather thongs. He used these weapons to stab both staff members about the head, chest and back causing serious puncture wounds. Walker subsequently received a Tier 3 Misbehavior Report and extensive sanctions. In addition to the Departmental sanctions, on July 9, 2001 inmate Walker pled guilty in Dutchess County Court to attempted Murder 1st, receiving a sentence of 15 years to life to be served consecutively.

**Information on the inmate's subsequent behavior and attitude:**

On 04/06/20, this writer met with Inmate Walker to discuss his Administrative Segregation placement. Inmate Walker acted appropriately during the interview. He reported no changes, and when asked if he had a statement, he said wanted to reiterate was that he is a good guy. He continues to participate in Cell Study even though he received his High School Diploma in 1987. His last visit was on 02/01/20 with Karen Spencer, Nathaniel Walker and Keisha Walker, all of whom are listed as siblings. An Administrative Segregation phone call was completed on 4/1/20 with his brother, Nathaniel Walker . He has been making daily phone calls from his tablet to family and friends. Inmate Walker has not received a Misbehavior Report since 6/1/17.

**Other factors which may favor retaining the inmate in or releasing the inmate from administrative segregation:**

Walker's past is marked with assaults and brutality showing an indifference to human life. Walker entered DOCS custody on July 26, 1994 to serve a 47 ½ year to life sentence from Kings County for Attempted Robbery 1st and Criminal Possession of Weapon 2nd two counts of Murder 2nd and one count each of Attempted Robbery 1st, Criminal Possession of a Weapon 2nd and Criminal Possession of Weapon 3rd. Walker was also sentenced on July 22, 1996 to life in federal prison without the possibility of parole for a capital murder offense and on narcotic related charges. During Walker's Federal trial, while housed in county jail, he plotted to escape and attempted to hire a "hit man" to kill a government witness, assaulted a Deputy and attempted to take his keys. He also smuggled a razor blade to Federal Court and assaulted another inmate by stabbing him 18 times.

Inmate Walker has demonstrated a propensity for assaultive and dangerous behavior during his incarceration and in his criminal history. Walker's ability to enact extreme violence on staff and other inmates has shown that his placement in Administrative Segregation is appropriate and greatly reduces the risk his behavior presents to staff and inmates, as well as the safety and security of the facility.

_____   _____   _____   _____
Offender Rehabilitation Coordinator   Security Supervisor   Committee Chairman   4-9-20
                                                                                 Date

**If Central Office review has not been directed, skip to C, below, for Superintendent's decision.**

B.  Summary report and recommendation of the Central Office three-member committee: ___ ___ ___ ___

___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___

_____   _____   _____   _____
Staff - Inspector General   Staff - Counsel   Chairman - Facility Operations   4/21/2020
                                                                               Date

C.  **Decision of the (Superintendent) (Deputy Commissioner for Correctional Facilities):**
      Release from administrative segregation.   A determination has been made to continue your administrative segregation for
the following reasons: _I concur with the above recommendation to continue your_
_Administrative Segregation status for the safety of all staff and_
_Offender population and the safety and security of the facility._

_____

Prior to your next review, which is scheduled for _____, you may write to the Superintendent or designee
to make a statement regarding the need for continued administrative segregation.  The reason(s) stated in this notice, any
written statement that you submit, as well as your overall custodial adjustment will be considered during the next
scheduled review.

_____   A/C OSU  D/C Olcoman   04/30/20
(Superintendent) (Deputy Commissioner for Correctional Facilities)   Date

Attach inmate's statement(s) and additional pages as necessary

**Administrative Segregation Summary Report and Recommendation
of the Central Office Three-Member Committee
for inmate Tyrone Walker (94-A-5258)**

**Review Date:  April 21, 2020**

Inmate Tyrone Walker, 94-A-5258, continues to serve an aggregate sentence of 47½ years to Life for Murder in the 2nd Degree (2 counts), Attempted Murder in the 1st Degree, Attempted Robbery in the 1st Degree, Robbery in the 1st Degree, Criminal Possession of a Weapon in the 2nd Degree and Criminal Possession of a Weapon in the 3rd Degree (VFO).

Prior to DOCCS' custody in 1994, Inmate Walker had been adjudicated a youthful offender for Attempted Criminal Possession of Stolen Property.  In February 1993, inmate Walker was arrested for violent crimes he had committed in both Kings and New York Counties, where, during one of these incidents, he shot and killed a person.

In 1996, a federal court sentenced him to life without parole for capital murder.  During his Federal trial, he plotted to escape and attempted to hire someone to murder a government witness.  He also assaulted a deputy in an escape attempt and separately assaulted another inmate by stabbing him 18 times using a razor blade he had smuggled into Court.

In September 2000, while confined at the Green Haven Correctional Facility, inmate Walker brutally attacked, stabbed and injured a Deputy Superintendent and a Correction Officer with sharp weapons attached to each of his wrists.  One weapon was six inches and the other ten inches in length.  He stabbed each victim multiple times, and each sustained serious injuries.  Apart from the administrative disciplinary sanction imposed for this behavior, inmate Walker's vicious assault resulted in a conviction for Attempted Murder in the 1st Degree in Dutchess County, New York.  He received an indeterminate sentence of 15 years to Life in prison.  His sentences are to be served consecutively.

Inmate Walker was placed in Administrative Segregation in January 2014 after completing his disciplinary confinement.  He has incurred nearly 30 misbehavior reports for such infractions as Possession of a Weapon, Drugs, Smuggling, Demonstration, Assault on Staff, Making Threats, Harassment, and Possession of an Altered Item. His most recent disciplinary matters include interference, harassment and direct order in June, 2017 and, in March 2014, having a weapon, bribery/extortion, having property in an unauthorized location and possessing an altered item.

Inmate Walker maintains good personal hygiene, his cell is acceptable and his interactions with staff appropriate.   He is a PIMS Level III and utilizes his privileges.  His last visit was on February 1, 2020 with his siblings and he has been making daily phone calls from his tablet to family and friends.

He continues to participate in Cell Study and has been enrolled in that program since January 30, 2018 (even though he received his High School diploma in 1987).

Inmate Walker continues to be seen on daily rounds and neither OMH nor medical staff report any issues.

Inmate Walker has demonstrated a propensity for extreme assaultive and explosive violent behavior which can manifest itself without warning or provocation. Although his placement in administrative segregation has significantly reduced the risk of such conduct from occurring, the Committee recognizes and encourages inmate Walker's positive behavior and continued participation in Cell Study. Such factors will be considered by the Committee in deciding whether a less restrictive environment may be appropriate in the future for inmate Walker. For now, however, the recommendation of the Committee is that inmate Walker remain in administrative segregation at this time.

Form 2170 (07/17)
Photocopy Locally
as Needed

Ref: 7 NYCRR
301.4(d)

STATE OF NEW YORK - DEPARTMENT OF CORRECTIONAL SERVICES

**ADMINISTRATIVE SEGREGATION REVIEW**
**UPSTATE** CORRECTIONAL FACILITY

| Directed Central Office Review? | |
|---|---|
| ☒ | Yes |
| ☐ | No |

NAME:  **WALKER, TYRONE**      DIN:   **94A5258**      REVIEW DATE:   **05/19/20**

Date placed in administrative segregation: 1/17/2014      Date hearing held:  2/26/2014

**A. Summary report of the facility three-member committee:**

<u>Reasons why inmate was initially determined to be appropriate for administrative segregation:</u>
On September 22, 2000 while in E and F yard at Green Haven Correctional Facility, Inmate Walker, without provocation, violently attacked Deputy Superintendent of Security Schneider and Corrections Officer Mitchetti, seriously injuring both staff members. Inmate Walker had armed himself with two homemade weapons described as one flat piece of metal; 10 ½" x ¾" and sharpened at one end and one ice pick type weapon 6" long. Both weapons were secured to each hand by leather thongs. He used these weapons to stab both staff members about the head, chest and back causing serious puncture wounds. Walker subsequently received a Tier 3 Misbehavior Report and extensive sanctions. In addition to the Departmental sanctions, on July 9, 2001 inmate Walker pled guilty in Dutchess County Court to attempted Murder 1st, receiving a sentence of 15 years to life to be served consecutively.

<u>Information on the inmate's subsequent behavior and attitude:</u>

On 05/11/20, this writer met with Inmate Walker to discuss his Administrative Segregation placement. Inmate Walker acted appropriately during the interview. He reported no changes, and when asked if he had a statement, he said wanted to reiterate that he is a great guy. He continues to participate in Cell Study even though he received his High School Diploma in 1987. His last visit was on 02/01/20 with Karen Spencer, Nathaniel Walker and Keisha Walker, all of whom are listed as siblings. An Administrative Segregation phone call was not completed as scheduled on 4/1/20 as his brother, Nathaniel Walker, did not call the facility. He has been making daily phone calls from his tablet to family and friends. Inmate Walker has not received a Misbehavior Report since 6/1/17.

<u>Other factors which may favor retaining the inmate in or releasing the inmate from administrative segregation:</u>
Walker's past is marked with assaults and brutality showing an indifference to human life. Walker entered DOCS custody on July 26, 1994 to serve a 47 ½ year to life sentence from Kings County for Attempted Robbery 1st and Criminal Possession of Weapon 2nd two counts of Murder 2nd and one count each of Attempted Robbery 1st, Criminal Possession of a Weapon 2nd and Criminal Possession of Weapon 3rd. Walker was also sentenced on July 22, 1996 to life in federal prison without the possibility of parole for a capital murder offense and on narcotic related charges. During Walker's Federal trial, while housed in county jail, he plotted to escape and attempted to hire a "hit man" to kill a government witness, assaulted a Deputy and attempted to take his keys. He also smuggled a razor blade to Federal Court and assaulted another inmate by stabbing him 18 times.

Inmate Walker has demonstrated a propensity for assaultive and dangerous behavior during his incarceration and in his criminal history. Walker's ability to enact extreme violence on staff and other inmates has shown that his placement in Administrative Segregation is appropriate and greatly reduces the risk his behavior presents to staff and inmates, as well as the safety and security of the facility.

**Administrative Segregation Summary Report and Recommendation
of the Central Office Three-Member Committee
for Inmate Tyrone Walker (94-A-5258)**

**Review Date: May 19, 2020**

Inmate Tyrone Walker, 94-A-5258, continues to serve an aggregate sentence of 47½ years to Life for Murder in the 2nd Degree (2 counts), Attempted Murder in the 1st Degree, Attempted Robbery in the 1st Degree, Robbery in the 1st Degree, Criminal Possession of a Weapon in the 2nd Degree and Criminal Possession of a Weapon in the 3rd Degree (VFO).

Prior to DOCCS' custody in 1994, Inmate Walker had been adjudicated a youthful offender for Attempted Criminal Possession of Stolen Property. In February 1993, inmate Walker was arrested for violent crimes he had committed in both Kings and New York Counties, where, during one of these incidents, he shot and killed a person.

In 1996, a federal court sentenced him to life without parole for capital murder. During his Federal trial, he plotted to escape and attempted to hire someone to murder a government witness. He also assaulted a deputy in an escape attempt and separately assaulted another inmate by stabbing him 18 times using a razor blade he had smuggled into Court.

In September 2000, while confined at the Green Haven Correctional Facility, inmate Walker brutally attacked, stabbed and injured a Deputy Superintendent and a Correction Officer with sharp weapons attached to each of his wrists. One weapon was six inches and the other ten inches in length. He stabbed each victim multiple times, and each sustained serious injuries. Apart from the administrative disciplinary sanction imposed for this behavior, inmate Walker's vicious assault resulted in a conviction for Attempted Murder in the 1st Degree in Dutchess County, New York. He received an indeterminate sentence of 15 years to Life in prison. His sentences are to be served consecutively.

Inmate Walker was placed in Administrative Segregation in January 2014 after completing his disciplinary confinement. He has incurred nearly 30 misbehavior reports for such infractions as Possession of a Weapon, Drugs, Smuggling, Demonstration, Assault on Staff, Making Threats, Harassment, and Possession of an Altered Item. His most recent disciplinary matters include interference, harassment and direct order in June, 2017 and, in March 2014, having a weapon, bribery/extortion, having property in an unauthorized location and possessing an altered item.

Inmate Walker is seen regularly on rounds. He interacts regularly with Executive and line staff. He continues to maintain good personal hygiene and his cell remains appropriate. Neither medical nor OMH have expressed any concerns during the current review period.

He is a PIMS Level III and utilizes his privileges including rec, phone calls, tablet, showers and commissary. He is taking advantage of some additional privileges within the PIMS system that has been offered by the facility. Due to the COVID pandemic no visits are

allowed to correctional facilities at this time but he has had visitors in the recent past and is using the tablet to make daily phone calls.

The Committee agrees with the facility that inmate Walker's current placement remains appropriate; however, the Committee continues to recognize and encourages inmate Walker's positive behavior and continued participation in Cell Study. These will be factors in making a future determination if transitioning to a less restrictive environment is appropriate for Inmate Walker.

_[signature]_     _[signature]_     _[signature]_     _5-11-20_

Offender Rehabilitation Coordinator    Security Supervisor    Committee Chairman    Date

**If Central Office review has not been directed, skip to C, below, for Superintendent's decision.**

B.  Summary report and recommendation of the Central Office three-member committee: _____

_____

_____

_[signature]_     _[signature]_     _5/19/2020_

Staff - Inspector General     Staff - Counsel     Chairman - Facility Operations     Date

C.  Decision of the (Superintendent) (Deputy Commissioner for Correctional Facilities):

     Release from administrative segregation.   A determination has been made to continue your administrative segregation for the following reasons: _I concur with the above recommendation to continue your Administrative Segregation status for safety of all staff for the safety of the offender population, and the safety and security of the facility._

_____

Prior to your next review, which is scheduled for _____, you may write to the Superintendent or designee to make a statement regarding the need for continued administrative segregation.  The reason(s) stated in this notice, any written statement that you submit, as well as your overall custodial adjustment will be considered during the next scheduled review.

_[signature]_ Assistant Commissioner, OBO The Glenn     _06/02/2020_

(Superintendent) (Deputy Commissioner for Correctional Facilities     Date

Attach inmate's statement(s) and additional pages as necessary

form 2173 (02/17)
Photocopy Locally
No Number

Ref. 7 NYCRR
311.4(b)

STATE OF NEW YORK - DEPARTMENT OF CORRECTIONAL SERVICES

**ADMINISTRATIVE SEGREGATION REVIEW**
**UPSTATE** CORRECTIONAL FACILITY

| Directed Central Office Review? | |
|---|---|
| ☑ | Yes |
| ☐ | No |

NAME:  **WALKER, TYRONE**          DIN:   **94A5258**          REVIEW DATE:   **6/16/20**

Date placed in administrative segregation: 1/17/2014                 Date hearing held:   2/26/2014

**A.  Summary report of the facility three-member committee:**

**Reasons why inmate was initially determined to be appropriate for administrative segregation:**
On September 22, 2000 while in E and F yard at Green Haven Correctional Facility, inmate Walker, without provocation, violently attacked Deputy Superintendent of Security Schneider and Corrections Officer Mitchetti, seriously injuring both staff members.  Inmate Walker had armed himself with two homemade weapons described as one flat piece of metal; 10 ½" x ¾" and sharpened at one end and one ice pick type weapon 6" long.  Both weapons were secured to each hand by leather thongs.  He used these weapons to stab both staff members about the head, chest and back causing serious puncture wounds.  Walker subsequently received a Tier 3 Misbehavior Report and extensive sanctions.  In addition to the Departmental sanctions, on July 9, 2001 inmate Walker pled guilty in Dutchess County Court to attempted Murder 1st, receiving a sentence of 15 years to life to be served consecutively.

**Information on the inmate's subsequent behavior and attitude:**

On 06/11/20, this writer met with Inmate Walker to discuss his Administrative Segregation placement.  Inmate Walker acted appropriately during the interview.  He reported no changes, and when asked if he had a statement, he said wanted to reiterate that he is a "great guy".  He continues to participate in Cell Study even though he received his High School Diploma in 1987.  His last visit was on 02/01/20 with Karen Spencer, Nathaniel Walker and Keisha Walker, all of whom are listed as siblings.  Inmate Walker has chosen to forego his Administration Segregation phone calls due to his ability to make calls daily with his tablet.  Inmate Walker has not received a Misbehavior Report since 6/1/17.

**Other factors which may favor retaining the inmate in or releasing the inmate from administrative segregation:**
Walker's past is marked with assaults and brutality showing an indifference to human life.  Walker entered DOCS custody on July 26, 1994 to serve a 47 ½ year to life sentence from Kings County for Attempted Robbery 1st and Criminal Possession of Weapon 2nd two counts of Murder 2nd and one count each of Attempted Robbery 1st, Criminal Possession of a Weapon 2nd and Criminal Possession of Weapon 3rd.  Walker was also sentenced on July 22, 1996 to life in federal prison without the possibility of parole for a capital murder offense and on narcotic related charges.  During Walker's Federal trial, while housed in county jail, he plotted to escape and attempted to hire a "hit man" to kill a government witness, assaulted a Deputy and attempted to take his keys.  He also smuggled a razor blade to Federal Court and assaulted another inmate by stabbing him 18 times.

Inmate Walker has demonstrated a propensity for assaultive and dangerous behavior during his incarceration and in his criminal history.  Walker's ability to enact extreme violence on staff and other inmates has shown that his placement in Administrative Segregation is appropriate and greatly reduces the risk his behavior presents to staff and inmates, as well as the safety and security of the facility.

_____     _____     _____   6/15/20
Offender Rehabilitation Coordinator          Security Supervisor                    Committee Chairman                Date

Administrative Segregation
Summary Report and Recommendation
April 21, 2020

Segregation is appropriate, remaining positively engaged in opportunities offered to him by the facility will weigh in any future decisions regarding his placement.

2

**If Central Office review has not been directed, skip to C, below, for Superintendent's decision.**

B.  Summary report and recommendation of the Central Office three-member committee: _____ _____ _____
_____ _____ _____ _____ _____ ____ ____
_____ _____ _____ _____ _____ ____ ____

_____            _____            _____       ___6/16/2020___
Staff - Inspector General        Staff - Counsel         Chairman - Facility Operations      Date

C. **Decision of the (Superintendent) (Deputy Commissioner for Correctional Facilities):**
Release from administrative segregation.  ✔ A determination has been made to continue your administrative segregation for
the following reasons: *I concur with the above recommendation to continue your*
*Administrative Segregation status for the safety of all staff for the*
*safety of the offender population and for the safety and security of the*
*facility*

Prior to your next review, which is scheduled for _____ ____ _____, you may write to the Superintendent or designee
to make a statement regarding the need for continued administrative segregation.  The reason(s) stated in this notice, any
written statement that you submit, as well as your overall custodial adjustment will be considered during the next
scheduled review.

_____  660 Dic O'Gorman _____        06/23/2020
(Superintendent) (Deputy Commissioner for Correctional Facilities                Date

Attach inmate's statement(s) and additional pages as necessary

### Administrative Segregation Summary Report and Recommendation
### of the Central Office Three-Member Committee
### for inmate Tyrone Walker (94-A-5258)

#### Review Date: June 16, 2020

Inmate Tyrone Walker, 94-A-5258, continues to serve an aggregate sentence of 47½ years to Life for Murder in the 2nd Degree (2 counts), Attempted Murder in the 1st Degree, Attempted Robbery in the 1st Degree, Robbery in the 1st Degree, Criminal Possession of a Weapon in the 2nd Degree and Criminal Possession of a Weapon in the 3rd Degree (VFO).

Prior to DOCCS' custody in 1994, Inmate Walker had been adjudicated a youthful offender for Attempted Criminal Possession of Stolen Property. In February 1993, inmate Walker was arrested for violent crimes he had committed in both Kings and New York Counties, where, during one of these incidents, he shot and killed a person.

In 1996, a federal court sentenced him to life without parole for capital murder. During his Federal trial, he plotted to escape and attempted to hire someone to murder a government witness. He also assaulted a deputy in an escape attempt and separately assaulted another inmate by stabbing him 18 times using a razor blade he had smuggled into Court.

In September 2000, while confined at the Green Haven Correctional Facility, inmate Walker brutally attacked, stabbed and injured a Deputy Superintendent and a Correction Officer with sharp weapons attached to each of his wrists. One weapon was six inches and the other ten inches in length. He stabbed each victim multiple times, and each sustained serious injuries. Apart from the administrative disciplinary sanction imposed for this behavior, inmate Walker's vicious assault resulted in a conviction for Attempted Murder in the 1st Degree in Dutchess County, New York. He received an indeterminate sentence of 15 years to Life in prison. His sentences are to be served consecutively.

Inmate Walker was placed in Administrative Segregation in January 2014 after completing his disciplinary confinement. He has incurred nearly 30 misbehavior reports for such infractions as Possession of a Weapon, Drugs, Smuggling, Demonstration, Assault on Staff, Making Threats, Harassment, and Possession of an Altered Item. His most recent disciplinary matters include interference, harassment and direct order in June 2017 and, in March 2014, having a weapon, bribery/extortion, having property in an unauthorized location and possessing an altered item.

Inmate Walker is seen regularly on rounds. As is consistent for him, he regularly engages in conversation with executive and line staff. His personal and cell maintenance are appropriate and neither medical nor OMH have raised any concerns during the current reporting period. He continues to utilize his PIMS allowances.

Inmate Walker should maintain the positive behavior that he has been exhibiting. His participation in programming prior to COVID should be continued once programming recommences. While the Committee feels his current placement in Administrative