**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

―――――――――――――――――――――――――

TYRONE WALKER,

                              Plaintiff,

        v.

BELLNIER, et al.,

                        Defendants.

No. 9:17-CV-1008
(GTS/CFH)

―――――――――――――――――――――――――

**APPEARANCES:**                    **OF COUNSEL:**

Tyrone Walker
94-A-5258
Upstate Correctional Facility
P.O. Box 2001
Malone, New York 12953
Plaintiff pro se

Attorney General for the             LYNN MARIE KNAPP, ESQ.
State of New York                    Assistant Attorney General
The Capitol
Albany, New York 12224
Attorney for Defendants

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER[1]

Plaintiff pro se Tyrone Walker ("plaintiff"), who was, at all relevant times, in the

custody of the New York State Department of Corrections and Community Supervision

("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983, alleging that defendants

Joseph Bellnier ("Bellnier"), former Deputy Commissioner for Correctional Facilities for

―――――――――――――――――――――――――

[1] This matter was referred to the undersigned for Report-Recommendation and Order pursuant to 28
U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

DOCCS; James A. O'Gorman ("O'Gorman"), current Deputy Commissioner for Correctional Facilities for DOCCS; Donald Ulher ("Uhler"), Superintendent of Upstate Correctional Facility ("Upstate CF"); Paul P. Woodruff ("Woodruff"), Deputy Superintendent of Security at Upstate CF; Joanne Fitchette ("Fitchette"), Deputy Superintendent of Programs at Upstate CF; and Melissa A. Cook ("Cook"), Offender Rehabilitation Coordinator at Upstate CF, violated his constitutional rights under the Fourteenth Amendment.  See Dkt. No. 31 ("SAC").  Presently pending before the Court are plaintiff's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."), see Dkt. No. 79, and defendants' cross motion for summary judgment.  See Dkt. No. 86.  Defendants also opposed plaintiff's motion.  See id.  Plaintiff filed a response to defendants' cross motion.  See Dkt. No. 100.  For the reasons that follow, it is recommended that plaintiff's motion be denied in its entirety, defendants' motion be granted in its entirety, and plaintiff's complaint be dismissed with prejudice.

### I. Background

### A. Relevant Regulatory Background

"Administrative segregation admission results from a determination by the facility that the inmate['s] presence in general population would pose a threat to the safety and security of the facility."  N.Y. COMP. CODES R. & REGS. tit. 7, § 301.4(b).  Section 301.4(d) provides that "[a]n inmate in administrative segregation status shall have such status reviewed every 60 days."  However, the parties agree that, in April 2017, 7 N.Y. C.R.R. § 301.4(d) was amended, as demonstrated in DOCCS Directive No. 4933, to

require that such reviews "shall" occur "every seven days for the first two months and at least every 30 days thereafter."  DOCCS Directive No. 4933 (Apr. 18, 2017), available at https://doccs.ny.gov/system/files/documents/2020/11/4933.pdf (last accessed Nov. 21, 2020).  O'Gorman further explained that, "[u]ntil July 2017, the reviews took place every 60 days.  Since then, the reviews take place every 30 days."  Dkt. No. 90 at 4 ¶ 20.  The regulations provide the procedure for conducting Ad-Seg review as follows:

> (1) A three-member committee consisting of a representative of the facility executive staff, a security supervisor, and a member of the guidance and counseling staff shall examine the inmate's institutional record and prepare and submit to the superintendent or designee a report setting forth the following:
> (i) reasons why the inmate was initially determined to be appropriate for administrative segregation;
> (ii) information on the inmate's subsequent behavior and attitude; and
> (iii) any other factors that they believe may favor retaining the inmate in or releasing the inmate from administrative segregation.

N.Y. Comp. Codes R. & Regs. tit. 7, § 301.4(d)(1)(i)-(iii).

"Upon receipt of the report and any written statement from the inmate, the superintendent shall . . . make a determination to retain or release the inmate."  N.Y. Comp. Codes R. & Regs. tit. 7, § 301.4(d)(2).  In cases, such as plaintiff's, where the Deputy Commissioner for Correctional Facilities has notified the superintendent that the subject inmate shall receive Central Office review, the superintendent will refer the report and inmate statement to a three-member Central Office committee.  See id. at § 301(d)(3).  The committee completes a review and forwards the paperwork, along with its recommendation, to the Deputy Commissioner for Correctional Facilities, who "shall make the determination to retain the inmate in or release the inmate from [Ad-Seg]."  Id.

3

> [W]henever a determination is made to continue the inmate in administrative segregation, the superintendent or, as applicable, the deputy commissioner for correctional facilities, shall provide a notice to the inmate that states the reason(s) for the determination and includes the following statement:
>
> "A determination has been made to continue your administrative segregation status for the reason(s) stated in this notice. Prior to your next . . . review, you may write to the superintendent or designee to make a statement regarding the need for continued administrative segregation. The reason(s) stated in this notice, any written statement that you submit, as well as your overall custodial adjustment will be considered during the next scheduled review."

Id. at § 301.4(d)(4).

## B. Relevant Facts

Plaintiff is an inmate currently incarcerated at Upstate CF, housed in the facility's Special Housing Unit ("SHU") on Administrative Segregation ("Ad-Seg") status. See SAC at 1. Plaintiff has been in DOCCS' custody since 1994, serving a sentence of 47½ years to life for a conviction in New York State court for first degree attempted robbery, second degree criminal possession of a weapon, and two counts of murder in the second degree. See Dkt. No. 90 at 4-5 ¶ 26. In 1996, plaintiff was convicted in federal court for capital murder and narcotic related offenses and received a life sentence without the possibility of parole. See id. at 5 ¶ 27. While plaintiff was in custody in county jail awaiting his federal trial, he plotted an escape, smuggled a razor blade into court, attempted to hire a hit man to kill witnesses, assaulted a deputy in an attempt to steal his keys, and assaulted another inmate by stabling him 18 times. See Dkt. No. 90-5 at 257. On September 27, 2000, while in DOCCS' custody at Green Haven

4

Correctional Facility ("Green Haven CF"), plaintiff attacked and stabbed the Deputy

Superintendent of Security ("DSS") and a correction officer with homemade weapons

that were secured to his hands with leather thongs, causing serious personal injuries to

both individuals.  See Dkt. No. 90 at 5 ¶ 29.   As a result of his September 2000

assaults at Green Haven CF, plaintiff pleaded guilty in Dutchess County Court to

attempted murder in the first degree and received an additional sentence of 15 years to

life.  See id. at ¶ 30.  As of August 2014, plaintiff had incurred 27 misbehavior reports

for violations of DOCCS rules, including weapons possession, drugs, smuggling,

assault on staff, altered items, creating a disturbance, and threats.  See Dkt. No. 90-5 at

257.

On January 17, 2014, while incarcerated at Clinton CF, plaintiff was placed on

Ad-Seg status, and an Ad-Seg review hearing was held on February 26, 2014.  See

Dkt. No. 90-5 at 289.  Plaintiff was transferred from Clinton CF to Upstate CF on March

4, 2014.  See id.  On March 13, 2014, the facility three-member committee at Upstate

CF ("the facility committee") conducted a 60-day Ad-Seg review.  See id.  The facility

committee observed that, as of March 13, 2014, the date of its report, plaintiff had a Tier

III misbehavior report pending for possessing a weapon, altered item, bribery/extortion,

and property unauthorized location stemming from an incident at Clinton CF.  See id.

Plaintiff was ultimately found guilty of those charges.  See Dkt. No. 90-5 at 100.  In its

summary report, the facility committee noted plaintiff's criminal history and history of

DOCCS disciplinary infractions, as recited above, and indicated that "[t]his type of

history in conjunction with [plaintiff's] propensity for violence cannot be taken lightly."  Id.

The facility committee observed that plaintiff "ha[d] spent the majority of his time [while

incarcerated] in SHU confinement and ha[d] not completed any of his recommended programs." Id. Further, the facility committee noted that, on March 11, 2014, Cook met with plaintiff and conducted an interview in which "the [Ad-Seg] Pilot incentive was discussed, and it was agreed that [plaintiff's status] would be reviewed again when [he] finished serving his disciplinary sanctions." Id. The committee determined to continue plaintiff's Ad-Seg status "[f]or the safety, security[,] and good order of the facility." Id. Moreover, the committee provided the following assessment

> Clearly, [plaintiff] has demonstrated a propensity for assaultive and dangerous behavior in the correctional facility and the community. [Plaintiff]'s willingness to enact extreme violence on staff and other inmates has proven his presence in general confinement of any correctional facility an extreme risk to staff and as well as the safety and security and good order of the facility.

Id. The Central Office three-member committee ("the Central Office committee") agreed with the facility committee's determination to keep plaintiff on Ag-Seg status on Mach 20, 2014, and Bellnier concurred with the Central Office committee's recommendation on May 11, 2014. See id. Another 60-day Ag-Seg review was conducted by the Upstate CF facility committee on May 5, 2014. See id. at 282. As relevant here, the facility committee's report indicated that plaintiff's disciplinary sanction would be complete on May 27, 2014, after which he would be entitled to the Ad-Seg Pilot Program privileges, and recommended continuing plaintiff on Ag-Seg status. See id. The Central Office committee also recommended continuing plaintiff's Ag-Seg status on May 13, 2014, and Bellnier concurred with that recommendation on July 25, 2014. See id. Following plaintiff's completion of his disciplinary sanctions, the Upstate CF facility committee conducted an Ad-Seg review for plaintiff on July 5, 2014, and generated a

6

report that indicated that plaintiff was "now participating in the Pilot Incentive Program," and recommended continuing his Ad-Seg status.  See id. at 274.  The Central Office committee also recommended continuing plaintiff on Ag-Seg status, and Bellnier concurred with the recommendation on August 19, 2014.  See id.  Thereafter, the Upstate CF facility committee conducted Ag-Seg reviews for plaintiff and recommended continuing his Ad-Seg status, as did the Central Office committee and the Deputy Commissioner for Correctional Facilities concurred, on the following dates:

| Ag-Seg Review by Facility Committee | Central Office Committee | Deputy Commissioner for Correctional Facilities | Record Cite |
|---|---|---|---|
| 8/20/14 | 9/8/14 | 10/8/14 | Dkt. No. 90-5 at 257 |
| 10/7/14 | 10/21/14 | 12/8/14 | Dkt. No. 90-5 at 248 |
| 11/21/14 | 12/12/14 | 2/13/15 | Dkt. No. 90-5 at 239 |
| 3/2/15 | 3/18/15 | 3/19/15 | Dkt. No. 90-5 at 231 |
| 4/28/15 | 4/29/15 | 6/30/15 | Dkt. No. 90-5 at 222 |
| 6/18/15 | 6/19/15 | 9/15/15 | Dkt. No. 90-5 at 214 |
| 8/11/15 | 8/12/15 | 10/6/15 | Dkt. No. 90-5 at 207 |
| 10/5/15 | 12/16/15 | 12/17/15 | Dkt. No. 90-5 at 200 |
| 12/4/15 | 4/4/16 | 4/6/16 | Dkt. No. 90-5 at 193 |
| 1/25/16 | 4/4/16 | 4/6/16 | Dkt. No. 90-5 at 185 |
| 3/16/16 | 6/22/16 | 6/27/16 | Dkt. No. 90-5 at 178 |
| 5/5/16 | 6/14/16 | 6/14/16 | Dkt. No. 90-5 at 170 |
| 6/27/16 | 10/18/16 | 10/19/16 | Dkt. No. 90-5 at 160 |
| 8/17/16 | undated | 2/10/17 | Dkt. No. 90-5 at 138 |
| 10/13/16 | 11/29/16 | 12/2/16 | Dkt. No. 90-5 at 128 |
| 1/30/17 | 7/2/17 | 7/31/17 | Dkt. No. 90-5 at 125 |
| 4/13/17 | 8/30/17 | 9/6/17 | Dkt. No. 90-5 at 123 |
| 6/12/17 | 9/21/17 | 9/25/17 | Dkt. No. 90-5 at 118 |
| 8/11/17 | undated | 12/12/17 | Dkt. No. 90-5 at 110 |
| 9/12/17 | 9/12/17 | 9/26/17 | Dkt. No. 90-5 at 107-08 |
| 10/10/17 | 10/10/17 | 10/24/17 | Dkt. No. 90-5 at 104-05 |
| 11/7/17 | 11/7/17 | 11/27/17 | Dkt. No. 90-5 at 101-02 |
| 12/5/17 | 12/5/17 | 12/28/17 | Dkt. No. 90-5 at 98-99 |
| 1/3/18 | 1/3/18 | 1/25/18 | Dkt. No. 90-5 at 84-85 |
| 1/31/18 | 1/31/18 | 2/12/18 | Dkt. No. 90-5 at 80-81 |
| 2/28/18 | 2/28/18 | 3/15/18 | Dkt. No. 90-5 at 77-78 |
| 3/27/17 | 3/27/18 | 3/29/18 | Dkt. No. 90-5 at 73-74 |

| 5/22/18 | 5/22/18 | 5/29/18 | Dkt. No. 90-5 at 69-70 |
|---------|---------|---------|------------------------|
| 6/19/18 | 6/19/18 | 7/16/18 | Dkt. No. 90-5 at 66-67 |
| 7/17/18 | 7/17/18 | 8/2/18 | Dkt. No. 90-5 at 63-64 |
| 8/14/18 | 8/16/18 | 9/5/18 | Dkt. No. 90-5 at 60-61 |
| 9/11/18 | 9/11/18 | 9/25/18 | Dkt. No. 90-5 at 55-56 |
| 10/10/18 | 10/10/18 | 11/6/18 | Dkt. No. 90-5 at 52-53 |
| 11/6/18 | 11/6/18 | 12/4/18 | Dkt. No. 90-5 at 46-47 |
| 12/4/18 | 12/4/18 | 12/14/18 | Dkt. No. 90-5 at 42-43 |
| 1/2/19 | 1/3/19 | 1/28/19 | Dkt. No. 90-5 at 35-36 |
| 1/29/19 | 1/29/19 | 2/5/19 | Dkt. No. 90-5 at 32-33 |
| 2/26/19 | 2/28/19 | 3/26/19 | Dkt. No. 90-5 at 25-26 |
| 3/26/19 | pages not included | pages not included | Dkt. No. 90-5 at 20 |
| 4/23/19 | 4/25/19 | 4/25/19 | Dkt. No. 90-5 at 17-18 |
| 5/21/19 | 5/21/19 | 6/5/19 | Dkt. No. 90-5 at 14-15 |
| 6/17/19 | 6/17/19 | 7/3/19 | Dkt. No. 90-5 at 4-5 |
| 7/16/19 | 7/16/19 | 7/22/19 | Dkt. No. 90-5 at 1-2 |

## II. Present Motions

### A. Plaintiff's Motion for Summary Judgment

Plaintiff contends that defendants subjected him to atypical and significant hardship in violation of his Fourteenth Amendment due process rights by failing to provide him with meaningful Ad-Seg reviews.  See Dkt. No. 79-2 at 1.  Plaintiff states that, "at times the reviews don't exist at all, or they are so late they undermine the process," and have prevented his "issues from being heard."  Id.  In particular, plaintiff posits that his August 17, 2016 Ad-Seg review was completed on February 10, 2017, but that he did not receive it until February 17, 2017; his January 30, 2017 review was completed on July 31, 2017, which he received on August 4, 2017; his June 12, 2017 review was completed on September 25, 2017, but he did not receive it until December 27, 2017; and from August 17, 2016, to December 27, 2017, plaintiff "either received over a year of late reviews or no reviews at all."  Id. at 5.  Plaintiff states that, "[o]n

8

January[] 24, 2019[, he] would receive 9 Ad-Seg reviews dated 9-12-17, 10-10-17, 11-07-17, 12-05-17, 1-03-18, 1-31-18, 2-28-18, 3-27-18 and 5-22-18," which are "all stamped Upstate [CF] Executive Office Jan. 22, 2019."  Id.  Plaintiff argues that the date stamp "indicate[s] when the facility received them."  Id.  He notes that he raised the issue of late receipt of his Ad-Seg reviews in his January 26, 2019 statement, but contends that "it was never responded to."  Id.  Plaintiff contend that his late receipt of Ad-Seg reviews "clearly establishes a due process liberty interest violation."  Id. at 13. Plaintiff cites Tellier v. Scott, 49 F. Supp. 2d 607 (1998) in support of this contention. See id.  Plaintiff also avers that his belated receipt of his Ad-Seg reviews obstructed his right to be heard, because it prevented him from addressing issues in subsequent reviews, including that his "debilitating health issues" prevent him from being a threat. Id. at 24.

Further, plaintiff posits that the criteria for meaningful review, as set forth in Proctor, "has not been met" because defendants "inserted" "blatantly false information . . . into [his Ad-Seg] reviews" to "bolster and magnif[y] the security threat plaintiff posed," making the reviews "a pretextual sham process."  Dkt. No. 79-2 at 14 (plaintiff arguing that his Ad-Seg reviews were "a sham, rote, perfunctory[,] and a fraud." (capitalization omitted)).  In particular, plaintiff contends that his "12-4-15, 1-25-16, 6-27-16, 1-30-17, 6-16-17, 8-11-17, 11-7-17[,] and 12-05-17 Ad-Seg reviews" contain the false statement that he "assaulted the Deputy Superintendent of Security" at Green Haven in September 2000, "for no reason in blind rage."  Id.  Plaintiff argues that defendants used this false statement "to support [his] continued confinement" on the basis that plaintiff is "unpredictable and . . . filled with rage."  Id. at 15.  In support of this argument, plaintiff

9

submits several exhibits, which he posits establishes that defendants acknowledged that the reason he attacked the Deputy Superintendent "was based on religious reasons and the blind rage was a lie."  Id.  Plaintiff cites several Ad-Seg reviews that indicate that he "violently assaulted Deputy Superintendent of Security Schneider and Corrections Officer Mitchetti" at Green Haven CF on September 22, 2000, with "two homemade weapons" that "were secured to each hand by leather throngs."  Dkt. No. 90-5[2] at 118 (June 12, 2017 Ad-Seg review); 101 (Nov. 7, 2017 Ad-Seg review); 98 (Dec. 5, 2017 Ad-Seg review); 193 (Dec. 4, 2015 Ad-Seg review); 185 (Jan. 25, 2016 Ad-Seg review)[3]; 125 (Jan. 30, 2017 Ad-Seg Review); 160 (June 27, 2016 Ad-Seg review).  Plaintiff also points to his December 27, 2000 Huntley notice relating to his criminal trial for his September 2000 assault of Deputy Superintendent Schneider and Correction Officer Mitchetti.  See Dkt. No. 79-2 at 14.  The Huntly notice states that plaintiff gave the following reasons for his September 2000 assaults: "I stabbed Dep. Schneider[] because he was fucking with Muslims.  He was oppressing the Muslim brothers.  I stabbed Mitchetti[] because he was an asshole and he deserved it."  Dkt. No. 90-5 at 93.  The Huntly notice further provides that plaintiff subsequently stated that "[s]omebody else is going to die."  Id.  Further, plaintiff points to defendants' memorandum of law in support of their motion to dismiss in which defendants noted that "it does appear that plaintiff was motivated by religious complaints when he brutally assaulted the Green Haven Deputy of Security," and that "despite this information, in

---

[2]  For the sake of ease, the Court will make all reference to plaintiff's Ad-Seg reviews to Dkt. No. 90-5, as that document contains all of plaintiff's Ad-Seg reviews in chronological order.

[3]  Plaintiff erroneously refers to his January 25, 2016 Ad-Seg review as the "2-16-16" Ad-Seg review.  See Dkt. No. 79-2 at 14; Dkt. No. 79-4 at 103 (Plaintiff's Exhibit 6 referring to "2-16-16 Ad Seg Review[]"); 106 (Jan. 25, 2016 Ad-Seg review).

two of four [Ad-Seg] reviews . . ., the central office committee indicated that plaintiff's attack was blind rage," but argued that, "[w]hile plaintiff makes much of this misstatement, this detail is of no consequence."  Dkt. No. 14 at 15.  Defendants further contended that, "[r]egardless of plaintiff's motive, his attack at Green Haven involved the deliberate creation of two improvised weapons, the fastening of those weapons to his arms to prevent him from being disarmed . . ., and the repeated stabbing of both staff members . . . resulting in numerous puncture wounds, multiple facial fractures, and an attempted murder conviction."  Id.  Moreover, plaintiff contends, as further evidence that defendants' Ad-Seg reviews were a sham, he "only acquired 1 tier II misbehavior report in the 6 years he was been in the Ad-Seg, so they created the false narratives in [his] Ad-Seg reviews that [he] is a person enraged, filled with so much rage that he attacked the DSS for no reason, it was blind rage."  Dkt. No. 79-2 at 18.

Plaintiff also asserts that defendants manufactured a "lie" that his September 2000 attack was based on the Deputy Superintendent's refusal to transfer his property.  Dkt. No. 79-2 at 15.  Plaintiff points to his February 28, 2018 and May 22, 2018 Central Office committee Ad-Seg reports and recommendations, which states

> Inmate Walker remains a serious risk for violence.  He has expressed a sense of entitlement to anything he wants, and when he does not get what he wants, he demonstrates significant anger.  In one recent incident, when he had a visitor who failed to take a package that Walker had left for him, Walker blamed the Department, and when the Department declined to send the package at Department expense, he demonstrated rage, suggesting that he would have assaulted the DSS if given the opportunity.  Both his propensity and high ability to fashion weapons and commit sever violence make him a high risk to staff and other inmates if he were given an opportunity to commit such violence.  He should not be given such an opportunity.  Consequently, [Ad-Seg] remains appropriate at this time.

11

Dkt. No. 90-5 at 71 (May 22, 2018); 79 (Feb. 28, 2018).  Plaintiff posits that this

characterization is false, and states that he expressed gratitude when the DSS

extended the time to hold plaintiff's property when his daughter forgot to take his

property until his brother was able to receive it when he visited plaintiff.  See Dkt. No.

79-2 at 15-16.  Plaintiff denies threatening anyone over this incident and notes

Woodruff's affirmative response to his interrogatory question: "If . . . [p]laintiff threatened

to cause physical harm to any correctional staff, would [he] have been issued a

misbehavior report?"  Dkt. No. 79-4 at 113; see Dkt. No. 79-2 at 16.  Plaintiff also cites

to the visitor's log at Upstate CF dated February 6, 2010, and his disposal of property

form dated April 10, 2017, which indicates that plaintiff was sending three draft bags full

of books with his brother.  See Dkt. No. 79-4 at 83, 144.

        Moreover, plaintiff contends that his Ad-Seg reviews include false statements

indicating that he has the ability to manipulate his environment, as evidenced by his

purposeful violation of DOCCS rules to stay at Clinton, and his ability and propensity to

create weapons.  See Dkt. No. 79-2 at 16.  Plaintiff cites to numerous Ad-Seg reviews

which contain the following statement in support of continuation of his Ad-Seg status:

> Walker has proven his ability to obtain and craft weapons
> and to manipulate his environment: he purposefully obtained
> or created a weapon in February 2014, while still at Clinton
> [CF] after he found out he was being transferred to Upstate
> [CF].  He knew possession of such contraband would result
> in a Tier III disciplinary action and believed that this would
> cause his transfer to be cancelled.

Dkt. No. 90-5 at 121 (Central Office committee's report and recommendation dated

June 16, 2017, following plaintiff's June 12, 2017 Ad-Seg review); see id. at 194

(Central Office committee's report and recommendation dated Dec. 22, 2015, following

plaintiff's Dec. 4, 2015 Ad-Seg review); 127 (Central Office committee's report and recommendation dated February 24, 2017, following plaintiff's January 30, 2017 Ad-Seg hearing); 162 (Central Office committee's report and recommendation dated July 5, 2016, following plaintiff's June 27, 2016 Ad-Seg review).  Plaintiff states that "[t]he idea of [him] being notified in advance that he was being transferred is false because based on plaintiff's security classification and central monitoring case designation . . . [he] is never notified in advance when he is being transferred outside the facility."  Dkt. No. 79-2 at 17.  He also posits that such a statement is belied by his own experiences of seeing other inmates with weapons charges transferred to different facilities and being "transferred himself with a weapon [sic] charge in Greenhaven [sic]."  Id.  Plaintiff posits that "obtaining a weapon on purpose to obtain a Tier III is contradicted by the misbehavior report itself."  Id.  Plaintiff has included his February 27, 2014 misbehavior report from Clinton in his list of exhibits.  See Dkt. No. 79-4 at 137.  The misbehavior report provides, in relevant part, that, on February 27, 2014, plaintiff stopped the authoring correction officer while he was making rounds in plaintiff's housing unit and that plaintiff stated that he found a 1¼ by 1/8 inch "half[-]moon shaped piece of metal that had been sharpened to a point" while plaintiff was cleaning his cell.  Id.  Plaintiff told the correction officer that he had found the object on the floor and that, "since he did a good deed their [sic] should be an award for his good behavior."  Id.  Plaintiff was charged and ultimately found guilty of possession of a weapon, altered item, possession of an article in an unauthorized area, and bribery.  See id. at 152.  Plaintiff argues that "seeking . . . a reward for a good deed do [sic] not mean obtaining a weapon charge." Dkt. No. 79-2 at 17.  He also argues that he "do [sic] not like getting misbehavior reports

. . ., nor never [sic] was a mental health patient."  Id.  In addition, plaintiff contends that the statement that he purposefully attempted to remain at Clinton by obtaining a weapons charge is "contradicted by the fact that [he] hated Clinton and sought a transfer from the facility whenever he was eligible, [and] was repeatedly placed on restraint orders, that required . . . plaintiff to remain in restraints in the visiting area and . . . plaintiff accused the administration of being white racist savage act . . . to make plaintiff's life a living hell."  Id. at 17-18.

Moreover, plaintiff notes his June 17, 2019 Ad-Seg report and recommendation, in which the Central Office committee noted that plaintiff had completed the Aggression Replacement Training ("ART") program, which it stated "was "a positive step for [him], but by no means justifies release from [Ad-Seg] in itself."  Dkt. No. 90-5 at 12; see Dkt. No. 79-2 at 19.  The Central Office committee noted plaintiff's letter dated June 13, 2019 to the Review Committee in which plaintiff sought to rebut "the assertion that he expresses entitlement and anger."  Dkt. No. 90-5 at 12; see id. at 6-7 (Plaintiff's June 13, 2019 Ad-Seg Statement).  The Central Office committee also noted that plaintiff's letter took issue with the inclusion of his skill at building weapons and inclination towards violence in his Ad-Seg reviews.  See id.  The Central Office Three-member committee stated that plaintiff "rightly point[ed] out his notable instances of violence . . . all occurred more than 20 years ago[,]" but posited that "his close supervision over the subsequent years has arguably prevented continued violence."  Id.  Further, "[r]ather than reflect on the lessons of ART," plaintiff stated in his letter to the Central Office committee that he "passed [the ART program] 'with ease.'"  Id. (quoting id. at 6). In addition, the Central Office committee noted that "[t]he only staff member [plaintiff]

14

named in his letter was derided as corrupt—a sign that he has a problem communicating respectfully[,]" and noted that plaintiff "closed his letter with the entitled inference that if he received a meaningful review he would be released from [Ad-Seg]." Id. at 12-13.  Moreover, the Central Office committee noted that plaintiff "had significant issues with his prior [Offender Rehabilitation C]ounselor and his supervision had to be reassigned last year"; that "staff noted that [plaintiff] is smart enough to communicate appropriately when he wants something, and that he is capable of manipulation"; and that, "[d]espite that ability, [plaintiff] repeatedly misses the mark when communicating with this committee."  Id. at 13.  The Central Office committee stated that "[r]elease from [Ad-Seg] . . . will require a level of humility and remorse that has thus far not been demonstrated[,]" and concluded with the following:

> There is no formula or benchmark for such a demonstration—only personal growth.  This is a high bar to demand for release form [sic] administrative segregation, but the cost of an untimely release could be the lives of other inmates or correctional staff.
>
> While the Committee recognizes the conundrum inherent in requiring a demonstration of growth and non-violent problem-solving while continuing [Ad-Seg] due to the risk of violence inherent in the subject, we are unable to recommend a step-down to a less restrictive environment. [Plaintiff] should remain in [Ad-Seg] at this time.

Id.  Plaintiff posits that this assessment is flawed, because in his December 27, 2017 Ad-Seg statement, he stated that he "regret[s] what [he] did in [his] past in respect to assaulting correctional staff (a show of remorse) and . . . ha[s] never done it again." Dkt. No. 79-2 at 20 (quoting Dkt. No. 95-5 at 86 (plaintiff's Dec. 27, 2017 Ad-Seg

Statement)).  Finally, plaintiff argues that defendants are not entitled to qualified immunity.  See id. at 26.[4]

### B. Defendants Cross Motion for Summary Judgment and Opposition

As an initial matter, defendants concede that, for the purpose of plaintiff's motion and defendants' cross motion, plaintiff has established a liberty interest in avoiding lengthy and restrictive confinement based on his placement in SHU on Ad-Seg status. See Dkt. No. 96 at 4.  "However," defendants contend, "[p]laintiff has not established, and cannot establish, that the process he was afforded was constitutionally defective." Id.  Insofar as plaintiff contends that the Ad-Seg review process was a sham because he received late reviews or, at times, no reviews at all, defendants counter that plaintiff's argument is meritless and belied by their admissible evidence.  See id. at 8.  In particular, defendants point to the "[c]opies of [plaintiff] Ad[-]Seg reviews from 2014 [to] 2019," attached to O'Gorman's declaration, which they contend "demonstrate that [p]laintiff has, in fact, always received periodic reviews since his initial Ad[-]seg placement."  Id.  Further, defendants posit, "[a] delay in providing [p]laintiff with copies of the signed [Ad-Seg] reviews is not a violation of his right to due process[,]" as "[t]here is no [c]onstitutionally mandated time-period in which the periodic reviews must be conducted, nor is there a  [c]onstitutionally mandated time-period for providing copies of the signed periodic reviews."  Id.  To the extent that plaintiff's argument is premised on a

---

[4]  Plaintiff's argument, although titled "Defendant's [sic] Are Not Entitled to Qualified Immunity," is a restatement of the Court's discussion of personal involvement contained in the January 2019 Order denying defendants' motion to dismiss.  See Dkt. No. 79-2 at 26-27; Walker v. Bellnier, No. 9:17-CV-1008 (GTS/CFH), 2019 WL 2479612, at *9-10 (N.D.N.Y. Jan. 15, 2019).

violation of DOCCS Directive No. 4933, defendants contend that "his argument has no merit in federal court." Id.

In addition, defendants argue that plaintiff's contention that he has been deprived the right to be heard and that his Ad-Seg review process was a sham lacks merit and is contradicted by the documentary evidence. See Dkt. No. 96 at 9. In particular, defendants posit that, "[a]t the facility level, [p]laintiff is given an opportunity to submit documentation for his periodic Ad[-]Seg reviews, and the documents that [p]laintiff has submitted are included in the[ir] supporting papers." Id. In this regard, defendants point to plaintiff's various Ad-Seg statements. See Dkt. No. 90-5 at 57-59 (Sept. 6, 2018 Ad-Seg Statement); 48 (Nov. 1, 2018 Ad-Seg Statement); 44 (Nov. 30, 2018 Ad-Seg Statement); 37-40 (Dec. 25, 2018 Ad-Seg Statement); 27-29 (Jan. 26, 2019 Ad-Seg Statement); 21-23 (Mar. 13, 2019 Ad-Seg Statement); 6 (June 13, 2019 Ad-Seg Statement). Defendants also note that plaintiff's comments to Upstate CF staff are reported to the Central Office Ad-Seg Review Committee during telephone conferences as part of his periodic Ad-Seg reviews. See id.

Finally, defendants contend that they are entitled to qualified immunity, because "[p]laintiff received the requisite periodic reviews as required by law" "using the three-tier system, by seven individual members of DOCCS staff." Dkt. No. 96 at 10. Therefore, defendants argue, "[i]t was objectively reasonable for all of [d]efendants to believe that they were not violating [p]laintiff's due process rights." Id. at 11. Moreover, defendants argue, "reasonable officials, similarly situated to . . . [d]efendants, would not have comprehended that their conduct in reviewing Plaintiff's Ad[-]Seg status" pursuant to the three-tier review system "violated any of [p]laintiff's rights." Id.

17

**C. Plaintiff's Response in Opposition to Defendants' Cross-Motion**

Plaintiff posits that defendants' argument that he was afforded adequate due process through his three-tiered Ad-Seg reviews "is based solely on . . . [d]efendants [sic] declaration and claims that they complied with the review process." Dkt. No. 100 at 3. Plaintiff states that the Ad-Seg review documents from 2014 to 2019 attached to O'Gorman's declaration "contradict his claims, and these documents support plaintiff's claims [that] he has not had reviews for over a year." Id. Plaintiff also contends that defendants' argument in this regard was previously rejected by the Court on defendants' motion to dismiss because "there was [sic] years of no reviews, which has not changed one document." Id. at 4. Further, plaintiff states that the documents attached to O'Gorman's declaration establish that "years [of reviews] are missing." Id. Plaintiff also argues that, pursuant to DOCCS Directive No. 4933, the 30-day timeline for periodic Ag-Seg reviews includes "receiving reviews every 30 days." Id. Moreover, plaintiff contends that defendants are not entitled to qualified immunity because "all of them are fully aware of the constitutional violation, and . . . of the Proctor case." Id. at 5.

**III. Discussion**[5]

**A. Legal Standard**

Summary judgment may be granted only if the submissions of the parties taken together "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986). "The party moving for summary

---

[5] All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to plaintiff.

judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists." Price v. Oropallo, No. 9:13-CV-0563 (GTS/TWD), 2014 WL 4146276, at *4 (N.D.N.Y. Aug. 19, 2014) (citing Salahuddin v. Goord, 467 F.3d 263, 272-73 (2d Cir. 2006)).  Facts are material if they may affect the outcome of the case as determined by substantive law.  See Anderson, 477 U.S. at 248.  A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.  "In determining whether summary judgment is appropriate, [the Court will] resolve all ambiguities and draw all reasonable inferences against the moving party." Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist.  See Salahuddin, 467 F.3d at 272-73.  The nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence. See Spiegel v. Schulmann, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.") (internal quotation marks and citation omitted).  A plaintiff's verified complaint is to be treated as an affidavit.[6]  See Colon v. Coughlin, 58

---

[6] Plaintiff's SAC in this case was not properly verified.  See SAC at 12.

F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit . . .

and therefore will be considered in determining whether material issues of fact exist

. . . ."). "To satisfy Rule 56(e), affidavits must be based upon concrete particulars, not

conclusory allegations." Schwapp v. Town of Avon, 118 F.3d 106, 111 (2d Cir. 1997)

(internal quotation marks and citation omitted). "Statements that are devoid of any

specifics, but replete with conclusions, are insufficient to defeat a properly supported

motion for summary judgment." Bickerstaff v. Vassar Coll., 196 F.3d 435, 452 (2d Cir.

1999). "'The mere existence of a scintilla of evidence in support of the plaintiff's position

will be insufficient; there must be evidence on which the jury could *reasonably* find for

the plaintiff.'" Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005) (brackets

omitted) (quoting Anderson, 477 U.S. at 252).

Where, as here, a party seeks judgment against a pro se litigant, a court must afford

the non-movant special solicitude. See Treistman v. Fed. Bureau of Prisons, 470 F.3d

471, 477 (2d Cir. 2006). As the Second Circuit stated,

> [t]here are many cases in which we have said that a pro se
> litigant is entitled to special solicitude, that a *pro se* litigant's
> submissions must be construed liberally, and that such
> submissions must be read to raise the strongest arguments
> that they suggest. At the same time, our cases have also
> indicated that we cannot read into *pro se* submissions claims
> that are not consistent with the *pro se* litigant's allegations,
> or arguments that the submissions themselves do not
> suggest, that we should not excuse frivolous or vexatious
> filings by *pro se* litigants, and that *pro se* status does not
> exempt a party from compliance with relevant rules of
> procedural and substantive law . . . .

Id. (internal quotation marks, citations, and footnote omitted); see also Sealed Plaintiff v.

Sealed Defendant, 537 F.3d 185, 191 (2d Cir. 2008) ("On occasions too numerous to

count, we have reminded district courts that when [a] plaintiff proceeds *pro se*, . . . a

court is obligated to construe his pleadings liberally.") (internal quotation marks and citations omitted).

When considering cross-motions for summary judgment, a court "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." Hotel Employees & Rest. Employees Union, Local 100 of New York, New York & Vicinity, AFL CIO v. City of New York Dep't of Parks & Recreation, 311 F.3d 534, 543 (2d Cir. 2002) (quoting Heublein, Inc. v. United States, 996 F.2d 1455, 1461 (2d Cir. 1993)). "[N]either side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it [and] a district court is not required to grant judgment as a matter of law for one side or the other." Heublein, 996 F.2d at 1461.

**B. Analysis**

Administrative Segregation is not punitive and is, therefore, governed by less restrictive procedural protections than those required when the "'sole purpose of confinement is punishment.'" Proctor v. LeClaire, 846 F.3d 597, 609 n.5 (2d Cir. 2017) (quoting Patterson v. Coughlin, 761 F.2d 886, 891 (2d Cir. 1985); see Wolff v. McDonnell, 418 U.S. 539, 558, 564-66 (1974) (setting forth the procedural due process required for an inmate facing disciplinary charges that may result in punitive segregation); see also Bolden v. Alston, 810 F.2d 353, 357 (2d Cir. 1987) ("[T]he level of procedural protection differs according to the purpose of the confinement."). In Hewitt v. Helms, 459 U.S. 460 (1983), the Supreme Court explained that an inmate confined for administrative reasons need receive only minimal due process rights. See Hewitt,

459 U.S. at 476, abrogated in part on other grounds by Sandin v. Conner, 515 U.S. 472, (1995).  Before confining an inmate in Ad-Seg, prison officials must provide "some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to [Ad-Seg]," although not necessarily a full hearing.  Id.  Once that has occurred, prison officials need only conduct "an informal, nonadversary evidentiary review" of whether the confinement is justified.  Id.  Under Hewitt, "periodic review of the confinement" is meant to verify that the inmate "remains a security risk" throughout his term.  Id. at 477 n.9.  Said another way, "[t]he purpose of these periodic reviews is to ensure that the state's institutional interest justifying the deprivation of the confined inmate's liberty has not grown stale and that prison officials are not using Ad Seg as 'a pretext for indefinite confinement of an inmate.'"  Proctor, 846 F.3d at 609 (quoting Hewitt, 459 U.S. at 477 n.9).  "Periodic Ad[-]Seg reviews are also flexible and may be based on 'a wide range of administrative considerations,' including but not limited to observations of the inmate in Ad-Seg, 'general knowledge of prison conditions,' misconduct charges, ongoing tensions in the prison, and any ongoing investigations."  Id. (quoting Hewitt, 459 U.S. at 477 n.9).  Prison officials' final Ad-Seg decision may "turn[] largely on purely subjective evaluations and on predictions of future behavior."  Hewitt, 459 U.S. at 474 (internal quotation marks and citation omitted).

"It is well established that whenever process is constitutionally due, no matter the context, '[i]t . . . must be granted at a meaningful time and in a meaningful manner.'"  Proctor, 846 F.3d at 609 (quoting Armstrong v. Manzo, 380 U.S. 545, 552 (1965)).  In

Proctor, the Second Circuit identified the following three criteria that prison officials must

satisfy in order to provide "meaningful" periodic Ad-Seg reviews:

> First, the reviewing prison officials must actually evaluate
> whether the inmate's continued Ad Seg confinement is
> justified.  It is not sufficient for officials to go through the
> motions of nominally conducting a review meeting when they
> have developed a pre-review conclusion that the inmate will
> be confined in Ad Seg no matter what the evidence shows.
> Review with a pre-ordained outcome is tantamount to no
> review at all.
>
> Second, the reviewing officials must evaluate whether the
> justification for Ad Seg exists at the time of the review or will
> exist in the future, and consider new relevant evidence as it
> becomes available.  [O]ngoing Ad Seg reviews may not be
> frozen in time, forever rehashing information addressed at
> the inmate's initial Ad Seg determination.  Rather, reviews
> must take into account prison conditions and inmate
> behavior as they change over time; those changes may
> modify the calculus of whether the inmate presents a current
> threat to the safety of the facility.  This is not to say that
> prison officials are barred from according significant weight
> to events that occurred in the past.  Neither do we suggest
> that recent events categorically ought to be more salient in
> periodic reviews than those that occurred long ago. We
> conclude merely that prison officials must look to the
> inmate's present and future behavior and consider new
> events to some degree to ensure that prison officials do not
> use past events alone to justify indefinite confinement.
>
> Third . . ., the reviewing officials must maintain institutional
> safety and security (or another valid administrative
> justification) as their guiding principles throughout an
> inmate's Ad Seg term.  SHU confinement that began for
> proper Ad Seg purposes may not morph into confinement
> that persists for improper purposes.  The state is entitled to
> the procedural flexibility that Hewitt allows because of its
> manifest interest in maintaining safe detention facilities and
> other similar administrative concerns . . . .  The state may
> not use Ad Seg as a charade in the name of prison security
> to mask indefinite punishment for past transgressions.

Proctor, 846 F.3d at 610-11 (internal quotation marks and citations omitted).

23

### 1. Timeliness of Reviews

As an initial matter, to the extent that plaintiff argues that he was not afforded timely periodic reviews, his contention is belied defendants' admissible evidence consisting of plaintiff's periodic Ag-Seg reviews.  See generally Dkt. No. 90-5; Chart contained in subsection I.B., supra (dates of plaintiff's Ad-Seg reviews between August 2014, and July 2019).  As defendants posit, contrary to plaintiff's contention and aside from several minor delays, his periodic facility committee reviews were timely conducted every 60 days until August 2017, after which plaintiff received Ad-Seg reviews every 30 days.  See Chart contained in subsection I.B., supra.   Further, plaintiff has failed to controvert defendants' admissible evidence, and his response in opposition proffers only conclusory arguments that are insufficient to raise a triable issue of fact.  See Batista v. Union of Needleworkers, No. 97-CV-4247 (HB), 2000 WL 1760923, at *3 (S.D.N.Y. Nov. 30, 2000) (holding that the plaintiff's "conclusory statements" offered "in response to [the] defendant's evidence" were "insufficient as a matter of law to raise an issue of fact."); see also Scott v. Coughlin, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case.").  Indeed, plaintiff fails to provide any explanation for his statements that O'Gorman's declaration "contradict [plaintiff's] claims, [that] th[o]se documents support plaintiff's claims [that] he has not had reviews for over a year," or that those documents establish that "years [of reviews] are missing."  Dkt. No. 100 at 3, 4.  As set forth in detail in the chart contained in subsection I.B., supra, plaintiff's statements are wholly contradicted by defendants' admissible evidence.

Moreover, although plaintiff heavily emphasizes that some of his reviews appear to have been completed with less frequency than every 30 or 60 days and without adequate notice for him to submit objections to the reviews, as required by pursuant to 7 N.Y. C.R.R. § 301.4 and DOCCS Directive No. 4933, "such failures to adhere strictly to state or institutional policy are not sufficient to establish a constitutional violation." H'Shaka v. O'Gorman, 444 F. Supp. 3d 355, 373 (N.D.N.Y. 2020); see Soto v. Walker, 44 F.3d 169, 173 (2d Cir. 1995) (noting that a violation of a state procedural statute alone, without a due process violation, "would not be enough generally to establish a constitutional claim"); Sanders v. Gifford, 9:11-CV-0326 (LEK/RFT), 2014 WL 5662775, at *4 (N.D.N.Y. Nov. 4, 2014) ("[E]ven assuming that [the d]efendant . . . deviated from state procedures or DOCCS Directives, a violation of such rules and regulations does not, standing alone give rise to liability under § 1983."); Ahlers v. Nowicki, 9:12-CV-0539 (DNH/RFT), 2014 WL 1056935, at *4 (N.D.N.Y. Mar. 18, 2014) ("[C]laims involving the improper adherence to proprietary facility policies are incognizable under § 1983; only rights secured by the Constitution and federal law are actionable under § 1983."). Further, even the minor delays between reviews does not give rise to a constitutional violation.  See Proctor v. Kelly, No. 9:05-CV-0692 (GTS/GJD), 2008 WL 5243925, at *7 (N.D.N.Y. Dec. 17, 2008) ("an inadvertent denial of a periodic review does not give rise to a due process violation.").  Rather, as explained in Hewitt and Proctor, "the Due Process Clause requires that the [Ad-Seg] reviews be conducted only "periodically." H'Shaka, 444 F. Supp. 3d at 373 (quoting Proctor, 846 F.3d at 601); see Hewitt, 459 U.S. at 477 n.9.  As discussed in detail above, the record establishes that the facility committee reviews were conducted every 60 days until August 2017, and then every 30

days thereafter; accordingly, the undersigned concludes that defendants have established that reviews were conducted periodically in satisfaction of constitutional due process requirements, in opposition to which plaintiff has failed to establish a genuine issue of material fact.  See H'Shacka, 444 F. Supp. 3d at 373 ("The record establishes that the facility-level committee reviews were completed approximately every two months; therefore, the Court finds that there is no issue of fact that these reviews were conducted at least periodically and that they thus satisfy the constitutional requirement in that respect.").

In addition, plaintiff's reliance on Tellier v. Scott, 49 F. Supp. 2d 607 (1998) is misplaced, as that case is factually distinguishable.  In Tellier, the plaintiff alleged that "he never received an administrative detention order specifying the reasons for his confinement" and "that no hearing was held concerning his detention status until . . . after he had served almost six months in the SHU."  Tellier, 49 F. Supp. 2d at 614. Finally, plaintiff's contention that his belated receipt of his Ad-Seg reviews obstructed his right to be heard because it prevented him from addressing issues in subsequent reviews, including that his "debilitating health issues" that prevent him from being a threat, is belied by the record.  Dkt. No. 79-2 at 24.  Plaintiff was able to raise issues, including his allegedly deteriorating health, in numerous Ad-Seg statements.  See Dkt. No. 90-5 at 37-38, 48, 89.  In addition, plaintiff's contention that his complaints regarding non-receipt of Ad-Seg reviews was specifically considered and addressed by the Central Office committee, after which plaintiff received his Ad-Seg reviews.  See Dkt. No. 90-5 at 60 (August 14, 2018 facility committee report, noting that, during his interview with his ORC, plaintiff "wanted to make sure that i[t] was known that he still

has not received any of his [Ad-Seg] Responses since 2017."); 69 (same); Dkt. No. 79-2 at 5 (acknowledging receipt of nine Ad-Seg reviews from September 12, 2017, to May 22, 2018). Thus, it is recommended that plaintiff's motion insofar as it seeks summary judgment on his Fourteenth Amendment due process claim based on untimely Ad-Seg reviews be denied, and defendants' cross-motion for summary judgment be granted, and plaintiff's claim in this regard be dismissed with prejudice.

### 2. Meaningful Review

Plaintiff's contention that his periodic reviews were a sham, rote, perfunctory, and a fraud is unsupported by the admissible record evidence. See Dkt. No. 79-2 at 14. Courts determine whether an initial Ad-Seg placement and/or subsequent periodic reviews comply with Due Process by assessing whether such determinations are supported by "'some evidence.'" Parson v. Miller, No. 9:16-CV-167 (DNH/CFH), 2018 WL 4233810, at *9 (N.D.N.Y. May 25, 2018) (quoting Sup't Mass. Corr. Inst., Walpole v. Hill, 472 U.S. 445, 455 (1985) (additional citation omitted)), report and recommendation adopted, No. 9:16-CV-167 (DNH/CFH), 2018 WL 4228427 (N.D.N.Y. Sept. 5, 2018); see also Davis v. Barrett, No. 02-CV-545 (KS), 2011 WL 2421109, at *3 (W.D.N.Y June 13, 2011) ("[T]he Court must find 'some evidence' in the record that could support the hearing officer's conclusion that placement in [Ad-Seg] was warranted." (quoting Taylor v. Rodriguez, 238 F.3d 188, 194 (2d Cir. 2001)). "Ascertaining whether [the some evidence] standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could

support the conclusion reached."  Hill, 472 U.S. at 455-56.  Further, "[p]rocedural due process does not permit a court to review the substance of [d]efendants' decision to confine [an inmate] in Ad Seg[,]"  Proctor, 846 F.3d at 608 (citation omitted).  A reviewing court "may not substitute [its] judgment for [d]efendants', nor may [it] rebalance the section 301.4(d) criteria."  Id. (internal citation omitted).  Rather, "[t]he Due Process Clause permits only an evaluation of whether [d]efendants' method for coming to their Ad Seg determinations is sufficient."  Id.  Courts afford significant deference to prison officials' Ad Seg determinations.  See id.

Here, plaintiff does not dispute that his initial placement in Ad-Seg was unsupported by sufficient evidence.  See generally SAC; Dkt. No. 79-2.  Indeed, as the record evidence demonstrates, plaintiff was initially placed in Ad-Seg because he incurred a misbehavior report on February 27, 2014, for possession of a weapon, altered item, possession of an article in an unauthorized area, and bribery.  See Dkt. No. 79-4 at 137; Dkt. No. 90-5 at 289 (plaintiff's Mar. 13, 2014 Ad-Seg review).  Plaintiff does not controvert that he was found guilty of these Tier III charges.  See Dkt. No. 90-5 at 152.  In subsequent Ad-Seg periodic reviews, the Central Office committee consistently noted plaintiff's "propensity and high ability to fashion weapons and commit sever violence," which the committee concluded "make[s] him a high risk to staff and other inmates if he were given an opportunity to commit such violence."  Dkt. No. 90-5 at 71 (May 22, 2018); 79 (Feb. 28, 2018); see 201 (Dec. 16, 2018) ("[Plaintiff's past ability to get weapons, or an altered item . . . indicates his dedication to and success at breaking the rules and obtaining contraband items sometimes ending in violent outcomes.").

Further, the facility three-member committee routinely noted plaintiff's past criminal activity in its summary reports, which, as discussed in detail above, included a violent assault on two DOCCS employees with homemade blade-type weapons, the smuggling of a razor blade into federal court, and assaulted another inmate by stabbing him 18 times.  See, e.g., Dkt. No. 90-5 at 200 (Oct. 5, 2015 Ad-Seg review).  In addition, plaintiff notes that he was issued restraint orders while incarcerated at Clinton CF.  See Dkt. No. 79-2 at 17-18.  However, plaintiff's own documentary evidence establishes that the reason for the restraint orders was that DOCCS personnel at Clinton CF discovered, through a confidential informant, that, in February 2011, plaintiff was "planning to assault staff" and that, on December 19, 2011, plaintiff was "found to have a weapon in his possession during a cell search[, which] was taped to the bottom of his foot."  Dkt. No. 79-4 at 69, 71.  Although plaintiff has not been charged with possessing a weapon since 2014—during which time he has been on Ag-Seg status—the review committees' conclusion that plaintiff remained a security risk based on his ability to fashion and/or obtain weapons and commit violent assaults on staff was supported by sufficient evidence, and the committees were not "barred from according significant weight to [these past] events."  Proctor, 864 F.3d at 611; see Parson, 2018 WL 4233810, at *9 (concluding that the review committee's recommendation to continue the plaintiff on Ad-Seg status "were supported by sufficient evidence" where they referenced plaintiff's history of "assaultive and disruptive behavior" against staff that served as the basis for his initial Ad-Seg placement and indicated that they "remained concerned by these incidents when approving the continuation of [his] confinement.").

29

Moreover, that the facility committees' reports routinely note that plaintiff had "maintained a positive disciplinary record" and exhibited "appropriate" interactions with staff does not, as plaintiff suggests, establish that the emphasis placed on his history of repeated weapons possession and extreme violence toward staff and other inmates was inappropriate.  See Proctor, 864 F.3d at 611 ("Neither do we suggest that recent events categorically ought to be more salient in periodic reviews than those that occurred long ago.").  In addition, the record evidence does not support plaintiff's contention that his reviews were "a pretextual sham process," Dkt. No. 79-2 at 14, or that the reviewing officials "use[d] past events alone to justify indefinite confinement," such that they would have recommended his continued Ad-Seg status "no matter what evidence was shown."  Proctor, 864 F.3d at 611.  Both the facility committee and Central Office committee considered plaintiff's recent behavior and reports from his ORC, as well as plaintiff's completion of the ART program in their periodic review determinations.  See, e.g., Dkt. No. 90-5 at 12 (June 17, 2019 Central Office report). Although, as the committee recognized, plaintiff's completion of the ART program was a "positive step for [plaintiff]," plaintiff's significant history of extreme violence and his attitude toward the review process provides some evidence that his release from Ad-Seg was not yet justified.  Id.  Further, as the Central Office committee observed, plaintiff's Ad-Seg statements demonstrated a sense of entitlement and anger toward the committee and review process.  See id.  For instance, in his June 13, 2019 Ad-Seg statement, plaintiff stated

> I've completed the ART program and passed it with ease,
> please enlighten me and tell me an example of this sense of
> entitlement and demonstration of significant anger.
> Furthermore, I'd appreciate it if you can give me an example

> of propensity . . . for building weapons and committing
> severe violence.  I never made a weapon ever, and I
> committed an act of severe violence over 19 years ago, that
> I've regretted ever since and refrained from any acts of
> violence for over 19 years, so your statement is baseless.

Id. at 6.  He also argued that at least one of his past weapons charges was erroneous, and suggested that "corrupt Captain Lucia" fabricated the related misbehavior report.  See id. at 6-7.  The Central Office committee noted plaintiff's statement that he passed the ART program "with ease," that "[t]he only staff member he named in his letter was derided as corrupt," and that "[h]e closed his letter with the entitled inference that if he received meaningful review he would be released from [Ad-Seg]."  Id. at 12-13.

In addition, the committees properly considered plaintiff's disciplinary record while on Ag-Seg status, which included a June 1, 2017 misbehavior report for interference, harassment, and failure to follow a direct order, for which he was found guilty and received a sanction of 30-days of keeplock.  See id. at 110, 118.  Further, the committees noted that plaintiff "smiles, talks, and interacts appropriately with managerial and line staff, [but that] he has been found using drag lines (used to smuggle contraband) which he turns over readily."  Id. at 121.  The Central Office committee observed that, "[s]ecurity staff continues to express concern that [plaintiff] has a short fuse and only with great effort restrains himself when angry," and that, although his current ORC indicated that "he has not observed any anger issues or sense of frustration and entitlement from [plaintiff,] plaintiff had significant issues with his prior counselor and his supervision had to be reassigned [in 2018]."  Id. at 13.  Therefore, not only is plaintiff's claim that the committees refused to consider his Ad-Seg statements belied by the record, the committees appropriately took into account plaintiff's recent

attitude and behavior in determining whether he "remain[ed] a security risk" at the time

of his periodic reviews.  Proctor, 846 F.3d at 611 (quoting Hewitt, 459 U.S. at 477 n.9).[7]

Thus, contrary to plaintiff's suggestion, the mere "fact that the reports contain similar

language does not necessarily mean that the reviews were a sham," Zimmerman v.

Seyfert, No. 9:03-CV-1389 (TJM), 2007 WL 2080517, at *20 (N.D.N.Y. July 19, 2007),

and the record establishes that DOCCS officials' method for reaching their periodic

review determinations was sufficient.  See Proctor, 846 F.3d at 608.  Moreover, aside

from plaintiff's conclusory and self-serving statements to the contrary, the documentary

evidence establishes that the decisions to continue plaintiff's Ag-Seg status were based

on concerns of institutional safety, as required under the third prong of the Proctor

analysis.  See id.

Next, the undersigned finds unpersuasive plaintiff's attempts to establish that his

periodic Ag-Seg reviews contain mischaracterizations of his past offenses.  For

instance, plaintiff heavily emphasizes that his September 2000 assault was not

committed out of "blind rage," as indicated in his Ad-Seg reviews, but that it was done

for "religious reasons."  Dkt. No. 79-2 at 15.  Plaintiff relies on his Huntley notice relating

to his September 2000 assaults, which states, "I stabbed Dep. Schneider[] because he

was fucking with Muslims.  He was oppressing the Muslim brothers.  I stabbed

Mitchetti[] because he was an asshole and he deserved it."  Dkt. No. 90-5 at 93.  The

Huntly notice further provides that plaintiff subsequently stated that "[s]omebody else is

going to die."  Id.  However, plaintiff fails to demonstrate how "blind rage" is a

---

[7]  To the extent plaintiff's motion may be read as arguing that the committees did not consider his Ad-Seg
statements because the committees did not provide an itemized list of responses to all of the complaints
raised therein, see Dkt. No. 79-2 at , plaintiff has not produced any authority requiring such a response in
Ad-Seg report summaries.

mischaracterization for describing his unprovoked attack of two DOCCS employees, even if done for his stated purpose of "religious reasons." Id.   If anything, this evidences that plaintiff committed the assault with forethought—in which case, the undersigned is perplexed as to how that should undercut the review committees' conclusions.  In any event, regardless of motive, the undisputed facts of the September 2000 assault—that plaintiff attacked two DOCCS employees with sharpened objects that were secured to his wrists by leather thongs—along with plaintiff's extensive history of violence, supports the committees' continued recommendation of Ag-Seg status to "reduce[] the risk his behavior presents to staff and inmates, as well as the safety of the facility." Dkt. No. 90-5 at 98.  Moreover, the undersigned finds equally unpersuasive plaintiff's arguments that his reviews falsely state that he purposefully obtained weapons charges at Clinton CF in an attempt to prevent his transfer, or that plaintiff displayed rage towards staff when personnel at Upstate CF refused to ship his property at the facility's expense.  See Dkt. No. 79-2 at 15, 16.  The documentation plaintiff references in relation to these arguments, including his disposal of property form and Woodruff's response to plaintiff's interrogatory, do not support his argument and/or are unrelated to the specific incidents at issue, and his conclusory and self-serving statements that this information is false are insufficient to defeat defendants' documentary case.  See Dkt. No. 79-4 at 83, 113, 144; Scott, 344 F.3d at 287.

As a final matter, to the extent that plaintiff claims that defendants have failed to provide him with adequate guidance as to how he might be released from Ad-Seg, see Dkt. No. 79-2 at 19-22, this Court has recently rejected a similar argument that "Proctor requires the establishment of unambiguously clear and concrete goalposts" for an

33

inmate's release from Ag-Seg.  H'Shaka, 444 F. Supp. 3d at 374.  Although the Central Office committee stated that "[t]here is no formula or benchmark" for obtaining a release from Ad-Seg, it explained that plaintiff must exhibit "personal growth."  Dkt. No. 90-5 at 13.  Contrary to plaintiff's position, the committee's instruction in this regard was not without any guidance, as it indicated that his personal growth must consist of properly communicating to the committee and demonstrating humility and remorse.  See id.  The record supports the Central Office committee's conclusion that plaintiff has failed to meet these requirements, as his Ad-Seg statements are replete with combative critiques of the Ad-Seg review process, instances in which plaintiff attempts to minimize his history of violence by focusing solely on his September 2000 assault, and his denial of his extensive history of weapons-making and possession.  See, e.g., id. at 6-7; 21-23.

In sum, the undersigned finds that the periodic reviews of plaintiff's Ad-Seg placement satisfied the three criteria for review set forth in Proctor, and that there was no violation of plaintiff's procedural due process rights.  Consequently, it is recommended that plaintiff's motion for summary judgment be denied in its entirety, defendants' motion for summary judgment be granted in its entirety, and plaintiff's Fourteenth Amendment due process claims be dismissed with prejudice.  Based on the foregoing, the undersigned declines to consider the parties' alternative arguments, including those addressing qualified immunity.

### IV. Conclusion

**WHEREFORE**, based on the findings set forth above, it is hereby:

34

**RECOMMENDED**, that plaintiff's Motion for Summary Judgment (Dkt. No. 79) be **DENIED IN ITS ENTIRETY**; and it is further

**RECOMMENDED**, that defendants' Cross Motion for Summary Judgment (Dkt. No. 86) be **GRANTED IN ITS ENTIRETY** and that plaintiff's claims be **DISMISSED WITH PREJUDICE**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed R. Civ. P. 6(a), 6(e), 72.[8]

Dated: December 1, 2020
Albany, New York

Christian F. Hummel
U.S. Magistrate Judge

---

[8] If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation & Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(C).